William N. Lobel (CA Bar No. 93202)
Ira D. Kharasch (CA Bar No. 109084)
Victoria A. Newmark (CA Bar No. 183581)
Erin Gray (CA Bar No. 157658)
PACHULSKI STANG ZIEHL & JONES LLP
650 Town Center Drive, Suite 1500
Costa Mesa, California  92626
Telephone:  (714) 384-4740
Facsimile:   (714) 384-4741
E-mail:    wlobel@pszjlaw.com
           ikharasch@pszjlaw.com
           vnewmark@pszjlaw.com
           egray@pszjlaw.com

[Proposed] Attorneys for Debtor and Debtor-in-Possession,
Bridgemark Corporation

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No.: 8:20-bk-10143-TA |
| Bridgemark Corporation,[1] | Chapter 11 |
| Debtor and Debtor-in-Possession. | **DECLARATION OF ROBERT J. HALL, PRESIDENT OF BRIDGEMARK CORPORATION, IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS** |
| | Date:    January 17, 2020 |
| | Time:   11:00 a.m. |
| | Place:   Courtroom 5B |
| |         411 West Fourth Street |
| |         Santa Ana, CA 92701 |
| | Judge:  Theodor C. Albert |

I, Robert J. Hall, declare:

1.      I am the President and Chief Executive Officer of Bridgemark Corporation (the "Debtor" or "Bridgemark").  I am also the chairman of its Board of Directors, and through various trusts, I am the beneficial owner of 66 percent of its voting common stock and 66 percent of its non-voting common stock.

---

[1] The Debtor's last four digits of its taxpayer identification number are (1669).  The headquarters and service address for the above-captioned Debtor is 17671 Irvine Blvd., Suite 217, Tustin, CA  92780.

2.      I am generally familiar with the current day-to-day operations, business, and financial affairs of the Debtor, as well as its books and records. Except as otherwise indicated, all facts set forth in this declaration are based on (i) my personal knowledge of Bridgemark's employees, operations, and finances, (ii) information learned from my review of relevant documents; (iii) information supplied to me by other members of Bridgemark's management team and its advisors, (iv) or my opinion based on my experience, knowledge and information concerning Bridgemark' operations and financial condition. I am over the age of 18 and am authorized to submit this declaration on behalf of Bridgemark. If called upon to, I could and would testify competently to the facts set forth herein.

3.      The Debtor filed a voluntary petition under chapter 11 of the United States Bankruptcy Code on January 14, 2020 (the "Petition Date") with the United States Bankruptcy Court for the Central District of California (Santa Ana Division) (the "Bankruptcy Court").  The Debtor has filed numerous motions and pleadings which seek various types of "first day" relief which will enable the company to meet necessary obligations, fulfill its obligations as debtor in possession and avoid a disruption of its business operations  (collectively, the "First Day Motions"). I am familiar with each First Day Motion and believe that the relief requested in each is necessary to enable the Debtor to operate in chapter 11 with minimal disruption and is critical to enable the Debtor to retain value. Accordingly, granting each First Day Motion is in the best interest of the Debtor's estate and its creditors. The facts set forth in each First Day Motion are incorporated by this reference.

4.      This declaration is organized into four sections: (1) section one provides background information about Bridgemark; (2) section two includes detailed information about Bridgemark's assets and debts; (3) section three describes the events leading to the filing of this chapter 11 case and (4) section four and **Exhibit A** summarize the relief requested and the legal and factual bases supporting each First Day Motion.

DOCS_LA:324833.8 10804/001

# SECTION I

## BACKGROUND AND OPERATIONS

### A. **General**

5.      Headquartered in Tustin, California, Bridgemark is a family-owned company that owns and operates proven oil and gas reserve leases and leasehold interests in Orange County California. As is set forth in more detail below, Bridgemark owns 100% of the Working Interest[2] under fourteen (14) oil & gas leases (the "Leases") and two (2) unit agreements (the "Unit Agreements") pursuant to which it operates forty-two (42) active wells (31 producers and 11 injectors) in its Richfield Field in Placentia, California and four (4) active wells in its Dowling Field in Anaheim, California.[3] In addition, Bridgemark has six (6) shut in wells in the Richfield Field.[4] In total, therefore, Bridgemark has fifty-two (52) wells in the Richfield and Dowling Fields (the "Wells"). A full list if the Leases, Unit Agreements, Subleases and Wells is attached as **Exhibit B**. Collectively, the Wells produce approximately 450 BBL (or barrels) of crude oil per day.

6.      Bridgemark also has a number of  Working Interests and/or Royalty Interests in the following oil and gas leasehold interests that it does not operate: (i) Chunchula Unit in Mobile Alabama; (ii) the Hualde Dome Unit in the Coyote-East Field in Fullerton, CA; and (iii) through one of its wholly-owned subsidiaries (Bridgemark Texas, LLC), leasehold interests in Nueces County, Texas.

7.      Bridgemark was incorporated in 1992 with the California Secretary of State. It is a privately held California corporation that has made an election under subchapter S of the Internal Revenue Code. It is owned 100% by the Hall family through various trusts. *See* List of Equity Security Holders filed concurrently herewith. Through three trusts of which I am the settlor and

---

[2] A "Working Interest" is a percentage of ownership in an oil and gas lease granting its owner the right to explore, drill and produce oil and gas from a tract of property. Working interest owners are obligated to pay a corresponding percentage of the cost of leasing, drilling, producing and operating a well or unit. After royalties are paid, the working interest also entitles its owner to share in production revenues with other working interest owners, based on the percentage of working interest owned.

[3] An "injector" is a well in which fluid is injected (in this case water) rather than produced, the primary objective typically being to maintain reservoir pressure. A "producer" is a well that is currently producing oil or gas.

[4] A "shut in well" is a well which is capable of producing but is not presently producing.

DOCS_LA:324833.8 10804/001

beneficiary, I own 9,900 shares of the voting common stock of the Company (66%) and 980,100 shares of non-voting common stock of the Company (66%).

8.    I am the President, Chief Executive Officer and Chairman of the Board of Bridgemark. Kevin Mugavero is the Chief Operating Officer. Carolyn P. Curry is the Chief Financial Officer.  Bridgemark has twelve (12) employees, seven (7) of whom are salaried and five (5) of whom are hourly. The employees are divided between the field and the office.  Bridgemark supplements its workforce with numerous independent contractors who provide services such as information technology, engineering, geological services, financial, legal and accounting and field security.

9.    For the year ended December 31, 2018, Bridgemark and its two wholly-owned subsidiaries (which are not debtors) had revenues of $10.9 million (net of royalties of $1,096,860) and net operating income of $3.2 million. Due to a $4.8 million loss related to the disposition of one if its former subsidiaries Las Cienegas, LLC ("Las Cienegas") in June of 2018, Bridgemark had a net loss of $936,755 for FYE December 31, 2018.  For the first three quarters of 2019, Bridgemark estimates that the Company and its two wholly-owned subsidiaries had revenues of approximately $7.0 million (net of royalties of $780,000.00) and net operating income of $444,000.00. The final figures for Q4 of 2019 are not yet available.

10.    Bridgemark has two wholly-owned subsidiaries (the "Subsidiaries"): (i) Gregson Energy Group, LLC ("Gregson"), a Wyoming limited liability company; and (ii) Bridgemark Texas, LLC ("BMT"), a Texas limited liability company.  Each of the Subsidiaries is in the oil and gas business. More specifically, Gregson owns one drilling rig. BMT has a 37% Working Interest in three (3) oil and gas leases located in Nueces County, Texas, and approximately $429,000 of cash. Neither Subsidiary is a debtor in a chapter 11 case. As was noted above, however, for accounting purposes, the Subsidiaries' operations are reported on a consolidated basis with those of Bridgemark.

**B.    Bridgemark's Oil & Gas Operations**

11.    As was noted above, Bridgemark is the lessee under various oil and gas Leases, dating back nearly 100 years and is the current operator, under Unit Agreements, which grant

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

Bridgemark the rights to explore, drill for, produce, treat, store and transport oil, gas and other hydrocarbons, substances and minerals, from the Richfield Field in the City of Placentia and the Dowling Oil Field in the City of Anaheim. Bridgemark also maintains a tank farm, injection plant, and related facilities associated with its oil and gas production operations in the Richfield Field.

12.    With the exception of five parcels which Bridgemark owns in the Richfield Field (see below), Bridgemark does not own the real properties on which it conducts its operations or lease the so-called "surface rights". Bridgemark, however, has the right to drill, extract, produce and transport the oil and gas by virtue of the Leases and Unit Agreements under which Bridgemark is the successor in interest to the original lessee of the subsurface oil & gas rights. In some cases, the oil & gas rights to contiguous tracts of land are combined into a unit (the "Unit Area") so that joint drilling and production operations can be conducted as if the entire Unit Area had been included in a single lease.  As is further detailed below, Bridgemark is a party to two Unit Agreements. Bridgemark is the operator under the majority of its Leases or, where applicable, Unit Agreements.

### 1.    The Richfield Field

13.    As is more specifically described below, Bridgemark is the lessee of the mineral rights under eleven (11) oil and gas leases and two (2) unit agreements, and operates forty-eight (48) wells (31 active producers, 10 active injectors, 1 active water source well, and 6 shut in wells (5 shut in producers and 1 shut in injector) in the Richfield Field (the "Richfield Wells"). They are:

NCT-3 Yarnell Wells: Bridgemark owns 100% of the Working Interests in the *Lease dated April 9, 1919 between Susan G. Yarnell, Jessie Y. Kimball, Katherine Yarnell, Ellis T. Yarnell and Esther Yarnell (as Lessors) and California Star Oil Company (as Lessee)* (the "Yarnell Lease"), pursuant to which it operates five (5) wells (three (3) producers and two (2) shut-in).[5]  Bridgemark pays royalties on a monthly basis to the current holders of the lessor's interests under the Yarnell Lease. Pursuant to the *Sublease between California Star Oil Company (sublessor) and Petroleum Midway Company (sublesee) dated April 19, 1919* (along with all amendments, modifications and

---

[5] The Wells (API#) are: Yarnell #23 (04059-06624), Yarnell #24 (04059-06625), Yarnell #25 (04059-06626), Yarnell #26 (04059-06627), Yarnell #30 (04059-06628).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

assignments thereto, the "Yarnell Sublease"), Bridgemark also pays a net profits interest quarterly to certain Net Profits Interest Holders.

Newell-Renton Wells: Bridgemark owns 100% of the Working Interests in the (i) *Lease dated May 31, 1917 between J.W. Newell and Lilla F. Newell (as Lessors) and Union Oil Company (as Lessee);* (ii) *Lease dated May 1, 1917 between Esther L. Newell (as Lessor) and Union Oil Company (as Lessee); and (iii) Lease dated April 12, 1949 between Malcom J. Renton, Executor of the Estate of David M. Renton, deceased (as Lessors) and Union Oil Company (as Lessee);* (collectively the "Newell-Renton Leases"), pursuant to which it operates one (1) well (a producer). [6] Bridgemark pays royalties on a monthly basis to the current holders of the lessor's interests under the Newell-Renton Leases.

Richfield Wells: Bridgemark owns 100% of the Working Interests in the *Lease between Morris D. Schatzman, John W. Schmid and Philip S. Magruder, co-executors of the Estate of A. Hartwell Bradford, deceased (lessor) and Union Oil Company (lessee) January 1, 1965* (along with all amendments, modifications and assignments thereto, the "Union-Hartwell Lease") pursuant to which it operates four wells (three (3) producers and one (1) shut-in). [7]

West Richfield Chapman Zone Unit: Bridgemark owns 100% of the Working Interests in the following leases which were subsequently unitized pursuant to the *Unit Agreement for the Chapman Zone, West Richfield Area, dated April 1, 1960,* (along with all amendments, modifications and assignments thereto, the "CZU Unit Agreement"). Bridgemark is the Unit Operator pursuant to the *Unit Operating Agreement for the Chapman Zone, West Richfield Area dated April 1, 1960* (along with all amendments, modifications and assignments thereto, the "CZU Operating Agreement"), pursuant to which Bridgemark operates nine (9) wells (seven (7) producers and two (2) injectors).[8]

---

[6] The Wells (API#) are Newell-Renton #1 (04059-06444).
[7] The Wells (API#) are Richfield #1 (04059-06446); Richfield #5 (04059-06450); Richfield #6 (04059-06451); Richfield #8 (04059-06453).
[8] The Wells (API#) are Mobil Thompson #11 (04059-06475); Mobil Thompson #12 (04059-06476); Texaco Yarnell #21 (04059-07327); Texaco Yarnell #22 (04059-06495); Texaco Yarnell #28 (04059-06496); Texaco Yarnell #31 (04059-06498); Thompson Goodwin #3 (04059-06479); Union Towell #7 (04059-20357); Union Morse #14 (04059-20941).

DOCS_LA:324833.8 10804/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

- *Lease between Stern Realty Company, Orrin M. Thompson and Margaret D. Thompson (lessors) and M.L. Jenks (lessee) dated August 1, 1918* (along with all amendments, modifications and assignments thereto, the "Mobil-Thompson Lease");

- Yarnell Lease (supra);

- *Lease between William A. Goodwin and Alice A. Goodwin, Orrin M. Thompson and Margaret D. Thompson (lessors) and Union Oil Company (lessee) dated March 27, 1919* (along with all amendments, modifications and assignments thereto, the "Thompson-Goodwin Lease");

- *Lease between Towell Investment Company and Union Oil Company dated August 21, 1917* (along with all amendments, modifications and assignments thereto, the "Towell Lease"); and

- *Lease between N. Frank Morse and Lottie E. Morse (lessor) and M.L. Jenks (lessee) dated February 24, 1917* (along with all amendments, modifications and assignments thereto, the "Morse Lease"").

West Richfield Kraemer Zone Unit Agreement, Bridgemark owns 100% of the Working Interests in the following leases which were subsequently unitized pursuant to the *Unit Agreement for the Kraemer Zone, West Richfield Area* dated February 2, 1970 (along with all amendments, modifications and assignments thereto, the "KZU Unit Agreement"). Bridgemark is the Unit Operator pursuant to the *Unit Operating Agreement for the Kraemer Zone, West Richfield Area dated February 2, 1970* (along with all amendments, modifications and assignments thereto, the "KZU Operating Agreement") pursuant to which Bridgemark operates twenty-nine (29) wells (seventeen (17) producers, nine (9) injectors and three (3) shut-in).[9]

---

[9] The Wells (API#) are:  Mobil Stern #8 (04059-06568); Mobil Stern #13 (04059-20880); Mobil Stern #14 (04059-21143); Mobil Stern #16 (04059-21090); Mobil Thompson #6 (04059-06573); Mobil Thompson #10 (04059-06574); Mobil Thompson #13 (04059-21093); Mobil Thompson #14 (04059-21092); Mobil Thompson #15 (04059-21091); Mobil Thompson #16 (04059-21144); Texaco Yarnell #29 (04059-06497); Texaco Yarnell #37 (04059-20859); Texaco Yarnell #39 (04059-20882); Union Hartwell #2 (04059-06415); Union Hartwell #3 (04059-06416); Union Hartwell #4 (04059-06417) (Make-Up Water Well); Union Morse #2 (04059-00221); Union Morse #6 (04059-06428); Union Morse #13 (04059-20881); Union Morse #15 (04059-20942); Union Morse #16 (04059-20943); Union Morse #17 (04059-20944); Union Morse #18 (04059-20945); Union Morse #19 (04059-21141); Union Sterns #4 (04059-06460); Union Sterns #5 (04059-06461); Union Sterns #7 (04059-06463); Union Sterns #11 (04059-06467); Union Sterns #16 (04059-21288).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:324833.8 10804/001

- *Lease between Stern Realty Company (lessor) and M.L. Jenks (lessee) dated August 1, 1918* (along with all amendments, modifications and assignments thereto, the "Mobile-Stern Lease");

- Mobil-Thomspon Lease (supra)

- Yarnell Lease (supra)

- Union-Hartwell Lease (supra)

- Morse Lease (supra)

- *Lease between Stern Realty Company (lessee) and M.L. Jenks (lessor) dated August 1, 1918* (along with all amendments, modifications and assignments thereto, the "Union-Stern Lease").

14.     Bridgemark is the sole operator with respect to all of the Richfield Wells and holds 100% of the Working Interests.  Bridgemark produces approximately 330 BBL (or barrels) of crude oil a day from the Richfield Field (the "Richfield Production"), which is held in the Company's tanks until it is transferred via pipeline to Phillips 66 Company ("Phillips 66"). Pursuant to its contract with Bridgemark, Phillips 66 pays the Debtor for the crude it purchases (after offsets for certain costs including transportation) on the 20th day of the month following delivery.  Sales to Phillips 66 account for approximately 71% of the Debtor's revenue.

2.     **The Dowling Field**

15.     Bridgemark owns 100% of the Working Interests in the  (i) *Lease dated February 23, 1956 between Robert Dowling et al (as lessors) and Albert Stevenson (as lessee)* (ii) *Lease dated February 27, 1956 between Reinhold Dinkler and Jennie Dinkler (as lessors) and Albert Stevenson (as lessee)*, and (iii) *Lease dated February 24, 1956 between Edward Mills, Edith Mills and Freda Carmen (as lessors) and Albert Stevenson (as lessee)* (collectively and along with all amendments, modifications and assignments thereto, the "Dowling Lease"), pursuant to which Bridgemark operates four (4) wells (all producers).[10]

---

[10] The Wells (API#) are: Dowling #1 (04059-05869); Dowling #2 (04059-05870); Dowling #3 (04059-05871); Dowling #4 (04059-05872).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

16. Bridgemark is the sole operator with respect to all of the Dowling Wells, and it holds 100% of the Working Interests. Bridgemark produces approximately 122 BBL (or barrels) of crude oil a day from the Dowling Field (the "Dowling Production"), which is held in the company's tanks until it is transferred via truck to PBF Holding Company, LLC ("PBF"). Pursuant to its contract with Bridgemark, PBF pays the Debtor for the crude it purchases (after offsets for certain costs including transportation) on the 20th day of the month following delivery. Sales to PBF account for approximately 26% of the Debtor's revenue.

### 3. The Chunchula Unit (Mobile, Alabama)

17. Pursuant to that certain *Unit Agreement (Chunchula Field)* dated July 1, 1980 (together with all amendments, modifications and assignments thereto, the "Chunchula Unit Agreement"), Bridgemark owns a small (.007%) Working Interest in the Chunchula Field Unit located in Mobile, Alabama. The Unit Operator is Hilcorp Energy Company. Bridgemark is entitled to receive a small share of the revenues from production and must also pay a portion of the costs on account of its Working Interest. Bridgemark also has a small (.00118682%) Royalty Interest in the Chunchula Field Unit. The revenue from the Chunchula Working Interest and Royalty Interest is approximately $3,600 per month. The unit expenses run approximately $1,900 per month.

### 4. The Hualde Dome Unit (Fullerton, California)

18. Bridgemark owns a .16666667% Royalty Interest in the production from a well in the Hualde Dome Unit in the Coyote-East Field in Fullerton, CA (the "Hualde Dome Royalty Interest"). This royalty interest returns between $5,000-$10,000 per month to Bridgemark.[11]

### 5. Bridgemark's Miscellaneous Income

19. Bridgemark receives about $5,000- $10,000 per month in interest income on its cash accounts.

20. Meadow Deep, LLC ("Meadow Deep") is a Nevada Limited liability company that was formerly owned by Bridgemark. Meadow Deep is the lessee under certain mineral leases in Wyoming. In 2013, Bridgemark sold its membership interests in Deep Meadow to me, and I

---

[11] Bridgemark's Working Interests and Royalty Interests described in sections (1)-(4) above are, collectively, the "Oil & Gas Interests".

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

subsequently transferred those interests to a trust, the O&G Investment Trust. Kevin Mugavero is the manager of Meadow Deep, and Meadow Deep pays Bridgemark $7,500 per month as a management fee.

## SECTION II

## BRIDGEMARK'S ASSETS AND DEBTS

### A. Bridgemark's Assets

21.    In addition to the Oil & Gas Interests described above and any reserves with respect to those Oil & Gas Interests, Bridgemark also has the following assets:

22.    <u>Cash</u>: As of the Petition Date, Bridgemark had unrestricted cash of approximately $4.2 million. Bridgemark also has $286,333 in cash that is restricted to secure its obligations to the California Division of Oil, Gas & Geothermal Resources ("<u>DOGGR</u>") in the form of certificates of deposit at California National Bank & Trust and Wells Fargo Bank, N.A.

23.    <u>Real Estate</u>: Bridgemark owns the fee simple title to five small parcels within the Richfield Field. More specifically, the property is described as follows: (i)  424 N Levin Ln Placentia, CA (APN# 341-433-05); (ii) 1421 E Cisneros Ln Placentia, CA (APN#341-433-48); (iii) 412 N Tidland Ct Placentia, CA  (APN# 341-433-34); (iv) 406 N Nevin Ln Placentia, CA  (APN# 341-433-23); and (5) 502 N Gerhold  Ln Placentia, CA  (#341-421-33). Bridgemark leases its office space at its Tustin headquarters from C&C Consolidated LLC (dba Tustin Sycamore Plaza) pursuant to a lease through September 30, 2020.

24.    <u>Furniture, Fixtures & Equipment and Other Personal Property</u>: Bridgemark owns numerous vehicles, tanks, drilling and production equipment, office equipment, furniture and computers.

25.    <u>Accounts Receivable</u>: As of the Petition Date, Bridgemark estimates that it has accounts receivable from third parties (including Phillips 66 and PBF) totaling $780,000.00.

26.    <u>Notes Receivable from Related Parties</u>: There are a number of intercompany obligations owed by the Subsidiaries to Bridgemark: (i) Gregson owes Bridgemark $1.83 million related to the acquisition of the rig; (ii) BMT owes Bridgemark approximately $602,000.00 related

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

10

to the drilling of a well. In addition, pursuant to an unsecured Three Year Interest Only Noted dated January 1, 2017 (renewed as of January 1, 2020), Bridgemark loaned $890,000 to Meadow Deep (the "Meadow Deep Note").  Interest is 4.75%, payable quarterly (commencing March 31, 2020), and the note matures on January 1, 2023. Finally, pursuant to a Three Year Interest Only Note dated October 30, 2016 (renewed effective as of October 31, 2019), I am indebted to Bridgemark for $710,000 (the "Hall Note"). Interest is 4.75%, payable quarterly (commencing January 31, 2020), and the note matures on January 31, 2023.  The Hall Note is related to the sale of Meadow Deep.

**B.  Bridgemark's Debts**

      **1.  Secured Debt**

27.      Bridgemark has secured debt of approximately $75,000 owing to Citizens Business Bank, Ford Credit and Ally of approximately $75,000 relating to three vehicles.

      **2.  Unsecured Debt**

28.      Royalties. Under the Leases, Bridgemark is obligated to pay royalties (the "Royalties") to the holders of the mineral rights (the "Royalty Owners") based on, among other things, the amount of oil or gas that is produced and sold. Royalties are paid monthly about five (5) weeks after the close of the month.  Royalties owing for November 1-31, 2019 of $75,706.19 were paid on January 8, 2020. As of the Petition Date, Bridgemark owed approximately $218,000 in Pre-Petition Royalties to approximately 290 Royalty Owners. This includes estimated outstanding royalties for December 2019 (which would typically be paid in the ordinary course of business on or about February 8, 2020) of $80,000.00; estimated outstanding Royalties for January 1-14, 2020 (which would typically be paid in the ordinary course of business on or about March 8, 2020) of $36,000, and $102,000.00 in uncollected royalties being held in the royalty suspension account (the "Pre-Petition Royalties").

29.      Accounts Payable. As of the Petition Date, Bridgemark owed approximately $403,000 to utilities, employees, taxing authorities, vendors, insurance premiums and other service providers.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

30.     <u>Net Profit Interest Holders</u>. Pursuant to the terms of the Yarnell Sublease, the Company makes quarterly distributions to 15 Net Profit Interest Holders of approximately $28,000.00 total.  As of the Petition Date, Bridgemark was current on all payments to Net Profit Interest Holders through Q3. The payment for amounts owing for Q4 of 2019, if any, will be due and owing, in the ordinary course of business, in February of 2020. The Debtor estimates that this will total approximately $0.00.

31.     <u>Plug & Abandonment Obligations</u>. When a well is no longer economically producing oil and natural gas, the well is evaluated for retirement and will undergo a process called "plug and abandonment".  Bridgemark has obligations under state law related to the plugging process with which it must comply. In addition, it has contractual obligations to properly P&A the wells upon retirement and remediate any damage to the property. Bridgemark estimates that it has approximately $8,000,000 of potential plug & abandonment exposure related to the Wells.

32.     <u>Damages Awarded in Placentia Development Company, LLC v. Bridgemark:</u> As is described in more detail below, a jury recently rendered a verdict against Bridgemark in Case No. 30-2016-00888920-CU-CO-CJC in the Superior Court of California, County of Orange (the '<u>State Court Action</u>") and awarded damages totaling $36,828,715.50, not including pre-judgment interest or costs. On December 31, 2019, the Superior Court entered judgment in the amount of $42,517,202.59 including pre-judgment interest with costs "TDB" or "to be determined" (the "<u>PDC Judgment</u>").  On January 3, 2020, PDC recorded an abstract of judgment in the Official Records of Orange County (Document No. 2020000002970).  Bridgemark intends to vigorously appeal the PDC Judgment.

## SECTION III

## EVENTS LEADING TO THE BANKRUPTCY

33.     Bridgemark currently operates eleven (11) wells (the "<u>Tract 15700 Wells</u>") and surface facilities that are located on land in Placentia, California owned by Placentia Development Company, LLC ("<u>PDC</u>")[12] (More specifically, the parcel is referred to as "<u>Tract 15700</u>".)

---

[12] Bridgemark currently operates eleven (11) Wells on the PDC Parcel. They are: Union Morse #2 (04059-00221); Union Morse #6 (04059-06428); Union Morse #13 (04059-20881); Union Morse #15 (04059-20942); Union Morse #16

Bridgemark's right to use and have access to Tract 15700 to explore, drill, extract, produce and

transport oil from the Tract 15700 Wells derives from the Leases and the Unit Agreements with the

owners of the mineral rights beneath Tract 15700, and this right exists so long as the Leases and the

Unit Agreements are in effect. PDC is not the owner of the mineral rights. PDC is not the lessor

under any of the Leases. It is the owner of the "surface rights" alone.

34.     Prior to 2000, PDC owned a second tract ("Tract 15699") on which Bridgemark

operated additional wells. PDC wanted to subdivide and develop parts of both tracts for residential

homes, and Bridgemark and PDC subsequently entered into an *Abandonment, Accommodation and*

*Remediation Agreement dated January 31, 2000* (together with all amendments thereto, the "AAR")

pursuant to which Bridgemark agreed, under certain specific circumstances and for consideration, to

plug and abandon certain of the wells that is operated on each tract and to quitclaim its surface rights

to PDC on both Tract 15699 and Tract 15700.  Bridgemark subsequently plugged and abandoned the

wells that were subject to the AAR on Tract 15699, and PDC developed that tract. Bridgemark also

plugged and abandoned certain wells on Tract 15700.

35.     Of the 11 remaining wells that Bridgemark continues to operate on Tract 15700, only

four (4) were subject to the restrictions set forth in the AAR (the "Disputed Wells").[13] In 2014 (14

years after PDC and Bridgemark entered into the AAR), Toll Brothers, Inc. bought PDC as a part of

the acquisition of PDC's parent company, Shapell Industries.  After the acquisition, in 2015, PDC

and Bridgemark engaged in negotiations to allow for the development of homes on Tract 15700 and

the potential abandonment of certain of the 4 Disputed Wells. These negotiations did not result in a

new agreement. Bridgemark declined to abandon the Disputed Wells, asserting, among other things,

that the AAR was no longer in effect.

36.     On November 23, 2016, PDC filed a complaint in Orange County Superior Court

(Case No. 30-2016-00888920-CU-CO-CJC) against Bridgemark (the "PDC Litigation") that alleged

---

(04059-20943); Union Morse #17 (04059-20944); Union Morse #18 (04059-20945); Union Morse #19 (04059-21141);
Texaco Yarnell #31 (04059-06498); Union Morse #14 (04059-20941) and Texaco Yarnell #29  (04059-06497)  (the
"Tract 15700  Wells").
[13] The Disputed Wells are: Union Morse #2 (04059-00221); Union Morse #6 (04059-06428); Union Morse #19 (04059-
21141); Texaco Yarnell #31 (04059-06498).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

13

that Bridgemark breached the AAR by failing to cease operations and plug the Disputed Wells.

Bridgemark filed a cross-complaint for declaratory relief in which it alleged, among other things,

that the AAR had been abandoned and was no longer enforceable, that PDC had to choose between

damages in tort or damages in contract and it raised the equitable defenses of laches, unclean hands,

estoppel, and unjust enrichment.

37.     The legal issues were tried first to the jury. Trial commenced on June 17, 2019 and

went to the jury on July 17, 2019.  On August 6, 2019, the jury found that Bridgemark liable for

breach of contract, trespass and nuisance and awarded compensatory damages of $18,330,509,

$4,167,697.50 and $4,330,509 respectively, totaling $26,828,715.50. It also returned a second

verdict on that same date which found that Bridgemark had committed trespass or nuisance with

malice, fraud or oppression. On August 20, 2019, the jury awarded PDC $10 million in punitive

damages.

38.     The equitable issues were then submitted to the Superior Court to be determined

based on the evidence produced during the jury phase. On September 26, 2019, the Superior Court

issued a tentative statement of decision (the "Tentative SOD") against Bridgemark on its cross-

complaint and its equitable defenses. On September 27, 2019, PDC lodged a proposed judgment (the

"Proposed Judgment"). On October 4, 2019, Bridgemark filed objections to the Proposed Judgment

and a Request for a Statement of Decision. The Superior Court subsequently assigned to PDC the

job of writing the Proposed SOD, which PDC lodged on October 26, 2019. Bridgemark filed

objections, and on December 9, 2019, the Superior Court adopted its Tentative SOD as final. As was

noted above, on December 31, 2019, PDC entered the PDC Judgment totaling $42,517,202.59.  On

January 6, 2020, Bridgemark was served with the Notice of Entry of the PDC Judgment.

39.     Bridgemark believes that it has excellent grounds for appeal and for a significant

reduction in damages in the context of a motion for a new trial or judgment notwithstanding verdict

prior to appeal. In fact, on January 6, 2020, Bridgemark filed its *Notice of Motion and Motion for

Judgment Notwithstanding The Verdict* and its *Notice of Intent to Move for New Trial* (the "New

Trial Motion"), and on January 14, 2020, it filed its *Memorandum in Support*. Bridgemark, however,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

is unable to pay the PDC Judgment, which is in excess of $42 million. Neither can it obtain the bond required by California Code of Civil Procedure section 917.1, which requires an undertaking of between 1.5 and 2 times the amount of the judgment in order to stay execution pending appeal. There are very few bonding companies that have any experience with oil and operations and oil and gas assets. Bridgemark was able to locate two firms with experience in that area, Tokio Marine HCC and International Sureties. Both firms indicated, however, that any bond would have to be fully collateralized. Bridgemark is simply unable to collateralize 100% of a $42 million judgment, much less one that is 150% of the PDC Judgement (approximately $64 million).

40.     In an effort to stave off the filing of this chapter 11 case unless it was absolutely necessary and because PDC's counsel was making threats to execute on PDC's assets even prior to entry of judgment, on October 7, 2019, Bridgemark filed an *Ex Parte Motion for Stay of Enforcement of Judgment Pursuant to California Code of Civil* Procedure 918 (the "Stay Motion"). On October 8, 2019, the Superior Court denied the application but treated the request as a noticed motion for a temporary stay of enforcement and set the matter for hearing on November 7, 2019. On October 24, 2019, the Superior Court, on its own motion, continued the hearing on the Stay Motion to November 14, 2019. Under the applicable rules, Bridgemark was required to file its objections to the Proposed SOD by November 12, 2019 (which it did) after which time the Superior Court was free to enter judgment notwithstanding the scheduled hearing on the Stay Motion on November 14, 2019. Accordingly, on November 5, 2019, Bridgemark filed an *Ex Parte Application for Temporary Stay of Entry of Judgment*, which sought to defer entry of judgment until after the hearing on the Stay Motion. The Superior Court summarily denied the request without a hearing on November 6, 2019.

41.     In a final effort to avoid the necessity of filing this chapter 11 case and to facilitate settlement discussions between the parties, on November 13, 2019, PDC and Bridgemark entered into a Forbearance Agreement, pursuant to which PDC agreed to forbear from executing on the PDC Judgment (which had not yet been entered) for "a period of 14 days following entry of judgment" (the "Forbearance Period").  Forbearance Agreement, at ¶ 1.  Either party could terminate the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

Forbearance Agreement on one full court days' notice to the other party. *Id*. In addition, if Bridgemark breached the Forbearance Agreement, the agreement provides,"PDC shall give one full business day written notice of default to Bridgemark before PDC can begin executing on its judgment, and during this time period Bridgemark may file for bankruptcy protection." *Id*. at ¶ 6. Thereafter, the parties engaged in settlement discussions.

42.    On December 19, 2019 (prior to entry of judgment), PDC alleged that Bridgemark breached the Forbearance Agreement by exceeding a cap on attorneys' fees contained in the agreement, that by its terms, applied only "during the Forbearance Period" (i.e., during the 14 days following entry of judgment). As judgment had not yet been entered, Bridgemark denied that it was in breach. On December 31, 2019, as Bridgemark was awaiting PDC's response to its latest settlement offer, the Superior Court entered the PDC Judgment.

43.    On January 2, 2020, PDC filed an abstract of judgment. Contending that this action violated the Forbearance Agreement, on January 3, 2019, Bridgemark filed its *Ex Parte Application to Strike Abstract of Judgment, Enforce Joint Stipulation to Forbear Executing on the Judgment and Stay Execution of Judgmen*t (the "Ex Parte Motion"),which was scheduled to be heard at 11:45 a.m. on Monday, January 6, 2020. After having been notified by Bridgemark of the *Ex Parte Motion*, PDC recorded the abstract. (The Debtor believes the recording of the abstract and any lien that arose thereby is subject to avoidance as a preference pursuant to Bankruptcy Code section 547. Accordingly, the Debtor believes that PDC's claim, if any, is unsecured.) Furthermore, PDC's opposition papers (filed January 5) made clear that PDC still contended that Bridgemark had breached the Forbearance Agreement and could not enforce it against PDC. Bridgemark ultimately withdrew its *Ex Parte Motion*, and after certain assurances were made, it continued to try to negotiate a settlement with PDC.

44.    In spite of the Forbearance Agreement, PDC filed three separate lawsuits against Bridgemark *during* the Forbearance Period: (i) Complaint for Creditor's Suit in Aid of Enforcement of Judgment, *PDC v. PBF Holding Company*, *Bridgemark Corporation*, et al. – OCSC – Case No. 30-2020-01122440-CU-EN-CJC, which was filed on or about January 6, 2020, but not served on

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

Bridgemark until January 14, 2020;  (ii) Complaint for Creditor's Suit in Aid of Enforcement of

Judgment, *PDC v. Phillips 66 Company, Bridgemark Corporation*, et al. – OCSC – Case No. 30-

2020-01122311-CU-EN-CJC, which was also filed on or about January 6, 2020, but not served on

Bridgemark until January 14, 2020, and (iii) Complaint for Creditor's Suit/Bill in Equity in Aid of

Enforcement of Judgment (Declaratory Relief re: Imposition of Alter Ego or Other Basis for Joint

and Several Liability), *PDC v. Robert James Hall,, Bridgemark Corporation*, et al – OCSC – Case

No. 30-2020-01122328-CU-EN-CJC, which was also filed on or about January 6, 2020, but not

served on Bridgemark until January 9, 2020.

45.    Unable to reach a settlement, the Forbearance Agreement expired on Janaury 14,

2020, and Bridgemark had no choice but to file this chapter 11 case to protect its ongoing operations,

its creditors, its employees, and its Royalty Holders.

DOCS_LA:324833.8 10804/001

1

**SECTION IV**

2

**FIRST DAY MOTIONS**

3        46.       The Debtor has filed a number of First Day Motions seeking orders that grant relief

4    intended to stabilize Bridgemark's operations and facilitate the efficient administration of the estate.

5        47.       I have reviewed each of the First Day Motions and believe that the relief requested

6    therein is necessary to allow the Debtor to operate with minimal disruption at this critical time. A

7    description of the relief requested and the facts supporting each of the First Day Motions is attached

8    as **Exhibit A**.

9

10        I declare under penalty of perjury that the foregoing is true and correct and that this

11    declaration was executed this 14th day of January 2020 at Tustin, California.

12

13

                                        _____
14                                        Robert J. Hall

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DOCS_LA:324833.8 10804/001

EXHIBIT "A"

**Exhibit A[1]**
**Evidentiary Support for First Day Motions**

**EMERGENCY MOTION FOR AN ORDER AUTHORIZING THE DEBTOR TO (I) PAY
AND/OR HONOR PREPETITION WAGES, SALARIES, EMPLOYEE BENEFITS, AND
OTHER COMPENSATION; AND (II) REMIT WITHHOLDING OBLIGATIONS;
(III) MAINTAIN EMPLOYEE COMPENSATION AND BENEFITS PROGRAMS AND PAY
RELATED ADMINISTRATIVE OBLIGATIONS
("Employee Motion")**

1.      Pursuant to the Employee Motion, Bridgemark seeks an order authorizing the Debtor,
in the ordinary course of business and in accordance with pre-petition practices to (i) pay and/or
honor prepetition wages, salaries, employee benefits, and other employee compensation or
reimbursements; (ii) remit withholding obligations; and (iii) maintain employee compensation and
benefits programs and pay related administrative obligations.

**A.      General**

2.      Bridgemark has 12 employees, seven of whom are salaried and five of whom are
hourly (the "Employees"). Five of the salaried Employees are insiders (the "Insider Employees").[2]
**The Employee Motion does not seek permission to pay compensation to any Insider Employee**.
The Employees, who are divided between the field and the office, are vital to the orderly
administration of the Debtor's estate and those of its affiliates. Bridgemark supplements its
workforce with certain independent contractors who provide services such as information
technology, engineering, geological services, financial, legal and accounting and field security (the
"Independent Contractors") whose services are equally important to the smooth administration of the
company's operations.[3]

**B.      Wages, Salaries and Associated Withholdings**

3.      The Employees typically are paid on the 10th and the 26th of each month (each, an
"Employee Pay Date").  The Debtor's last Employee Pay Date before the Petition Date was January
10, 2020, which paid salaried Employees through January 15, 2020 and hourly employees through

---

[1] If not defined in this **Exhibit A**, capitalized terms have the definition given to them in the applicable  motion.
[2] The Insider Employees are Robert J. Hall (President, CEO and Chairman of the Board of Directors ("BOD")), Kevin
Mugavero (Chief Operating Officer, BOD member), Greg Hall (BOD member), Chad Hall (BOD member), Mark Hall
(BOD member).
[3] One Independent Contractor, Carolyn P. Curry is the Chief Financial Officer of the company and is therefore an
insider. The Debtor does not seek any authority to pay any compensation to Ms. Curry.

1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

December 31, 2019. The first Employee Pay Date after the Petition Date will be on January 24, 2020 (the Friday before Sunday, January 26, 2020). This payroll will pay salaried Employees for January 16, 2020-January 31, 2020 and hourly Employees through January 15, 2020.

4.    On the first Employee Pay Date to be funded after the Petition Date (January 24, 2020), approximately $53,000 in Wages (including direct deposits, and accounting for Withholding Obligations) will be owing to Employees. Due to the filing date of January 14, 2020, no **prepetition** Wages are owing to non-insider salaried Employees. Specifically, of the $41,728.33 in Wages that will be paid on January 24, 2020, $21,728.33 will be **postpetition** wages for non-insider salaried Employees for the period 1/16/20-1/31/20 (which is entirely post-petition) and $20,000.00 will be Prepetition Wages owing to hourly Employees for the period 1/1/20-1/14/20.)

5.    The Debtor utilizes Paychex, a payroll processing provider, to process its payroll. Paychex withdraws from the Debtor's bank account the amounts to be paid to Employees and for taxes one (1) business day before the Employee Pay Date. On a monthly basis, the Debtor pays Paychex approximately $250 in fees to process payroll.

6.    Finally, the Debtor's Independent Contractors invoice the Debtor for their services, typically on a monthly basis in arrears. Compensation of the Independent Contractors historically averages approximately $8,000 per month (excluding Insiders).

7.    No payments to any single Employee or Independent Contractor on account of prepetition Wages (including any discretionary bonus) will exceed the $13,650 priority cap of section 507(a)(4) of the Bankruptcy Code.

**C.    <u>Withholding Obligations</u>**

8.    In the ordinary course of its business, the Debtor (and Paychex on behalf of the Debtor) routinely withhold from Wages certain amounts that the Debtor is required to transmit to third parties for purposes such as social security and Medicare, federal and state or local income taxes, garnishment, child support or similar obligations pursuant to court order or law (collectively, the "<u>Withholding Obligations</u>"). Prior to the Petition Date, the Debtor's average semi-monthly Withholding Obligations were approximately $10,000, including payroll tax obligations, payroll fees

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

and garnishments. The Debtor seeks authority to remit Withholding Obligations of up to $5,000 on account of the prepetition period that are currently due.

### D. Corporation Credit Cards and Boot Allowance

9.     Certain of the Debtor's Employees incur business expenses in the ordinary course of performing their duties on behalf of the Debtor.  Such expenses are limited to gas purchases made on corporate credit cards ("Gas Card Purchases")[4] and a boot allowance for the Debtor's field employees (the "Boot Allowance" and, together with the Gas Card Purchases, the "Employee Incurred Expenses"). Historically, the Employee Incurred Expenses are either incurred directly by the Employee and submitted for reimbursement in the case of the Boot Allowance or charged to corporate credit cards issued in the name of certain Employees but invoiced directly to the Debtor. On an average monthly basis, the Debtor has paid approximately $6,000 on account of the corporate credit cards and an additional $150 for the Boot Allowance reimbursements.  As of the Petition Date, the Debtor believes it owes up to the amount of $7,500 on account of Employee Incurred Expenses.

### E. Health Benefits

10.     The Debtor provides health insurance to certain Employees, including medical, vision, and dental, and life insurance (collectively, the "Health Plans"), as described in more detail below.  The administrators of the Health Plans invoice the Debtor in advance for the full amount of fixed premiums owing as of the first of each month for that month's coverage period.  The Debtor requests authority to remit any amounts owing on account of its portion of the Health Plans for the prepetition period.   As described in greater detail below, for the Health Plans, Employees make contributions towards the Health Plan premiums and the Debtor deducts the Employees' portion of the premiums owing under the Health Plans from their Wages every pay period.  The Debtor then provides the administrator of the Health Plan with the full payment of premiums, the cost of which is shared by the Debtor and the Employees.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

---

[4] The corporate credit cards are issued by Valley Bank and are non-recourse to the Employees.

DOCS_LA:324833.8 10804/001

11.    The Debtor provides eligible Employees with HMO/PPO medical insurance plans offered by Blue Shield[5] and/or Health Net of California[6] (the "Medical Plans").  The Medical Plans provide an inclusive package of general health, dental, vision and life insurance benefits.  Of the Employees' fixed premiums under the Medical Plans, the Debtor pays 100% for a single Employee and 70% of each dependent.  On an average monthly basis, the Debtor remits approximately $10,000 in the aggregate to Blue Shield and Health Net of California on account of the Medical Plans, approximately $1,600 of which is the Employees' share. As of the Petition Date, the Debtor is current on the payment of invoiced premiums and claims due and owing to Blue Shield and Health Net of California. While the Debtor is current on obligations owing, in the abundance of caution, the Debtor seeks herein authorization to pay up to $25,000 (which figure includes the Employees' share) of prepetition claims on account of the Medical Plans.

**F.    Holidays, Vacation, and Leave**

12.    The Debtor pays for ten (10) paid holidays for its Eligible Employees.  The Debtor also provides its Eligible Employees with regular paid time off ("PTO") to cover sick leave and vacation time. PTO is determined in large part by the length of employment of the Eligible Employee.  Full-time Employees are entitled to accrue vacation at a rate per year that is based upon the number of years that such Employee has been employed by the Debtor, up to maximum aggregate limits.  All Employees are also entitled to five (5) days per year of paid sick leave. If not used, the hourly Employees are paid their accrued PTO quarterly and the Debtor seeks authority to continue to do so. Approximately $7,000.00 in prepetition PTO may be owing to Employees, which would be paid to Employees, should they so desire, on a quarterly basis.

**G.    Workers' Compensation Insurance**

13.    Under applicable states' laws, the Debtor is required to maintain workers' compensation insurance to provide its Employees with coverage for injury claims arising from or

---

[5] The Debtor's Employees are eligible for coverage if they work 32 or more hours per week (the "Eligible Employees"). Eligible Employees are eligible for coverage under the Blue Shield HMO plan.

[6] Mark Hall, director and equity holder of the Debtor, is the only individual covered under the Health Net of California plan. Directors and equity holders Gregson Hall and Chad Hall are the only two individuals covered under the Blue Shield PPO plan. Unless and until the Debtor complies with the Notices of Setting Insider Compensation, any portion of the premiums paid on behalf of Insiders will be reimbursed by the Insider.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:324833.8 10804/001

related to their employment with the Debtor.  The Debtor obtains workers' compensation insurance

through State Compensation Insurance Fund of California (the "WC Insurer"). The Debtor is

required to pay premiums to the WC Insurer (the "Workers' Compensation Obligations").  The

Debtor pays premiums to its WC Insurer based on self-reported payroll. The estimated aggregate

annual premium for the 2019/2020 coverage year is approximately $14,700. At the end of each

coverage year, amounts owing by the WC Insurer to the Debtor or vice versa are trued up and come

due.  As of the Petition Date, the Debtor is current on monthly premiums.  In an abundance of

caution, however, the Debtor requests permission to pay any portion of any premium that might

arguably be attributable to the prepetition period.

### H.    401(k) Plan

14.     The Debtor provides Employees with a 401(k) retirement plan (the "401(k) Plan").

The Debtor also matches up to 4% of Employee contributions.  Employee contributions are withheld

from paychecks as Withholding Obligations.  The Debtor's matching contributions are made to the

401(k) Plan in connection with each applicable payroll and are subsequently deposited to the

participating Employees' respective 401(k) accounts.  To the extent any prepetition 401(k)

contributions have not yet been made, the Debtor seeks authority to process those contributions.  The

Debtors also seek authority, in their discretion, to continue to their 401(k) Plan postpetition in the

ordinary course of business, including continuing to match Employee contributions to the 401(k)

Plan consistent with their 401(k) Plan policy.

### I.    Summary

15.     The Debtor has been paying and/or honoring the Wages and Benefits in the ordinary

course of business up to the Petition Date. The Debtor will have sufficient funds available

postpetition to pay or honor promptly all amounts related to the Wages and Benefits, to the extent

described in the Employee Motion, on an ongoing basis and in the ordinary course of business.

Payment of, and otherwise honoring, the Employee Obligations is necessary to maintain the

Employees' morale through the administration of the Debtor's case and to prevent many of the

Employees from suffering extreme personal hardship or from leaving the Debtor during the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

pendency of its case.  Payment of, and otherwise honoring, the prepetition Wages and other

Employee Obligations in the ordinary course of business will not prejudice general unsecured

creditors or materially affect the Debtor's estate because these claims would otherwise be entitled to

priority under sections 507(a)(4) and (a)(8)(D) of the Bankruptcy Code and would be entitled to be

paid ahead of general unsecured claims.  The payment of such amounts by the Debtor is critical to

the Debtor's ability to operate. Should the Employee Obligations not be met, there is a significant

risk that the Employees would cease working with the Debtor, and the Debtor's operations would be

irreparably damaged, to the detriment of all parties.

### EMERGENCY MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105(a) AND 366: (I) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE, (II) DETERMINING ADEQUATE ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES, AND (III) ESTABLISHING PROCEDURES FOR DETERMINING ADEQUATE ASSURANCE OF PAYMENT ("Utilities Motion")

1.      Pursuant to the Utilities Motion, Bridgemark seeks an order: (i) prohibiting the utility

providers utilized by the Debtor (collectively, the "Utility Companies" and each individually a

"Utility Company") from altering, refusing, or discontinuing service to the Debtor without further

order of the Court, (ii) determining adequate assurance of payment for future utility services, and

(iii) establishing procedures for determining adequate assurance of payment.

A.      **General**

2.      The Debtor receives essential utility services from a number of utility companies. A

list of the Utility Companies, the type of utility service received and the Debtor's utility accounts is

attached to the Utilities Motion as **Exhibit A**. Pursuant to section 366 of the Bankruptcy Code, the

Debtor seeks a determination that (a) a deposit in a segregated account of an amount equal to

approximately one month of the estimated average monthly cost[7] for services provided to the Debtor

by each Utility Company (the "Utility Deposit"), (b) the ability of any Utility Company to obtain an

initial hearing on the adequacy of the Utility Deposit, and (c) the ability of any Utility Company to

obtain an expedited hearing regarding further adequate assurance if there is a failure to cure a

_____

[7] The average monthly cost amount was determined by averaging the most recent monthly bills received from each
Utility Company over the past 12 months.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:324833.8 10804/001

postpetition payment default within twenty-one (21) days after written notice of such default (collectively, the "Proposed Adequate Assurance"), constitute adequate assurance of payment for future utility services. For expediency, the Debtor proposes to limit the Utility Deposits required to only those Utility Companies whose Utility Deposit would exceed $250.

3. The Debtor routinely pays its regular monthly utility obligations when due. The Debtor's chapter 11 filing occurred during the middle of the billing cycles for many, if not all, of the Utility Companies. As a result, there are likely outstanding prepetition amounts owed to the Utility Companies. The Debtor has and will have adequate cash to meet all of its necessary postpetition operating expenses on a current basis, including payments to the Utility Companies and including the payment of the Utility Deposits.

**B.    Summary**

4. At this critical time, uninterrupted water, electricity, gas, trash, sewer, local and long distance telephone services, cable, and internet services are essential to the ongoing operations of the Debtor's business and to the preservation of the value thereof. Any interruption, however brief, in utility services to the Debtor's facilities or to the Debtor's Employees will irreparably disrupt the Debtor's business operations. It is therefore critical that the Court prohibit the Utility Companies from altering, refusing, or discontinuing service to the Debtor without further order of this Court. The Deposit for each of the Utility Companies coupled with the streamlined mechanism for requesting further adequate assurance described in the Utilities Motion provides adequate assurance of payment to the Utility Companies and safeguards the Debtor's continuing business operations.

**EMERGENCY MOTION OF DEBTOR FOR AN ORDER AUTHORIZING (A) MAINTENANCE OF EXISTING BANK ACCOUNTS, (B) CONTINUANCE OF EXISTING CASH MANAGEMENT SYSTEM,  BANK ACCOUNTS, CHECKS, AND (C) RELATED RELIEF ("Cash Management Motion")**

1. Pursuant to the Cash Management Motion, the Debtor seeks an order authorizing the (i) maintenance of existing Bank Accounts including the authority to pay routine prepetition banking fees owed to financial institutions; (ii) continued use of the existing Cash Management System, Bank Accounts, and checks; and (iii) related relief.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

7

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

**A.    General**

2.    In connection with the normal operation of its business, the Debtor maintains certain bank accounts at Valley Republic Bank ("VRB"), California Bank and Trust ("CB&T"), East West Bank ("East West"), Citizens Business Bank ("Citizens Bank"), and Wells Fargo Bank ("Wells Fargo," and together with VRB, CB&T, East West, and Citizens Bank, the "Bank Accounts") for the Debtor's deposits, disbursements, and certificates of deposit (the "Cash Management System").

3.    More specifically, the Bank Accounts are used by the Debtor for all receipts and disbursements from operations, as follows:

- Prepetition the Debtor maintained 3 operating bank accounts at VRB (7913, 7921, 7905), one checking account at California Bank and Trust (5772), one money market account at Citizens Business Bank (4980) and a money market account at East West Bank (4392).  In addition, the Debtor maintained one certificate of deposit account at California Bank and Trust (0079) and five certificate of deposit accounts at Wells Fargo Bank (438, 6086, 2929, 5575, 180).  All of the certificate of deposit accounts are collateral for certain obligations to the California Division of Oil, Gas, and Geothermal Resources ("DOGGR") and need to be maintained postpetition to comply with DOGGR requirements.

-  Cash receipts from the Debtor's operations, consisting primarily of two monthly electronic deposits from the Debtor's customers, are deposited into Valley Bank account number 7921. The Debtor will notify its customers of the new DIP accounts established at East West and request that postpetition payments be made to that account. The Debtor will transfer receipts deposited to account number 7921 to the DIP general account until the customers are able to make the change in their banking systems, at which time the account will be closed.

- Valley Bank account number 7913 is the Debtor's general disbursement account and is used to fund payroll through the Debtor's payroll service, Paychex. The account also receives a monthly electronic funds transfer ("EFT") that will need to be

8

redirected to the East West DIP general account. The Debtor will transfer receipts deposited to account number 7913 to the DIP general account until the EFT can be redirected, at which time the account will be closed.

- VRB account number 7905 is used to make the Debtor's royalty payments obligations.  Funds in the account will be transferred to the East West DIP general account and the account will be closed. The Debtor will make postpetition royalty payments from the DIP general account.

- California Bank and Trust account number 5772 was established by the Debtor to increase the yield on certificate of deposit number 0079. Funds in the account will be transferred to the East West DIP general account and the account will be closed.

- East West Bank account number 4392 is an investment account. Funds in the account will be transferred to the East West DIP general account and the account will be closed.

- Citizens Business Bank account number 4980 is required to make automatic payments on an automobile loan. The Debtor will transfer sufficient funds to make the automatic payment on a monthly basis. No other transactions will be processed through this account.

**B. <u>Summary</u>**

4.      By this Motion, the Debtor seeks partial relief from the obligation to immediately close the Bank Accounts and open new DIP bank accounts.  As discussed in the Motion, the Debtor will close most of its disbursement accounts and open new disbursement accounts immediately. However, if the Debtor is required to immediately close its deposit account, its customers may not respond quickly to the change and will likely continue to send deposits to the original deposit account.  In addition, certain of the non-disbursement Bank Accounts are required to be maintained in connection with the Debtor's business operations. Thus, requiring the Debtor to close all of its Bank Accounts and immediately open new ones would likely cause a major disruption in the Debtor's cash flow and other complications.  The Debtor's new disbursement accounts will be

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

9

opened at East West, which is FDIC insured and listed on the list of approved depositories of the Office of the United States Trustee (the "<u>UST</u>").

### EMERGENCY MOTION FOR ORDER AUTHORIZING THE PAYMENT OF WORKING INTEREST EXPENDITURES, JOINT INTEREST BILLINGS, ROYALTY PAYMENTS AND NET PROFIT INTERESTS ("<u>Royalty Motion</u>")

1.    Pursuant to the Royalty Motion, the Debtor seeks an order authorizing, but not directing, the Debtor to pay in the ordinary course of business all prepetition and postpetition amounts owing on account of (a) Working Interest Expenditures, (b) Joint Interest Billings, (c) Royalty Payments, and (d) Net Profit Interest Payments (as defined below).

### A.    <u>General</u>

2.    In order to maintain its Leases, Unit Agreements and Working Interests, the Debtor must pay certain obligations, namely: (a) the upfront expenditures associated with exploration, development, and production on account of themselves as Operator (the "<u>Working Interest Expenditures</u>"); (b) the pro rata share of Working Interest Expenditures owed by the Debtor as non-operating parties under Joint Operating Agreements ("<u>JOA</u>"), Unit Operating Agreements ("<u>UOA</u>"), or other applicable contractual or budgetary arrangements (each, a "<u>Joint Interest Billing</u>"); and (c) payments in lieu of a share of production owed to the Royalty Holders pursuant to the terms of the Debtor's respective Leases ("<u>Royalty Payments</u>") and  to certain Net Profit Interest Holders pursuant to the terms of the Yarnell Sublease (the "<u>Net Profit Interest Payments</u>"). (Collectively, the Royalty Payments, Net Profit Interest Payments, Working Interest Expenditures, and the Joint Interest Billings, are the "<u>Oil and Gas Obligations</u>").

3.    In the typical arrangement, the Operator remits substantially all of the Working Interest Expenditures associated with a project, including payments to third parties such as vendors. As was noted above, the Debtor serves as the Operator for the Leases in the Richfield Field and the Leases in the Dowling Field. As of the Petition Date, the Debtor estimates that is has up to approximately $75,000.00 of accrued but unpaid Working Interest Expenditures relating to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

10

Richfield Leases and the Dowling Lease (the "Prepetition Working Interest Expenditures") that may

be due and owing within the next 21 days.

4.    The Debtor is also a non-operating party in the Chanchula Field in Mobile, Alabama,

for which the Debtor is obligated for its pro rata share of the Working Interest Expenditures upon

receipt of any Joint Interest Billings. In such circumstances, a third party acts as Operator (in this

case Hilcorp Energy Company) and is charged with the daily operations and related Working

Interest Expenditures. The Debtor's Joint Interest Billings are not uniform and are not predictable on

a month-to-month basis. The Operator of an oil and gas property is often granted a contractual lien

on Non-Operating Parties' interests in the oil and gas property to secure the payment of obligations

owed to the Operator. As such, the Debtor's failure to timely pay the Joint Interest Billings may

result in the Operator asserting liens under applicable state and federal law against the Debtor's

interests in their leases or any production therefrom.[8] If asserted, such liens could restrict the

Debtor's ability to dispose, transfer, or otherwise assign their property, potentially severely

impairing the Debtor's businesses.

5.    Historically, the Debtor has paid approximately $2,000- 3,000 per month in Joint

Interest Billings in connection with its Working Interest in the Chunchula Field Unit. Typically, the

Debtor is required to pay Joint Interest Billings within 15 days of receipt. As of the Petition Date, the

Debtor estimates that it has approximately $2,000-$3,000 of accrued but unpaid Joint Interest

Billings relating to Chunchula (for December and pre-petition portion of January) (the "Pre-Petition

Joint Interest Billings").

48.    Under the Leases, Bridgemark is obligated to pay royalties (the "Royalties") to the

holders of the mineral rights (the "Royalty Holders") based on, among other things, the amount of

oil or gas that is produced and sold. Royalties are paid monthly about five (5) weeks after the close

of the month.  Royalties owing for November 1-31, 2019 of $75,706.19 were paid on January 8,

2020. As of the Petition Date, Bridgemark owed approximately $218,000 in Pre-Petition Royalties to

---

[8] For the avoidance of doubt, the Debtor does not concede that the assertion of any such liens would constitute a
valid basis for removing the Debtor as Operator of any Lease, and the Debtor expressly reserves the right to contest any
such contention.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

DOCS_LA:324833.8 10804/001

approximately 290 Royalty Owners. This includes estimated outstanding royalties for December

2019 (which would typically be paid in the ordinary course of business on or about February 8,

2020) of $80,000.00; estimated outstanding Royalties for January 1-14, 2020 (which would typically

be paid in the ordinary course of business on or about March 8, 2020) of $36,000, and $102,000.00

in uncollected royalties being held in the royalty suspension account (the "Pre-Petition Royalties").

By the Motion, the Debtor seeks authority to pay the Pre-Petition Royalties.

6.    Pursuant to the terms of the Yarnell Sublease, the Debtor makes quarterly

distributions to 15 Net Profit Interest Holders of approximately $28,000.00 total.  As of the Petition

Date, Bridgemark was current on all payments to Net Profit Interest Holders through September 30,

2019.  The payment for amounts owing for the fourth quarter of 2019 will be due and owing, in the

ordinary course of business, in February of 2020. The Debtor seeks authority to pay the pre-petition

portion (to the extent there is one) (the "Pre-Petition Net Profit Interest Payment") of the Net Profit

Interest Payment for the 4th quarter of 2019 when it is due, if it is due, in the ordinary course of its

business. The Debtor estimates that this will be $0. Casa Real LP ("Casa Real") is one of the

Debtor's Net Profit Interest Holders.  Casa Real's general partner is Casa Real Management LLC, of

which I am managing member. The Debtor does not seek to make any payments to Casa Real

pursuant to the Royalty Motion. No payments will be made to Casa Real without prior court

approval.

**B.    Summary**

7.    In sum, the Debtor seeks authority, but not direction, to continue paying the Oil and

Gas Obligations described above in the Debtor's reasonable business judgment consistent with past

practice, including payment of certain prepetition obligations related thereto. Estimated total Pre-

Petition Oil & Gas Obligations that would be paid pursuant to this Motion be $330,000.00,

comprised of the following: Pre-Petition Working Interest Expenditures of up to $75,000.00, Pre-

Petition Joint Interest Billings of up to $5,000.00, and Pre-Petition Royalty Payments of up to

approximately $250,000.00 as and when due. The Debtor does not seek authority to make any

payments to Insiders or Affiliates pursuant to this Motion.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

8.    The Debtor's Leases are "leases by production" meaning that the term of the Leases extends, in general, only so long as "oil and gas or other hydrocarbon substances are being produced in paying quantities from the leased land". Accordingly, if a disruption in the Debtor's business operations caused production to cease, the Debtor's Leases could expire, and with them, the Debtor's right to extract and produce oil and its access to the reserves below. In addition, the Debtor is responsible for the payment of all labor and materials and other expenses in connection with the Leases and to keep the leased property free from liens and claims. Finally, in general, if the Debtor fails to pay Royalty Payments when due, the Leases may terminate.  Any termination or expiration of the Leases would be catastrophic for the Debtor as its Oil and Gas Leases are its most valuable assets. Accordingly, it is critical that the Debtor be permitted to pay the Pre-Petition Oil & Gas Obligations in the ordinary course of business.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CA

13

EXHIBIT "B"

| Bridgemark Wells, Leases and Unit Agreements | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Well/API Number | Well Status | Unit | Surface Rights[1] | Disputed Well under AAR[2] | BM's Working Interest | Operator | Third Party Interest | Applicable Documents |
| **WEST RICHFIELD KRAEMER ZONE UNIT[3]** | | | | | | | | |
| Mobil Stern #8 (04059-06568) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Mobil-Stern Lease[4] KZU Unit Agreement KZU Operating Agreement |
| Mobil Stern #13 (04059-20880) | SI-INJ | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Stern Lease KZU Unit Agreement KZU Operating Agreement |
| Mobil Stern #14 (04059-21143) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Mobil-Stern Lease KZU Unit Agreement KZU Operating Agreement |
| Mobil Stern #16 (04059-21090) | INJ | WRKZU | Altura HOA | - | 100% | BM | Royalty | Mobil-Stern Lease KZU Unit Agreement KZU Operating Agreement |
| Mobil Thompson #6 (04059-06573) | PRO | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease[5] KZU Unit Agreement KZU Operating Agreement |
| Mobil Thompson #10 (04059-06574) | PRO | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease KZU Unit Agreement KZU Operating Agreement |
| Mobil Thompson #13 (04059-21093) | INJ | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease KZU Unit Agreement KZU Operating Agreement |

---

[1] To the best of Bridgemark's knowledge, the party indicated is the owner of the real property on which the applicable Well is located.

[2] Nothing in this exhibit is an admission that any of the wells are subject to the AAR or that the AAR is in effect.

[3] Pursuant to the Unit Agreement for the Kraemer Zone, West Richfield Area, effective October 1, 1972, various oil and gas leases and mineral interests in the Richfield Field were unitized (along with all amendments, modifications and assignments thereto, the "KZU Unit Agreement"). Bridgemark is the Unit Operator pursuant to the Unit Operating Agreement for the Kraemer Zone, West Richfield Area dated February 2, 1970 (along with all amendments, modifications and assignments thereto, the "KZU Operating Agreement").

[4] Lease between Stern Realty Company (lessor) and M.L. Jenks (lessee) dated August 1, 1918 ((along with all amendments, modifications and assignments thereto, the "Mobile-Stern Lease").

[5] Lease between Stern Realty Company, Orrin M. Thompson and Margaret D. Thompson (lessors) and M.L. Jenks (lessee) dated August 1, 1918 ((along with all amendments, modifications and assignments thereto, the "Mobil-Thompson Lease").

| Mobil Thompson #14 (04059-21092) | INJ | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
|---|---|---|---|---|---|---|---|---|
| Mobil Thompson #15 (04059-21091) | PRO | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Mobil Thompson #16 (04059-21144) | INJ | WRKZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Texaco Yarnell #29 (04059-06497) | PRO | WRKZU | PDC | NO | 100% | BM | Royalty<br>Net Profit | Yarnell Lease[6]<br>KZU Unit Agreement<br>KZU Operating Agreement<br>Yarnell Sublease[7] |
| Texaco Yarnell #37 (04059-20859) | INJ | WRKZU | City of Placentia | - | 100% | BM | Royalty<br>Net Profit | Yarnell Lease<br>KZU Unit Agreement<br>KZU Operating Agreement<br>Yarnell Sublease |
| Texaco Yarnell #39 (04059-20882) | PRO | WRKZU | City of Placentia | - | 100% | BM | Royalty<br>Net Profit | Yarnell Lease<br>KZU Unit Agreement<br>KZU Operating Agreement<br>Yarnell Sublease |
| Union Hartwell #2 (04059-06415) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Hartwell Lease[8]<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Hartwell #3 (04059-06416) | INJ | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Hartwell Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Hartwell #4 (04059-06417) Make-Up Water Well | INJ | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Hartwell Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |

---

[6] Lease Agreement between Susan G. Yarnell, Jessie Y. Kimball, Katherine Yarnell, Ellis T. Yarnell and Esther Yarnell (lessors) and California Star Oil Company (lessee) dated April 9, 1919 (along with all amendments, modifications and assignments thereto, the "Yarnell Lease").

[7] Sublease between California Star Oil Company (sublessor) and Petroleum Midway Company (sublessee) dated April 19, 1919 (along with all amendments, modifications and assignments thereto, the "Yarnell Sublease").

[8] Lease between Morris D. Schatzman, John W. Schmid and Philip S. Magruder, co-executors of the Estate of A. Hartwell Bradford, deceased (lessor) and Union Oil Company (lessee) January 1,1965 (along with all amendments, modifications and assignments thereto, the "Union-Hartwell Lease").

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Union Morse #2[9]<br>(04059-00221) | SI | WRKZU | PDC | YES | 100% | BM | Royalty | Morse Lease[10]<br>KZU Unit Agreement<br>KZU Operating Agreement<br>AAR |
| Union Morse #6<br>(04059-06428) | PRO | WRKZU | PDC | YES | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement<br>AAR |
| Union Morse #13<br>(04059-20881) | INJ | WRKZU | PDC | NO | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Morse #15<br>(04059-20942) | INJ | WRKZU | PDC | NO | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Morse #16<br>(04059-20943) | PRO | WRKZU | PDC | NO | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Morse #17<br>(04059-20944) | PRO | WRKZU | PDC | NO | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Morse #18<br>(04059-20945) | PRO | WRKZU | PDC | NO | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Morse #19<br>(04059-21141) | PRO | WRKZU | PDC | YES | 100% | BM | Royalty | Morse Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Sterns #4<br>(o4059-06460) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Stern Lease[11]<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Sterns #5<br>(04059-06461) | SI | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Stern Lease<br>KZU Unit Agreement<br>KZU Operating Agreement |
| Union Sterns #7<br>(o4059-06463) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Stern Lease<br>KZU Unit Agreement |

---

[9] Permit pending to convert this shut-in producer to injection well.

[10] Lease between N. Frank Morse and Lottie E. Morse (lessor) and M.L. Jenks (lessee) dated February 24, 1917 (along with all amendments, modifications and assignments thereto, the "Morse Lease'").

[11] Lease between Stern Realty Company (lessee) and M.L. Jenks (lessor) dated August 1, 1918 (along with all amendments, modifications and assignments thereto, the "Union-Stern Lease").

| | | | | | | | | KZU Operating Agreement |
|---|---|---|---|---|---|---|---|---|
| Union Sterns #11 (o4059-06467) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Stern Lease KZU Unit Agreement KZU Operating Agreement |
| Union Sterns #16 (o4059-21288) | PRO | WRKZU | Altura HOA | - | 100% | BM | Royalty | Union-Stern Lease KZU Unit Agreement KZU Operating Agreement |
| **WEST RICHFIELD CHAPMAN ZONE UNIT[12]** | | | | | | | | |
| Mobil Thompson #11 (04059-06475) | INJ | WRCZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease CZU Unit Agreement CZU Operating Agreement |
| Mobil Thompson #12 (04059-06476) | PRO | WRCZU | Bridgemark | - | 100% | BM | Royalty | Mobil-Thompson Lease CZU Unit Agreement CZU Operating Agreement |
| Texaco Yarnell #21 (04059-07327) | PRO | WRCZU | Fieldstone or HOA | - | 100% | BM | Royalty Net Profit | Yarnell Lease CZU Unit Agreement CZU Operating Agreement |
| Texaco Yarnell #22 (04059-06495) | PRO | WRCZU | City of Placentia | - | 100% | BM | Royalty Net Profit | Yarnell Lease CZU Unit Agreement CZU Operating Agreement Yarnell Sublease |
| Texaco Yarnell #28 (04059-06496) | INJ | WRCZU | City of Placentia | - | 100% | BM | Royalty Net Profit | Yarnell Lease CZU Unit Agreement CZU Operating Agreement Yarnell Sublease |
| Texaco Yarnell #31 (04059-06498) | PRO | WRCZU | PDC | YES | 100% | BM | Royalty Net Profit | Yarnell Lease CZU Unit Agreement CZU Operating Agreement AAR/Yarnell Sublease |
| Thompson Goodwin #3 (04059-06479) | PRO | WRCZU | Terra Linda Estates | - | 100% | BM | Royalty | Thompson-Goodwin Lease[13] CZU Unit Agreement CZU Operating Agreement |
| Union Towell #7 | PRO | WRCZU | | - | 100% | BM | Royalty | Towell Lease[14] |

---

[12] Pursuant to the Unit Agreement for the Chapman Zone, West Richfield Area, dated April 1, 1960, various oil and gas leases and mineral interests in the Richfield Field were unitized (along with all amendments, modifications and assignments thereto, the "CZU Unit Agreement"). Bridgemark is the Unit Operator pursuant to the Unit Operating Agreement for the Chapman Zone, West Richfield Area dated April 1, 1960 (along with all amendments, modifications and assignments thereto, the "CZU Operating Agreement").

[13] Lease between William A. Goodwin and Alice A. Goodwin, Orrin M. Thompson and Margaret D. Thompson (lessors) and Union Oil Company (lessee) dated March 27, 1919 (along with all amendments, modifications and assignments thereto, the "Thompson-Goodwin Lease").

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (04059-20357) | | | | | | | | CZU Unit Agreement<br>CZU Operating Agreement |
| Union Morse #14<br>(04059-20941) | PRO | WRCZU | PDC | NO | 100% | BM | Royalty | Morse Lease<br>CZU Unit Agreement<br>CZU Operating Agreement |
| **RICHFIELD** | | | | | | | | |
| Richfield #1<br>(04059-06446) | PRO | - | Terra Linda Estates | - | 100% | BM | Royalty | Union-Hartwell Lease |
| Richfield #5<br>(04059-06450) | PRO | - | Chevron USA & Plains Exploration | - | 100% | BM | Royalty | Union-Hartwell Lease |
| Richfield #6<br>(04059-06451) | SI | - | Chevron USA & Plains Exploration | - | 100% | BM | Royalty | Union-Hartwell Lease |
| Richfield #8<br>(04059-06453) | PRO | - | Santa Fe Energy Resources | - | 100% | BM | Royalty | Union-Hartwell Lease |
| **NEWELL-RENTON** | | | | | | | | |
| Newell-Renton #1<br>(04059-06444) | PRO | - | | - | 100% | BM | Royalty | Newell-Renton Lease[15] |
| **NCT-3 YARNELL** | | | | | | | | |
| Yarnell #23<br>(04059-06624) | SI | - | Las Brisas HOA | - | 100% | BM | Royalty<br>Net Profit | Yarnell Lease<br>Yarnell Sublease |
| Yarnell #24<br>(04059-06625) | SI | - | Las Brisas HOA | - | 100% | BM | Royalty<br>Net Profit | Yarnell Lease<br>Yarnell Sublease |
| Yarnell #25<br>(04059-06626) | PRO | - | Las Brisas HOA | - | 100% | BM | Royalty<br>Net Profit | Yarnell Lease<br>Yarnell Sublease |

---

[14] Lease between Towell Investment Company and Union Oil Company dated August 21, 1917 (along with all amendments, modifications and assignments thereto, the "Towell Lease").

[15] (i) Lease dated May 31, 1917 between J.W. Newell and Lilla F. Newell (as Lessors) and Union Oil Company (as Lessee); (ii) Lease dated May 1, 1917 between Esther L. Newell (as Lessor) and Union Oil Company (as Lessee); and (iii) Lease dated April 12, 1949 between Malcom J. Renton, Executor of the Estate of David M. Renton, deceased (as Lessors) and Union Oil Company (as Lessee); (collectively and along with all amendments, modifications and assignments thereto, the "Newell-Renton Lease").

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Yarnell #26 (04059-06627) | PRO | - | Las Brisas HOA | - | 100% | BM | Royalty Net Profit | Yarnell Lease Yarnell Sublease |
| Yarnell #30 (04059-06628) | PRO | - | Las Brisas HOA | - | 100% | BM | Royalty Interest Net Profit | Yarnell Lease Yarnell Sublease |
| **DOWLING FIELD** <br> **Anaheim, CA** | | | | | | | | |
| Dowling #1 (04059-05869) | PRO | | Frontera, LLC | - | 100% | BM | Royalty | Dowling Lease[16] |
| Dowling #2 (04059-05870) | PRO | - | Frontera, LLC | - | 100% | BM | Royalty | Dowling Lease |
| Dowling #3 (04059-05871) | PRO | - | Frontera, LLC | - | 100% | BM | Royalty | Dowling Lease |
| Dowling #4 (04059-05872) | PRO | - | Ridley Politiski | - | 100% | BM | Royalty | Dowling Lease |

---

[16] (i) Lease dated February 23, 1956 between Robert Dowling et al (as lessors) and Albert Stevenson (as lessee) (ii) Lease dated February 27, 1956 between Reinhold Dinkler and Jennie Dinkler (as lessors) and Albert Stevenson (as lessee), and (iii) Lease dated February 24, 1956 between Edward Mills, Edith Mills and Freda Carmen (as lessors) and Albert Stevenson (as lessee) (collectively and along with all amendments, modifications and assignments thereto, the "Dowling Lease").

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 1500, Costa Mesa, CA  92626**

A true and correct copy of the foregoing document entitled: **DECLARATION OF ROBERT J. HALL, PRESIDENT OF BRIDGEMARK CORPORATION, IN SUPPORT OF CHAPTER 11 FILING AND FIRST DAY MOTIONS** thereof will be served or was served **(a)** on the judge in chamber in the form and manner required by LBR 5005-2(d); and the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **1/15/2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **1/15/2020**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 1/15/2020 | Nancy Lockwood | /s/ Nancy Lockwood |
|-----------|----------------|--------------------|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Nancy S Goldenberg    nancy.goldenberg@usdoj.gov
- William N Lobel    wlobel@pszjlaw.com, nlockwood@pszjlaw.com;jokeefe@pszjlaw.com;banavim@pszjlaw.com
- Robert J Pfister    rpfister@ktbslaw.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

**2**. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL**

<u>Via Messenger</u>
**T**he Honorable Theodor C. Albert
United States Bankruptcy Court
Central District of California
Ronald Reagan Federal Building and Courthouse
411 West Fourth Street, Suite 5085 / Courtesy Bin
Santa Ana, CA 92701-4593

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
DOCS_LA:327031.1 10804/001

**F 9013-3.1.PROOF.SERVICE**