William N. Lobel, Esq. (State Bar No. 93202)
wlobel@tocounsel.com
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone:     (714) 549-6200
Facsimile:     (714) 549-6201

[Proposed] Co-Counsel for Debtor and Debtor in
Possession, Bridgemark Corporation

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:20-bk-10143-TA |
| BRIDGEMARK CORPORATION, | Chapter 11 |
| Debtor and Debtor-in Possession.[1] | **NOTICE OF MOTION AND MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365 AND FED. R. BANKR. P. 9019 FOR ENTRY OF ORDER (I) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, ROBERT J. HALL, AND PLACENTIA DEVELOPMENT COMPANY AND RELATED AGREEMENTS, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, (III) APPROVING ASSUMPTION AND/OR ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) MODIFYING ORDER AUTHORIZING EMPLOYMENT OF NUMERIC SOLUTIONS LLC, AND (V) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| | **Hearing** |
| | Date:      March 31, 2021 |
| | Time:      10:00 a.m. |
| | Place:     ZoomGov (see instructions below) |

---

[1] The Debtor's last four digits of its taxpayer identification number are (1669). The headquarters and service address for the above-captioned Debtor is 17671 Irvine Blvd., Suite 217, Tustin, CA 92780.

**TO THE HONORABLE THEODOR C. ALBERT, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, ALL COUNTERPARTIES TO ASSIGNED CONTRACTS, AND ALL OTHER PARTIES ENTITLED TO NOTICE:**

**PLEASE TAKE NOTICE** that a hearing will be held on **March 31, 2021 at 10:00 a.m.** to consider and act upon the *Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365 and Fed. R. Bankr. P. 9019 for Entry of Order (I) Approving Settlement Agreement Between the Debtor, Robert J. Hall, and Placentia Development Company and Related Agreements, (II) Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens, (III) Approving Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Modifying Order Authorizing Employment of Numeric Solutions LLC, and (V) Granting Related Relief* (the "Motion"). **Instructions regarding audio and video participation in the hearing are provided below.** As set forth in greater detail in the Memorandum of Points and Authorities attached hereto, Bridgemark has determined in the exercise of its reasonable business judgment that entering into the agreements and transactions described in the Motion is in the best interests of the estate and creditors.

**PLEASE TAKE FURTHER NOTICE** that the relief requested is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the concurrently-filed Declarations of Robert J. Hall, Seth Ring, Clifton O. Simonson, and John Harris, the record in this case, and such further oral and documentary evidence as may be presented at the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), any response or opposition to the Motion, including any response or opposition to the assumption and/or assignment, as applicable, of the Assigned Contracts set forth in Exhibit A to the Motion, must be in writing and filed with the Court and served upon the undersigned counsel no later than **March 17, 2021**. Pursuant to Local Bankruptcy Rule 9013-1(h), the failure to timely file any response or opposition may be deemed by the Court to be consent to the approval of the Motion. Replies, if any, are due no later than **March 24, 2021**.

**PLEASE TAKE FURTHER NOTICE** that **Exhibit A** to the Motion includes a schedule of Assigned Contracts (as defined in the Motion) of Bridgemark that are proposed to be assigned

i

1    (or, in the case of Assigned Contracts that have not previously been assumed, assumed and

2    assigned) to Buyer.  **PARTIES TO EXECUTORY CONTRACTS OR UNEXPIRED LEASES**

3    **WITH BRIDGEMARK ARE ADVISED TO CAREFULLY REVIEW THE**

4    **INFORMATION CONTAINED IN THE MOTION AND IN <u>EXHIBIT A</u> TO THE**

5    **MOTION.**  Section 365(b)(1)(A) of the Bankruptcy Code requires that Bridgemark cure or

6    provide adequate assurance that it will promptly cure existing defaults under the Assigned

7    Contracts at the time of assumption.  Bridgemark's determination of the amounts required to cure

8    any defaults under the Assigned Contracts (the "<u>Cure Amounts</u>"), if any, are set forth in Exhibit A

9    to the Motion.  **Bridgemark has determined that there are no Cure Amounts owing with**

10   **respect to any of the Assigned Contracts**.

11   　　　　**PLEASE TAKE FURTHER NOTICE that any objection by a counterparty to an**

12   **Assigned Contract to (i) any Cure Amount, (ii) the ability of Buyer to provide "adequate**

13   **assurance of future performance" (within the meaning of section 365 of the Bankruptcy**

14   **Code) under the applicable Assigned Contract, or (iii) any other matter pertaining to**

15   **assumption, assumption and assignment, or the Cure Amounts required by section 365(b)(1)**

16   **of the Bankruptcy Code must be in writing and filed with the Court and served upon the**

17   **undersigned counsel no later than <u>March 17, 2021</u>.**

18   　　　　**PLEASE TAKE FURTHER NOTICE** that any counterparty to an Assigned Contract

19   that fails to timely file and serve an objection as proscribed herein may be deemed to have

20   assented to such assumption, assumption and assignment, and Cure Amount.

21   　　　　**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 6004-

22   1(c), Bridgemark provides the following information regarding the proposed Sale Transaction:[2]

23

24

25

26   _____

27   [2] The information in this table is set forth for convenience, and is qualified in its entirety by the
     actual terms of the Asset Purchase Agreement and other Agreements.  In the event of any

28   conflict between this summary and the actual Agreements, the latter shall control.

| | |
|---|---|
| **Name and address of proposed buyer** | The purchasers of the Purchased Assets are California Natural Resources Group Orange County, LLC, Realm California, LLC, and Alatex, LLC.  Their notice address is set forth in Section 12.4 of the Asset Purchase Agreement (Exhibit C to the Motion). |
| **Description of the property to be sold** | Substantially all non-cash assets of Bridgemark.  The Purchased Assets are described in greater detail in Section 2.1 of the Asset Purchase Agreement. |
| **Terms and conditions of the proposed sale, including the price and contingencies** | The terms and conditions of the proposed sale are summarized in Part IV of the attached Memorandum of Points and Authorities. |
| **Whether the proposed sale is free and clear of liens, claims or interests, or subject to them, and a description of all such liens, claims, or interests.** | The proposed sale is free and clear of all liens, claims and interests, including the liens asserted by: (i) PDC; (ii) Citizens Business Bank; (iii) Watsonville Ford Lincoln; and (iv) Watsonville Chrysler Dodge Jeep.  *See* Part VI.B.3 of Memorandum of Points and Authorities. |
| **Whether the proposed sale is subject to higher and better bids** | The proposed sale is part of an inextricably intertwined and interdependent set of Agreements and is not subject to higher and better bids. |
| **The consideration to be received by the estate, including estimated commissions, fees, and other costs of sale** | The total consideration received by the estate includes, *inter alia*, release of PDC's claims against the estate, as set forth in greater detail in Part IV of the Memorandum of Points and Authorities.  There are no commissions, fees, or other costs of sale. |
| **If authorization is sought to pay a commission, the identity of the auctioneer, broker, or sales agent and the amount or percentage of the proposed commission to be paid** | N/A |

| A description of the estimated or possible tax consequences to the estate, if known, and how any tax liability generated by the sale of the property will be paid | Bridgemark is an S corporation which meets the IRS requirements to be taxed under Chapter 1, Subchapter S of the Internal Revenue Code.  Any income tax liabilities resulting from the proposed sale would be tax liabilities of Bridgemark's equity holders.  The Buyer is responsible for any transfer taxes, as set out in more detail in Section 11.4 of the Asset Purchase Agreement.  There is no expected tax liability to the estate. |

**PLEASE TAKE FURTHER NOTICE** that because of the COVID-19 pandemic, the Court will conduct the hearing using ZoomGov audio and video technology.  Information on how to participate in the hearing using ZoomGov is provided below.

**PLEASE TAKE FURTHER NOTICE** that hearing participants and members of the public may participate in and/or observe the hearing using ZoomGov, free of charge.

**PLEASE TAKE FURTHER NOTICE** that individuals may connect by ZoomGov audio and video using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device with an integrated camera, microphone and speaker (such as an iPhone, iPad, Android phone or Android tablet).  The connection can be initiated by entering the "Meeting URL" into a web browser on any of these devices, provided the device is connected to the Internet.  Individuals connecting in this manner will be prompted for the Meeting ID and Password shown below.

**PLEASE TAKE FURTHER NOTICE** that individuals also may connect to the hearing by telephone only, using the telephone number provided below.  Individuals connecting in this manner also will be prompted for the Meeting ID and Password.

**PLEASE TAKE FURTHER NOTICE** that neither a Zoom nor a ZoomGov account is necessary to participate in or observe the hearing, and no pre-registration is required.

**PLEASE TAKE FURTHER NOTICE** that the audio portion of the hearing will be recorded electronically by the Court and constitute its official record.

**PLEASE TAKE FURTHER NOTICE** that all persons are strictly prohibited from making any other recording of court proceedings, whether by video, audio, "screenshot," or

1  otherwise.  Violation of this prohibition may result in the imposition of monetary and non-

2  monetary sanctions.

3       **PLEASE TAKE FURTHER NOTICE** that the following is the unique ZoomGov

4  connection information for the above-referenced hearing:

| Meeting URL: | https://cacb.zoomgov.com/j/1616297986 |
|---|---|
| Meeting ID: | 161 629 7986 |
| Password: | 626055 |
| Telephone: | 1 (669) 254-5252 or 1 (646) 828-7666 |

     **PLEASE TAKE FURTHER NOTICE** that more information on using ZoomGov to

participate in this hearing is available on the Court's website at the following web address:

https://www.cacb.uscourts.gov/news/zoom-video-hearing-guide-participants.

March 10, 2021             THEODORA ORINGHER PC

            By:   */s/ William N. Lobel*

                William N. Lobel, Esq. (State Bar No. 93202)

                *[Proposed] Co-Counsel for Debtor and*
                *Debtor in Possession, Bridgemark*
                *Corporation*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ............................................................................................1

II.    JURISDICTION...............................................................................................................3

III.    FACTUAL BACKGROUND ...........................................................................................3

    A.    General Overview of Bridgemark's Business ...................................................3

    B.    Prepetition Dispute with PDC ..........................................................................4

    C.    Postpetition Disputes with PDC ........................................................................6

    D.    Term Sheet and Negotiation of Definitive Documentation ......................................8

IV.    SUMMARY OF MATERIAL TERMS OF AGREEMENTS ...........................................11

    A.    Settlement Agreement ....................................................................................11

    B.    Asset Purchase Agreement..............................................................................12

    C.    Transaction Agreement ...................................................................................13

    D.    Surface Use Agreement ...................................................................................14

V.    RELIEF REQUESTED ..................................................................................................14

VI.    BASIS FOR RELIEF ....................................................................................................14

    A.    The Agreements Should Be Approved Pursuant to Bankruptcy Rule 9019 ...........14

        1.    Legal Standard.....................................................................................14

        2.    The Rule 9019 Factors Overwhelmingly Favor Approval of the Agreements............................................................................................16

    B.    Approval of the Sale is Warranted Under Bankruptcy Code Section 363 ...............17

        1.    Legal Standard.....................................................................................17

        2.    The Sale Transaction is an Exercise of the Debtor's Sound Business Judgment ............................................................................................18

        3.    The Sale Should be Approved Free and Clear of All Liens, Claims, and Encumbrances.............................................................................19

        4.    Buyer and PDC Should be Afforded All Protections Under Section 363(m) ................................................................................................22

        5.    The Break-Up Fee is Reasonable and Appropriate and Should Be Approved ...........................................................................................23

C.    The Assumption and Assignment of the Assigned Contracts Should be
Approved Pursuant to Bankruptcy Code Section 365 ................................................24

    1.    Legal Standard ................................................................24

    2.    Bridgemark Has a Sound Business Purpose for Assigning (and, in
Certain Limited Instances, Assuming and Assigning) the Assigned
Contracts ................................................................25

D.    The Numeric Solutions Employment Order Should Be Modified to
Authorize Mr. Harris to Serve as Chief Wind-Down Officer ................................27

E.    Relief from the 14-Day Waiting Period Under Bankruptcy Rules 6004(h)
and 6006(d) is Appropriate ................................................................29

VII.    CONCLUSION ................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re A&C Props.*,
    784 F.2d 1377 (9th Cir. 1986) ................................................................................................. 15

*In re All Am. of Ashburn, Inc.*,
    56 B.R. 186 (Bankr. N.D. Ga. 1986) ...................................................................................... 22

*In re Am. W. Airlines, Inc.*,
    166 B.R. 908 (Bankr. D. Ariz. 1994) ..................................................................................... 23

*In re ASARCO, L.L.C.*,
    650 F.3d 593 (5th Cir. 2011) ................................................................................................. 17

*In re AWTR Liquidation Inc.*,
    548 B.R. 300 (Bankr. C.D. Cal. 2016) .................................................................................. 17

*In re Blair*,
    538 F.2d 849 (9th Cir. 1976) ................................................................................................. 15

*Blixseth v. Credit Suisse (In re Yellowstone Mountain Club, LLC)*,
    961 F.3d 1074 (9th Cir. 2020) ......................................................................................... 11, 27

*In re Bygaph, Inc.*,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) ..................................................................................... 25

*In re Carla Leather, Inc.*,
    44 B.R. 457 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985) ........................... 15

*In re Carlisle Homes, Inc.*,
    103 B.R. 524 (Bankr. D.N.J. 1989) ....................................................................................... 25

*In re Catapult Entm't, Inc.*,
    165 F.3d 747 (9th Cir. 1999) ................................................................................................. 26

*In re Dundee Equity Corp.*,
    1992 Bankr. LEXIS 436 (Bankr. S.D.N.Y. Mar. 6, 1992) ...................................................... 20

*In re Energytec, Inc.*,
    739 F.3d 215 (5th Cir. 2013) ................................................................................................. 22

*In re Ewell*,
    958 F.2d 276 (9th Cir. 1992) ................................................................................................. 22

*Folger Adam Security v. DeMatteis/MacGregor JV*,
    209 F.3d 252 (3d Cir. 2000) ................................................................................................. 21

*In re Hoffman*,
  53 B.R. 874 (Bankr. D.R.I. 1985) ...........................................................................21

*In re Hupp Indus.*,
  140 B.R. 191 (Bankr. N.D. Ohio 1997) ...................................................................23

*In re Integrated Res., Inc.*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992) ..................................................17, 23, 24

*John S. Marandas, P.C. v. Bishop (In re Sassalos)*,
  160 B.R. 646 (D. Or. 1993) .....................................................................................15

*In re Johns-Manville Corp.*,
  60 B.R. 612 (Bankr. S.D.N.Y. 1986) .....................................................................17

*In re Klein Sleep Prods., Inc.*,
  78 F.3d 18 (2d Cir. 1996)..........................................................................................25

*In re Leckie Smokeless Coal Co.*,
  99 F.3d 573 (4th Cir. 1996).......................................................................................21

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
  837 F.2d 89 (2d Cir. 1988)........................................................................................21

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*,
  930 F.2d 1132 (6th Cir. 1991)...................................................................................19

*In re Montgomery Ward Holding Corp.*,
  242 B.R. 147 (D. Del. 1999) ....................................................................................17

*In re Natco Indus., Inc.*,
  54 B.R. 436 (Bankr. S.D.N.Y. 1985) .....................................................................25

*In re New England Fish Co.*,
  19 B.R. 323 (Bankr. W.D. Wash. 1982) .................................................................21

*Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*,
  846 F.2d 1170 (9th Cir. 1988)...................................................................................22

*In re Pac. Gas & Elec. Co.*,
  304 B.R. 395 (Bankr. N.D. Cal. 2004) ...................................................................15

*Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc)*,
  163 F.3d 570 (9th Cir. 1998)....................................................................................22

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
  390 U.S. 414 (1968) .................................................................................................14

*In re S.N.A. Nut Co.*,
  186 B.R. 98 (Bankr. N.D. Ill. 1995)........................................................................23

*Smith v. Van Gorkom*,
  488 A.2d 858 (Del. 1985) ..................................................................................................17

*In re Stein*,
  236 B.R. 34 (D. Or. 1999) ................................................................................................15

*The Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*,
  195 B.R. 716 (Bankr. N.D. Ind. 1996) .............................................................................21

*In re Trans World Airlines, Inc.*,
  322 F.3d 283 (3d Cir. 2003) .............................................................................................21

*In re Twenver, Inc.*,
  149 B.R. 954 (Bankr. D. Colo. 1992) ...............................................................................23

*In re W.T. Grant Co.*,
  699 F.2d 599 (2d Cir. 1983) .............................................................................................15

*In re Walter*,
  83 B.R. 14 (B.A.P. 9th Cir. 1988) .....................................................................................17

*In re Women First Healthcare, Inc.*,
  332 B.R. 115 (Bankr. D. Del. 2005) .................................................................................23

*In re WPRV-TV, Inc.*,
  143 B.R. 315 (D.P.R. 1991) ..............................................................................................18

**The Bankruptcy Code (11 U.S.C.)**

  § 105(a) ...................................................................................................1, 3, 14, 17

  § 361 ...................................................................................................................................7

  § 362 ...................................................................................................................................7

  § 363(b) ..................................................................................................1, 3, 17, 18, 22

  § 363(b)(1) .......................................................................................................................18

  § 363(f) ...............................................................................................................19, 20, 21, 22

  § 363(m) ....................................................................................................................22, 23

  § 365 .....................................................................................................1, 3, 24, 25, 26

**The Judicial Code (28 U.S.C.)**

  § 157 ...................................................................................................................................3

  § 157(b)(2) .........................................................................................................................3

x

§ 1334 ...................................................................................................................3

§ 1408 ...................................................................................................................3

§ 1409 ...................................................................................................................3

**Federal Rules of Bankruptcy Procedure**

Rule 6004 ...............................................................................................3, 18, 29

Rule 6006 ...................................................................................................3, 29

Rule 9019 ......................................................................1, 3, 9, 14, 16, 17

**Other Authorities**

CAL. PRAC. GUIDE: CORPS. (THE RUTTER GROUP 2015) CH. 6–C ...................................17

3 Collier on Bankruptcy, ¶ 363.06[1] (L. King, 15th rev. ed. 1988)...............................21

## MEMORANDUM OF POINTS AND AUTHORITIES

Bridgemark Corporation ("Bridgemark") respectfully submits this memorandum of points and authorities, together with the concurrently filed *Declaration of Robert J. Hall* ("Hall Declaration"), *Declaration of Seth Ring* ("Ring Declaration"), *Declaration of Clifton O. Simonson* ("Simonson Declaration"), and *Declaration of John Harris* ("Harris Declaration) in support of its *Notice of Motion and Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365 and Fed. R. Bankr. P. 9019 for Entry of Order (I) Approving Settlement Agreement Between the Debtor, Robert J. Hall, and Placentia Development Company and Related Agreements, (II) Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens, (III) Approving Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Modifying Order Authorizing Employment of Numeric Solutions LLC, and (V) Granting Related Relief* (the "Motion").

### I. PRELIMINARY STATEMENT

The Court is well aware of the longstanding dispute between Bridgemark and Placentia Development Company, LLC ("PDC").  Broadly speaking, and without rehashing the details of the multiyear proceedings, the dispute concerned Bridgemark's failure to plug and abandon oil wells on the PDC Parcel (as defined below), as the state court ultimately determined that Bridgemark was legally obligated to do, such that PDC could develop the residential homes on the PDC Parcel.  PDC obtained an approximately $42 million judgment, which it duly recorded and thus created a lien on all of Bridgemark's real property, and further filed creditors' suits against Bridgemark's oil buyers that created further liens on Bridgemark's payment streams.

Bridgemark filed for bankruptcy in January 2020.  Following a flurry of litigation in this Court – including a motion to dismiss and a motion for relief from stay filed by PDC and an adversary proceeding seeking avoidance of PDC's liens – the Court expressed significant doubt over whether Bridgemark could ever propose a feasible non-consensual plan of reorganization, but gave Bridgemark a brief window to assemble such a plan.  During that window, Bridgemark, PDC, and Robert J. Hall ("Hall") engaged in extensive settlement negotiations and ultimately

1  entered into a term sheet on April 15, 2020 (the "Term Sheet"), which the Court approved by

2  order entered on June 26, 2020.

3      The Term Sheet contemplated, among other things, that the parties would exchange full

4  mutual releases and that Bridgemark would make its entire enterprise value available to PDC or its

5  designee, with the details of such transaction to be set forth in subsequent "Definitive

6  Documentation" subject to this Court's approval.  The Term Sheet further contemplated that the

7  Definitive Documentation would ultimately bind Hall and also certain related persons and entities

8  (the Hall-Related Parties, as defined more particularly below).  After months of good faith, arms'

9  length bargaining, the parties have reached agreement on the terms of several interrelated and

10  intertwined Agreements (as defined below) that collectively comprise the "Definitive

11  Documentation" contemplated by the Term Sheet.  This Motion seeks approval of those

12  Agreements and the transactions contemplated therein.

13      In broad strokes – and subject entirely to the specific terms of the actual Agreements – the

14  transactions contemplated by the Agreements will result in essentially all of Bridgemark's non-

15  cash assets that are *not* located on the PDC Parcel being transferred to a third-party Buyer (as

16  defined below), free and clear of PDC's liens, and Buyer will also assume certain liabilities of

17  Bridgemark (such purchase, sale, assignment, and assumption collectively, the "Sale

18  Transaction").  Buyer will transfer to PDC certain monetary consideration in exchange for PDC's

19  designation of Buyer as the acquirer of the purchased assets, and PDC in turn will transfer the

20  Remainder Tract (as defined below) to Buyer.  Finally, the settlement between PDC, Bridgemark,

21  Hall, and the Hall-Related Parties will go into effect.  All of this will happen on a date (the

22  "Closing Date") to occur shortly following the entry of the Order (as defined below).

23      Following the Closing Date, Bridgemark will be left with only minimal non-cash assets –

24  primarily the wells on the PDC Parcel.  Bridgemark will immediately stop pumping from those

25  wells.  Hall and his affiliates will resign from all positions and titles held at Bridgemark.

26  Bridgemark, under the direction and control of a Chief Wind-Down Officer already employed as

27  an estate professional, will pursue confirmation of a chapter 11 plan of liquidation that will leave

28  all claims unimpaired and pay all allowed non-PDC claims in full and in cash on the Plan effective

2

1  date.  The primary purpose of the plan will be the creation of a liquidation trust tasked with

2  plugging and abandoning the remaining wells on the PDC Parcel so that PDC can finally develop

3  residential homes thereon – and thus finally remedy the breach that gave rise to this bankruptcy.

4      In short, the relief requested in this Motion will finally put an end to the longstanding

5  dispute between Bridgemark and PDC and pave a clear path for the orderly wind-down of this

6  estate, the ultimate payment in full of all allowed claims under a liquidating plan, and the ultimate

7  plugging and abandonment by a liquidation trust of the wells on the PDC Parcel such that PDC

8  can build residential homes.  It is an outstanding result for Bridgemark, the estate, creditors, and

9  all other parties in interest.

## II.  JURISDICTION

11  This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  This is a

12  core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to

13  28 U.S.C. §§ 1408 and 1409.  The statutory predicates for this Motion are Bankruptcy Code

14  sections 105(a), 363(b) and 365 and Rules 6004, 6006 and 9019 of the Federal Rules of

15  Bankruptcy Procedure (the "Bankruptcy Rules").

## III.  FACTUAL BACKGROUND[3]

### A.    General Overview of Bridgemark's Business

18  Bridgemark is a privately-held oil and gas production company that operates primarily in

19  Orange County California.  As is described in more detail below, Bridgemark's primary assets are

20  100% of the working interests under fourteen oil and gas leases and two unit agreements and two

21  operating agreements pursuant to which it operates forty-eight wells in its Richfield Field in

_____

[3] The factual background set forth herein regarding Bridgemark's operations, the history of the dispute between Bridgemark and PDC, and the negotiations culminating in the Term Sheet is reflected in the Recitals in the Settlement Agreement (as defined below) and detailed in the parties' extensive prior submissions, including, *inter alia*, the (i) *Declaration of Robert J. Hall, President of Bridgemark Corporation, in Support of Chapter 11 Filing and First Day Motions* [Docket No. 8]; *Declaration of Michael D. Kibler in Support of Placentia Development Company, LLC's (I) Motion to Dismiss Chapter 11 Case [Etc.]* [Docket No. 56]; and (iii) *Declaration of Robert J. Hall* [Docket No. 221] filed in support of the Term Sheet Approval Motion (as defined below), all of which is incorporated herein by reference.

1    Placentia, California and four wells in its Dowling Field in Anaheim, California.  Of the wells that

2    Bridgemark operates in Placentia, California, a portion are situated on real property (the "PDC

3    Parcel") owned by PDC, on which PDC intends to build residential homes.  Bridgemark also owns

4    and operates an oil tank farm on the PDC Parcel.  The portion of the PDC Parcel on which the oil

5    tank farm is located is referred to as the "Remainder Tract."

6          In total, Bridgemark operates fifty-two wells in the Richfield and Dowling Fields.  Pre-

7    petition, the Wells produced approximately 450 barrels of crude oil per day.  Bridgemark sold the

8    production from its Richfield Field to Phillips 66 and its production from its Dowling Field to PBF

9    Holding Company.  Bridgemark currently sells its production to Texican pursuant to production

10   purchase agreements entered into post-petition.  Bridgemark also has a number of working

11   interests and/or royalty interests in the following oil and gas leasehold interests that it does not

12   operate: (i) Chunchula Unit in Mobile Alabama; (ii) the Hualde Dome Unit in the Coyote-East

13   Field in Fullerton, CA; and (iii) through one of its wholly-owned subsidiaries, Bridgemark Texas,

14   LLC ("Bridgemark Texas"), leases in Nueces County, Texas.  Bridgemark also wholly owns non-

15   debtor subsidiary, Gregson Energy Group, LLC ("Gregson" and, together with Bridgemark Texas,

16   the "Non-Debtor Subsidiaries").

17   **B.        Preparation Dispute with PDC**

18         The precipitating event of this chapter 11 case was the entry, on December 31, 2019, of a

19   judgment (as subsequently amended, the "PDC Judgment") in favor of PDC and against

20   Bridgemark by the Superior Court of the State of California in and for the County of Orange (the

21   "State Court") in the action styled *Placentia Development Company, LLC v. Bridgemark*

22   *Corporation*, Case No. 30-2016-00888920-CU-CO-CJC (the "PDC Action").  The PDC Judgment

23   was originally in the principal amount of approximately $42 million, and was subsequently

24   amended in post-judgment proceedings such that it is now in the principal amount of

25   approximately $38 million.  An appeal of the PDC Judgment (the "Appeal") is pending but stayed.

26   PDC filed Proof of Claim No. 30-1 in respect of the PDC Judgment.

27         The factual and procedural intricacies of the PDC Action are beyond the scope of this

28   Motion.  For present purposes, a brief summary of the salient facts follows.  PDC owns the PDC

4

1    Parcel, which is entitled for the construction of homes.  Bridgemark operates oil wells and owns

2    and operates a tank farm on the PDC Parcel pursuant to oil and gas leases.  PDC and Bridgemark

3    negotiated an agreement by which Bridgemark would plug and abandon the wells in phases that

4    corresponded to PDC's residential development of the property.  These negotiations culminated in

5    the *Abandonment, Accommodation and Remediation Agreement*, dated January 31, 2000 (as

6    thereafter amended from time to time, the "AAR Agreement").

7        Broadly speaking, the PDC Judgment arose out of Bridgemark's failure to plug and

8    abandon oil wells on the PDC Parcel, as the State Court determined that Bridgemark was legally

9    obligated to do, such that PDC could develop residential homes on the PDC Parcel.  Under the

10   AAR Agreement, Bridgemark agreed to plug and abandon specified then-existing oil wells that

11   interfered with PDC's development plans and to quitclaim its rights in specified portions of the

12   property to PDC.  In return, PDC agreed that Bridgemark could continue its oil and gas operations

13   in certain areas on the PDC Parcel and that PDC would pay Bridgemark, up to a capped amount,

14   the costs of plugging and abandoning the wells and an additional reserve payment to compensate

15   Bridgemark for the oil reserves that Bridgemark was abandoning by plugging and abandoning

16   wells before the ends of their economic lives.

17       PDC commenced the PDC Action on November 23, 2016 by filing a complaint in the State

18   Court against Bridgemark.  The complaint alleged that Bridgemark breached the AAR by failing

19   to cease operations and plug and abandon wells on the PDC Parcel.  Bridgemark answered and

20   filed a cross-complaint for declaratory relief in which it alleged, among other things, that the AAR

21   had been abandoned and was no longer enforceable, that PDC had to choose between damages in

22   tort or damages in contract and it raised the equitable defenses of laches, unclean hands, estoppel,

23   and unjust enrichment.

24       The legal issues were tried first to the jury.  Trial commenced on June 17, 2019 and went

25   to the jury on July 17, 2019.  On August 6, 2019, the jury found Bridgemark liable for breach of

26   contract, trespass and nuisance and awarded compensatory damages of $18,330,509,

27   $4,167,697.50 and $4,330,509 respectively, totaling $26,828,715.50.  It also returned a second

28   verdict on that same date which found that Bridgemark had committed trespass or nuisance with

1  malice, fraud or oppression.  On August 20, 2019, the jury awarded PDC $10 million in punitive

2  damages.  On December 31, 2019, the Superior Court entered a judgement against Bridgemark

3  and in favor of PDC in the amount of $42,517,202.59.  Following resolution of certain post-trial

4  motions,[4] on September 25, 2020, the State Court entered an amended PDC Judgment in the

5  amount of $38,017,202.59.  The Appeal is presently stayed.

6          On January 3, 2020, PDC recorded an abstract of judgment in the official records of

7  Orange County, creating a lien on all of Bridgemark's real property in Orange County.  PDC also

8  commenced the following litigation in aid of enforcement of the PDC Judgment: (i) on January 6,

9  2020, PDC filed a complaint against Bridgemark and its customer Phillips 66 Company (*Placentia*

10  *Development Company, LLC v. Phillips 66 Company, et al.* (Case No. 30-2020-01122311-CU-

11  EN-CJC)), creating a lien on Bridgemark's "Payment Rights" from Phillips 66 in accordance with

12  Cal. Civ. Proc. Code § 708.250 (the "Phillips 66 Action"); (ii) on January 7, 2020, PDC filed a

13  complaint against Bridgemark and its customer PBF Holdings (*Placentia Development Company,*

14  *LLC v. PBF Holding LLC, et al.* (Case No. 30-2020-01122440-CU-EN-CJC)), creating a lien on

15  Bridgemark's "Payment Rights" from PBF Holdings in accordance with Cal. Civ. Proc. Code

16  § 708.250 (the "PBF Action"); and (iii) on January 7, 2020, PDC filed suit (*Placentia*

17  *Development Company, LLC v. Robert James Hall, et al.* (Case No. 30-2020-01122328-CU-EN-

18  CJC) (the "Alter Ego Action" and, together with the Phillips 66 Action and the PBF Action, the

19  "Judgment Enforcement Litigation") against Robert Hall and certain of his family members and

20  affiliated entities, in which PDC alleges, among other things, alter ego claims against the

21  defendants.

22  **C.      Postpetition Disputes with PDC**

23          On January 14, 2020 (the "Petition Date"), Bridgemark filed a voluntary petition for relief

24  under chapter 11 of the Bankruptcy Code.

25

26  _____

27

28  [4]  Postpetition, Bridgemark obtained partial relief from stay to prosecute its post-judgment
      motions and appeal from the PDC Judgment.  *See* Docket No. 69.

1    The litigation between Bridgemark and PDC continued post-petition.  On January 31,

2  2020, Bridgemark filed its *Complaint for Avoidance and Recovery of Preferential Transfer*, Adv.

3  Proc. No. 8:20-ap-01011-TA, pursuant to which Bridgemark seeks to avoid all of PDC's alleged

4  liens as preferential transfers pursuant to Bankruptcy Code sections 547 and 551 and Bankruptcy

5  Rule 7001 (the "Adversary Proceeding").  Pursuant to that certain *Stipulation Between*

6  *Bridgemark Corporation and Placentia Development Company, LLC Regarding (I) Use of Cash*

7  *Collateral Pursuant to 11 U.S.C. § 363; and (II) Grant of Adequate Protection Pursuant to 11*

8  *U.S.C. § 361, 362, and 363* [Docket No. 140] and the order approving same [Docket No. 155],

9  funds subject to PDC's liens as a result of the Phillips 66 Action and the PBF Action have been

10  deposited in a restricted debtor-in-possession account at East West Bank (the "Customer DIP

11  Account").  There is no dispute that PDC holds valid, perfected, first-position liens on the funds in

12  the Customer DIP Account, although Bridgemark's Adversary Proceeding alleges that the liens

13  are avoidable – an allegation PDC denies (and a contention that is being forever waived and

14  compromised under the Settlement Agreement).

15    On February 5, 2020, PDC filed its *Motion to Dismiss Chapter 11 Case Pursuant to 11*

16  *U.S.C. § 1112(b)* [Docket No. 54] and its *Motion for Full Relief from the Automatic Stay Under 11*

17  *U.S.C. § 362* [Docket No. 53] (collectively, the "PDC Motions").  Pursuant to the PDC Motions,

18  PDC seeks dismissal of Bridgemark's chapter 11 case, or alternatively, the appointment of a

19  chapter 11 trustee or the conversion of the case to one under chapter 7 of the Bankruptcy Code.  At

20  the initial hearing on the PDC Motions on February 26, 2020, the Court indicated that unless

21  Bridgemark filed a confirmable plan of reorganization by April 29, 2020 (the continued hearing

22  date for the PDC Motions), the Court was inclined to dismiss the bankruptcy case or grant relief

23  from the automatic stay.  The Court also indicated that it would not extend the period in which

24  Bridgemark had the exclusive right to file a plan of reorganization.

25    Following the initial hearing on the PDC Motions, Bridgemark filed the *Application of*

26  *Debtor and Debtor in Possession to Employ Numeric Solutions LLC as Expert Valuation*

27  *Consultant and John Harris as Expert Witness Effective as of February 24, 2020* [Docket No.

28  114] (the "Numeric Solutions Application"), pursuant to which Bridgemark sought authority to

retain Numeric Solutions LLC ("Numeric Solutions") as valuation consultant and John Harris as expert witness in connection with Bridgemark's efforts to propose and confirm a non-consensual chapter 11 plan of reorganization. On April 14, 2020, the Court authorized Bridgemark to employ and retain Numeric Solutions and John Harris as estate professionals [Docket No. 162] (the "Numeric Solutions Employment Order").

Between the initial hearing on the PDC Motions (February 26, 2020) and the continued hearing date, COVID-19 became a pandemic, and then-President Trump declared a national emergency in response to the COVID-19 outbreak. In less than a month, the governors of every state ordered citizens to shelter-in-place and closed non-essential businesses. The world literally stopped flying, driving, and manufacturing. In other words, it stopped using oil. The U.S. oil industry, and, in particular, the California oil industry, was dramatically affected by the impact of COVID-19 on the California economy and the price war between Saudi Arabia and Russia suddenly flooded the global market with crude oil. These global events caused an oil glut and resulted in some of the steepest drops in crude oil prices in the last forty years. West Texas Intermediate Crude, which closed at $58.23 a barrel on the Petition Date, closed at about $20.00 a barrel on April 14, 2020 (the day prior to the execution of the Term Sheet) and dropped to a record low of *negative* $37.63 a barrel on April 20, 2020. The dramatic decrease in the price of oil (and the resulting impact on the value of Bridgemark's assets) and the uncertainty of the continued demand for oil due to the COVID-19 crisis made it extremely challenging, if not impossible, for Bridgemark to file a confirmable plan of reorganization prior to the continued hearing date on the PDC Motions set for April 29, 2020. Exclusivity expired on May 13, 2020.

**D.    Term Sheet and Negotiation of Definitive Documentation**

It is against this backdrop that Bridgemark and PDC began negotiating the terms of a settlement, and on or about April 15, 2020, PDC, Bridgemark, and Hall reached a conditional settlement of all issues among them, and executed the Term Sheet.

Salient terms of the Term Sheet are summarized in – and a copy of the Term Sheet is attached to – Bridgemark's *Notice of Motion and Motion for Order Approving Settlement Term Sheet Between the Debtor, Robert J. Hall and Placentia Development Company, LLC* [Docket No.

221] (the "<u>Term Sheet Approval Motion</u>").  The Term Sheet provides for, *inter alia*:[5] (i) the

deposit by Hall of $4.375 million of his personal funds in an escrow account (the "<u>Hall Cash</u>

<u>Contribution</u>"); (ii) a diligence period for PDC to conduct diligence with respect to assets of

Bridgemark; (iii) a standstill of all litigation, including the PDC Motions, the Adversary

Proceeding, the PDC Action, and the Alter Ego Action; and (iv) if, after the conclusion of the

diligence period, PDC elects to consummate the settlement, then (*x*) the parties will negotiate a

Transaction (as defined in the Term Sheet) in which the full Enterprise Value (as defined in the

Term Sheet) of Bridgemark will be made available to PDC or its designee; (*y*) PDC will receive

the Hall Cash Contribution; and (*z*) Bridgemark, Hall, and PDC will exchange full mutual general

releases.

On June 3, 2020, Bridgemark filed the Term Sheet Approval Motion, seeking entry of an

order, pursuant to Bankruptcy Rule 9019, approving the Term Sheet and "authorizing the Debtor

to take any and all actions reasonably necessary to effectuate the Term Sheet without further order

of the Court." Term Sheet Approval Mot. at 13.  No objections were filed.  On June 26, 2020, the

Court entered an order [Docket No. 240] granting the Term Sheet Approval Motion.

Both before and after entry of the order approving the Term Sheet, PDC and Bridgemark

worked cooperatively to ensure that PDC and its designee were able to perform the diligence

necessary to assess whether to consummate the Transaction contemplated by the Term Sheet.  Hall

Decl. ¶ 5.  On June 8, 2020, PDC exercised its right, pursuant to Section 3.1 of the Term Sheet, to

extend the diligence period by an additional 60 days.  *See* Docket No. 225.

Following the conclusion of the diligence period, pursuant to Section 3.3 of the Term

Sheet, on August 13, 2020, PDC provided written notice to Bridgemark of PDC's election to

proceed with the Transaction.  The parties and their respective counsel have thereafter been

engaged in extensive arms' length negotiation regarding the Definitive Documentation (as defined

in the Term Sheet) embodying the material terms of the Term Sheet.  Hall Decl. ¶ 6.  Numerous

---

[5]  This summary of the Term Sheet is for convenience only and is qualified in its entirety by the
Term Sheet and the Settlement Agreement, as applicable.

1  drafts of the Agreements were exchanged between Bridgemark, Hall, PDC, and Buyer (as defined

2  below).  *Id.*  All parties involved made material concessions during the bargaining process.

3      Ultimately, Bridgemark, Hall, and PDC reached agreement on the *Settlement Agreement*

4  (the "Settlement Agreement," a copy of which is attached hereto as **Exhibit B**), which – with that

5  certain *Asset Purchase Agreement by and among Bridgemark Corporation, Gregson Energy*

6  *Drilling LLC, and Bridgemark Texas LLC, collectively, as Seller, and California Natural*

7  *Resources Group Orange County, LLC, Realm California, LLC, and Alatex, LLC, collectively, as*

8  *Buyer* (the "Asset Purchase Agreement"), that certain *Transaction Agreement* (the "Transaction

9  Agreement"), and that certain *Surface Use and Cooperation Agreement* (the "Surface Use

10  Agreement," and, collectively with the Settlement Agreement, Asset Purchase Agreement, and

11  Transaction Agreement, the "Agreements")[6] – collectively constitute the "Definitive

12  Documentation" contemplated by the Term Sheet.

13      California Natural Resources Group Orange County, LLC ("CalNRG OC"), a third-party

14  buyer, is a party to the Asset Purchase Agreement, Transaction Agreement, and Surface Use

15  Agreement, but is not a party to the Settlement Agreement.  Realm California LLC ("Realm"), an

16  affiliate of CalNRG OC, is a party to the Asset Purchase Agreement and the Surface Use

17  Agreement but none of the other Agreements.  Alatex, LLC ("Alatex"), an affiliate of CalNRG

18  OC and Realm, is a party to the Asset Purchase Agreement but none of the other Agreements.

19  Except where necessary for the sake of clarity, CalNRG OC, Real, and Alatex are referred to

20  herein collectively as "Buyer."

21

22

23

24

25

_____

26  [6] Copies of the Settlement Agreement, Asset Purchase Agreement, and Transaction Agreement
    are attached hereto as **Exhibit B**, **Exhibit C**, and **Exhibit D**, respectively.  A form of Surface
27  Use Agreement (which, subject to approval of this Motion, will be executed on the Closing
    Date) is attached hereto as **Exhibit E**.
28

## IV. SUMMARY OF MATERIAL TERMS OF AGREEMENTS[7]

**A.    Settlement Agreement**

Certain material terms of the Settlement Agreement are summarized below:

- **Parties**: the parties to the Settlement Agreement are Bridgemark, PDC, and Hall, both individually and for the other "Hall-Related Parties" described therein.

- **Releases**: on the Closing Date, the parties to the Settlement Agreement will exchange full global releases.  Settlement Agreement § 5.

- **Resignation of Hall and Hall-Related Parties**: from and after the Closing Date, Hall and all Hall-Related Parties (as defined in the Settlement Agreement) shall be deemed to have resigned from any position or title held at Bridgemark or the Non-Debtor Subsidiaries and shall waive their rights to receive distributions (subject to Section 5(c) of the Settlement Agreement) or exercise control on account of their equity interests in Bridgemark.  *Id.* § 3.  In light of the relinquishment by Hall and the Hall-Related Parties of all direct or indirect control of Bridgemark pursuant to the Settlement Agreement, the proposed Order provides that neither Hall nor any Hall-Related Party shall have or incur any legal liability relating solely to or arising solely out of post-Closing-Date equity ownership of Bridgemark.  *See* Order ¶ 52.  *Cf. Blixseth v. Credit Suisse (In re Yellowstone Mountain Club, LLC)*, 961 F.3d 1074, 1081–1085 (9th Cir. 2020).

- **Appointment of Chief Wind-Down Officer**:  on the Closing Date, John Harris of Numeric Solutions shall be appointed Chief Wind-Down Officer and shall be responsible for directing and overseeing the affairs of Bridgemark until the effective date of the Plan (as defined below).  The Settlement Agreement provides for the execution of a shareholder consent that, among other things, amends Bridgemark's bylaws to designate the Chief Wind-Down Officer as the chairperson, president, secretary, and chief financial officer of Bridgemark.  *Id.* § 3(c).

- **Cessation of Oil Extraction**: upon entry of the Order, Bridgemark will cease all active extraction of oil from the PDC Parcel.  *Id.* § 4(a).

- **Dismissal of Litigation**: on the Closing Date, the Judgment Enforcement Litigation and the Adversary Proceeding will all be dismissed with prejudice.  *Id.* § 3(c).  The Appeal will remain open but stayed until a satisfaction of judgment has been filed with respect to the PDC Judgment as provided for in the Plan Term Sheet.

- **Certain Payments to PDC**: on the Closing Date, the Hall Cash Contribution and the funds held in the Customer DIP Account will be paid to PDC.  *Id.*

- **Filing of Liquidating Chapter 11 Plan**: after the Closing Date, Bridgemark will file and prosecute confirmation of a liquidating chapter 11 plan (the "Plan") that is consistent with the Plan Term Sheet attached as Exhibit E to the Settlement Agreement (the "Plan Term Sheet").  The Plan will, among other things, provide

---

[7] The summaries set forth herein are for convenience only and are qualified in their entirety by the actual terms of the Agreements.  In the event of any inconsistency between these summaries and the terms of the applicable Agreement, the applicable Agreement shall control.

for (i) payment in full in cash on the Plan effective date of all allowed claims; (ii) cancellation of all equity interests in Bridgemark; (iii) creation of a Liquidation Trust, with the Chief Wind-Down Officer to be appointed as the Trustee, that will be vested with Bridgemark's then-remaining assets and be responsible for plugging and abandoning all wells on the PDC Parcel. The Plan will leave all creditors unimpaired. *Id.* § 4(d) & Ex. E.

- **Bridgemark's Compliance With Other Agreements**: the Settlement Agreement provides that Bridgemark shall comply fully with all directions from PDC in connection with effectuating the Transaction Agreement and Surface Use Agreement. *Id.* § 2(c).

## B.    Asset Purchase Agreement

Certain material terms of the Asset Purchase Agreement are summarized below:

- **Parties**: the parties to the Asset Purchase Agreement are Bridgemark and the Non-Debtor Subsidiaries, as sellers, and CalNRG OC, Real, and Alatex, as buyers.

- **Purchased Assets**: the Purchased Assets (as defined in the Asset Purchase Agreement) include substantially all assets of Bridgemark, excluding the Excluded Assets (as defined in the Purchase Agreement). *See* Asset Purchase Agreement §§ 2.1, 2.2.

- **Assumed Obligations**: Buyer is assuming certain Assumed Obligations (as defined in the Purchase Agreement) in connection with the sale, including, responsibility for performance under the Assigned Contracts (as defined below) and responsibility for payment of all royalties, overriding royalties, production payments, and certain other payments to which the Purchased Assets are subject, to the extent attributable to the period from and after the Effective Date (as defined in the Asset Purchase Agreement). *Id.* § 2.4.

- **Assumption of Contracts**: the Asset Purchase Agreement provides for the assignment of the Assigned Contracts (as defined below), as well as the assignment of certain contracts of the Non-Debtor Subsidiaries. *Id.* § 2.6. For the avoidance of doubt, all of the Assigned Contracts for which approval of assignment (or, in the case of the Remaining Contracts (as defined below), assumption and assignment) is sought in this Motion are contracts of Bridgemark.

- **Consideration**: the aggregate consideration for the Purchased Assets will be (i) the assumption of the Assumed Obligations by Buyer at Closing, (ii) the mutual promises and releases contained in the Asset Purchase Agreement and in the Settlement Agreement, and (iii) other good and valuable consideration. *Id.* § 3.1. As set forth in the below summary of the Transaction Agreement, Buyer will make a cash payment to PDC in consideration for, *inter alia*, PDC naming Buyer as its designee of PDC's rights under the Term Sheet to acquire all or a portion of the enterprise value of Bridgemark.

- **No Auction**: in light of the Court's order approving the Term Sheet, which provides that the enterprise value of Bridgemark shall be made available to PDC, the Asset Purchase Agreement does not provide for the sale of the Purchased Assets to be subject to a bidding process.

- **Break-Up Fee**: in consideration for Buyer having expended considerable time and expense in connection with the Asset Purchase Agreement, the Asset Purchase

Agreement provides for payment of a $200,000 Break-Up Fee to Buyer in the event that the Court subjects the Sale Transaction to auction and Buyer is not the successful purchaser at such auction. *Id.* §§ 8.2 & 10.1(j).

- **Allocation of Purchased Assets**: the allocation of the Purchased Assets among CalNRG OC, Realm, and Alatex is set forth in Exhibit A-10 to the Asset Purchase Agreement.

- **Closing Date**: Closing shall occur on the first date that is two business days after satisfaction or waiver of the conditions to Closing set forth in Article 9 of the Asset Purchase Agreement. *Id.* § 7.1. It is anticipated that the Closing will occur approximately two business days after entry of the Order.

- **Conditions to Closing**: conditions to Closing include entry of the Order and certain other standard conditions to closing. In addition, the Closing under the Asset Purchase Agreement may not occur unless: (a) concurrently therewith, (i) PDC receives the Purchase Price (as defined in the Transaction Agreement) and (ii) CalNRG OC, Realm and PDC have executed and delivered the Surface Use Agreement in accordance with the Transaction Agreement and (b) no breach by Bridgemark of the Settlement Term Sheet or the Settlement Agreement shall have occurred or be continuing except for any such breach waived in writing by PDC. *Id.* § 9.

## C.    Transaction Agreement

Certain material terms of the Transaction Agreement are summarized below:

- **Parties**: the parties to the Transaction Agreement are PDC and CalNRG OC.

- **Purchase Price and Consideration**: CalNRG OC agrees to pay to PDC $6,500,000 contemporaneously with the Closing. As consideration for such payment, (a) PDC designates CalNRG OC to enter into the Asset Purchase Agreement as "Buyer" thereunder in accordance with PDC's rights under the Settlement Agreement, and (b) PDC will convey the Remainder Tract to Realm. Transaction Agreement § 1.

- **Deposit**: on or about September 15, 2020, an affiliate of CalNRG OC deposited $100,000 into escrow in connection with the transactions contemplated by the Asset Purchase Agreement. *Id.*, Recitals. The Transaction Agreement provides for an additional deposit of $400,000 upon the filing of this Motion (together with the initial deposit, the "Deposit," as more specifically defined in the Transaction Agreement), which shall be refundable to CalNRG's affiliate only if (i) CalNRG OC validly terminates the Asset Purchase Agreement due to the Bankruptcy Court not entering the Order, including pursuant to Section 10.1(f) of the Asset Purchase Agreement, or (ii) the Asset Purchase Agreement is terminated pursuant to Section 10.1(i) of the Asset Purchase Agreement. *Id.* § 4. If the closing does not occur before May 14, 2021, or the Asset Purchase Agreement is earlier terminated for any reason other than as described in the immediately preceding sentence, the Deposit is to be released to PDC. If the Closing occurs and PDC has received the Purchase Price, the Deposit is to be returned to CalNRG's affiliate without credit to the Purchase Price.

- **Releases**: PDC and CalNRG will exchange general releases of, *inter alia*, claims relating to the transactions contemplated by the Asset Purchase Agreement. *Id.* § 7.

**D.     Surface Use Agreement**

Certain material terms of the Surface Use Agreement are summarized below:

- **Parties**: the parties to the Surface Use Agreement are PDC, CalNRG, and Realm.

- **Cooperation Regarding Residential Development of PDC Parcel**: the Surface Use Agreement generally sets out the terms and conditions on which PDC, Realm, and CalNRG OC agree to cooperate in the future such that PDC can develop residential homes on the PDC Parcel. Surface Use Agreement §§ 2, 3. Among other things, the Surface Use Agreement provides that CalNRG and Realm agree to support (and not oppose) any and all of PDC's efforts with respect to the Re-Entitlement (as defined in the Surface Use Agreement), so long as said Re-Entitlement would not result in a Development Plan (as defined in the Surface Use Agreement) which causes a Material Adverse Effect (as defined in the Surface Use Agreement) on CalNRG OC or Realm with respect to the Remainder Tract or the Purchased Assets. *Id.* § 2.1.

- **Restrictive Covenant**: The covenants and agreements of the parties under the Surface Use Agreement constitute restrictive covenants that burden the Remainder Tract and the PDC Parcel such that the parties and any of their successors in title to all or any portion of the Remainder Tract and the PDC Parcel shall be subject to the terms and provisions of the Surface Use Agreement. *Id.* § 6.1.

## V.  RELIEF REQUESTED

By this Motion, Bridgemark requests the entry of an order (the "<u>Order</u>"), substantially in the form attached as Exhibit C to the Settlement Agreement, (i) approving the Agreements; (ii) authorizing the sale of the Purchased Assets to Buyer free and clear of all liens, claims, and interests; (iii) authorizing the assignment (or, as applicable, the assumption and assignment) of the Assigned Contracts; (iv) modifying the Numeric Solutions Employment to the extent set forth herein; and (v) granting related relief as set forth herein and in the proposed Order.

## VI.  BASIS FOR RELIEF

**A.     The Agreements Should Be Approved Pursuant to Bankruptcy Rule 9019**

**1.     Legal Standard**

Section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a).

Compromises and settlements are "a normal part of the process of reorganization." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414,

1  424 (1968).  In the bankruptcy context, the law "favors compromise and not litigation for its own

2  sake." *In re A&C Props.*, 784 F.2d 1377, 1381 (9th Cir. 1986) (citation omitted); *see also John S.*

3  *Marandas, P.C. v. Bishop (In re Sassalos)*, 160 B.R. 646, 653 (D. Or. 1993) (noting that

4  compromises are favored in bankruptcy).  Approval of a settlement is committed to the sound

5  discretion of the bankruptcy court.  *In re Stein*, 236 B.R. 34, 37 (D. Or. 1999) (the "decision of the

6  bankruptcy judge to approve or disapprove the compromise of the parties rests in his or her sound

7  discretion").  The bankruptcy court, however, should not substitute its own judgment for the

8  judgment of a debtor-in-possession.  *See In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr.

9  S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985).

10      In considering whether to approve a proposed settlement, the bankruptcy court must

11  determine if the settlement is reasonable under the circumstances, fair and equitable, and in the

12  best interests of the estate and its constituencies.  *See, e.g.*, *In re A & C Properties*, 784 F.2d at

13  1381.  The court is not required to conduct a mini-trial on the merits of the underlying claims.  *See*

14  *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976).  The court need only "canvass the issues and see

15  whether the settlement falls below the lowest point in the range of reasonableness."  *In re W.T.*

16  *Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (internal quotation marks and citation omitted).  The

17  Ninth Circuit has set forth factors relevant to determining whether a settlement is fair and

18  equitable:

19      In determining the fairness, reasonableness and adequacy of a proposed
        settlement, the court must consider: (a) the probability of success in the
20      litigation; (b) the difficulties, if any, to be encountered in the matter of
        collection; (c) the complexity of the litigation involved, and the expense,
21      inconvenience and delay necessarily attending it; [and] (d) the paramount
22      interest of creditors and a proper deference to their reasonable views in the
        premises.

23

24  *In re A & C Properties*, 784 F.2d at 1381.  A proposed settlement need not satisfy each of these

25  factors, so long as "the factors as a whole favor approving the settlement."  *In re Pac. Gas & Elec.*

26  *Co.*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004) (citation omitted).

27

28

**2.      The Rule 9019 Factors Overwhelmingly Favor Approval of the Agreements**

For many of the same reasons why the Term Sheet satisfied the standard for approval

under Rule 9019, here too the *A&C Properties* factors overwhelmingly militate in favor of

approval of the Agreements:

- *Probability of success in the litigation*. The filing of this bankruptcy case was necessitated by the PDC Judgment. After four years of hard-fought litigation and a jury trial and post-trial motions in the State Court, the State Court entered the amended PDC Judgment in the amount of approximately $38 million against Bridgemark. Although Bridgemark believes it has meritorious arguments on appeal, it acknowledges that any effort to overturn a judgment on appeal is inherently risky. Avoiding appellate proceedings, which would necessarily entail substantial time and attorneys' fees, is sensible. Moreover, as the Court noted in its Tentative Ruling on the PDC Motions, confirming a non-consensual plan over PDC's objection would be challenging, to say the least, given the magnitude of the PDC Judgment.

- *Difficulties to be encountered in collection*. This factor is neutral, as Bridgemark is not seeking any recovery against any of the parties to the Agreements.

- *Complexity of the litigation and expense, inconvenience, uncertainty and delay attending it*. The PDC Action involves complex legal and factual issues and was the subject of an 18-day jury trial. Prosecution of the pending appeal of the PDC Judgment would require full briefing before one or more appellate courts and could take years to resolve. The expense, delay, uncertainty, and inconvenience would be substantial.

- *The interests of creditors*. This factor is paramount here. As noted above, it would be extremely challenging to confirm a non-consensual plan over PDC's objection, and thus the likely outcome of this case in the absence of the Agreements would be dismissal or conversion to chapter 7. In either event, Bridgemark's other unsecured creditors would receive nothing or, at most, pennies on the dollar. Under the Agreements, by contrast, there will be a clear path to a liquidating chapter 11 plan that will pay all allowed claims in full in cash. This factor weighs heavily in favor of approval of the Agreements.

Accordingly, the transactions embodied in the Agreements are the product of Bridgemark's

sound business judgment and are in the best interests of the estate. *See* Hall Decl. ¶ 7. The

Agreements effectuate a Term Sheet which the Court has already approved as fair and reasonable

under Bankruptcy Rule 9019 and, collectively, they will provide a foundation for an orderly and

efficient wind-down of this estate.

Although Bridgemark is not a party to the Surface Use Agreement and the Transaction,

those agreements are inextricably intertwined with the Settlement Agreement and Asset Purchase

Agreement. PDC would not agree to release its substantial claims against Hall and Bridgemark in

1    the Settlement Agreement absent the consideration it is receiving from Buyer under the

2    Transaction Agreement.  Buyer, in turn, would not agree to pay that consideration to PDC absent

3    the rights it is receiving from PDC under the Surface Use Agreement.  Closing under the Asset

4    Purchase Agreement is conditioned on execution of the other Agreements.  Each of the

5    Agreements is an integral component of an overall settlement and sale transaction that clearly

6    benefits Bridgemark, the estate, and creditors.  Approval of all of the Agreements under

7    Bankruptcy Code section 105(a) and Rule 9019 is necessary and appropriate.

8    **B.**      **Approval of the Sale is Warranted Under Bankruptcy Code Section 363**

9         **1.**      **Legal Standard**

10         Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing,

11    may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

12    U.S.C. § 363(b).  Although section 363(b) does not specify a standard for determining when it is

13    appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a

14    debtor's assets should be authorized if there is a sound business purpose for the sale.  *See, e.g.*, *In*

15    *re Walter*, 83 B.R. 14, 17 (B.A.P. 9th Cir. 1988) ("The bankruptcy court has considerable

16    discretion in deciding whether to approve or disapprove the use of estate property by a debtor in

17    possession, in the light of sound business justification."); *In re ASARCO, L.L.C.*, 650 F.3d 593,

18    601 (5th Cir. 2011) ("The business judgment standard in section 363 is flexible and encourages

19    discretion."); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (use of

20    assets outside the ordinary course of business permitted if "sound business purpose justifies such

21    actions").

22         Once a debtor articulates a valid business justification under section 363 of the Bankruptcy

23    Code, a presumption arises that the debtor's decision was made on an informed basis, in good

24    faith, and in the honest belief, the action was in the best interest of the company.  *In re Integrated*

25    *Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d

26    858, 872 (Del. 1985)).  *See also In re AWTR Liquidation Inc.*, 548 B.R. 300, 314 (Bankr. C.D.

27    Cal. 2016) (referencing the Cal. Prac. Guide: Corps. (The Rutter Group 2015) Ch. 6–C); *In re*

28    *Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the

1    continued operation of a business by a debtor and a presumption of reasonableness attaches to a

2    debtor's management decisions"). Thus, if, as here, a debtor's actions satisfy the business

3    judgment rule, then the transaction in question should be approved under section 363(b)(1) of the

4    Bankruptcy Code.

5        The foregoing standards apply to both private sales of estate assets and public auctions.

6    Bankruptcy Rule 6004(f) expressly states that "[a]ll sales not in the ordinary course of business

7    may be by private sale *or* by public auction." Fed. R. Bankr. P. 6004(f) (emphasis added). The

8    decision whether to proceed via private sale or public auction is a matter within the debtor in

9    possession's business judgment. *See, e.g.*, *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991)

10   ("The trustee has ample discretion to administer the estate, including authority to conduct public

11   or private sales of estate property. Courts have much discretion on whether to approve proposed

12   sales, but the trustee's business judgment is subject to great judicial deference.").

13        **2.      The Sale Transaction is an Exercise of the Debtor's Sound Business Judgment**

14       The sale of the Purchased Assets to Buyer is supported by a sound business justification

15   and is in the best interests of Bridgemark, its estate, and creditors. As noted above, given the

16   magnitude of the PDC Judgment and the challenge, expense, uncertainty and delay of overturning

17   the PDC Judgment on appeal, the Agreements as a whole are the only viable path toward

18   meaningful payments to unsecured creditors. Hall Decl. ¶ 8. The sale of the Purchased Assets is

19   an essential component of a set of Agreements that, if approved and effectuated, will result in

20   satisfaction of PDC's claims and a roadmap to payment in full of all allowed claims pursuant to a

21   plan of liquidation.

22       The determination to sell the Purchased Assets via a private sale – rather than public

23   auction – is also a reasonable exercise of Bridgemark's business judgment. The aggregate value

24   of Bridgemark's assets – whether valued as a going concern or on a liquidation basis – is

25   substantially less than the amount of the PDC Judgment. *See* Hall Decl. ¶ 9. Bridgemark has not

26   been contacted by any potential overbidder and, in Bridgemark's business judgment, there are no

27   viable alternative purchasers. *See id.* at ¶ 10. Furthermore, the Court has already approved the

28   Term Sheet, which provides that PDC or its designee shall have the right to acquire all or a portion

18

1   of Bridgemark's assets.  Proceeding via private sale to Buyer – who is PDC's designee under the

2   Term Sheet and who will make a cash payment to PDC under the Transaction Agreement in

3   exchange for being so designated – is consistent with the Term Sheet and ensures that Bridgemark

4   will receive the substantial benefits thereunder.

5         Accordingly, absent the sale of the Purchased Assets to Buyer and corresponding release

6   of PDC's claims, there is no viable path to any meaningful payment to unsecured creditors, much

7   less the payment in full contemplated by the Plan Term Sheet.  *Id.* at ¶ 10.  In addition, Buyer

8   intends to continue to operate the Purchased Assets as a going concern, *see* Simonson Decl. ¶¶ 15,

9   16, which is likely to provide an additional benefit to some or all of Bridgemark's unsecured

10  creditors to the extent they maintain business relations with Buyer after the Closing Date.

11        **3.     The Sale Should be Approved Free and Clear of All Liens, Claims, and
            Encumbrances**

12

13        Bridgemark further submits that it is appropriate to sell the Purchased Assets free and clear

14  of liens pursuant to section 363(f) of the Bankruptcy Code.  Section 363(f) of the Bankruptcy

    Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances
15
    if:
16
          (1)    applicable nonbankruptcy law permits the sale of such property free and clear of
17                such interests;

18        (2)    such entity consents;

19        (3)    such interest is a lien and the price at which such property is to be sold is greater
20                than the value of all liens on such property;

21        (4)    such interest is in bona fide dispute; or

22        (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a
                  money satisfaction of such interest.
23
    11 U.S.C. § 363(f).
24
          Because section 363(f) is drafted in the disjunctive, satisfaction of any one of its five
25
    requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and
26
    interests.  *See Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930
27
    F.2d 1132, 1147 n.24 (6th Cir. 1991) (holding that the court may approve the sale "free and clear"
28

                                                    19

1    provided at least one of the subsections of section 363(f) is met); *In re Dundee Equity Corp.*, 1992

2    Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive,

3    such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f)

4    have been met.").

5        Here, Bridgemark is aware of only four creditors who assert liens in the Purchased Assets.

6    The first is PDC, who consents to the sale. *See* 11 U.S.C. § 363(f)(2). The other three creditors

7    (collectively, the "Auto Lenders") are automobile lenders who assert security interests in the

8    following vehicles owned by Bridgemark:

| Lender | Collateral |
|---|---|
| Citizens Business Bank | 2019 Ford F150, VIN: 1FTMF1CBOKKC54723 |
| Watsonville Ford Lincoln | 2019 Ford F150, VIN: 1FTMF1CB9KKC54722 |
| Watsonville Chrysler Dodge Jeep[8] | 2019 Ford F150, VIN: 1FTMF1CBKKD33749 |

14        Bridgemark is current on all monthly payments to the Auto Lenders. Pursuant to the Asset

15    Purchase Agreement, Buyer will pay the outstanding loan balance owed to each of the Auto

16    Lenders in full in cash on the Closing Date, *see* Asset Purchase Agreement § 7.9, which will

17    extinguish the Auto Lenders' security interests. Accordingly, the automobiles may be sold to

18    Buyer free and clear of the Auto Lenders' liens.

19        To the extent any other creditor asserts a lien or other interest in the Purchased Assets,

20    Bridgemark believes that at least one of the tests of section 363(f) of the Bankruptcy Code is

21    satisfied with respect to the transfer of the Purchased Assets pursuant to the Asset Purchase

22    Agreement. In particular, Bridgemark disputes the existence and validity of any such alleged lien

23    and therefore the Purchased Assets may be sold free and clear of such lien. *See* 11 U.S.C.

24    § 363(f)(4). Moreover, section 363(f)(2) will be met in connection with the transactions proposed

---

[8]  Bridgemark is informed that the loans held by Watsonville Ford Lincoln and Watsonville
Chrysler Dodge Jeep were assigned to such Auto Lenders after the Petition Date by Ford Motor
Credit and Ally Financial, respectively. Upon being notified of such assignment, Bridgemark
transmitted payment to the assignees in an amount sufficient to bring each loan current.

1    under the Purchase Agreement with respect to any alleged lienholder who does not object to this

2    Motion, and will therefore be deemed to have consented to the Sale Transaction.

3        Accordingly, section 363(f) of the Bankruptcy Code authorizes the transfer and

4    conveyance of the Purchased Assets free and clear of any claims, interests, liabilities, or liens.

5        The Purchased Assets should also be sold free and clear of any claims of successor liability

6    or similar theories.  Although section 363(f) of the Bankruptcy Code provides for the sale of assets

7    "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy

8    Code.  *Folger Adam Security v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000).  In

9    the case of *In re Trans World Airlines, Inc*., 322 F.3d 283, 288-89 (3d Cir. 2003), the Third Circuit

10   specifically addressed the scope of the term "any interest."  The Third Circuit observed that while

11   some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the

12   trend in modern cases is towards "a more expansive reading of 'interests in property' which

13   'encompasses other obligations that may flow from ownership of the property.'"  *Id*. at 289 (citing

14   3 Collier on Bankruptcy, ¶ 363.06[1] (L. King, 15th rev. ed. 1988)).  As determined by the Fourth

15   Circuit in *In re Leckie Smokeless Coal Co*., 99 F.3d 573, 581-582 (4th Cir. 1996), the scope of

16   section 363(f) is not limited to *in rem* interests.  Thus, debtors may "sell their assets under § 363(f)

17   free and clear of successor liability that otherwise would have arisen under federal statute."

18   *Folger*, 209 F.3d at 258 (citing *Leckie*, 99 F.3d at 582).

19       Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363

20   sale takes such assets free from successor liability resulting from pre-existing claims.  *See The

21   Ninth Ave. Remedial Group v. Allis-Chalmers Corp.*, 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996)

22   (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could

23   be brought against the bankruptcy estate during the bankruptcy); *MacArthur Co. v. Johns-

24   Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of

25   claims to proceeds consistent with intent of sale free and clear under section 363(f) of the

26   Bankruptcy Code); *In re New England Fish Co.*, 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982)

27   (transfer of property in free and clear sale included free and clear of Title VII employment

28   discrimination and civil rights claims of debtor's employees); *In re Hoffman*, 53 B.R. 874, 876

21

1 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even

2 though the estate had unpaid taxes); *In re All Am. of Ashburn, Inc.*, 56 B.R. 186, 190 (Bankr. N.D.

3 Ga. 1986) (product liability claims based on successor doctrine precluded after sale of assets free

4 and clear).

5    The purpose of an order purporting to authorize the transfer of assets free and clear of all

6 "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert

7 claims against the purchaser arising from Bridgemark's pre-sale conduct.  Under section 363(f) of

8 the Bankruptcy Code, Buyer is entitled to know that the Purchased Assets are not infected with

9 latent claims that will be asserted against Buyer after the proposed transaction is completed.

10 Accordingly, consistent with the above-cited case law, the order approving the Sale Transaction

11 should state that Buyer is not liable as a successor under any theory of successor liability for

12 claims that encumber or relate to the Purchased Assets.

13    **4.    Buyer and PDC Should be Afforded All Protections Under Section 363(m)**

14    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in

15 property purchased from the debtor's estate notwithstanding that the sale conducted under §

16 363(b) is later reversed or modified on appeal. Specifically, § 363(m) states that:

17    The reversal or modification on appeal of an authorization under [section
18    363(b)] … does not affect the validity of a sale . . . to an entity that
    purchased … such property in good faith, whether or not such entity knew
19    of the pendency of the appeal, unless such authorization and such sale
    were stayed pending appeal.

20 11 U.S.C. § 363(m).  Section 363(m) "codifies Congress's strong preference for finality and

21 efficiency" in bankruptcy proceedings.  *In re Energytec, Inc*., 739 F.3d 215, 218-19 (5th Cir.

22 2013); *cf. Onouli-Kona Land Co. v. Estate of Richards (In re Onouli-Kona Land Co.)*, 846 F.2d

23 1170, 1172 (9th Cir. 1988) ("Finality in bankruptcy has become the dominant rationale for our

24 decisions …").  The Ninth Circuit has repeatedly held that, under section 363(m), "[w]hen a sale

25 of assets is made to a good faith purchaser, it may not be modified or set aside unless the sale was

26 stayed pending appeal." *Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc)*,

27 163 F.3d 570, 576 (9th Cir. 1998); *see also In re Ewell*, 958 F.2d 276, 282 (9th Cir. 1992)

28

1    ("Because the Buyer was a good faith purchaser, under 11 U.S.C. § 363(m) the sale may not be

2    modified or set aside on appeal unless the sale was stayed pending appeal.").

3          Here, the Hall Declaration, the Simonson Declaration, and the Ring Declaration establish

4    that the sale of the Purchased Assets to PDC's designee, Buyer, was the product of extensive

5    arms'-length, good-faith negotiations.  Accordingly, Buyer and PDC are good faith purchasers

6    entitled to the protections of section 363(m) of the Bankruptcy Code.

7          **5.        The Break-Up Fee is Reasonable and Appropriate and Should Be Approved**

8          Bridgemark submits that the Break-Up Fee is a normal and oftentimes necessary

9    component of sales outside the ordinary course of business under section 363 of the Bankruptcy

10   Code.  In particular, such a protection encourages a potential purchaser to invest the requisite time,

11   money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent

12   risks and uncertainties of the chapter 11 process.  *See, e.g.*, *In re Hupp Indus.*, 140 B.R. 191, 194

13   (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an

14   initial bid for fear that their first bid will be shopped around for a higher bid from another bidder

15   who would capitalized on the initial bidder's ... due diligence").  A proposed bidding incentive,

16   such as the Break-Up Fee, should be approved when it is in the best interests of the estate.  *See In*

17   *re S.N.A. Nut Co*., 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see also In re Am. W. Airlines, Inc.*,

18   166 B.R. 908 (Bankr. D. Ariz. 1994).

19         In evaluating the appropriateness of a break-up fee, the appropriate question for the Court

20   to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract

21   or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders

22   to follow; or (3) to attract additional bidders."  *In re Integrated Resources*, 147 B.R. at 662.  The

23   published opinions addressing break-up fees provide for a broad range of break-up fees, typically

24   in the range of 1-5% of the purchase price.  *See, In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D.

25   Colo. 1992) (stating that breakup fees of 1% to 2% are found to be reasonable in the majority of

26   cases approving such fees); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 118, (Bankr. D.

27   Del. 2005) (court approved break-up fee and expense reimbursement that equaled 4.7% percent of

28

1  the purchase price); *see also In re Integrated Resources*, 147 B.R. at 662 (where the Court heard

2  testimony that the average breakup fee in the industry is 3.3%).

3        Here, the Break-Up Fee was necessary to "attract or retain a potentially successful bid." *In*

4  *re Integrated Resources*, 147 B.R. at 662.  Bridgemark agreed to the Break-Up Fee in

5  consideration for Buyer having expended considerable time and expense in connection with the

6  Asset Purchase Agreement, the negotiation thereof, and the diligence process.  *See* Asset Purchase

7  Agreement § 8.2.  Buyer indicated that the Break-Up Fee was an integral component of the

8  transaction and that it would not have entered into the Asset Purchase Agreement but for the

9  Break-Up Fee.  *See* Simonson Decl. ¶ 9.  In percentage terms, the $200,000 Break-Up Fee is just

10  0.53% of the PDC Judgment (the release of which is consideration flowing to Bridgemark under

11  the Agreements) and 3.08% of the cash consideration to be paid from Buyer to PDC under the

12  Transaction Agreement, placing the Break-Up Fee well within the range of accepted break-up

13  fees.

14        For the avoidance of doubt, the Asset Purchase Agreement provides that the Break-Up Fee

15  shall be payable only in the event that the Court requires the Sale Transaction to be subject to

16  competing bids at an auction and Buyer is not the successful bidder in such auction.  In such

17  event, Bridgemark requests that the order approving the sale to such other and higher bidder

18  provide for payment of the Break-Up Fee to Buyer from the cash proceeds of such sale.

19  **C.     The Assumption and Assignment of the Assigned Contracts Should be Approved
           Pursuant to Bankruptcy Code Section 365**

20

21        **1.     Legal Standard**

22        Section 365(a) of the Bankruptcy Code provides that, subject to the court's approval, a

23  debtor in possession "may assume or reject any executory contracts or unexpired leases of the

24  debtor."  11 U.S.C. § 365(a).  Subject to certain exceptions, the debtor in possession may not

25  assume an executory contract or unexpired lease unless it "cures, or provides adequate assurance

26  that [the debtor in possession] will promptly cure" defaults under the applicable contract or lease.

27  11 U.S.C. § 365(b)(1)(A).  The debtor in possession's decision to assume or reject an executory

28

contract or unexpired lease is subject to the business judgment test.  *See,e.g.*, *In re Klein Sleep Prods., Inc.*, 78 F.3d 18, 25 (2d Cir. 1996).

Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an executory contract or unexpired lease of nonresidential real property if:

> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *In re Bygaph, Inc.*, 56 B.R. 596, 605-6 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

### 2.    Bridgemark Has a Sound Business Purpose for Assigning (and, in Certain Limited Instances, Assuming and Assigning) the Assigned Contracts

As a threshold matter, the vast majority of the executory contracts and unexpired leases proposed to be assigned from Bridgemark to Buyer were previously assumed by Bridgemark pursuant to the *Order Authorizing Debtor to Assume Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Section 365(a)* [Docket No. 203] (the "Prior Assumption Order").  **Exhibit A** hereto is a comprehensive list of all of the agreements proposed to be assigned from Bridgemark to Buyer (collectively, the "Assigned Contracts"), broken into two categories: (i) contracts and leases that have already been assumed pursuant to the Prior

25

1  Assumption Order (collectively, the "Prior Assumed Contracts"); and (ii) contracts and leases that

2  have not yet been assumed (the "Remaining Contracts").[9]

3        Through this Motion, Bridgemark seeks to assume and assign the Remaining Contracts and

4  to assign the Prior Assumed Contracts to Buyer.  Bridgemark has a sound business reason for

5  doing so: Bridgemark and Buyer negotiated for Buyer to take assignment of the Assigned

6  Contracts as a material portion of the consideration for the overall Sale Transaction.  Absent

7  assignment of the Assigned Contracts, Buyer would not be able to operate the Purchased Assets

8  and, therefore, would not consummate the Sale Transaction.  Following the sale of the Purchased

9  Assets to Buyer, Bridgemark will have no need for the Assigned Contracts.  Hall Decl. ¶ 11.

10       Except as otherwise limited by section 365 of the Bankruptcy Code, any provision in the

11  Assigned Contracts that would restrict, condition, or prohibit an assignment of such contracts will

12  be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.  The Prior

13  Assumed Contracts having been previously assumed by Bridgemark, objections to assignment

14  (other than cure objections and objections to adequate assurance of performance) of such leases

15  have been waived.  *Cf. In re Catapult Entm't, Inc.*, 165 F.3d 747, 754 (9th Cir. 1999).

16       With respect to adequate assurance, the Simonson Declaration demonstrates the financial

17  credibility, willingness, and ability of Buyer to perform under the Assigned Contracts.  Among

18  other things, Buyer is owned and operated by Golden State Exploration and Production, LLC,

19  which has experience operating in the oil industry in California, is well-capitalized, and committed

20  to successfully acquiring, transitioning, and operating the Purchased Assets.  *See* Simonson Decl.

21  ¶¶ 10-18.

22       With respect to cure costs, Bridgemark believes that the cure cost associated with each

23  Assigned Contract is $0.00, as set forth in Exhibit A.  However, all Assigned Contract

24  counterparties will receive the foregoing Notice of Motion, which provides instructions for

25

26  ─────────────────

27  [9]  Inclusion of any document or agreement on the list of Assigned Contracts shall not constitute or
     be deemed to be a determination or admission by Bridgemark, Buyer, PDC, or any other party

28   that such document or agreement is, in fact, an executory contract or unexpired lease within the
     meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

objecting to the cure costs set forth in Exhibit A (and/or lodging other objections to assumption and/or assignment, as applicable).  In the event that any timely cure objections are received, Bridgemark will first attempt to resolve such objections consensually (in consultation with Buyer and PDC).  If a consensual resolution cannot be reached, cure objections will be resolved at the hearing on the Motion or, if that is not feasible, at a later hearing to be noticed by Bridgemark. Bridgemark proposes that, with respect to any cure objections that are either consensually resolved in advance of the Closing Date or determined by the Court at the hearing on the Motion, Bridgemark shall pay such cure costs, if any, no later than three days after the Closing Date.  *See* Order ¶ 44.  Bridgemark further proposes that the assumption and assignment of the Remaining Contracts and the assignment of the Prior Assumed Contracts shall be effective upon entry of the Order (conditioned upon closing of the Sale Transaction) notwithstanding timely unresolved objections to the proposed cure costs, which objections shall be preserved and shall not delay closing of the Sale Transaction.  The undisputed portion of the proposed cure costs, if any, shall be paid by Bridgemark within three days after the Closing Date.  Any remaining disputed cure costs must be paid by the earlier of (a) when Bridgemark, Buyer, PDC, and the Assigned Contract counterparty can agree to an amount or (b) the date specified in a final and non-appealable order entered by this Court.  *See id*.

In sum, Bridgemark submits that the assignment of the Assigned Contracts and the assumption and assignment of the Remaining Contracts is a reasonable exercise of Bridgemark's business judgment and should be approved as set forth in the Order.

**D.    The Numeric Solutions Employment Order Should Be Modified to Authorize Mr. Harris to Serve as Chief Wind-Down Officer**

As noted above, an essential term of the Settlement Agreement is that Hall and all Hall-Related Parties will resign from their positions and titles with Bridgemark as of the Closing Date. In light of the relinquishment by Hall and the Hall-Related Parties of all direct or indirect control of Bridgemark pursuant to the Settlement Agreement, the proposed Order provides that neither Hall nor any Hall-Related Party shall have or incur any legal liability relating solely to or arising solely out of post-Closing-Date equity ownership of Bridgemark.  *See* Order ¶ 52.  *Cf. Blixseth v.*

*Credit Suisse (In re Yellowstone Mountain Club, LLC)*, 961 F.3d 1074, 1081–1085 (9th Cir. 2020).

The Settlement Agreement provides that Mr. Harris of Numeric Solutions will be appointed the Chief Wind-Down Officer of Bridgemark, with responsibility for administering the estate during the brief period between the Closing Date of the Sale Transaction and the effective date of the Plan contemplated in the Plan Term Sheet. The Settlement Agreement includes the corporate governance documents necessary to effectuate this transition in accordance with state law, including an amendment to Bridgemark's bylaws that will make Mr. Harris the Chief Wind-Down Officer, president, chairperson, chief financial officer, and secretary of Bridgemark.

In order to effectuate this provision of the Settlement Agreement, Bridgemark requests that the Court modify the scope of the Numeric Solutions Employment Order to the extent set forth in the proposed Order. Specifically, Mr. Harris, in his capacity as Chief Wind-Down Officer, should be authorized to perform the following services: (i) appropriate claim administration, reconciliation, satisfactions, compromises, and/or objections with respect to claims that were not Assumed Obligations transferred to Buyer; (ii) appropriate reconciliation and satisfaction of any remaining obligations to royalty holders that were not Assumed Obligations transferred to Buyer; (iii) appropriate disposition of any remaining assets that were not Purchased Assets transferred to Buyer; (iv) appropriate resolution of all administrative expense applications and related matters of Bankruptcy Case administration, including the filing of all required reports and the payment of all required U.S. Trustee fees; (v) appropriate formulation and prosecution of the liquidating chapter 11 plan contemplated in the Plan Term Sheet; and (vi) such other work as is reasonable and appropriate in connection with the administration of the estate and consistent with Bridgemark's bylaws.

Numeric Solutions and Mr. Harris are well qualified to perform this work. Numeric Solutions has provided consulting services and advisory services for the energy and water management industry since 1999. Harris Decl. ¶ 4. Its founding staff has professional experience in upstream oil and gas development, energy finance, water management, water well design, well field optimization, and environmental regulatory support and compliance. *Id.* Mr. Harris is a

1   geoscientist and energy industry professional with over 20 years of experience in oil and gas

2   exploration and development as well as water resource management.  *Id.*

3        Numeric Solutions and Mr. Harris are already intimately familiar with Bridgemark's

4   assets, liabilities, and operations.  *See id.* at ¶ 6.  Therefore, the appointment of Mr. Harris as Chief

5   Wind-Down Officer – and corresponding modification of the scope of his role as estate

6   professional – will ensure an efficient and orderly transition from the closing of the Sale

7   Transaction to the prosecution and confirmation of the Plan.

8        Numeric Solutions typically charges $275.00 per hour for consulting services, as disclosed

9   in the Numeric Solutions Application.  However, Numeric Solutions has agreed to reduce its rate

10   to $175.00 per hour for services provided by Mr. Harris in his capacity as Chief Wind-Down

11   Officer.  *See id.* at ¶ 11.

12        In the Numeric Solutions Application, Numeric Solutions complied fully with all of the

13   disclosure requirements set forth in the Bankruptcy Code and Bankruptcy Rules.  All of the

14   disclosures and representations made in the Numeric Solutions Application remain true and

15   correct as of the date hereof.  *See* Harris Decl. ¶ 6.

16        Accordingly, modification of the Numeric Solutions Employment Order to the extent set

17   forth in the Order is necessary, appropriate, and in the best interests of the estate and creditors.

18   **E.    Relief from the 14-Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d)
         is Appropriate**

19

20        Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of

21   property … is stayed until the expiration of 14 days after entry of the order, unless the court orders

22   otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to

23   assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after

24   the entry of the order, unless the court orders otherwise."

25        Bridgemark requests that the Order be effective immediately and provide that the 14-day

26   stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.  Immediate effectiveness of the

27   Order is in the best interests of Bridgemark and all parties in interest as it will expedite the

28   occurrence of the Closing Date.

# VII.  CONCLUSION

For the reasons set forth above, Bridgemark respectfully requests that the Court (i) enter an order substantially in the form of the proposed Order, and (ii) grant such other relief as the Court deems just and proper.

DATED: March 10, 2021                Respectfully submitted,

                                     THEODORA ORINGHER, PC

                                     */s/ William N. Lobel*
                                     William N. Lobel, Esq. (State Bar No. 93202)

                                     *[Proposed] Co-Counsel for Debtor and Debtor in
                                     Possession, Bridgemark Corporation*

# EXHIBIT A

# EXHIBIT A

## ASSUMED AND/OR ASSIGNED CONTRACTS AND REAL PROPERTY LEASES[1]

**BRIDGEMARK'S PROPOSED CURE COST FOR EACH OF THE AGREEMENTS LISTED HEREIN IS $0.00.**

**AGREEMENTS TO BE ASSUMED AND ASSIGNED:**

The following agreements are to be assumed and assigned:

1. Factory Protection Plan – End User Agreement, dated as of March 15, 2014, with Capstone Turbine Corporation/Regatta Solutions

2. Factory Protection Plan – End User Agreement, dated as of June 3, 2015, with Capstone Turbine Corporation/Regatta Solutions

3. Invoice No. 1399, dated as of September 24, 2018, with Cal Mictroturbine, Inc.

**POSTPETITION AGREEMENTS TO BE ASSIGNED:**

The following agreements are to be assigned:

1. Production Purchase Contract, dated as of August 21, 2020, with Texican Crude & Hydrocarbons, LLC

2. Production Purchase Contract, dated as of June 25, 2020, with Texican Crude & Hydrocarbons, LLC

**PREVIOUSLY ASSUMED AGREEMENTS TO BE ASSIGNED**:

*(Listed on following pages)*

---

[1]  Inclusion of any document or agreement on this Exhibit A shall not constitute or be deemed to be a determination or admission by Bridgemark, Buyer, PDC, or any other party that such document or agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

## AGREEMENTS TO BE ASSIGNED[2]:

The agreements listed below were assumed pursuant to that certain *Order Authorizing Debtor to Assume Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Section 365(a)* [Docket No. 203] and are to be assigned to Buyer:

| RICHFIELD LEASES | | | | | | |
|---|---|---|---|---|---|---|
| LESSOR | LESSEE | RECORDED DATE | EFFECTIVE DATE | BOOK | PAGE | LEGAL – SEE RECORDED DOCUMENTS FOR FULL DESCRIPTIONS |
| Joanna Adella Coyle | Union Oil Company of California, a California corporation | 11/26/1917 | 6/26/1917 | 8 | 257 | Lot 17, Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Harold H. Coyle and Genevieve B. Coyle, his wife (et al) | Union Oil Company of California, a California corporation | 11/26/1917 | 6/26/1917 | 8 | 264 | The West 11.25 acres of Lot 25, Hazard's Subdivision, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California, excepting therefrom a lot in the northeast corner thereof, described as follows: Beginning at the Northeast corner of said land; thence South 50 feet; thence West parallel with the North line thereof, 140 feet; thence North 50 feet to the North line thereof and thence East 140 feet to the point of beginning |

---

[2]  The list of agreements herein matches Exhibits A-1 and A-6 to the Asset Purchase Agreement, but excludes certain agreements of Bridgemark's non-debtor subsidiaries to which Bridgemark is not a party.

| | | | | | | |
|---|---|---|---|---|---|---|
| N. Frank Morse and Mrs. Lottie E. Morse | M.L. Jenks | 11/26/1917 | 2/24/1917 | 8 | 274 | Lot 16 and the North 3.28 acres of the East 11 acres of Lot 25, and the North 50 feet of the East 140 feet of the West half (W 1/2) of Lot 25, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Charlotte S. Ayers, a widow and William J. Parson, a single man | Union Oil Company of California, a California corporation | 11/26/1917 | 8/1/1917 | 8 | 298 | Lot 20, Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Towell Investment Company, a California corporation | Union Oil Company of California, a California corporation | 11/26/1917 | 8/1/1917 | 8 | 305 | The East half (E 1/2) and the South half (S 1/2) of the West half (W 1/2) of Lot 19, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company of Los Angeles California | M.L. Jenks | 9/20/1918 | 8/1/1918 | 7 | 76 | Lot 22, Hazard's Subdivision of the Shanklin Tract, as shown on Map Lot 22, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |

3

| Stern Realty Company of Los Angeles California (et al) | M.L. Jenks | 9/20/1918 | 8/1/1918 | 7 | 81 | Blocks 16, 18 and 19, Lots 1 to 11 inclusive, in Block 27, Block 28 and Block 29, as shown on Amended Map of Richfield, filed in Book 1 at Page 26 of Licensed Surveyors Maps, Records of Orange County, California |
|---|---|---|---|---|---|---|
| Susan C. Yarnell (et al) | California Star Oil Company, a corporation | 10/27/1919 | 4/9/1919 | 12 | 87 | Lot 24 and the East half (E 1/2) of Lot 25 of Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California, excepting the Northerly 3.29 acres of said Lot 25, which 3.28 acres is bounded and described as follows: Beginning at the Northeast corner of said Lot 25; thence South 300 feet along the East line of said Lot 25 to a point; thence West 478.525 feet to a point; thence North 300 feet to the North line of said Lot 25; thence East to the point of beginning |
| California Star Oil Company, a corporation | Petroleum Midway Company, LTD., a corporation | 10/27/1919 | 4/18/1919 | 12 | 95 | Lot 24 and the East half (E 1/2) of Lot 25 of Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California, excepting the Northerly 3.29 acres of said Lot 25, which 3.28 acres is bounded and described as follows: Beginning at the Northeast corner of said Lot 25; thence South 300 feet along the East line of said Lot 25 to a point; |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | thence West 478.525 feet to a point; thence North 300 feet to the North line of said Lot 25; thence East to the point of beginning |
| Oak Company, a California corporation | L.M. Dorn | 9/7/1939 | 3/17/1939 | 1012 | 207 | The North half (N 1/2) of the West half (W 1/2) of Lot 19, Hazard's Subdivision, Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company | Union Oil Company of California, a California corporation Recorded: | 11/15/1918 | 11/1/1918 | 7 | 185 | (a) The South 5.695 acres of that portion of Lot 2 in Section 24, Township 4 South, Range 9 West, S.B.B.M., Orange County, California.<br><br>(b) Lot 35, of Hazard's Subdivision, excepting a strip of land containing 1.10 acres conveyed by Jacob Stern to Santa Fe Land Improvement Company; also a strip of land 50.00 feet wide lying South of and contiguous to the South line of that certain piece of land conveyed by said deed to the Santa Fe Land Improvement Company and extending from the West line of Block 44 of the Town of Richfield; also excepting the South Half of the East 20.00 acres (being 10.00 acres) of said Lot 35.<br><br>Also excepting the following: Commencing |

5

at a point in the West line of Lot 35 of Hazard's Subdivision, as per amended Map of Richfield filed in Book 1, Page 26 of Licensed Surveyor's Map, records of Orange County, California, said point bearing North 03° 36' West along lot line 843.02 feet from the Southwest corner of Lot 35; thence North 03° 36' West 195.92 feet to an intersection with the South line of the Atchison, Topeka and Santa Fe Railway Co's right of way as per Deed recorded in Book 178, Page 28 of Deeds, records of Orange County, California; thence Easterly along the South line of the above mentioned right of way 778.47 feet to an intersection with the West line of "Block 44 Richfield as shown on said Map, thence South parallel to the East line of said Lot 35,
201.60 feet; thence West 765.29 feet to the point of beginning.

(c) Lots 17, 20 and 23, in Block 22; and Lots 27 to 32, inclusive, in Block 24; and Lots 16, 17 and 18 in Block 25; and Lots 1 to 5, inclusive, and Lot 11, in Block 26, all as shown on the amended Map of Richfield filed in Book 1, Page 26 of Licensed Surveyor's Map, records of Orange County, California.

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | (d) Lot 36 of Hazard's Subdivision.<br><br>(e) Lot 37 of Hazard's Subdivision; excepting therefrom the North Half of the South Half and the South Half of the South Half of the North Half of said Lot, conveyed to Edith Mary Abel.<br><br>(Parcel 16 continued)<br>(f) Lot 39 of Hazard's Subdivision; excepting portions conveyed to the Richfield Mutual Water Company and to Anna W. Grace, and the North Half of the South Half of said Lot.<br><br>(g) Lot 40 of Hazard's Subdivision; excepting therefrom the South 10.00 acres conveyed to Sol Goodman.<br><br>(h) Lot 41 of Hazard's Subdivision; excepting therefrom the South 5.00 acres.<br><br>(i) Lot 42 of Hazard's Subdivision; excepting 7.19 acres conveyed to Anaheim Union Water Company, and 5.00 acres conveyed to William P. Speer, and 10.00 acres conveyed to Martin Apalategui.<br><br>(j) Block 44, Town of Richfield, reserving therefrom the Northerly 100.00 feet. |

7

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | (k) Blocks 16, 18 and 19, Town of Richfield.<br><br>(l) Lots 1 to 11, inclusive, in Block 27, Town of Richfield.<br><br>(m) Blocks 28 and 29, Town of Richfield. |
| William A. Goodwin and Alice A. Goodwin, his wife (et al) | Union Oil Company of California, a California corporation | 3/27/1919 | 5/10/1919 | 10 | 197 | Portion of Lot 21, Hazard's Subdivision as shown on Map recorded in Book 1, Page 26, Licensed Surveyors' Maps, Official Records of Orange County, California, described as follows: Parcel A: Commencing at the Southwest corner of Lot 21 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyors' Maps, Records of Orange County, California, |
| A.S. Bradford and Winifred W. Bradford, his wife (et al) | Chiksan Oil Company, a California corporation | 5/2/1924 | 3/31/1924 | 45 | 186 | Portion of Lot 26 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Commencing at the northeast corner of Lot 27 of said Hazard's Subdivision; thence southerly, along the easterly line of said Lot 27, 325 feet; thence westerly, parallel with the northerly line of said Lots 26 and 27, 862 feet, more or less, to the true point of beginning; thence southerly, at right angles 350 feet, to a |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | point which is 349.37 feet northerly, measured at right angles, from the southerly line of said Lots 26 and 27; thence westerly, parallel to said southerly line of Lots 26 and 27, 586.79 feet; thence southerly, parallel with the easterly line of said Lot 27, 349.37 feet to the southerly line of said Lots 26 and 27; thence westerly, along the southerly line of said Lots 26 and 27, 256.65 feet, more or less, to the southwest corner of said Lot 26; thence northerly, along the westerly line of said Lot 26, 601.13 feet; thence easterly, parallel with the northerly line of said Lot 26, 318.48 feet; thence northerly, at right angles, 100 feet; thence easterly, parallel with the northerly line of said Lot 26, 569.3 feet to the true point of beginning |
| Bradford Bros. Inc., a Nevada corporation (et al) | The Texas Company, a Delaware corporation Recorded | 9/7/1945 | 8/20/1945 | 1322 | 465 | That portion of Lot 26 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Commencing at the northeast corner of Lot 27 of said Hazard's Subdivision; thence southerly, along the easterly line of said Lot 27, 675 feet; thence westerly, parallel with the northerly lines of said Lots 26 and 27, 950.07 feet, to the true point of beginning; thence southerly, parallel with the easterly line of said Lot |

9

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | 27, 349.37 feet to the southerly line of said Lots 26 and 27; thence westerly, along the southerly line of said Lots 26 and 27, 498.72 feet; thence northerly, parallel with the easterly line of said Lot 27, 349.37 feet; thence easterly, parallel with the northerly line of said Lots 26 and 27, 498.72 feet to the true point of beginning |
| Bradford Bros. Inc., a Nevada corporation (et al) | Arrowhead Oil Company, LTD.., a Nevada corporation Recorded | 8/12/1945 | 7/1/1947 | 1538 | 310 | Lots 26 and 27 of Hazard's Subdivision as shown on map filed in Book 1, Page 26 of Licensed Surveyor's Maps records of Orange County, State of California, described as follows: Beginning at the Northeast corner of Lot 27 of said Hazard's Subdivision, thence Southerly along the Easterly boundary of said Lot 27 a distance of 325 feet; thence Westerly parallel with the Northerly boundary of said Lots 26 and 27 a distance of 547 feet from the Easterly boundary of Lot 27; thence Southerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 315 feet; thence Northerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 569.3 feet; thence southerly at right angles a distance of 100 feet; thence Westerly at |

10

| | | | | | | right angles a distance of 318.48 feet to the Westerly boundary of Lot 26; thence Northerly along the Westerly boundary of Lot 26 a distance of 425.85 feet to the Northwesterly corner of said Lot 26; thence Easterly along the Northerly boundary of Lots 26 and 27 to the point of beginning |
| Chanslor-Canfield Midway Oil Company, a California corporation (et al) | A.H. Bradford | 1/19/1966 | 9/28/1949 | 7813 | 45 | Lot 6, 7, 8 and 14, in Block 26, Lots 1 to 6, inclusive, in Block 33, and Lots 1 to 4, inclusive, in Block 34, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California.<br><br>That portion of Lot 21 of Hazard's Subdivision, as per map there of recorded in Book 1, Page 26 of Record of Surveys, in the office of the County Recorder of Orange County, California, lying within Lots 1 to 15, inclusive, and Lots 26 to 29, inclusive, in Block 31 of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California.<br><br>Beginning at the Northwest corner of Lot 1, in Block 34, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California, and |

running thence Northeasterly to the
Southwest corner of Lot 1, in Block 33 of
said Richfield; thence Easterly along the
South lien of said Lot 1, in Block 33,
184.63 feet to the Southeast corner of said
Lot 1 in Block 33; thence South at right
angles to said South line 30.00 feet, to the
center line of Orange Street (vacated);
thence West along said center line to the
Northerly extension of the East line of said
Lot 1 in Block 34; thence South along said
Northerly extension 30.00 feet to the
Northeast corner of said Lot 1 in Block 34;
thence West along the North line of said
Lot 1 in Block 34, 150.00 feet to the point
of beginning.

Beginning at the Northwest corner of Lot 6,
in Block 33, of Richfield, as per map
thereof recorded in Book 31, at Pages 61 to
66, inclusive, of Miscellaneous Records,
Los Angeles County, California, and
running thence Northeasterly to the
Southwest corner of Lot 1 in Block 31 of
said Richfield; thence Easterly along the
South line of said Lot 1,
184.63 feet to the Southeast corner of said
Lot 1; thence South, at right angles to said
South line, 25.00 feet; to the center line
Pine Street (vacated); thence West, along
said center line, to a line of said Lot 6 at

12

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | right angles with the North line of said Lot 6; thence South 25.00 feet to the Northeast corner of Lot 6; thence West along the North lien of said Lot 6, 184.63 feet to the point of beginning. |
| *Susan C. Yarnell, Jessie Y. Kimball, Katherine Yarnell, Ellis T. Yarnell and Esther Yarnell | California Star Oil Company | April 9, 1919 | April 9, 1919 | 18 | 7 | Lot 18, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California |
| *Bradford Bros. Inc., as Lessor | Arrowhead Oil Company, Ltd. | 8/12/1947 | 7/1/1947 | 1538 | 310 | Portion of Lots 26 and 27 of Hazard's Subdivision as shown on map filed in Book 1, Page 26 of Licensed Surveyor's Maps records of Orange County, State of California, described as follows: Beginning at the Northeast corner of Lot 27 of said Hazard's Subdivision, thence Southerly along the Easterly boundary of said Lot 27 a distance of 325 feet; thence Westerly parallel with the Northerly boundary of said Lots 26 and 27 a distance of 547 feet from the Easterly boundary of Lot 27; thence Southerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 315 feet; thence Northerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | Northerly boundary of Lots 26 and 27 a distance of 569.3 feet; thence southerly at right angles a distance of 100 feet; thence Westerly at right angles a distance of 318.48 feet to the Westerly boundary of Lot 26; thence Northerly along the Westerly boundary of Lot 26 a distance of 425.85 feet to the Northwesterly corner of said Lot 26; thence Easterly along the Northerly boundary of Lots 26 and 27 to the point of beginning |
| *A.S. Bradford | Chiksan Oil Company | 3/31/1924 | 3/31/1924 | 45 | 186 | Lot 27 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Beginning at a point in the easterly line of said Lot 27, distant 325 feet southerly from the northeast corner of said lot; thence westerly parallel to the North line of said Lot 27, 547 feet; thence southerly at right angles, 350 feet to a point which is 349.37 feet northerly measured at right angles from the southerly line of said Lot 27; thence easterly, parallel with said southerly line 547 feet, more or less, to a point in the easterly line of said Lot 27; thence northerly along said easterly line 350 feet, more or less, to the point of beginning |

| | | | | | | |
|---|---|---|---|---|---|---|
| *Morris D. Schatzman, John W. Schmid and Philip S. Magruder, coexecutors of the Estate of A. Hartwell Bradford, deceased | Union Oil Company | 1/1/1965 | | | | Block 17, Hazard's Subdivision as per Map of Richfield, recorded in Book 1, Page 26 of Licensed Surveyor's Maps, records of Orange County, State of California |
| *J.W. Newell and Lilla F. Newell | Union Oil Company | N/A | 5/31/1917 | N/A | N/A | N/A |
| *Esther L. Newell | Union Oil Company | N/A | 5/1/1917 | N/A | N/A | N/A |
| *Lilla F. Newell | Union Oil Company | 4/12/1949 | 11/15/1948 | 1828 | 128 | Records of Orange County, State of California |
| *Malcom J. Renton, Executor of the Estate of David M. Renton | Union Oil Company | 5/11/1949 | 4/12/1949 | 1841 | 400 | Records of Orange County, State of California |

| *Malcom J. Renton, Executor of the Estate of David M. Renton | Union Oil Company | 8/16/1950 | 3/20/1950 | 2057 | 298 | Line Well Agreement, Records of Orange County, State of California |
| *Charles C. Chapman | Union Oil Company | 3/31/1917 | 3/31/1917 | 8 | 219 | Records of Orange County, State of California |

| DOWLING OLIVE LEASES | | | | | |
|---|---|---|---|---|---|
| LESSOR | LESSEE | EFFECTIVE DATE | DATE | BOOK | PAGE |
| Robert R. Dowling and Marquita S. Dowling et al | Alberta Stevenson | 2/23/1956 | 4/17/1956 | 3471 | 573 |
| Edward Mills et al | Alberta Stevenson | N/A | N/A | 3476 | 495 |
| Reinhold Dinkler et al | Alberta Stevenson | N/A | N/A | 3483, 3832 | 550, 175 |

| EAST COYOTE | | | | |
|---|---|---|---|---|
| LESSOR | LESSEE | EFFECTIVE DATE | RECORDED | BOOK / PAGE | DESCRIPTION |
| Anaheim Union Water Company | William Loftus | 12/1/1906 | 4/17/1907 | 3 / 25 | Hualde Dome Unit Tract 5 |

16

| Alabama | | | | | |
|---|---|---|---|---|---|
| GRANTOR | GRANTEE | RECORDED DATE | BOOK | PAGE | INSTRUMENT |
| COASTAL EXPLORATION INC | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0812 | 2003031873 |
| EUBANKS B R | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0816 | 2003031875 |
| JACKSON ALAN | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0825 | 2003031878 |
| KNIGHT LUNA HASKEL KNIGHT SHIRLEY B | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0840 | 2003031881 |
| MILES JESSE M ERNST & YOUNG | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0843 | 2003031883 |
| O'CONNOR RALPH S | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0846 | 2003031885 |
| PERKINS MARION M | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0859 | 2003031894 |
| SMITH PAUL D | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0867 | 2003031900 |
| STRUZIK PATRICIA WYNN | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0872 | 2003031903 |

17

| | | | | | |
|---|---|---|---|---|---|
| TARGET INVEST LLC | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0889 | 2003031919 |
| JIM TRUCKS | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0897 | 2003031926 |
| WEBER DAVID J | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0903 | 2003031931 |
| GLADSTONE WILLIAM L | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0907 | 2003031934 |
| MENKE EVELYN C | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0916 | 2003031936 |
| WELBORN JOE | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0922 | 2003031939 |
| EDWARD W CARTER FAMILY TR LTD | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0925 | 2003031941 |
| ESMERALDA INVEST | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0927 | 2003031942 |
| PITTS GLENN E | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0930 | 2003031944 |
| THOMPSON JAMES R | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0932 | 2003031945 |
| HEDERMAN H H | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0945 | 2003031948 |

18

| MCCOY BONNIE JEAN IRRV TR | BRIDGEMARK CORP | 04/25/2003 | 5353 | 1170 | 2003034790 |
|---|---|---|---|---|---|
| PRINCE SYDNEY R | BRIDGEMARK CORP | 08/26/2003 | 5443 | 0012 | 2003075665 |
| DICKINSON MAUDIE M | BRIDGEMARK CORP | 08/26/2003 | 5443 | 0014 | 2003075666 |
| PXP GULF COAST INC | BRIDGEMARK CORP | 11/14/2003 | 5494 | 0685 | 2003101809 |
| KIDWELL SUZANNE L TR | BRIDGEMARK CORP | 12/23/2003 | 5514 | 0298 | 2003112006 |
| MALONE L E | BRIDGEMARK CORP | 12/23/2003 | 5514 | 0300 | 2003112007 |
| BOWEN DORIS WEIR | BRIDGEMARK CORP | 06/04/2004 | 5602 | 1977 | 2004041585 |
| CLINEBURG SUSAN E | BRIDGEMARK CORP | 10/20/2004 | 5674 | 1427 | 2004078078 |
| ELLIOT JAMES N JR | BRIDGEMARK CORP | 10/20/2004 | 5674 | 1429 | 2004078079 |
| EXXON MOBIL CORP | BRIDGEMARK CORP | 06/22/2007 | 6207 | 1139 | 2007047504 |

| ASSIGNMENTS | | | |
|---|---|---|---|
| GRANTOR | GRANTEE | RECORDED DATE | INSTRUMENT |
| Blackhawk Oil Company | Bridgemark Corporation | 10/3/1996 | 96-0505658 |
| Nuevo Energy Company | Bridgemark Corporation | 6/25/1996 | 96-0321908 |
| Texaco Exploration and Production Inc. | Bridgemark Corporation | 9/20/1993 | 93-0635294 |
| Mobil Oil Corporation | Bridgemark Corporation | 10/11/1994 | 94-0604269 |
| Hartwel Oil Inc. | Bridgemark Corporation | 1/31/2003 | 03-00121560 |

| TYPE | COMPANY | DATE | BOOK | PAGE | UNIT DESCRIPTION |
|---|---|---|---|---|---|
| Unit Agreement | Union Oil Company of California | 7/19/1972 | 10231 | 96 | West Richfield Kraemer Zone |
| Unit Agreement | Union Oil Company of California | 6/7/1961 | 5764 | 759 | West Richfield Chapman Zone |

20

| | | | | | |
|---|---|---|---|---|---|
| Unit Operating Agreement for the Kraemer Zone | Union Oil Company of California | February 2, 1970 | | | West Richfield Kraemer Zone |
| Unit Operating Agreement for the Chapman Zone | Union Oil Company of California | April 1, 1960 | | | West Richfield Chapman Zone |
| **[Chunchula Unit Agreement]** Unit Agreement for Chunchula Unit dated July 1, 1980 by and between Union Oil Company of California and the other parties who executed or ratified the Agreement | | | | | |
| **[Chunchula Operating Agreement]** Unit Operating Agreement, Fieldwide Unitization, Chunchula Field, Mobile County, Alabama, dated July 1, 1980 by and between Union Oil Company of California and the other parties who executed or ratified the Agreement | | | | | |

21

# EXHIBIT B

## SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement"), dated as of March 9, 2021 (the "Execution Date"), is entered into by (i) Placentia Development Company LLC ("PDC"); (ii) Bridgemark Corporation ("Bridgemark"); and (iii) Robert J. Hall, both individually ("Hall") and for the persons and entities listed on **Exhibit A** hereto (the "Hall-Related Parties") in Hall's capacity as agent with respect to each such person or entity as specified therein.

### Recitals

A.  PDC owns certain real property (the "PDC Parcel") in the City of Placentia, California that is entitled for the construction of homes.  Bridgemark operates oil wells and an oil tank farm on the PDC Parcel pursuant to certain oil and gas leases.  Bridgemark operates other oil wells and has other assets that are not on the PDC Parcel.

B.  On December 31, 2019, a judgment (as subsequently amended, the "PDC Judgment") was entered in favor of PDC and against Bridgemark by the Superior Court of the State of California in and for the County of Orange (the "State Court") in the action styled *Placentia Development Company, LLC v. Bridgemark Corporation*, Case No. 30-2016-00888920-CU-CO-CJC (the "PDC Action").  The PDC Judgment was originally in the principal amount of approximately $42 million, and was subsequently amended in post-judgment proceedings such that it is now in the principal amount of approximately $38 million.  An appeal of the PDC Judgment (the "Appeal") is pending but stayed.  PDC filed Proof of Claim No. 30-1 in respect of the PDC Judgment (the "PDC Claim").

C.  Broadly speaking, and without rehashing the details of the multi-year PDC Action or the parties' claims and contentions therein, the PDC Judgment arose out of Bridgemark's failure to plug and abandon oil wells on the PDC Parcel, as the State Court determined that Bridgemark was legally obligated to do, such that PDC could develop residential homes on the PDC Parcel.  This Agreement will, *inter alia*, facilitate the fulfillment of that legal obligation by a liquidating trust to be created pursuant to a chapter 11 plan of liquidation.

D.  The following litigation was commenced by PDC in aid of enforcement of the PDC Judgment: (i) *Placentia Development Co., LLC v. Robert James Hall, et al.*, Case No. 30-2020-01122328-CU-ENCJC (Cal. Super. Ct., filed January 6, 2020) (the "Alter Ego Action"); (ii) *Placentia Development Co., LLC v. Phillips 66 Co., et al.*, Case No. 30-2020-01122311-CU-EN-CJC (Cal. Super. Ct., filed January 6, 2020) (the "Phillips 66 Action"); and (iii) *Placentia Development Co., LLC v. PBF Holding LLC, et al.*, Case No. 30-2020-01122440-CU-EN-CJC (Cal. Super Ct., filed January 7, 2020) (the "PBF Action," and together with the Alter Ego Action and the Phillips 66 Action, the "Judgment Enforcement Litigation").

E.  On January 14, 2020, Bridgemark commenced in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") the chapter 11 bankruptcy case styled *In re Bridgemark Corp.*, Case No. 8:20-bk-10143-TA ("Bankruptcy Case").  On January 31, 2020, Bridgemark commenced in the Bankruptcy Court the adversary

proceeding styled *Bridgemark Corp. v. Placentia Development Co., LLC*, Adv. Proc. No. 8:20-ap-01011-TA ("Adversary Proceeding").

F.      On April 14, 2020, the Bankruptcy Court entered the *Order Approving Application of Debtor and Debtor in Possession to Employ Numeric Solutions LLC as Expert Valuation Consultant and John Harris as Expert Witness Effective as of February 24, 2020* [Docket No. 162], pursuant to which the Bankruptcy Court authorized Bridgemark to employ and retain John Harris and Numeric Solutions LLC ("Numeric Solutions") as estate professionals.

G.      Pursuant to that certain *Stipulation Between Bridgemark Corporation and Placentia Development Company, LLC Regarding (I) Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Grant of Adequate Protection Pursuant to 11 U.S.C. § 361, 362, and 363* and the order approving same, funds subject to PDC's liens as a result of the Phillips 66 Action and the PBF Action have been deposited in a restricted debtor-in-possession account at East West Bank (the "Customer DIP Account"). There is no dispute that PDC holds valid, perfected, first-position liens on the funds in the Customer DIP Account, although Bridgemark's Adversary Proceeding alleges that the liens are avoidable – an allegation PDC denies, and a contention that is being forever waived and compromised in this Agreement.

H.      On April 15, 2020, PDC, Bridgemark, and Hall executed that certain *Term Sheet* (the "Term Sheet"), as clarified by the correspondence dated August 10, 2020, pursuant to which they agreed to compromise and resolve all disputes between them on the terms set out therein, with the proviso that definitive documentation (the "Definitive Documentation") would thereafter be executed. Hall deposited $4.375 million of his personal funds (the "Hall Cash Contribution") into an escrow account pursuant to the Term Sheet. The Bankruptcy Court approved Bridgemark's entry into the Term Sheet by order dated June 26, 2020.

I.      The parties have negotiated this Agreement, which – together with that certain *Asset Purchase Agreement by and among Bridgemark Corporation, Gregson Energy Drilling LLC, and Bridgemark Texas LLC, collectively, as Seller, and California Natural Resources Group Orange County, LLC, Realm California, LLC, and Alatex, LLC, collectively, as Buyer* (the "Asset Purchase Agreement"), that certain *Transaction Agreement* (the "Transaction Agreement"), and that certain *Surface Use and Cooperation Agreement* (the "Surface Use Agreement," and with the Asset Purchase Agreement and Transaction Agreement, the "Ancillary Agreements") – collectively constitute the Definitive Documentation contemplated by the Term Sheet. California Natural Resources Group Orange County, LLC ("CalNRG OC"), a third-party buyer, is a party to the Ancillary Agreements but is not a party to this Agreement. Realm California LLC ("Realm"), an affiliate of CalNRG OC, is a party to the Asset Purchase Agreement and Surface Use Agreement but is not a party to this Agreement. Alatex, LLC ("Alatex"), an affiliate of CalNRG OC and Realm, is a party to the Asset Purchase Agreement but is not a party to this Agreement. Except where necessary for the sake of clarity, CalNRG OC, Realm, and Alatex are referred to herein collectively as "Buyer."

In consideration of the foregoing Recitals, which are an integral part of this Agreement and are incorporated as part of this Agreement for all purposes, the Parties agree as follows:

Section 1.    <u>Sale of Certain of Bridgemark's Assets to Buyer</u>

(a)    The Asset Purchase Agreement sets out the terms and conditions on which Bridgemark will sell the Purchased Assets (as defined in the Asset Purchase Agreement) and assign the Assumed Obligations (as defined in the Asset Purchase Agreement) to Buyer, which desires to acquire the Purchased Assets and to assume the Assumed Obligations on the terms and conditions set forth in the Asset Purchase Agreement (such purchase, sale, assignment, and assumption collectively, the "<u>Sale Transaction</u>").  Exhibit A-10 to the Asset Purchase Agreement sets forth the allocation of the Purchased Assets among CalNRG OC, Realm, and Alatex.

(b)    Bridgemark will comply fully with the Asset Purchase Agreement, and will exercise all rights and remedies under the Asset Purchase Agreement at the direction of PDC.  At PDC's request, Bridgemark will assign to PDC any rights Bridgemark has under the Asset Purchase Agreement and/or appoint PDC as its agent to exercise any rights Bridgemark has under the Asset Purchase Agreement.

Section 2.    <u>PDC's Transactions with Realm and CalNRG OC</u>

(a)    The Transaction Agreement sets out the terms and conditions on which PDC will transfer to Realm the Remainder Tract (as defined in the Transaction Agreement), which Realm desires to acquire on the terms and conditions set forth in the Transaction Agreement.  The Transaction Agreement also sets out the terms and conditions on which CalNRG OC will transfer to PDC certain monetary consideration in exchange for PDC's designation of Buyer as the acquirer of the Purchased Assets from Bridgemark under the Asset Purchase Agreement.

(b)    The Surface Use Agreement sets out the terms and conditions on which PDC is consenting to Buyer acquiring the Purchased Assets from Bridgemark pursuant to the Asset Purchase Agreement, and on which Realm is acquiring the Remainder Tract from PDC pursuant to the Transaction Agreement.  The Surface Use Agreement also sets out the terms and conditions on which PDC, Realm, and CalNRG OC agree to cooperate in the future such that PDC can develop residential homes on the PDC Parcel.

(c)    Bridgemark is not a party to the Transaction Agreement or the Surface Use Agreement, but nonetheless will comply fully with all directions from PDC in connection with effectuating those agreements and will use its best efforts to ensure that PDC enjoys the full benefit of those agreements.

(d)    To facilitate the transactions contemplated by the Transaction Agreement and the Surface Use Agreement, Bridgemark, Hall, and certain Hall-Related Parties will execute quitclaim deeds substantially in the form of **<u>Exhibit B</u>** hereto (the "<u>Quitclaim Deeds</u>") on the Closing Date (as defined below); *provided, however,* that PDC may remove one or more of the parties listed as "Grantor" on Exhibit B in the event Hall certifies that such party or parties are not connected directly or indirectly with Hall.

3

Section 3.    <u>Court Approval and Implementation of Transactions and Settlement</u>

(a)    Promptly after the execution of this Agreement and the Ancillary Agreements, Bridgemark will seek Bankruptcy Court approval of this Agreement and the Ancillary Agreements via a single motion that explains why the agreements and the transactions they contemplate are inextricably intertwined, interdependent, and collectively in the best interest of the estate, creditors, and all stakeholders.  The motion shall seek entry of an order substantially in the form of **<u>Exhibit C</u>** hereto (as entered, the "<u>Approval Order</u>").

(b)    The Sale Transaction between Bridgemark and Buyer pursuant to the Asset Purchase Agreement and the various transactions between PDC, Realm, and CalNRG OC pursuant to the Transaction Agreement and the Surface Use Agreement will close (the "<u>Closing Date</u>"): (i) as soon as practicable after entry of the Approval Order; and (ii) substantially concurrently with each other.

(c)    The Closing Date will also be the Transaction Effective Date (as defined in the Term Sheet) – that is, the date on which the settlement between PDC, Bridgemark, and Hall becomes effective.

(i)    No later than five days after the Closing Date, the Judgment Enforcement Litigation and the Adversary Proceeding will be dismissed with prejudice without any award of costs or fees.

(ii)    The Appeal will remain open but stayed until a satisfaction of judgment has been filed with respect to the PDC Judgment as provided for in the Plan Term Sheet (as defined below).

(iii)    On the Closing Date, the Hall Cash Contribution, together with all interest that has accrued thereon, will be paid to PDC.

(iv)    On the Closing Date, the funds held in the Customer DIP Account, together with all interest that has accrued thereon, will be paid to PDC.

(v)    On the Closing Date, Hall will withdraw with prejudice Proof of Claim No. 31, filed November 13, 2020 in the amount of $130,625.

(vi)    On the Closing Date, the purported "Net Profits Interest" claim held by Casa Real LP in the amount of $25,289.10 appearing on Bridgemark's *Schedule E/F: Creditors Who Have Unsecured Claims* [Docket No. 70] shall be forever waived and released by Casa Real LP.

(vii)    On the Closing Date, the $710,000 note issued in favor of Bridgemark by Hall and the $890,000 note issued in favor of Bridgemark by Meadow Deep, LLC, in each case together with any interest accrued thereon, as reflected in Bridgemark's *Schedule A/B: Assets – Real and Personal Property* [Docket No. 70], shall be forever waived and released by Bridgemark.

(viii)    On the Closing Date, any and all other interests (other than equity interests, which they retain until confirmation of the Plan (as defined below) contemplated by the Plan Term Sheet (as defined below)) and rights of Hall and any Hall-Related Parties in or to the Purchased Assets or Bridgemark's remaining operations shall be forever waived and released by Hall and the Hall-Related Parties, regardless of whether those interests or rights were specifically listed or disclosed in any books, records, schedules, statements, proofs of claim, or otherwise, and as is set forth in further detail below, Hall and the Hall-Related Parties shall have no further responsibilities related to the Purchased Assets or Bridgemark's remaining operations.

(ix)    On the Closing Date, the releases specified in Section 5 shall take effect, and from and after the Closing Date, the sole obligations of PDC, Bridgemark, and Hall vis-à-vis each other will be the obligations specified in this Agreement, the Ancillary Agreements, and the Approval Order.

(x)    From and after the Closing Date, Hall, all Hall-Related Parties, and any other officers or directors of Bridgemark shall, by operation of this Agreement and the Approval Order and without any further action on their part, be deemed to have resigned from any position or title they presently hold at Bridgemark or any of the Non-Debtor Subsidiaries (as defined below) and shall have no involvement in or right to participate in or manage the business and affairs of Bridgemark's remaining operations (which will be limited to those operations specified in Section 4 of this Agreement) or the remaining operations of Gregson Energy Group, LLC and Bridgemark Texas, LLC (together, "Non-Debtor Subsidiaries"). Instead, such operations will be directed and overseen by the Chief Wind-Down Officer appointed by the Bankruptcy Court in the Approval Order. The Chief Wind-Down Officer of Bridgemark from and after the Closing Date shall be John Harris of Numeric Solutions, or any successor approved by the Bankruptcy Court and consented to by PDC.

(xi)    From and after the Closing Date, Hall and the Hall-Related Parties waive and release any and all rights to, (i) subject to Section 5(c), receive any distributions on account of their equity interests in Bridgemark, and, (ii) subject to the remainder of this Section 3(c)(xi), vote, manage, or otherwise exercise direct or indirect control with respect to Bridgemark or the Non-Debtor Subsidiaries. From and after the Closing Date, the number of directors of Bridgemark shall be the minimum number permitted by Bridgemark's state of incorporation and the board of directors of Bridgemark shall be comprised of the Chief Wind-Down Officer, serving as chairperson, president, secretary, and chief financial officer of Bridgemark, and the minimum number of additional directors required, each of which shall be designated by the Chief Wind-Down Officer with the consent of PDC. Each Hall-Related Party that is a shareholder of Bridgemark shall (x) without limiting Section 6(c), take any actions with respect to its equity interests in Bridgemark as requested by the Chief Wind-Down Officer and consented to by PDC to implement or maintain any of the terms of this Agreement, (y) not take any action with respect to its equity interests in Bridgemark that would conflict with, impede, delay, or result in a breach of the terms of this Agreement, and (z) not call any meeting of the shareholders of Bridgemark, transfer or assign its equity interests, grant any proxies with respect to its equity interests, exercise any other rights or remedies with respect to its equity interests in Bridgemark, or permit or vote in favor of any amendment, modification, restatement, supplement, or replacement of any of the organizational documents of Bridgemark except, in each case, at the request of the Chief Wind-Down Officer with the consent of PDC. In

furtherance of the foregoing, the applicable Hall-Related Parties will fully execute a Unanimous Written Consent of the Shareholders of Bridgemark Corporation substantially in the form of **Exhibit D** hereto on the Closing Date.

Section 4.    Post-Settlement Wind-Down

(a)    Immediately upon entry of the Approval Order, Bridgemark will cease all active extraction of oil from the PDC Parcel.

(b)    After the Closing Date, Bridgemark, under the direction and control of the Chief Wind-Down Officer, will begin to wind down (the "Wind Down") whatever minimal operations remain following the close of the Sale Transaction between Bridgemark and Buyer.

(c)    The Wind-Down will include, without limitation: (i) appropriate claim administration, reconciliation, satisfactions, compromises, and/or objections with respect to claims that were not Assumed Obligations transferred to Buyer; (ii) appropriate reconciliation and satisfaction of any remaining obligations to royalty holders that were not Assumed Obligations transferred to Buyer; (iii) appropriate disposition of any remaining assets that were not Purchased Assets transferred to Buyer; and (iv) appropriate resolution of all administrative expense applications and related matters of Bankruptcy Case administration, including the filing of all required reports and the payment of all required U.S. Trustee fees.

(d)    After the Closing Date, Bridgemark will file and prosecute confirmation of a chapter 11 plan of liquidation (the "Plan") that is in all material respects consistent with the term sheet attached hereto as **Exhibit E** (the "Plan Term Sheet").

(e)    Hall and the Hall-Related Parties agree that they will not be impaired by any Plan that effectuates this Agreement and is consistent in all material respects with the Plan Term Sheet, and agree not to object to confirmation of such Plan or to contend that they are impaired by such Plan or have any right to vote on such Plan.

(f)    For the avoidance of doubt, the effectiveness of this Agreement, including, *inter alia*, the releases set forth herein, is not conditioned on confirmation of the Plan.

(g)    Bridgemark will cooperate fully with PDC in connection with the Wind-Down and will undertake the Wind-Down in a cost-effective manner.  Bridgemark will consult and cooperate with PDC with respect to all ongoing operations and expenditures.

Section 5.    Releases and Dismissal of State Court Litigation

(a)    As used herein:

(i)    "Bridgemark Releasing Parties" refers, jointly and severally, individually and collectively, to Bridgemark, the bankruptcy estate of Bridgemark, each of Bridgemark's past and present direct and indirect parents, subsidiaries, divisions, joint ventures, and affiliates, wherever located, on their own behalf and on behalf of any person or entity that can claim by or through them, and the successors, heirs, executors, administrators, and assigns of any of the foregoing.

6

(ii)     "Bridgemark Released Parties" refers, jointly and severally, individually and collectively, to Bridgemark and its bankruptcy estate, on their own behalf and on behalf of each of their respective past and present predecessors and successors; each of their respective direct and indirect parents, subsidiaries, divisions, joint ventures, and affiliates; each and all of the past and present principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, agents, servants, and stockholders; and the predecessors, successors, heirs, executors, administrators, and assigns or transferees, immediate and remote, of any of the foregoing.

(iii)    "Hall Releasing Parties" refers, jointly and severally, individually and collectively, to Hall and the Hall-Related Parties, on their own behalf and on behalf of any person or entity that can claim by or through them, and the successors, heirs, executors, administrators, and assigns of any of the foregoing.

(iv)     "Hall Released Parties" refers, jointly and severally, individually and collectively, to Hall and the Hall-Related Parties, on their own behalf and on behalf of each of their respective past and present predecessors and successors; each of their respective direct and indirect parents, subsidiaries, divisions, joint ventures, and affiliates; each and all of the past and present principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, agents, servants, and stockholders; and the predecessors, successors, heirs, executors, administrators, and assigns or transferees, immediate and remote, of any of the foregoing.

(v)      "PDC Releasing Parties" refers, jointly and severally, individually and collectively, to PDC, on its own behalf and on behalf of any person or entity that can claim by or through it, and the successors, heirs, executors, administrators, and assigns of any of the foregoing.

(vi)     "PDC Released Parties" refers, jointly and severally, individually and collectively, to PDC, on its own behalf and on behalf of each of its past and present predecessors and successors; each of its respective direct and indirect parents, subsidiaries, divisions, joint ventures, and affiliates; each and all of the past and present principals, partners, officers, directors, supervisors, employees, representatives, insurers, attorneys, agents, servants, and stockholders; and the predecessors, successors, heirs, executors, administrators, and assigns or transferees, immediate and remote, of any of the foregoing.

(vii)    "Released Parties" refers, collectively, to the Bridgemark Released Parties, Hall Released Parties, and PDC Released Parties.

(viii)   "Releasing Parties" refers, collectively, to the Bridgemark Releasing Parties, Hall Releasing Parties, and PDC Releasing Parties.

(b)     On the Closing Date, and with the sole exception provided in Section 5(c), by operation of this Agreement and the Approval Order, and without the need for any further steps or actions to be taken by any party, each of the Releasing Parties shall irrevocably and completely release, acquit, and forever discharge the Released Parties from any and all manner of claims, counterclaims, demands, actions, suits, judgments, and causes of action, whether

direct, indirect, or otherwise in nature, for damages whenever and however incurred (whether direct or indirect, actual, punitive, treble, compensatory, consequential, or otherwise), liabilities of any kind, including costs, fees, penalties, or losses of any kind or nature, known or unknown, suspected or unsuspected, accrued or unaccrued, asserted or unasserted, whether in law, in equity, or otherwise, seeking damages or other relief arising at any time prior to the Execution Date.  The claims covered by the foregoing releases are referred to hereinafter as the "Released Claims."

(c)     Notwithstanding the foregoing Section 5(b):

(i)     The Released Claims shall not include claims for breach of this Agreement or any claims that any Releasing Party may in the future have against any of the Released Parties based solely on conduct after the Execution Date.

(ii)     There shall be no release of the joint obligation of Bridgemark and PDC set forth in Paragraph 4 of that certain letter agreement dated as of August 10, 2020 by and among Bridgemark, PDC, and Hall – to wit, that "[i]f Bridgemark earns a profit during the extended period envisioned for preparation of the Definitive Documentation, PDC and Bridgemark will … in recognition of Bridgemark's status as an 'S' corporation … cooperate to ensure that Bridgemark's current equityholders are not required to go out-of-pocket to make tax payments on such profit, including by (if necessary) facilitating a distribution from Bridgemark sufficient to cover what would otherwise be required as an out-of-pocket payment" – which joint obligation of Bridgemark and PDC is specifically incorporated into this Agreement.

(iii)     Hall and the Hall-Related Parties represent and warrant that they have no direct or indirect interest in the landlord or owner of the leased premises located at 17671 Irvine Boulevard, Suite 217, Tustin, California 92780, and that they receive no portion of the monthly rent remitted by Bridgemark for the lease of such premises.  There shall be no release of liability for breach of this representation and warranty.

(iv)     To the extent any entity listed on Exhibit A is not connected directly or indirectly with Hall, Hall will so certify in writing.  There shall be no release of liability for breach of this representation and warranty.

(d)     The Releasing Parties acknowledge that they or their attorneys may hereafter discover facts different from or in addition to the facts that they now know or believe to be true with respect to the subject matter of this Agreement, but that it is their intention to hereby fully, finally, absolutely, and forever release any and all claims released pursuant to Section 5(b) which now do exist, may exist, or heretofore have existed between them, and that in furtherance of such intentions the release as given herein by the Releasing Parties, shall be and remain in effect as a full and complete release of the claims released, notwithstanding the discovery of any such different or additional facts.  The Releasing Parties certify that they have read Section 1542 of the California Civil Code set forth below:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT**

**THE TIME OF EXECUTING THE RELEASE AND THAT, IF
KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY
AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR
OR RELEASED PARTY.**

The Releasing Parties waive application of Section 1542 of the California Civil Code and any other statutes, common law rights, rules or the like which may operate to limit the intent of this Agreement with respect to the claims released above.   The Releasing Parties understand and acknowledge the significance and consequence of this waiver of Section 1542 of the California Civil Code is that even if one of the Releasing Parties should eventually suffer additional damages on account of the claims released above, they will not be permitted to make any claim for such damages.

Section 6.     Third Parties, Cooperation, and Further Efforts

(a)     There are no third-party beneficiaries of this Agreement, with only two exceptions: (i) Buyer is a beneficiary of Bridgemark's obligation in Section 4(a) to immediately cease all active extraction of oil from the PDC Parcel upon entry of the Approval Order; and (ii) the Released Parties are beneficiaries of the releases set out in Section 5.

(b)     With specific respect to the Hall-Related Parties listed on Exhibit A, PDC may require the execution and delivery of a joinder, power of attorney, and ratification substantially in the form of **Exhibit F** hereto, by which the Hall-Related Party expressly joins this Agreement, appoints Hall as his, her, or its attorney-in-fact solely for purposes of executing this Agreement and any documents in furtherance hereof, and ratifies Hall's execution of this Agreement.  For the avoidance of doubt, the Hall-Related Parties are Hall Releasing Parties pursuant to Section 5 and shall be bound by the releases set forth herein.

(c)     The Parties shall, upon request by one or more of the other Parties, execute such further documents and shall perform such further acts as may be reasonably necessary to carry out and give full effect to the terms of this Agreement and the Ancillary Agreements.  Without limiting the generality of the preceding sentence, Hall (in his individual capacity and in his capacity as agent and attorney-in-fact for the Hall-Related Parties) and Bridgemark agree to cooperate with PDC following the Execution Date and to adjust, initial, re-execute and re-deliver the Agreement, the Ancillary Agreements, and any amendments thereto, or any closing statements or closing certificates, estoppels, authorizing resolutions, certificates, deeds, assignments, confirmations, ratifications, releases, withdrawals, or similar documents if, as, and when deemed necessary or desirable in the reasonable discretion of PDC to provide for consistency with or to effectuate the agreed terms of the Agreement or any of the Ancillary Agreements.

Section 7.     Additional Provisions

(a)     This Agreement represents the entire understanding and agreement between the parties with respect to the specific subject matter hereof and supersedes all prior discussions and agreements between the parties with respect to the specific subject matter hereof. Notwithstanding the foregoing, the Ancillary Agreements contain the complete terms of the

9

specific matters addressed therein, and in the event of any conflict between a more general provision of this Agreement and a more specific provision of any of the Ancillary Agreements, the more specific provision of the Ancillary Agreement shall control. Any amendment of this Agreement must be in writing and signed by all parties.

(b)    This Agreement is governed by and shall be construed in accordance with the laws of the State of California, without regard to its conflict of laws principles. The Bankruptcy Court shall have exclusive jurisdiction to interpret and enforce this Agreement, except that if the Bankruptcy Court is unable or unwilling to exercise such jurisdiction, then the State Court shall have jurisdiction. All parties to this Agreement consent to the jurisdiction and venue of the Bankruptcy Court (or, if the Bankruptcy Court is unable or unwilling to exercise jurisdiction, the State Court) for purposes of any action based upon, arising out of, or related to this Agreement, and waive any objection to such jurisdiction and venue.

(c)    All parties have been represented by counsel of their choice in the negotiations leading up to the execution of this Agreement, and they have read this Agreement carefully and have discussed it fully with such counsel. All parties and their counsel have had full and equal opportunity to participate and cooperate in the drafting and preparation of this Agreement, and no constructional preference for or against any party as the "drafter" of this Agreement is appropriate.

(d)    This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Signatures by .PDF, facsimile, DocuSign, or the like are as valid as manuscript signatures. Each person affixing his or her signature to this Agreement represents that he or she has the authority to bind the person or entity on who behalf he or she is executing the Agreement.

[Remainder of page intentionally left blank; signature page follows.]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Execution Date.

**PDC:**

**PLACENTIA DEVELOPMENT COMPANY LLC,**
a California limited liability company

By: _____

Name: _____Seth Ring_____

Title: _____Authorized Person_____

**BRIDGEMARK:**

**BRIDGEMARK CORPORATION,**
a California corporation

By: _____

Name: _____Robert J. Hall_____

Title: _____President and Chief Executive Officer

**HALL:**

**ROBERT J. HALL,**
individually and in his capacity as agent for the persons and entities listed on Exhibit A hereto

_____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Execution Date.

**PDC:**

**PLACENTIA DEVELOPMENT COMPANY LLC,**
a California limited liability company

By: _____

Name: _____Seth Ring_____

Title: _____Authorized Person_____

**BRIDGEMARK:**

**BRIDGEMARK CORPORATION,**
a California corporation

By: _____

Name: _____Robert J. Hall_____

Title: _____President and Chief Executive Officer____

**HALL:**

**ROBERT J. HALL,**
individually and in his capacity as agent for the persons and entities listed on Exhibit A hereto

_____

Signature Page

**Exhibit A – Hall-Related Parties**

| Equity Holders of Bridgemark | |
|---|---|
| *Trust* | *Nature of Hall's Authority to Bind Trust to This Agreement* |
| Chad T. Hall Irrev. Trust Dated 1/1/89 | Either Trustee or Joinder |
| Gregson B. Hall Irrev. Trust Dated 1/1/89 | Either Trustee or Joinder |
| Mark Hall Separate Property Trust | Either Trustee or Joinder |
| The Hall Family Trust | Either Trustee or Joinder |
| C. Hall GRAT I Dated 7/30/12 | Either Trustee or Joinder |
| C. Hall GRAT II Dated 7/30/12 | Either Trustee or Joinder |
| G. Hall GRAT I Dated 7/30/12 | Either Trustee or Joinder |
| G. Hall GRAT II Dated 7/30/12 | Either Trustee or Joinder |
| Hall Investment Trust I Dated 7/17/06 | Either Trustee or Joinder |
| Hall Investment Trust II Dated 7/17/06 | Either Trustee or Joinder |
| M. Hall GRAT I Dated 7/30/12 | Either Trustee or Joinder |
| M. Hall GRAT II Dated 7/30/12 | Either Trustee or Joinder |

**Exhibit A – Hall-Related Parties**

| Current or Former Officers or Directors of Bridgemark[1] | |
|---|---|
| *Person* | *Nature of Hall's Authority to Bind Person to This Agreement* |
| Robert J. Hall | Self |
| Mark Hall | Joinder |
| Gregson Hall | Joinder |
| Chad Hall | Joinder |
| Carl Hall | Joinder |

---

[1] For the avoidance of doubt, Carolyn P. Curry and Kevin Mugavero are current or former officers or directors of Bridgemark, but are not "Hall-Related Parties."

**Exhibit A – Hall-Related Parties**

| Other Hall-Related Parties[2] | |
|---|---|
| *Entity* | *Nature of Hall's Authority to Bind Entity to This Agreement* |
| Robert J. Hall Family Trust | Either Trustee or Joinder |
| Casa Real LP | Either Authorized Signatory or Joinder |
| Casa Real Management, LLC | Either Authorized Signatory or Joinder |
| Casa Real Apartments, L.P. | Either Authorized Signatory or Joinder |
| Casa Real GP, LLC | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Holdings, LLC | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real LLC | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Management, LLC | Either Authorized Signatory or Joinder |
| Casa Real Preferred Income Associates | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Properties, LLC | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Property Group LLC | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real, Inc. | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Mortgage, Inc. | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Homes, Inc. | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| Casa Real Corporation | Either Authorized Signatory or Joinder or Certification Pursuant to Note 2 Hereof |
| O&G Investment Trust | Either Trustee or Joinder |
| Las Cienegas, LLC | Either Authorized Signatory or Joinder |
| Meadow Deep LLC | Either Authorized Signatory or Joinder |
| Gregson Energy Group, LLC | Authorized Signatory |

---

[2]    To the extent any entity listed below is not connected directly or indirectly with Hall, Hall will so certify in writing.  If such certification is inaccurate in any respect, the damages caused by such inaccuracy shall not be released.

**Exhibit A – Hall-Related Parties**

| Other Hall-Related Parties[2] | |
|---|---|
| Bridgemark Texas, LLC | Authorized Signatory |

**Exhibit B – Form of Quitclaim Deeds**

Recording Requested By &
When Recorded Mail Recorded Document &
Tax Statements To:

---

**[Orange County Assessor's Parcel Nos. 341-501-01-65**

**[Documentary Transfer Tax:  $0.]  This is the surrender of a partial interest in an oil and gas lease, the value of which is less than $100.  R&T Code Section _____.**

**By:  _____**

### SURRENDER AND QUITCLAIM OF SURFACE RIGHTS

Bridgemark Corporation, a California corporation ("Grantor"), does hereby surrender, relinquish, and release to Placentia Development Company LLC, a California limited liability company ("Grantee"), any and all of Grantor's right, title, and interest in, under and to the following described land and instruments (including, without limitation, in its capacities as lessee under those certain Oil and Gas Leases and Operator under the Chapman Zone Unit Agreement dated April 1, 1960 (which was recorded on June 7, 1961 in Book 5746, page 759, as Document 4625 of the Official Records of Orange County, California), and the Kramer Zone Unit Agreement dated February 2, 1970 (which was recorded on July 19, 1972 in Book 10231, Page 96 as Document 17083 of the Official Records of Orange County, California)):

See Exhibit A attached hereto and incorporated herein by this reference.

Dated:  [_____], 2021                    **BRIDGEMARK:**

                                            **BRIDGEMARK CORPORATION**,
                                            a California corporation


                                            By:  _____

                                            Name:  _____

                                            Title:  _____

**Exhibit B – Form of Quitclaim Deeds**

Exhibit A

From the surface to 500' below for Lots 1-65 (including Tebay Drive, Saucedo Circle, Baumann Way, Troop Way, Fergus Court and Blankenship Circle) of Tract NO. 15700 in the Assessors Map Book 342, Page 50, Records of Orange County

APNS: 341-501-01 through 341-501-65



**Exhibit B – Form of Quitclaim Deeds**

Recording Requested By &
When Recorded Mail Recorded Document &
Tax Statements To:

**[Orange County Assessor's Parcel No. 341-301-09]**

**[Documentary Transfer Tax:  $0.]  This is the surrender of partial rights and interests arising under oil and gas leases, the value of which is less than $100.  R&T Code Section _____.**

**By:  _____**

## SURRENDER AND QUITCLAIM

The Robert J. Hall Family Trust; Casa Real LP, a California limited partnership; Casa Real Management, LLC, a California limited liability company; Casa Real Apartments, LP, a California limited partnership; Casa Real GP, LLC, a California limited liability company; Casa Real Holdings, LLC, a Nevis limited liability company; Casa Real LLC, a Nevada limited liability company; Casa Real Preferred Income Associates, a California limited partnership; Casa Real Properties, LLC, a California limited liability company; Casa Real Property Group LLC, a California limited liability company; Casa Real Mortgage, Inc., a California corporation; Casa Real Homes, Inc., a California corporation; Casa Real Corporation, a California corporation; O&G Investment Trust, a Nevada Trust; Las Cienegas, LLC, a California limited liability company; Meadow Deep LLC, a Wyoming limited liability company; Gregson Energy Group, LLC, a Wyoming limited liability company; and Bridgemark Texas, LLC, a Texas limited liability company (collectively, "Grantor") do hereby surrender, relinquish, and release to Realm California, LLC, a Delaware limited liability company ("Grantee"), any and all of Grantor's individual and collective rights, title, and interest in, under and to the following described land and instruments:

See Exhibit A attached hereto and incorporated herein by this reference.

## [SIGNATURE PAGES FOLLOW]

**Exhibit B – Form of Quitclaim Deeds**

GRANTOR

Dated:_____, 2021

ROBERT J. HALL FAMILY TRUST

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL MANAGEMENT, LLC,
a California limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL GP, LLC,
a California limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL, LLC,
a Nevada limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL, LP,
a California limited partnership

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL APARTMENTS, LP,
a California limited partnership

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL HOLDINGS, LLC,
a Nevis limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL PREFERRED INCOME
ASSOCIATES,
a California limited partnership

By: _____

Name:_____

Title:_____

**Exhibit B – Form of Quitclaim Deeds**

Dated:_____, 2021

CASA REAL PROPERTIES, LLC,
a California limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL MORTGAGE, INC.,
a California corporation

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL CORPORATION,
a California corporation

By: _____

Name:_____

Title:_____

Dated:_____, 2021

LA CIENEGAS, LLC,
a California limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL  PROPERTY GROUP, LLC,
a California limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

CASA REAL HOMES, INC.,
a California corporation

By: _____

Name:_____

Title:_____

Dated:_____, 2021

O&G INVESTMENT TRUST,
a Nevada Trust

By: _____

Name:_____

Title:_____

Dated:_____, 2021

MEADOW DEEP, LLC,
a Wyoming limited liability company

By: _____

Name:_____

Title:_____

**Exhibit B – Form of Quitclaim Deeds**

Dated:_____, 2021

GREGSON ENERGY GROUP, LLC,
a Wyoming limited liability company


By: _____

Name:_____

Title:_____


**<u>GRANTEE</u>:**

Dated:_____, 2021

Realm California, LLC,
a Delaware limited liability company

By: _____

Name:_____

Title:_____

Dated:_____, 2021

BRIDGEMARK TEXAS, LLC,
a Texas limited liability company

By: _____

Name:_____

Title:_____


?

**Exhibit B – Form of Quitclaim Deeds**

EXHIBIT A

All real and personal property rights, title and interests, subject to, and located within the boundaries of, the Chapman Zone Unit Agreement dated April 1, 1960 (which was recorded on June 7, 1961 in Book 5746, page 759, as Document 4625 of the Official Records of Orange County, California), and the Kramer Zone Unit Agreement dated February 2, 1970 (which was recorded on July 19, 1972 in Book 10231, Page 96 as Document 17083 of the Official Records of Orange County, California), including, without limitation, all royalty interests, overriding royalty interests, fee interests (both in the surface estate and/or the mineral estate), net profits interests, income interests, oil and gas leasehold working interests, easements, rights of way, licenses, equipment, facilities, pipelines, utility lines, and any and all other similar real and personal property rights, title and interests.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:20-bk-10143-TA |
| BRIDGEMARK CORPORATION,[3] | Chapter 11 |
| Debtor. | **ORDER (I) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, ROBERT J. HALL, AND PLACENTIA DEVELOPMENT COMPANY AND RELATED AGREEMENTS, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, (III) APPROVING ASSUMPTION AND/OR ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) MODIFYING ORDER AUTHORIZING EMPLOYMENT OF NUMERIC SOLUTIONS LLC, AND (V) GRANTING RELATED RELIEF** |

This matter having come before the Court on the *Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365 and Fed. R. Bankr. P. 9019 for Entry of Order (I) Approving Settlement Agreement Between the Debtor, Robert J. Hall, and Placentia Development Company and Related Agreements, (II) Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens, (III) Approving Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Modifying Order Authorizing Employment of Numeric Solutions LLC, and (V) Granting Related Relief* (the "Motion"); and the Court having read and considered the Motion, and being fully advised of the premises, for good cause shown,

IT IS HEREBY ORDERED that the Court makes the following findings of fact and conclusions of law:[4]

---

[3] The Debtor's last four digits of its taxpayer identification number are (1669), and its headquarters and service are 17671 Irvine Boulevard, Suite 217, Tustin, California 92780.

[4] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable to these proceedings pursuant to Rules 7052 and

**Exhibit C – Form of Approval Order**

1.      On January 14, 2020 (the "<u>Petition Date</u>"), Bridgemark Corporation ("<u>Bridgemark</u>")
filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the
above-captioned case (the "<u>Bankruptcy Case</u>").  Bridgemark has continued to operate its business
and manage its affairs as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the
Bankruptcy Code.

2.      Bridgemark's primary assets are certain oil and gas leases and related agreements
and rights pursuant to which Bridgemark operates wells in Placentia, California and Anaheim,
California.  Bridgemark also has certain non-operating interests in wells in Mobile, Alabama;
Fullerton, California; and Nueces County, Texas, as well as certain other assets, including through
Bridgemark's two non-debtor subsidiaries, Gregson Energy Group, LLC ("<u>Gregson</u>") and
Bridgemark Texas, LLC ("<u>Bridgemark Texas</u>," and together with Gregson, the "<u>Non-Debtor
Subsidiaries</u>").

3.      Of the wells that Bridgemark operates in Placentia, California, a portion are situated
on land (the "<u>PDC Parcel</u>") owned by Placentia Development Company, LLC ("<u>PDC</u>"), on which
PDC intends to build residential homes.  Bridgemark also owns and operates an oil tank farm on a
portion of real property within the PDC Parcel (the "<u>Remainder Tract</u>," as more specifically defined
in the Transaction Agreement).

4.      On December 31, 2019, a judgment (as subsequently amended, the "<u>PDC
Judgment</u>") was entered in favor of PDC and against Bridgemark.  The PDC Judgment was
originally in the principal amount of approximately $42 million, and was subsequently amended in
post-judgment proceedings such that it is now in the principal amount of approximately
$38 million.  An appeal of the PDC Judgment (the "<u>Appeal</u>") is pending but stayed.

5.      Broadly speaking, and without rehashing the details of the multi-year proceedings
that culminated in the PDC Judgment or the parties' claims and contentions related thereto, the
PDC Judgment arose out of Bridgemark's failure to plug and abandon oil wells on the PDC Parcel,

9014 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>").  To the extent that any of the following
findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following
conclusions of law constitute findings of fact, they are adopted as such.

as the state court determined that Bridgemark was legally obligated to do, such that PDC could

develop the residential homes on the PDC Parcel.

6.      Pursuant to that certain *Stipulation Between Bridgemark Corporation and Placentia Development Company, LLC Regarding (I) Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Grant of Adequate Protection Pursuant to 11 U.S.C. § 361, 362, and 363* [Docket No. 140] and the order approving same [Docket No. 155], funds subject to PDC's liens have been deposited in a restricted debtor-in-possession account at East West Bank (the "Customer DIP Account"). There is no dispute that PDC holds valid, perfected, first-position liens on the funds in the Customer DIP Account, although Bridgemark's Adversary Proceeding alleges that the liens are avoidable (an allegation PDC denies).

7.      On April 14, 2020, the Court entered the *Order Approving Application of Debtor and Debtor in Possession to Employ Numeric Solutions LLC as Expert Valuation Consultant and John Harris as Expert Witness Effective as of February 24, 2020* [Docket No. 162] (the "Numeric Solutions Employment Order"), pursuant to which the Court authorized Bridgemark to employ and retain John Harris and Numeric Solutions LLC ("Numeric Solutions") as estate professionals.

8.      On April 15, 2020, PDC, Bridgemark, and Robert J. Hall ("Hall") executed that certain *Term Sheet* (the "Term Sheet"), as clarified by the correspondence dated August 10, 2020, pursuant to which they agreed to compromise and resolve all disputes between them on the terms set out therein, with the proviso that definitive documentation (the "Definitive Documentation") would thereafter be executed.  The Term Sheet contemplated that the Definitive Documentation would ultimately bind Hall and also certain related persons and entities (the "Hall-Related Parties"). Hall deposited $4.375 million of his personal funds (the "Hall Cash Contribution") into an escrow account pursuant to the Term Sheet.  This Court approved Bridgemark's entry into the Term Sheet by order dated June 26, 2020.

9.      On May 13, 2020, the Court entered the *Order Authorizing Debtor to Assume Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Section 365(a)*

[Docket No. 203] (the "Prior Assumption Order"), pursuant to which the Court authorized

Bridgemark to assume, *inter alia*, the oil and gas leases listed on Exhibit 1 thereto.

10.    Bridgemark, PDC, and Hall (both individually and as agent for the Hall-Related

Parties) have negotiated that certain *Settlement Agreement* (the "Settlement Agreement"), which –

together with that certain *Asset Purchase Agreement by and among Bridgemark Corporation,*

*Gregson Energy Drilling LLC, and Bridgemark Texas LLC, collectively, as Seller, and California*

*Natural Resources Group Orange County, LLC, Realm California, LLC, and Alatex, LLC,*

*collectively, as Buyer* (the "Asset Purchase Agreement"), that certain *Transaction Agreement* (the

"Transaction Agreement"), and that certain *Surface Use and Cooperation Agreement* (the "Surface

Use Agreement," and together with the Settlement Agreement, the Asset Purchase Agreement, and

the Transaction Agreements, the "Agreements") – collectively constitute the Definitive

Documentation contemplated by the Term Sheet.  The Hall-Related Parties are specifically

identified in Exhibit A to the Settlement Agreement.

11.    California Natural Resources Group, LLC ("CalNRG OC"), a third-party buyer, is a

party to the Asset Purchase Agreement, the Transaction Agreement, and the Surface Use

Agreement.  Realm California LLC ("Realm"), an affiliate of CalNRG OC, is a party to the Asset

Purchase Agreement and the Surface Use Agreement.  Alatex, LLC ("Alatex"), an affiliate of

CalNRG OC and Realm, is a party to the Asset Purchase Agreement.  Except where necessary for

the sake of clarity, CalNRG OC, Realm, and Alatex are referred to herein collectively as "Buyer."

12.    By the Motion, Bridgemark seeks this Court's approval of the Agreements as well as

authorization and direction to proceed with the consummation of the transactions contemplated by

the Agreements.

13.    In broad strokes – and subject entirely to the specific terms of the actual Agreements

– the transactions contemplated by the Agreements will result in essentially all of Bridgemark's

non-cash assets that are ***not*** located on the PDC Parcel being transferred to Buyer, which will also

assume certain liabilities of Bridgemark (such purchase, sale, assignment, and assumption

collectively, the "Sale Transaction"); PDC, in turn, will transfer the Remainder Tract to Realm,

**Exhibit C – Form of Approval Order**

which is CalNRG OC's affiliate; the settlement between PDC, Bridgemark, and Hall (the "Settlement") will go into effect – all on a date (the "Closing Date") to occur shortly following the entry of this Order. The specific allocation of the Purchased Assets among CalNRG, Realm, and Alatex is set forth in Exhibit A-10 to the Asset Purchase Agreement.

14. The Asset Purchase Agreement provides for Bridgemark to assign certain contracts and agreements (collectively, the "Assigned Contracts") to Buyer. A complete list of the Assigned Contracts and the cure costs associated therewith is set forth in Exhibit A to the Motion.[5] Certain of the Assigned Contracts (the "Prior Assumed Contracts") were previously assumed by Bridgemark pursuant to the Prior Assumption Order, as set forth in Exhibit A to the Motion. The remainder of the Assigned Contracts (the "Remaining Contracts") were not previously assumed. Through the Motion, Bridgemark seeks to assign the Prior Assumed Contracts and assume and assign the Remaining Contracts to Buyer.

15. Following the Closing Date, Bridgemark will be left with only minimal non-cash assets – primarily the wells on the PDC Parcel. Bridgemark will immediately stop pumping from those wells. John Harris of Numeric Solutions will be appointed Chief Wind-Down Officer. Bridgemark, under the direction and control of the Chief Wind-Down Officer, will pursue confirmation of a non-impaired chapter 11 plan of liquidation that is consistent with the Plan Term Sheet attached to the Settlement Agreement. The primary purpose of the plan will be the creation of a liquidation trust tasked with plugging and abandoning the remaining wells on the PDC Parcel so that PDC can develop residential homes on the PDC Parcel.

16. Following the Closing Date, neither Hall nor any of the Hall-Related Parties shall serve as an officer or director of Bridgemark, nor shall they have any involvement in or right to participate in or manage the business or affairs of Bridgemark's limited remaining operations. In addition, although certain Hall-Related Parties will continue to the be equityholders of Bridgemark until a chapter 11 plan of liquidation that cancels their equity interests takes effect (as provided for

---

[5]  Inclusion of any document or agreement on the list of Assigned Contracts shall not constitute or be deemed to be a determination or admission by Bridgemark, Buyer, PDC, or any other party that such document or agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

**Exhibit C – Form of Approval Order**

in the Plan Term Sheet), they are waiving their rights to receive any distributions on account of such equity (subject to Paragraph 5(c) of the Settlement Agreement) or to vote, manage, or otherwise exercise direct or indirect control with respect to Bridgemark on account of such equity, and thus will have no legal or practical control over Bridgemark such that it would not be lawful or appropriate for Hall or any Hall-Related Parties to have or incur any legal liability on account of such post-Closing-Date equity ownership.

17.    The Court has subject matter jurisdiction over the Bankruptcy Case and authority to hear and determine the Motion.  The Motion was timely served on the parties listed on the Proof of Service filed with respect to the Motion – which include all potentially affected landowners, royalty holders, regulators, contract counterparties, lienholders, and other parties in interest – and appropriate notice and opportunity to be heard regarding the relief requested has been provided.

18.    The Agreements for which approval is sought and the Sale Transaction and Settlement contemplated thereby are all fair, reasonable, and in the best interests of Bridgemark and its estate, creditors, and all parties in interest.  No creditor, royalty holder, or other party in interest shall have any claim for damages arising from the Sale Transaction or the transactions contemplated in the Plan Term Sheet, including, without limitation, the plugging and abandonment contemplated thereby.

19.    Bridgemark has demonstrated sound business reasons for the Agreements for which approval is sought and the Sale Transaction and Settlement contemplated thereby, all of which are the product of extensive arms'-length, good-faith negotiations and are not tainted by fraud or collusion.  All terms of the Sale Transaction and Settlement, as well as the genesis and background of the arrangements, have been appropriately disclosed to the Court and all parties in interest.

20.    CalNRG OC, Realm, Alatex, and PDC are acquiring the assets they are acquiring in good faith and qualify as good-faith purchasers within the meaning of Section 363(m) of the Bankruptcy Code.  CalNRG OC, Realm, and Alatex are not related to Bridgemark or PDC, and all material terms of the arrangements have been disclosed.  Accordingly, the Agreements may not be

avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.

21.    The Agreements and the Sale Transaction and Settlement contemplated thereby constitute the highest and best offer for the assets being acquired, and will provide a greater recovery for the estate than would be provided by any other available alternative.  Bridgemark's determination that the Agreements and the Sale Transaction and Settlement contemplated thereby constitute the highest and best offer for the assets being acquired constitutes a valid and sound exercise of Bridgemark's business judgment.  The consideration to be provided is fair and adequate, and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under other applicable law.

22.    No party to the Agreements has entered into the Agreements, or proposes consummating the Sale Transaction and Settlement contemplated thereby, for the purpose of hindering, delaying, or defrauding any present or future creditor.  Nor is any party to the Agreements a continuation or successor to Bridgemark or its estate.  None of the transactions contemplated by the Agreements amount to a consolidation, merger, or *de facto* merger of any entity.

23.    PDC, as Bridgemark's secured creditor, has consented to the sale of the assets being sold to Buyer on the terms set forth in the Agreements.  In addition, the automobile lenders, as Bridgemark's other secured creditors, will be paid in full in cash on the Closing Date.  Accordingly, the conditions for a sale free and clear of all encumbrances pursuant to Section 363(f) of  the Bankruptcy Code have been satisfied.

24.    Bridgemark has satisfied all conditions and requirements for assumption, assignment, and sale of the assigned contracts and leases pursuant to Section 365 of the Bankruptcy Code.  The assignment of the Prior Assumed Contracts and the assumption and assignment of the Remaining Contracts is a sound exercise of Bridgemark's business judgment.

25.    The transactions contemplated by the Agreements are legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation,

Sections 105(a), 363(b), 363(f), 363(m), 365(a) and 365(f) and all applicable requirements of such Sections have been complied with in respect of the transaction.

26. The appointment of John Harris of Numeric Solutions as Chief Wind-Down Officer – and the modification of the Numeric Solutions Employment Order consistent therewith – is reasonable, appropriate, and in the best interest of the estate and creditors.

27. The relinquishment by Hall and all Hall-Related Parties from all officer and director positions and their exclusion from any involvement in or right to participate in or manage the business or affairs of Bridgemark's limited remaining operations following the Closing Date is reasonable, appropriate, and in the best interest of the estate and creditors. The amendments to Bridgemark's bylaws and the other governance changes provided for in the Settlement Agreement are reasonable, appropriate, and in the best interest of the estate and creditors.

28. Given the relinquishment by Hall and the Hall-Related Parties of all direct or indirect control of Bridgemark pursuant to the Settlement Agreement approved hereby, the Court has jurisdiction and authority to conclude and order that neither Hall nor any Hall-Related Party shall have or incur any legal liability solely on account of post-Closing-Date equity ownership of Bridgemark. *Cf. Blixseth v. Credit Suisse (In re Yellowstone Mountain Club, LLC)*, 961 F.3d 1074, 1081–1085 (9th Cir. 2020).

29. This Order is a final and appealable order. Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no reason to delay implementation of this Order.

\*        \*        \*

Based on the foregoing findings of fact and conclusions of law, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

30. The Motion is GRANTED in its entirety.

31. The Settlement Agreement, the Asset Purchase Agreement, the Transaction Agreement, and the Surface Use Agreement – including each and every term and condition in each

– are approved in their entirety.  The failure to identify any particular provision of the Settlement Agreement or any of the other the Agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreements be authorized and approved in their entirety.

32.     Bridgemark is authorized and directed to perform all obligations under the Agreements to which it is a party and to take any and all actions reasonably necessary and appropriate to consummate the Agreements and to perform any and all obligations contemplated therein.

33.     Upon the closing of the Sale Transaction, Buyer shall take title to and possession of the Purchased Assets (as defined in the Asset Purchase Agreement).  Pursuant to Section 363(f), the transfer of title to the Purchased Assets shall be free and clear of any and all liens, interests, and encumbrances except for any obligations expressly assumed by Buyer.

34.     Neither Buyer nor PDC is a successor and neither shall be deemed a successor to Bridgemark or its estate as a result of the consummation of the Sale Transaction or for any other reason.  Buyer and PDC have given substantial consideration under the Agreements for the ultimate benefit of Bridgemark, its estate, and the holders of any encumbrances.  The consideration given by Buyer and PDC is valid and valuable consideration for the releases of any potential claims of successor or transferee liability against Buyer and PDC, which releases shall be deemed to have been given in favor of Buyer and PDC by all holders of encumbrances against Bridgemark or any of the Purchased Assets.  Therefore, following the closing date of the Sale Transaction, all persons and entities are forever prohibited and enjoined from taking any action against Bridgemark or its estate that would adversely affect or interfere with the ability of Bridgemark to sell and transfer the Purchased Assets to Buyer in accordance with the Agreements and this Order to the fullest extent provided by Section 363 or adversely affect or interfere with Buyer's title to or use and enjoyment of the Purchased Assets based on or related to any such Claim or based on any actions Bridgemark may take in this chapter 11 case.

**Exhibit C – Form of Approval Order**

35.     Except as expressly set forth herein or in the Agreements, Buyer and PDC, and their

respective successors and assigns shall have no liability for any claim against Bridgemark or its

estate, whether known or unknown as of the closing date of the Sale Transaction, now existing or

hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee,

successor, *alter ego*, or otherwise, of any kind, nature or character whatsoever, by reason of any

theory of law or equity, including claims arising under, without limitation: (i) any employment or

labor agreements or the termination thereof relating to Bridgemark; (ii) any pension, welfare,

compensation or other employee benefit plans, agreements, practices and programs, including,

without limitation, any pension plan of or related to Bridgemark or any affiliate or predecessor or

any current or former employee of any of the foregoing, including, without limitation, any

participation or other agreements related to any of the foregoing, or the termination of any of the

foregoing; (iii) Bridgemark's business operations or the cessation thereof; (iv) any litigation

involving Bridgemark; and (v) any employee, workers' compensation, occupational disease or

unemployment or temporary disability related law, including, without limitation, claims that might

otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as

amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the

Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker

Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee

Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with

Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the

Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws;

(L) state and local unemployment compensation laws or any other similar state and local laws;

(M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws,

regulations or rules or other state, local or federal laws, regulations or rules relating to, wages,

benefits, employment, or termination of employment with Bridgemark or any predecessor; (O) any

antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise;

(Q) any environmental laws, rules, or regulations, including, without limitation, under the

**Exhibit C – Form of Approval Order**

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statutes; (R) any bulk sales or similar laws; (S) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (T) any common-law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability. For the avoidance of doubt nothing in this paragraph shall (i) restrict a party's right to appeal this Order or (ii) release Buyer or PDC from an applicable authority's proper exercise of police and regulatory powers.

36.     Except as expressly permitted or otherwise specifically provided in the Agreements or this Order, all persons or entities holding encumbrances in all or any portion of the Purchased Assets (other than any obligations expressly assumed by Buyer) arising under or from, or in any way relating to Bridgemark, the Purchased Assets, the operation of Bridgemark's business prior to the Closing Date or the transfer of the Purchased Assets to Buyer, are forever barred, estopped, and permanently enjoined from asserting against Buyer or PDC or their respective successors or assigns, or their property such persons' or entities' encumbrances in and to the Purchased Assets, or in any way asserting or pursuing any action against Buyer, Buyer's successors or assigns, PDC, PDC's successors or assigns, and/or the Purchased Assets based on any theory of successor or transferee liability.  Effective as of the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release any encumbrances on the Purchased Assets, as provided herein, that may have been recorded or may otherwise exist. If a creditor fails to cause an encumbrance to be released, Bridgemark is hereby authorized and directed, and Buyer is hereby authorized, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Purchased Assets.  The transactions authorized herein shall be of full force and effect, regardless of Bridgemark's lack of good standing in any jurisdiction in which it is formed or authorized to transact business.

37.     All persons and entities that are in possession of some or all of the Purchased Assets on the closing date of the Sale Transaction are directed to surrender possession of such Purchased

**Exhibit C – Form of Approval Order**

Assets to Buyer at the Closing Date.  The provisions of this Order authorizing the Sale Transaction by Bridgemark free and clear of encumbrances shall be self-executing, and none of Bridgemark, Buyer, PDC, or any other party shall be required to execute or file releases, termination statements, assignments, cancellations, consents or other instruments to effectuate, consummate, and/or implement the provisions hereof with respect to the Sale Transaction; ***provided, however,*** that this paragraph shall not excuse such parties from performing any and all of their respective obligations under the Agreements or as otherwise set forth in this Order, requested by Buyer, or sought by PDC.

38.    Without limiting the foregoing, a certified copy of this Order may be filed with the appropriate clerk or recorded to act to cancel any encumbrances on the Purchased Assets of record. This Order is binding upon all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons or entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions of Bridgemark contemplated by the Agreements; provided that nothing herein shall relieve any entity of the obligation to pay filing fees required to be paid under applicable non-bankruptcy law.

39.    Any and all governmental recording offices and all other parties, persons, or entities are authorized to accept this Order for recordation on or after the closing date of the Sale Transaction as conclusive evidence of the free, clear, and unencumbered, transfer of all right, title, interest, and ownership in and to the Purchased Assets conveyed to Buyer upon closing.

40.    Bridgemark is authorized and directed to (i) assign and sell each of the Prior Assumed Contracts to Buyer, and (ii) assume, assign and sell each Remaining Contract to Buyer, in each case free and clear of all encumbrances, as described herein.  The Prior Assumed Contracts

having been previously assumed by Bridgemark, any and all objections to assignment of such

leases are overruled.  *Cf. In re Catapult Entm't, Inc.*, 165 F.3d 747, 754 (9th Cir. 1999).

Bridgemark is authorized to pay any cure costs, as contemplated by the Asset Purchase Agreement.

The payment of the applicable cure costs (if any) in connection with an Assigned Contract shall (a)

effect a cure of all defaults existing thereunder as of the closing date of the Sale Transaction and

(b) compensate for any actual pecuniary loss to such non-debtor party resulting from such default.

Buyer shall then have assumed the assigned contracts and assigned real property leases and,

pursuant to section 365(f) of the Bankruptcy Code, the assignment by Bridgemark of such Assigned

Contracts shall not be a default thereunder.  Upon the payment of the relevant cure costs, if any,

Bridgemark shall have no further liabilities to the counterparties to the Assigned Contracts that

accrue and become due and payable on or after the closing date of the Sale Transaction except as

provided in the Agreements.  *See* 11 U.S.C. § 365(k).

41.    Upon the assumption of an assigned contract and assigned real property lease and

the payment of the relevant cure costs, if any, in accordance with the Asset Purchase Agreement,

Buyer shall be deemed to be substituted for Bridgemark as a party to the applicable Assigned

Contracts and Bridgemark shall be relieved, pursuant to Section 365(k) of any further liability

under the Assigned Contracts.  Bridgemark may assume (in the case of the Remaining Contracts),

assign and sell the Assigned Contracts notwithstanding the provision in any such contract or lease

that prohibits or restricts assumption or assignment or that conditions assumption or assignment

upon the consent of the non-debtor counterparty thereto.

42.    To the extent any counterparty to an Assigned Contract failed to timely object to the

cure cost set forth in Exhibit A to the Motion, such cure cost shall be deemed to be finally

determined as of the entry of this Order and any such counterparty shall be barred from challenging,

objecting to or denying the validity of the cure cost.  All other requirements and conditions under

Sections 363 and 365 for the assumption by Bridgemark and the assignment and sale to Buyer of

the Assigned Contracts have been satisfied.  Upon the closing of the Sale Transaction, in

accordance with Sections 363 and 365, Buyer shall be fully and irrevocably vested with all legal,
equitable, and beneficial right, title, and interest of Bridgemark under the Assigned Contracts.

43.    To the extent necessary and applicable, Buyer has provided adequate assurance of
future performance under the Assigned Contracts within the meaning of Sections 365(b)(1)(C),
365(b)(3) (to the extent applicable) and 365(f)(2)(B).  Pursuant to Sections 105(a) 363, and 365, all
counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising
or asserting against Bridgemark, Buyer, or PDC any assignment fee, default, breach or claim of
pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts
existing as of the closing of the Sale Transaction or arising by reason of such closing.

44.    The assumption and assignment of the Remaining Contracts and the assignment of
the Prior Assumed Contracts shall be effective upon entry of this Order (conditioned upon the
closing of the Sale Transaction) notwithstanding timely unresolved objections to the proposed cure
costs, which objections are hereby preserved and shall not delay closing of the Sale Transaction.
The undisputed portion of the proposed cure costs, if any, shall be paid by Bridgemark within three
days after the Closing Date.  Any remaining disputed cure costs must be paid by the earlier of
(a) when Bridgemark, Buyer, PDC, and the Assigned Contract counterparty can agree to an amount
or (b) the date specified in a final and non-appealable order entered by this Court.  With respect to
any cure objections resolved by the Court at the hearing on the Motion, Bridgemark shall pay the
cure cost, if any, no later than three days after the Closing Date.  Bridgemark shall use
commercially reasonable efforts to cooperate with Buyer and PDC in resolving any disputed cure
costs arising after the closing of the Sale Transaction.

45.    Nothing contained in any chapter 11 plan confirmed in this case, any order
confirming any such chapter 11 plan, any order approving wind-down or dismissal of this chapter
11 case or any subsequent chapter 7 case, or any other order of any type or kind entered in this case
shall conflict with or derogate from the provisions of the Agreements or this Order; and to the
extent of any conflict or derogation between this Order or the Agreements and such future plan or
order, the terms of this Order and the Agreements shall control.

46.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and Bridgemark, Buyer, Hall, and PDC are authorized to effectuate the Agreements and close the Sale Transaction immediately upon entry of this Order.

47.     The Sale Transaction shall be exempt from any "bulk sales" or similar law of any state or jurisdiction.  There are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

48.     This Order may be recorded in the land records and relied upon by title insurers and subsequent purchasers.

49.     Immediately upon entry of the Approval Order, Bridgemark shall cease all active extraction of oil from the PDC Parcel.

50.     The Chief Wind-Down Officer of Bridgemark from and after the Closing Date shall be John Harris of Numeric Solutions, or any successor approved by the Bankruptcy Court and consented to by PDC.  The Chief Wind-Down Officer is authorized to perform the following services: (i) appropriate claim administration, reconciliation, satisfactions, compromises, and/or objections with respect to claims that were not Assumed Obligations transferred to Buyer; (ii) appropriate reconciliation and satisfaction of any remaining obligations to royalty holders that were not Assumed Obligations transferred to Buyer; (iii) appropriate disposition of any remaining assets that were not Purchased Assets transferred to Buyer; (iv) appropriate resolution of all administrative expense applications and related matters of Bankruptcy Case administration, including the filing of all required reports and the payment of all required U.S. Trustee fees; (v) appropriate formulation and prosecution of the liquidating chapter 11 plan contemplated in the Plan Term Sheet; (vi) such other work as is reasonable and appropriate in connection with the administration of the estate and consistent with Bridgemark's bylaws.  The Numeric Solutions Employment Order is hereby modified, effective as of March 10, 2021, to the extent necessary to authorize the performance of such services.

51.     Hall and each Hall-Related Party shall be prohibited from objecting to confirmation of any chapter 11 plan that is materially consistent with the Plan Term Sheet.

52.    Neither Hall nor any Hall-Related Party shall have or incur any legal liability relating solely to or arising solely out of post-Closing-Date equity ownership of Bridgemark.

53.    The releases set forth in Section 5 of the Settlement Agreement are approved, subject to the occurrence of the Closing Date.  For the avoidance of doubt, the Hall-Related Parties (as defined in the Settlement Agreement) are Releasing Parties (as defined in the Settlement Agreement) and are bound by the releases set forth in the Settlement Agreement.

54.    The parties to the Settlement Agreement shall, upon request by one or more of the other parties, execute such further documents, agreements, and contracts, and shall perform such further acts as may be reasonably necessary to carry out and give full effect to the terms of Agreements.  Without limiting the generality of the preceding sentence, Hall, in his individual capacity and in his capacity as agent and attorney-in-fact for the Hall-Related Parties, and Bridgemark shall cooperate with PDC to adjust, initial, re-execute and re-deliver the Agreements and any amendments thereto, or any closing statements or closing certificates, estoppels, authorizing resolutions, certificates, deeds, assignments, confirmations, ratifications, releases, withdrawals, or similar documents if, as, and when deemed necessary or desirable in the reasonable discretion of PDC to provide for consistency with or to effectuate the agreed terms of the Agreements.

55.    The Agreements, and any related agreements or other instruments (other than this Order), may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further notice to or order of this Court; provided, however, that any such modification, amendment or supplement does not materially affect Bridgemark's estate in adverse fashion.

56.    The terms of this Order shall govern any inconsistencies between the terms of this Order and the Agreements.

57.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

**Exhibit C – Form of Approval Order**

58.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms of the Order and the Agreements, as well as all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, and to adjudicate, if necessary, any and all disputes relating in any way to the Agreements or Sale Transaction.

###

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

# UNANIMOUS WRITTEN CONSENT

# OF THE

# SHAREHOLDERS OF

# BRIDGEMARK CORPORATION

April__, 2021

The undersigned, being all of the holders of outstanding shares of capital stock (the "**Shareholders**") of Bridgemark Corporation, a California corporation (the "**Corporation**"), having not less than the minimum number of votes that would be necessary to authorize or take the following actions at a meeting at which all shareholders entitled to vote thereon were present and voted, consent to the following actions be taken without a meeting and without prior notice as authorized by the Bylaws of the Corporation and Section 603(a) of the California Corporations Code.

## I.    AMENDED AND RESTATED BYLAWS OF THE CORPORATION

WHEREAS, the Shareholders believe it to be in the best interests of the Corporation that the Amended and Restated Bylaws (the "**Bylaws**"), attached hereto <u>Exhibit A</u>, be approved and adopted as the Bylaws of the Corporation;

NOW, THEREFORE, BE IT RESOLVED, the Bylaws be, and they hereby are approved.

## II.    REMOVAL OF DIRECTORS

WHEREAS, the Shareholders have determined to immediately remove all the members of the Board of Directors of the Corporation as directors of the Corporation.

NOW, THEREFORE, BE IT RESOLVED, that the Shareholders hereby immediately remove all the members of the Board of Directors of the Corporation as directors of the Corporation.

## III.    ELECTION OF DIRECTORS

WHEREAS, the Shareholders believe it to be in the best interest of the Corporation to elect (a) John Harris (the "**New Director**") from Numeric Solutions, LLC as a director and chairperson of the Board of Directors of the Corporation, (b) [_____] as a director of the Board of Directors of the Corporation and (c) [_____] as a director of the Board of Directors of the Corporation (collectively, the "**New Directors**").

NOW, THEREFORE, BE IT RESOLVED, that, effective immediately, the New Directors are appointed as directors of the Board of Directors of the Corporation and, in the case of John Harris, the chairperson of the Board of Directors of the Corporation, and shall hold such positions until their respective successor is duly elected and qualified or his earlier death, resignation, or removal.

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

RESOLVED FURTHER, that any and all acts taken and any and all agreements or other instruments executed by the New Directors prior to the execution hereof in furtherance of the foregoing resolutions be, and they hereby are, ratified, confirmed, adopted, authorized and approved.

RESOLVED FURTHER, that the New Directors or their designee be, and hereby are, authorized, empowered and directed to prepare, execute and deliver all such documents and instruments and to take all such actions as the New Directors or their designees may deem necessary or advisable to carry out and perform the purposes of these resolutions.

This Written Consent may be executed in several counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.  The actions taken by this Written Consent shall have the same force and effect as if taken by the undersigned at a meeting of shareholders of the Corporation, duly called and constituted pursuant to the laws of the State of California.  This Written Consent shall be filed with the minutes of the proceedings of the shareholders of the Corporation and shall have the same force and effect as though adopted at a meeting duly called and held.

*[The remainder of this page is intentionally left blank.]*

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

IN WITNESS WHEREOF, each of the undersigned hereby consent to the foregoing resolutions effective as of the date first above written:

Chad T. Hall Irrev. Trust Dated 1/1/89

By: _____

Name: _____

Title: _____

Gregson B. Hall Irrev. Trust Dated 1/1/89

By: _____

Name: _____

Title: _____

Mark Hall Separate Property Trust

By: _____

Name: _____

Title: _____

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

The Hall Family Trust

By: _____

Name: _____

Title: _____

C. Hall GRAT I Dated 7/30/12

By: _____

Name: _____

Title: _____

C. Hall GRAT II Dated 7/30/12

By: _____

Name: _____

Title: _____

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

G. Hall GRAT I Dated 7/30/12

By: _____

Name: _____

Title: _____

G. Hall GRAT II Dated 7/30/12

By: _____

Name: _____

Title: _____

Hall Investment Trust I Dated 7/17/06

By: _____

Name: _____

Title: _____

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

Hall Investment Trust II Dated 7/17/06

By: _____

Name: _____

Title: _____

M. Hall GRAT I Dated 7/30/12

By: _____

Name: _____

Title: _____

M. Hall GRAT II Dated 7/30/12

By: _____

Name: _____

Title: _____

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

## <u>EXHIBIT A</u>

**Bylaws**

(see attached)

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

AMENDED AND RESTATED BYLAWS OF

BRIDGEMARK CORPORATION

A California Corporation

ARTICLE I

Offices

Section 1.    Principal Office.

The principal office for the transaction of business in this State shall be located in the County of Orange.

Section 2.    Other Offices.

This Corporation may also have offices at such other places both within and without the State of California as the Board of Directors may from time to time determine as the business of the Corporation may require.

ARTICLE II

Shareholders' Meeting

Section 1.    Place of Meetings.

All meetings of the shareholders shall be held at the office of the Corporation, in the State of California, as may be designated for that purpose from time to time by the Board of Directors.

Section 2.    Annual Meetings.

The annual meeting of the shareholders shall be held, each year, at the time and on the day following:

Time of Meeting:    9:00 a.m.

Date of Meeting:    First Tuesday in June

If this day shall be a legal holiday, then the meeting shall be held on the next succeeding business day at the same hour. At the annual meeting, the shareholders shall elect a Board of Directors, consider reports of the affairs of the Corporation and transact such other business as may properly be brought before the meeting.

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

<u>Section 3.</u>    Special Meetings.

Special meetings of the shareholders for any purpose or purposes may be called at any time by the Chief Wind-Down Officer, the Board of Directors, or shareholders holding not less than ten percent (10%) of the voting power of the Corporation. Nothing contained in this section shall be construed as limiting, fixing or affecting the time or date when a meeting of shareholders called by action of the Board of Directors may be held.

<u>Section 4.</u>    Notice of Meetings.

Notices of meetings, annual or special, shall be given either personally or in writing to shareholders entitled to vote by the Secretary or the Assistant Secretary, or,  if  there  be no such officer or in the case of his neglect or refusal, by any director or shareholder.

Notices shall be sent to the shareholders' addresses appearing on the books of the Corporation, or supplied by them to the Corporation for the purpose of notice, not less than ten (10) days nor more than sixty (60) days before such meeting, except in the case of a meeting for the purpose of approving a merger or consolidation agreement in which case the notice must be given not less than twenty (20) days prior to the date of the meeting.

Notice of any meeting of shareholders shall specify the place, the day and the hour of the meeting, and in case of special meetings, as provided by the Corporations Code of California, the general nature of the business to be transacted, and no other business may be transacted. The notice of any meeting at which directors are to be elected shall include the names of nominees intended at the time of the notice to be presented by management for election.

If a shareholder supplies no address, notice shall be deemed to have been given to him if mailed to the place where the principal office of the Corporation is situated, or published at least once in some newspaper of general circulation in the county of said principal office. Such notice shall specify the place, the day and hour of the meeting, and the case of special meetings, the general nature of the business to be transacted.

It shall not be necessary to give any notice of the time and place of an adjourned meeting or of the business to be transacted thereat, other than by announcement at  the meeting at which the adjournment is taken; provided, however, when any shareholders' meeting is adjourned for more than forty-five (45) days or, if after adjournment,  a  new record date is fixed for the adjourned meeting, notice of the  adjourned  meeting shall be given as in the case of an original meeting.

<u>Section 5.</u>    Consent to Shareholders' Meetings.

The transactions of any meeting of shareholders, however called and noticed, shall be valid as though had at a meeting duly held after regular call and notice if a quorum is present either in person or by proxy, and if, either before or after the meeting, each of the shareholders entitled to vote, not present in person or by proxy, signs a written waiver of notice, or a consent to the holding of such meeting, or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the minutes of the

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

meeting. Executors, administrators, guardians, trustees, and other fiduciaries entitled to vote shares may sign such waivers, consents and approvals.

Section 6.     Shareholders Acting Without a Meeting.

Any action which may be taken at a meeting of the shareholders may be taken without a meeting, without prior notice and without a vote, if authorized by a writing setting forth the action so taken, signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of corporate action without a meeting by less than unanimous written consent shall be given to those shareholders who have not consented in writing.

Section 7.     Quorum.

The holders of a majority of the shares entitled to vote present in person or represented by proxy, shall be requisite and shall constitute a quorum at all meetings of the shareholders for the transaction of business except as otherwise provided by law, by the Articles of Incorporation, or by these Bylaws. In the absence of a quorum, any meeting of shareholders may be adjourned from time to time by the vote of a majority of the shares, the holders of which are either present in person or represented by proxy, but no other business may be transacted. At an adjourned meeting at which the requisite amount of voting shares is represented, any business may be transacted which might have been transacted at the meeting as originally notified. The shareholders present at a duly called or held meeting at which a quorum is present may continue to do business until adjournment notwithstanding the withdrawal of enough shareholders to leave less than a quorum.

Section 8.     Voting Rights; Cumulative Voting.

Only persons in whose names shares entitled to vote and stand on the stock records of the Corporation on the day of any meeting of shareholders, unless some other day be fixed by the Board of Directors for the determination of shareholders of record, and then on such other day, shall be entitled to vote at such meeting.

Every shareholder entitled to vote at any election for directors may cumulate his votes and give one candidate a number of votes equal to the number of directors to be elected multiplied by the number of votes to which his shares are entitled, or distribute his votes on the same principle among as many candidates as he thinks fit; provided, however, that no shareholder shall be entitled to cumulate votes unless the candidate or candidates' names have been placed in nomination prior to the voting and the shareholder has given notice at the meeting prior to the voting of the shareholder's intention to cumulate his votes. If any one shareholder has given proper notice, all shareholders may cumulate their votes for candidates in nomination.

The candidates receiving the highest number of votes, up to the number of directors to be elected, are elected.

The Board of Directors may fix a time in the future not exceeding thirty (30) days preceding the date of any meeting of shareholders or the date fixed for the payment of any

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

dividend or distribution, or for the allotment of rights, or when any change or conversion or exchange of shares shall go into effect, as a record date for the determination of the shareholders entitled to notice of and to vote at any meeting, or entitled to receive any dividend or distribution, or any allotment of rights, or to exercise the rights in respect to any change, conversion of exchange of shares. Only shareholders of record on the date so fixed shall be entitled to notice of and to vote at such meeting, or to receive such dividends, distribution or allotment of rights, or to exercise such rights, notwithstanding any transfer of any shares on the books of the Corporation after the record date.

Section 9.        Proxies.

Every shareholder entitled to vote, or to execute consents, may do so, either in person or by written proxy, executed in accordance with the provisions of Section 705 of the Corporations Code of California and filed with the Secretary of the Corporation.

A proxy is not valid after the expiration of eleven (11) months from the date of its execution, unless the person executing it specifies therein the length of time for which the proxy is to continue in force, which in no case shall exceed seven (7) years from the date of its execution.

Any proxy duly executed is not revoked, and continues in full force and effect, until a revocation in writing or a duly executed proxy bearing a later date, is filed with the Secretary of the Corporation. A proxy is not revoked by the death or incapacity of the maker unless, before the vote is counted or the authority is exercised, written notice of the death or incapacity is given to the Corporation. Notwithstanding that a valid proxy is outstanding, the powers of the proxy holder are suspended, except in the case of a proxy coupled with an interest, which states that fact on its face, if the person executing the proxy is present at the meeting and elects to vote in person.

If any instrument of proxy designates two or more persons to act as proxy, in the absence of any provision in the proxy to the contrary, the persons designated may represent and vote the shares in accordance with the vote or consent of the majority of the persons named as such proxies. If only one proxy is present, he may vote all the shares, and all of the shares standing in the name of the principal or principals for whom such proxy acts shall be deemed represented for the purpose of obtaining a quorum. The foregoing provisions shall apply to the voting of shares by proxies for any two or more administrators, executors, trustees or other fiduciaries, unless an instrument or order of the court appointing them otherwise directs.

The Board of Directors may, in advance of any annual or special meeting of the shareholders, prescribe additional regulations concerning the manner of execution and filing of proxies and the validation of the same, which are intended to be voted at any such meeting.

Section 10.        Organization.

The President, or in the absence of the President, any Vice President, shall call the meeting of the shareholders to order, and shall act as chairman of the meeting. In the absence of the President and all of the Vice Presidents, a Chairman chosen by a majority in interest of the shareholders of the Corporation present in person or by proxy and entitled to vote, shall act as

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

chairman. The Secretary of the Corporation shall act as secretary of all meetings of the shareholders, but in the absence of the Secretary at any meeting of the shareholders, the presiding officer may appoint any person to act as secretary of the meeting.

<u>Section 11.</u>    Inspectors of Election.

In advance of any meeting of shareholders, the Board of Directors may, if they so elect, appoint inspectors of election to act at the meeting or any adjournments thereof. If inspectors of election are not appointed, the chairman of any meeting may, and on the request of any shareholder or his proxy shall, make such appointment at the meeting. The number of inspectors shall be either one (1) or three (3).

If appointed at a meeting on the request of one or more shareholders or proxies, the majority of shares present shall determine whether one or three inspectors are to be appointed. In case any person appointed as inspector fails to appear, or fails or refuses to act, the vacancy may be filled by appointment by the Board of Directors in advance of the meeting, or at the meeting by the person acting as chairman.

The inspectors of election shall (i) determine the number of shares outstanding and the voting power of each, the shares represented at the meeting, the existence of a quorum, the authenticity, validity, and effect of proxies, (ii) receive votes, ballots, or consents, (iii) hear and determine all challenges and questions in any way arising in connection with the right to vote, (iv) count and tabulate all votes or consents and determine the result, and do such acts as may be proper to conduct the election or vote with fairness to all shareholders. The inspectors of election shall perform their duties impartially, in good faith, to the best of their ability and as expeditiously as is practical. On request of the chairman of the meeting or of any shareholder or his proxy, the inspectors shall make a report in writing of any challenge or question or matter determined by them and execute a certificate of any fact found by them. Any report or certificate made by them is prima facie evidence of the facts stated therein.

ARTICLE III

Directors: Management

<u>Section 1.</u>    Powers.

If initial directors have not been named in the Articles of Incorporation, the incorporator or incorporators, until such time as directors may be elected, may do whatever is necessary and proper to perfect the organization of the Corporation including the adoption and amendment of Bylaws of the Corporation and the election of directors and officers. Subject to the limitation of the Articles of Incorporation, of the Bylaws, and of the laws of the State of California as to action to be authorized or approved by the shareholders, all corporate powers shall be exercised by or under authority of, and the business and affairs of this Corporation shall be controlled by a Board of Directors.

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

Section 2.    Number and Qualification.

The authorized number of directors of the Corporation shall be the minimum number of directors permitted by the Corporations Code of California.

Section 3.    Election and Tenure of Office.

The directors shall be elected by ballot at the annual meeting of the shareholders, to serve for one (1) year or until their successors are elected and have qualified. Elections for directors need not be by ballot unless a shareholder demands election by ballot at the election and before the voting begins, or unless the Bylaws so require. The term of office of the directors shall begin immediately after election.

Section 4.    Vacancies.

Except for a vacancy created by the removal of a director, vacancies in the Board of Directors may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, and each director so elected shall hold office until his successor is elected at an annual meeting of shareholders or at a special meeting called for that purpose.

A vacancy or vacancies shall be deemed to exist in case of the death, resignation or removal of any director, or if the shareholders shall increase the authorized number of directors but shall fail at the meeting at which such increase is authorized, or at an adjournment thereof, to elect the additional director so provided for, or in case the shareholders fail at any time to elect the full number of authorized directors.

If the Board of Directors accepts the resignation of a director tendered to take effect at a future time, the Board, or the shareholders, shall have power to elect a successor to take office when the resignation shall become effective.

No reduction of the number of directors shall have the effect of removing any director prior to the expiration of his term of office.

The Board of Directors may declare vacant the office of a director (1) if the director is declared of unsound mind by an order of the court, or finally convicted of a felony or (2) if within sixty (60) days after notice of his election the director does not accept the office either in writing or by attending a meeting of the Board of Directors.

Section 5.    Removal of Directors.

The entire Board of Directors or any individual director may be removed from office as provided by Section 303 of the Corporations Code of the State of California.

Section 6.    Place of Meetings.

Meetings of the Board of Directors shall be held at the office of the Corporation in the State of California, as designated for that purpose, from time to time, by resolution of the Board of Directors or written consent of all of the members of the Board. Any meeting shall be

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

valid, wherever held, if held by the written consent of all members of the Board of Directors, given either before or after the meeting and filed with the Secretary of the Corporation.

Members of the Board of Directors may participate in a meeting of the Board of Directors by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other and such participation in a meeting shall constitute presence in person at the meeting.

Section 7.    Organization Meetings.

The organization meetings of the Board of Directors shall be held immediately following the adjournment of the annual meetings of the shareholders.

Section 8.    Other Regular Meetings.

Regular meetings of the Board of Directors shall be held at the corporate offices, or such other place as may be designated by the Board of Directors, as follows:

Time of Regular Meeting:    10:00 a.m.

Date of Regular Meeting:    First Tuesday in June

If said day shall fall on a holiday, the meeting shall be held on the next succeeding business day. No notice need be given of regular meetings.

Section 9.    Special Meetings - Notices.

Special meetings of the Board of Directors for any purpose or purposes may be called at any time by the Chairman of the Board or the President or by any Vice President or the Secretary or by any two (2) directors.

Written notice of the time and place of special meetings shall be delivered personally to each director or sent to each director by letter or by telegram, charge prepaid, addressed to him at his address as it is shown upon the records of the Corporation, or if it is not shown on such records or is not readily ascertainable, at the place in which the meetings of the directors are regularly held. In case such notice is mailed or telegraphed, it shall be deposited in the United States mail or delivered to the telegraph company in the place in which the principal office of the Corporation is located at least forty-eight (48) hours prior to the time of the holding of the meeting. In case such notice is delivered personally, it shall be delivered at least twenty-four (24) hours prior to the time of the holding of the meeting.

Section 10.    Waiver of Notice.

When all of the directors are present at any directors' meeting, however called or noticed, and sign a written consent thereto on the records of such meeting, or, if a majority of the directors are present, and if those not present sign a written waiver of notice of such meeting, whether prior to or after the holding of such meeting, which said waiver shall be filed with the

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

Secretary of the Corporation, the transactions thereof are as valid as if had at a meeting regularly called and noticed.

Section 11.    Directors Acting Without a Meeting by Unanimous Written Consent.

Any action required or permitted to be taken by the Board of Directors may be taken without a meeting and with the same force and effect as if taken by a unanimous vote of directors, if authorized by a writing signed by all members of the Board. Such consent shall be filed with the regular minutes of the Board.

Section 12.    Notice of Adjournment.

Notice of the time and place of holding an adjourned meeting shall be given to  absent directors prior to the time of the meeting if the adjournment is for more than twenty-four (24) hours.

Section 13.    Quorum.

A majority of the number of directors as fixed by the Articles of Incorporation or Bylaws shall be necessary to constitute a quorum for the transaction of business. A quorum shall not be less than one-third (1/3) of the authorized number of directors or less than two, whichever is larger, unless the authorized number of directors is one, in which case one director shall constitute a quorum. The action of a majority of  the  directors present at any meeting at which there is a quorum, when duly assembled, is valid as a corporate act; provided that a minority of the directors, in the absence of a quorum, may adjourn from time to time, but may not transact any business. A duly called and noticed Board meeting at which a quorum is initially present and assembled shall be able to continue the transaction of business notwithstanding the withdrawal of a sufficient number of directors to break a quorum provided that any action so taken is approved by at least a majority of the required quorum for such a meeting.

Section 14.    Compensation of Directors.

Directors shall not receive any stated salary for their services as directors, but by resolution of the Board a fixed sum and expense of attendance may be allowed for attendance at each regular and special meeting of the Board; provided that nothing herein contained shall be construed to preclude any director from serving the Corporation in any other capacity and receiving compensation therefor.

Section 15.    Executive Committee.

An executive committee may be appointed by resolution passed by a majority of the Board. The executive committee shall be composed of members of the Board, and shall have such powers as may be expressly delegated  to  it  by resolution  of  the  Board  of  Directors. It shall act only in the intervals between meetings of the Board and shall be subject at all times to the control of the Board of Directors.

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

ARTICLE IV

Officers

Section 1.       Officers.

The officers of the Corporation shall be a Chief Wind-Down Officer, President, a Secretary, and a Chief Financial Officer. The Corporation may also have, at the discretion of the Board of Directors, a Chairman of the Board, one or more Vice Presidents, one or more Assistant Secretaries, one or more Assistant Chief Financial Officers, and such other officers as may be appointed in accordance with the provisions of Section 3 of this Article IV. Any number of offices may be held by the same person unless the Articles of Incorporation or Bylaws provide otherwise.

Section 2.       Election.

The officers of the Corporation, except such officers as may be appointed in accordance with the provisions of Section 3 or Section 5 of this Article IV, shall be chosen annually by the Board of Directors, and each shall hold his office until he shall resign or shall be removed or otherwise disqualified to serve, or his successor shall be elected and qualified.

Section 3.       Subordinate Officers, Etc.

The Board of Directors may appoint such other officers as the business of the Corporation may require, each of whom shall hold office for such period, have  such  authority and perform such duties as are provided in the Bylaws or  as  the  Board  of Directors may from time to time determine.

Section 4.       Removal and Resignation.

Any officer may be removed, either with or without cause, by a majority of the directors at the time in office, at any regular or special meeting of the  Board, or, except in case of an officer chosen by the Board of Directors, by any officer upon whom such power of removal may be conferred by the Board of Directors.

Any officer may resign at any time by giving written notice to the Board of Directors, or to the President, or to the Secretary of the Corporation. Any resignation shall take effect at the date of the receipt of such notice or at any later time specified therein. Unless otherwise specified therein, the acceptance of the resignation shall not be necessary to make it effective.

Section 5.       Vacancies.

A vacancy in any office because of death, resignation, removal, disqualification or any other cause shall be filled in the manner prescribed in the Bylaws for regular appointments to such office.

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

Section 6.    Chairman of the Board.

The Chairman of the Board, if there shall be such an officer, shall, if present, preside at all meetings of the Board of Directors, and shall exercise and perform such other powers and duties as may be from time to time assigned to him by the Board of Directors or prescribed by the Bylaws.

Section 7.    Chief Wind-Down Officer; President.

Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if there be such an officer, the Chief Wind-Down Officer shall be the President, which person shall be the Chief Executive Officer of the Corporation and shall, subject to the control of the Board of Directors, have general supervision, direction, and control of the business and officers of the Corporation. The Chief Wind-Down Officer and President shall preside at all meetings of the shareholders and in the absence of the Chairman of the Board, or if there be none, at all meetings of the Board of Directors. The Chief Wind-Down Officer and President shall be ex officio a member of all the standing committees, including the executive committee, if any, and shall have the general powers and duties of management usually vested in the president of a corporation, together with all additional powers and duties as may be prescribed by the Board of Directors or the Bylaws.

Section 8.    Vice President.

In the absence or disability of the President, the Vice Presidents, in order of their rank as fixed by the Board of Directors, or if not ranked, the Vice President designated by the Board of Directors, shall perform all the duties of the President, and when so acting shall have all the power of, and be subject to all the restrictions upon, the President. The Vice Presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them by the Board of Directors or the Bylaws.

Section 9.    Secretary.

The Chief Wind-Down Officer shall be the Secretary.  The Secretary shall keep, or cause to be kept, a Book of Minutes at the principal office or such other place as the Board of Directors may order, of all meetings of directors and shareholders, with the time and place of holding, whether regular or special, and if special, how authorized, the notice given, the names of those present at directors' meetings, the number of shares present or represented at shareholders' meetings and the proceedings thereof.

The Secretary shall keep, or cause to be kept, at the principal office or at the office of the Corporation's transfer agent, a share register, or duplicate share register, showing the names of the shareholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued and the number and date of cancellation of every certificate surrendered for cancellation.

The Secretary shall give, or cause to be given, notice of all the meetings of the shareholders and of the Board of Directors required by the Bylaws or by law to be given, shall

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

keep the seal of the Corporation in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by the Bylaws.

    <u>Section 10.</u>    Chief Financial Officer.

    The Chief Wind-Down Officer shall be the Chief Financial Officer.  The Chief Financial Officer shall keep and maintain, or cause to be kept and maintained, adequate and correct accounts of the properties and business transactions of the Corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, surplus and shares. Any surplus, including earned surplus, paid-in surplus and surplus arising from a reduction of stated capital, shall be classified according to source and shown in a separate account. The Books of Account shall at all reasonable times be open to inspection by any director.

    The Chief Financial Officer shall deposit all monies and other valuables in the name and to the credit of the Corporation with such depositaries as may be  designated by the  Board of Directors, shall disburse the funds of the Corporation as may be ordered by the Board of Directors, shall render to  the  President  and directors,  whenever  they request  it, an account of all of his transactions as Chief Financial Officer  and  of  the  financial condition of the Corporation, and shall have such other powers and perform such  other  duties as may be prescribed by the Board of Directors or the Bylaws.

ARTICLE V

Corporate Records and Reports – Inspection

    <u>Section 1.</u>    Records.

    The Corporation shall maintain adequate and correct accounts, books and records of its business and properties at its principal place of business in the State of California, as fixed by the Board of Directors from time to time.

    <u>Section 2.</u>    Inspection of Books and Records.

    All books and records provided for in Sections 1600 through 1602 of the Corporations Code of California shall be open to inspection  of  the  directors and shareholders  from time to time and in the manner provided in Sections 1600 through 1602.

    <u>Section 3.</u>    Certification and Inspection of Bylaws.

    The original or a copy of these Bylaws, as amended or otherwise altered to date, certified by the Secretary, shall be open to inspection by the shareholders  of  the  Corporation, as provided in Section 213 of the Corporations Code of California.

    <u>Section 4.</u>    Checks.

    All checks, drafts or other orders for payment of money, notes or other evidences of indebtedness, issued in the name of or payable to the Corporation, shall be signed or endorsed by

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

such person or persons and in such manner as shall be determined from time to time by resolution of the Board of Directors.

<u>Section 5.</u>    Contracts.

The Board of Directors may authorize any officer or officers, agent or agents, to enter into any contract or execute any instrument in the name of and on behalf of the Corporation. Such authority may be general or confined to specific instances. Unless so authorized by the Board of Directors, no officer, agent or employee shall have any power or authority to bind the Corporation in any material matter by any contract or engagement, or to pledge its credit to any significant extent or to render it liable for any material purposes or to any significant amount.

<u>Section 6.</u>    Annual Report.

The annual report to shareholders ref erred to in Section 1501 of the California Corporations Code is expressly waived, but nothing herein shall be interpreted as prohibiting the Board of Directors from issuing annual or other periodic reports to shareholders.

ARTICLE VI

Certificates and Transfer of Shares

<u>Section 1.</u>    Certificates for Shares.

Certificates for shares shall be of such form and device as the Board of Directors may designate and shall state the name of the record holder of the shares represented thereby; its number; date of issuance; the number of shares for which it is issued; a statement of the rights, privileges, preferences and restrictions, if any; a statement as to the redemption or conversion, if any; a statement of liens or restrictions upon transfer or voting, if any; if the shares be assessable or, if assessments are collectible by personal action, a plain statement of such facts.

Every certificate for shares must be signed by the President or a Vice President, and the Secretary or an Assistant Secretary or by facsimiles of the signatures of the President or Vice President and Secretary or Assistant Secretary.

<u>Section 2.</u>    Transfer on the Books.

Upon surrender to the Secretary or transfer agent of the Corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duty of the Corporation to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

<u>Section 3.</u>    Lost or Destroyed Certificates.

Where the holder of a share certificate claims that the certificate has been lost, destroyed or wrongfully taken, the holder shall make an affidavit or affirmation of that fact and advertise the same in such manner as the Board of Directors may require, and shall if the directors so

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

require give the Corporation a bond of indemnity, in form and with one or more sureties satisfactory to the Board, in at least double the value of the stock represented by said certificate, whereupon a new certificate shall be issued in the same tenor and for the same number of shares as the one alleged to be lost, destroyed or wrongfully taken if the owner so requests before the Corporation has notice that the share has been acquired by a bona fide purchaser.

Where a share certificate has been lost, apparently destroyed, or wrongfully taken and the owner fails to notify the Corporation of that fact within a reasonable time after he has notice of it, and the Corporation registers a transfer of the shares represented by the certificate before receiving such a notification, the owner is precluded from asserting against the Corporation any claim to a new certificate.

If after the issue of a new certificate as a replacement for a lost, destroyed or wrongfully taken certificate, a bona fide purchaser of the original certificate presents it for registration of transfer, the Corporation must register the transfer unless registration would result in over-issue. In addition to any rights on the indemnity bond, the Corporation may recover the new certificate from the person to whom it was issued or any person taking under him except a bona fide purchaser.

Section 4.    Transfer Agents and Registrars.

The Board of Directors may appoint one or more transfer agents or transfer clerks, and one or more registrars which shall be an incorporated bank or trust company, either domestic or foreign, and which shall be appointed at such times and places as the requirements of the Corporation may necessitate and the Board of Directors may designate.

Section 5.    Closing Stock Transfer Books.

The Board of Directors may close the transfer books in its discretion for a period not exceeding thirty (30) days preceding any meeting, annual or special, of the shareholders, or the day appointed for the payment of a dividend.

Section 6.    Legend Condition.

In the event any shares of this Corporation are issued pursuant to a permit or exemption therefrom requiring the imposition of a legend condition, the person or persons issuing or transferring such shares shall make sure the legend appears on the certificate and on the stub relating thereto in the stock record book and shall not be required to transfer any shares free of such legend unless an amendment to the permit or a new permit is issued authorizing such a deletion.

ARTICLE VII

Corporate Seal

The corporate seal shall be circular in form, and shall have inscribed thereon the name of the Corporation, the date of its incorporation, and the word "California."

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

ARTICLE VIII

Indemnification

Section 1.    Definitions.

For the purposes of these Bylaws, "agent" means any person who is or was a director, officer, employee, or other agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, or other enterprise, or was a director, officer, employee or agent of a foreign or domestic corporation which was a predecessor corporation of the Corporation or of another enterprise at the request of such predecessor corporation.

For the purposes of these Bylaws, "proceeding" means any threatened, pending, or completed action or proceeding, whether civil, criminal, administrative, or investigative; and "expenses" include without limitation attorneys' fees and any expenses of establishing a right to indemnification under Section 3 or Paragraph (c) of Section 4 of this Article VIII.

Section 2.    Power to Indemnify.

(a)    The Corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any proceeding (other than an action by or in the right of the Corporation to procure a judgment in its favor) by reason of the fact that such person is or was an agent of the Corporation, against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with such proceeding if such person acted in good faith and in a manner such person reasonably believed to be in the best interests of the Corporation and, in the case of a criminal proceeding, had no reasonable cause to believe the conduct of such person was unlawful. The termination of any proceeding by judgment, order, settlement, conviction, or on a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the person did not act in good faith an in a manner which the person reasonably believed to be in the best interests of the Corporation or that the person had reasonable cause to believe that the person's conduct was unlawful.

(b)    The Corporation shall have the power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed action by or in the right of the Corporation to procure a judgment in its favor by reason of the fact that such person is or was an agent of the Corporation, against expenses actually and reasonably incurred by such person in connection with the defense or settlement of such action if such person acted in good faith, in a manner such person believed to be in the best interests of the Corporation and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances. No indemnification shall be made under this paragraph, however:

(1)    In respect of any claim, issue, or matter as to which such person shall have been adjudged to be liable to the Corporation in the performance of such person's duty to the Corporation, unless and only to the extent that the

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

court in which such proceeding was or is pending shall determine on application that, in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnify for the expenses which such court shall determine;

(2)     Of amounts paid in settling or otherwise disposing of a threatened or pending action, with or without court approval; or

(3)     Of expenses incurred in defending a threatened or pending action which is settled or otherwise disposed of without court approval.

Section 3.     Expenses of Successful Agent.

To the extent that an agent of this Corporation has been successful on the merits in the defense of any proceeding referred to in Section 2 or in defense of any claim, issue, or matter therein, the agent shall be indemnified against expenses actually and reasonably incurred by the agent in connection therewith.

Section 4.     Determination That Indemnification is Proper.

Except as provided in Section 3, any indemnification under Article VIII of these Bylaws shall be made by the Corporation only if authorized in the specific case, on a determination that indemnification of the agent is proper in the circumstances because the agent has met the applicable standard of conduct set forth in Section 2 by:

(a)     A majority vote of a quorum consisting of directors who are not parties to such proceeding;

(b)     Approval of the shareholders, as that term is defined in Section 153 of the California Corporations Code, with the share owned by the person to be indemnified not being entitled to vote thereon; or

(c)     The court in which such proceeding is or was pending on application made by the Corporation or the agent or the attorney or other person rendering services in connection with the defense, whether not such application by the agent, attorney, or other person is opposed by the Corporation.

Section 5.     Advance of Expenses.

Expenses incurred in def ending any proceeding may be advanced by the Corporation prior to the final disposition of such proceeding on receipt of any undertaking by or on behalf of the agent to repay such amount unless it shall be determined ultimately that the agent is entitled to be indemnified as authorized in this Article VIII of these Bylaws.

Section 6.     Inconsistent Provisions.

No provision made by this Corporation to indemnify its (or its subsidiary's) directors or officers for the defense of any proceeding shall be valid unless consistent with this Article VIII

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

of these Bylaws. Nothing in this Section shall, however, affect any right to indemnification to which persons other than such directors and officers may be entitled by contract or otherwise.

Section 7.    Limitation on Indemnification.

No indemnification or advance shall be made under this Article VIII of these Bylaws, except as provided in Section 3 or Paragraph (c) of Section 4, in any circumstance where it appears:

(a)    That it would be inconsistent with a provision of the Articles, these Bylaws, a resolution of the shareholders, or an agreement in effect at the time of the accrual of the alleged cause of action asserted in the proceeding in which the expenses were incurred or other amounts were paid, which prohibits or otherwise limits indemnification; or

(b)    That it would be inconsistent with any condition expressly imposed by a court in approving a settlement.

Section 8.    Insurance.

The Corporation shall have the power to purchase and maintain insurance on behalf of any agent in such capacity or arising out of the agent's status as such whether or not the Corporation would have the power to indemnify the agent against such liability under the provisions of this Article VIII.

ARTICLE IX

Amendments to Bylaws

Section 1.    By Shareholders.

New Bylaws may be adopted or these Bylaws may be repealed or amended at the annual meetings, or any other meeting of the shareholders called for that purpose, by a vote of shareholders entitled to exercise a majority of the voting power of the Corporation, or by written assent of such shareholders.

Section 2.    Powers of Directors.

Subject to the right of the shareholders to adopt, amend or repeal Bylaws, as provided in Section 1 of this Article IX, the Board of Directors may adopt, amend or repeal any of these Bylaws other than a Bylaw or amendment thereof changing the authorized number of directors.

Section 3.    Record of Amendments.

Whenever an amendment or new Bylaw is adopted, it shall be copied in the book of Bylaws with the original Bylaws in the appropriate place. If any Bylaw is repealed, the fact of repeal with the date of the meeting at which the repeal was enacted or written assent was filed shall be stated in said book.

**Exhibit D – Unanimous Written Consent of the Shareholders of Bridgemark Corporation**

ARTICLE X

Incorporation by Reference

Whenever any reference is made in these Bylaws to any legislative enactment, whether law, statute or ordinance, such enactment shall be deemed incorporated by reference herein.

**Exhibit E – Plan Term Sheet**

## <u>SUMMARY PLAN TERM SHEET</u>[1]

*In re Bridgemark Corp.*, Case No. 8:20-bk-10143-TA (Bankr. C.D. Cal.)

**This document is not a solicitation or a vote for any proposed plan, but rather memorializes an agreement among Bridgemark, Hall, the Hall-Related Parties, and PDC with respect to the contours of a plan of liquidation – the interstitial details of which remain subject to further review, comment, and final approval by the parties.**

**A.    Timing**

After the Closing of the Sale Transaction, Bridgemark will file and prosecute confirmation of a chapter 11 plan (the "<u>Plan</u>") consistent with this Plan Term Sheet.

**B.    Treatment of Allowed Claims**

The Plan will provide for payment in full in cash of all allowed claims (other than the PDC Claim) on the effective date of the Plan (the "<u>Plan Effective Date</u>"), or other treatment that leaves unaltered the legal, equitable, and contractual rights to which such claim entitles the holder of such claim.

All allowed claims (including the PDC Claim) and interests shall be unimpaired under the Plan.  Accordingly, Bridgemark shall not be required to solicit votes on the Plan or to prepare and file a disclosure statement.

**C.    Cancellation of Equity Interests; Hall's Consent to Plan Treatment**

All existing equity interests, including, without limitation, interests held by Hall and any Hall-Related Parties, shall be deemed void, cancelled, and of no further force and effect.  Hall and each Hall-Related Party have already in the Settlement Agreement (i) consented to the cancellation of their equity interests, (ii) agreed not to object to any Plan that is materially consistent with this Plan Term Sheet, and (iii) agreed that their legal, equitable, and contractual rights are unaltered and unimpaired by any Plan that effectuates the terms of the Settlement Agreement and is materially consistent with this Plan Term Sheet.

**D.    Liquidation Trust**

On the Plan Effective Date, a Liquidation Trust (the "<u>Liquidation Trust</u>") will be formed. The Liquidation Trust will be vested with all then-remaining assets of Bridgemark and its estate. The Chief Wind-Down Officer shall be the trustee ("<u>Trustee</u>") of the Liquidation Trust.  The sole beneficiary of the Liquidation Trust will be PDC.

The compensation, rights, duties, and obligations of the Trustee will be set forth in the Plan, the order confirming the Plan (the "<u>Confirmation Order</u>"), and/or the trust agreement (the "<u>Trust Agreement</u>" and, together with the Plan and Confirmation Order, the "<u>Plan Documents</u>")

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Settlement Agreement to which this Plan Term Sheet is attached.

**Exhibit E – Plan Term Sheet**

to be filed in connection with the Plan.  The Trustee will be required to, *inter alia*, (i) marshal and dispose of any remaining assets of Bridgemark or its estate that are vested in the Liquidation Trust; and (ii) plug and abandon all wells on the PDC Parcel and remove appurtenant structures, equipment, and flow lines so that the area in which the wells have been plugged and abandoned is clean, level, safe, and at a sufficient depth beneath the surface to accommodate residential development of the PDC Parcel.

The plugging and abandonment required by the Plan Documents will be performed in strict accordance with all applicable laws and the terms and conditions of any applicable contracts or leases, and will be approved by the requisite regulatory authorities.  The work will be undertaken by a licensed contractor engaged with the approval of the Bankruptcy Court pursuant to a work plan approved by the Bankruptcy Court.

Once the plugging and abandonment required by the Plan Documents is complete:

(i)     The Trustee will take whatever steps are necessary to fully terminate and disclaim all right, title, and interest in or to any portion of the PDC Parcel.  The Confirmation Order will confirm that once such plugging and abandonment is complete, no person or entity other than PDC has any surface rights to the PDC Parcel or any oil or gas extraction rights within five hundred (500) feet of the surface of the PDC Parcel, and will further provide that such Confirmation Order may be recorded in the land records and relied upon by title insurers and subsequent purchasers;

(ii)    PDC and the Trustee, if applicable, will file a satisfaction of judgment with respect to the PDC Judgment, specifying that the monetary portion of the PDC Judgment has been satisfied and disclaiming any further rights under the PDC Judgment (including but not limited to rights with respect to the PDC Parcel – all of which are forever waived and released under the Settlement Agreement), and the Trustee will dismiss the Appeal with prejudice, with each party to bear its own fees and costs;

(iii)   The Trustee will (distribute all remaining monetary assets of the Liquidation Trust to PDC, and PDC will have the right (but not the obligation) to take any other remaining assets of the Liquidation Trust; and

(iv)    The Trustee will seek entry of an order closing the bankruptcy case.

**Exhibit F – Form of Joinder, Power of Attorney, and Ratification**

## JOINDER, POWER OF ATTORNEY, AND RATIFICATION

The undersigned ("Joining Party"), having reviewed that certain *Settlement Agreement* (the "Agreement"), dated as of [_____], 2021, entered into by (i) Placentia Development Company LLC ("PDC"); (ii) Bridgemark Corporation ("Bridgemark"); and (iii) Robert J. Hall, both individually ("Hall") and in his capacity as agent for the persons and entities listed on Exhibit A thereto, hereby agrees and acknowledges as follows:

(1)    Joining Party is a "Hall-Related Party," as that term is defined in the Agreement.

(2)    Joining Party hereby joins in and agrees to be bound by the Agreement.

(3)    Joining Party hereby irrevocably makes, constitutes, and appoints Hall to act as such Joining Party's sole true and lawful attorney-in-fact, agent and proxy, with full and exclusive power and authority, including power of substitution and resubstitution, acting in the name of and for and on behalf of such Joining Party: (a) to execute and deliver the Agreement and to exercise Joining Party's rights and perform its obligations thereunder on behalf of Joining Party; (b) to deliver any document or notice required or permitted to be delivered by Joining Party under the Agreement or under the Ancillary Agreements (as defined in the Agreement); (c) to act for and on behalf of Joining Party with respect to any claim, settlement or other resolution or for any other matter relating to Joining Party arising on or after the Execution Date (as defined in the Agreement); and (e) take all actions necessary or appropriate in the good faith judgment of Hall for the accomplishment of the foregoing.

(4)    Joining Party acknowledges that the appointment of Hall is coupled with an interest and may not be revoked and shall not be subject to termination by operation of law, whether by the death or incapacity or liquidation, dissolution or winding up of Joining Party. Hall accepts such appointment and authorization to act as attorney-in-fact and agent of Joining Party.  The power and authority granted hereunder will be exclusive, and Joining Party shall not be entitled to exercise any right under the Agreement held by Hall except through Hall.  Without limiting the foregoing, any determination or resolution (in any proceeding, by agreement or otherwise) of any dispute, controversy or claim relating to the Agreement or the Ancillary Agreements to which Hall is a party shall be binding on Joining Party and its successors, assigns, heirs, next-of-kin, representatives, administrators, executors and affiliates.

(5)    In furtherance of the appointment of Hall herein made and to the extent of the authority granted to Hall hereby, Joining Party, fully and without restriction: (a) agrees to be bound by all notices received and agreements and determinations made by and documents executed and delivered by Hall under the Agreement; (c) ratifies Hall's entry into the Agreement as of the Execution Date; and (c) authorizes Hall to (i) perform the transactions to be performed pursuant to the Agreement, (ii) negotiate and compromise any dispute which may arise under the Agreement, (iii) act for and on behalf of Joining Party with respect to any claim or matter arising on or after the Execution Date under the Agreement, (iv) exercise or refrain from exercising any remedies available to Joining Party under the Agreement, (v) sign any releases or other documents with respect to any such dispute or remedy, (vi) waive any condition contained in, or execute any amendment to, the Agreement, (vii) give such instructions and do such other things and refrain from doing such other things as Hall, in his sole discretion, deems appropriate to

**Exhibit F – Form of Joinder, Power of Attorney, and Ratification**

carry out the provisions of the Agreement and (viii) retain such counsel, accountants and other professional advisors as Hall reasonably deems necessary to assist him in the performance of his duties under the Agreement.

[_____],
a [_____]


By: _____

Name: _____

Title: _____

Date: _____

# EXHIBIT C

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BRIDGEMARK CORPORATION, GREGSON ENERGY DRILLING LLC, AND BRIDGEMARK TEXAS LLC,**

**COLLECTIVELY, AS SELLER,**

**AND**

**CALIFORNIA NATURAL RESOURCES GROUP ORANGE COUNTY, LLC, REALM CALIFORNIA, LLC, AND ALATEX, LLC,**

**COLLECTIVELY, AS BUYER**

**Dated as of March 10, 2021**

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS .................................................................................. 2

**Section 1.1**      **Definitions.** .................................................................... 2
**Section 1.2**      **Other Capitalized Terms** ............................................. 9
**Section 1.3**      **Interpretive Provisions** ............................................. 10

ARTICLE 2 PURCHASE AND SALE ................................................................ 12

**Section 2.1**      **The Purchased Assets** ................................................ 12
**Section 2.2**      **Excluded Assets** .......................................................... 14
**Section 2.3**      **Ownership of Production from the Purchased Assets; Allocation of Property Costs** 14
**Section 2.4**      **Assumed Obligations** ................................................. 14
**Section 2.5**      **Excluded Obligations** ................................................. 15
**Section 2.6**      **Assumption of Contracts** .......................................... 17
**Section 2.7**      **Assignment of Purchased Assets Subject to Consent Requirements and Preferential Rights** ............................................................................... 17

ARTICLE 3 CONSIDERATION ........................................................................ 17

**Section 3.1**      **Consideration** .............................................................. 17
**Section 3.2**      **Allocation of Values** ................................................... 18

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLER ................ 18

**Section 4.1**      **Organization and Good Standing** ............................. 18
**Section 4.2**      **Authority** ..................................................................... 18
**Section 4.3**      **Consents; Fees** ............................................................ 18
**Section 4.4**      **No Conflict** .................................................................. 19
**Section 4.5**      **Contracts** ..................................................................... 19
**Section 4.6**      **Permits, Easements and Surface Rights** ................... 19
**Section 4.7**      **Wells** ............................................................................ 19
**Section 4.8**      **AFEs.** ........................................................................... 20
**Section 4.9**      **Preferential Rights** .................................................... 20
**Section 4.10**     **Taxes** ............................................................................ 20
**Section 4.11**     **Litigation** ..................................................................... 20
**Section 4.12**     **Compliance with Applicable Laws** ............................ 20
**Section 4.13**     **Environmental Matters** .............................................. 20
**Section 4.14**     **Suspense Funds** ........................................................... 21
**Section 4.15**     **Imbalances.** .................................................................. 21
**Section 4.16**     **Brokers or Finders** ..................................................... 21
**Section 4.17**     **Benefit Plans** ............................................................... 21
**Section 4.18**     **Real Property Leases; Royalties; Payments** ............. 22
**Section 4.19**     **Bonds; Insurance** ........................................................ 22
**Section 4.20**     **Condition of Equipment** ............................................ 22
**Section 4.21**     **Employee, Consultant or Contractor Bonuses** ......... 22

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER .................. 22

526512.000004 23802768.24

**Section 5.1**      **Organization and Good Standing**.........................................................22
**Section 5.2**      **Authority**.........................................................................................................22
**Section 5.3**      **No Conflict**......................................................................................................23
**Section 5.4**      **Bankruptcy**.....................................................................................................23
**Section 5.5**      **Litigation**........................................................................................................23
**Section 5.6**      **Brokers or Finders**........................................................................................23

ARTICLE 6 ACTIONS PRIOR TO THE CLOSING DATE .......................................... 23

**Section 6.1**      **Access and Reports** ......................................................................................23
**Section 6.2**      **Operations Prior to the Closing Date**........................................................24
**Section 6.3**      **Real Property Lease Expirations**.................................................................25
**Section 6.4**      **RWI Policy**......................................................................................................25

ARTICLE 7 CLOSING, POST-CLOSING OBLIGATIONS .......................................... 25

**Section 7.1**      **Closing Date**....................................................................................................25
**Section 7.2**      **Deliveries by Seller**........................................................................................25
**Section 7.3**      **Deliveries by Buyer** .......................................................................................26
**Section 7.4**      **Delivery of Property Records; Recording** ..................................................27
**Section 7.5**      **Further Assurances**........................................................................................27
**Section 7.6**      **Employee Matters** ..........................................................................................27
**Section 7.7**      **Adequate Assurance and Performance**.......................................................28
**Section 7.8**      **Delivery of Certain Funds** ............................................................................28
**Section 7.9**      **Vehicles. .** .........................................................................................................29

ARTICLE 8 BANKRUPTCY COURT MATTERS ........................................................ 29

**Section 8.1**      **Bankruptcy Court Filings** ............................................................................29
**Section 8.2**      **Break-Up Fee** .................................................................................................30

ARTICLE 9 CONDITIONS TO CLOSING....................................................................... 30

**Section 9.1**      **Conditions Precedent to the Obligations of the Buyer and the Seller**..........30
**Section 9.2**      **Conditions Precedent to the Obligations of the Seller**...............................30
**Section 9.3**      **Conditions Precedent to the Obligations of the Buyer** .................................31
**Section 9.4**      **Frustration of Closing Conditions**...............................................................31
**Section 9.5**      **Transaction Agreement, Settlement Agreement and Surface Use**
**Agreement**      31

ARTICLE 10 TERMINATION ........................................................................................... 31

**Section 10.1**    **Termination** ....................................................................................................31
**Section 10.2**    **Procedure Upon Termination** .......................................................................33
**Section 10.3**    **Effect of Termination** ....................................................................................33

ARTICLE 11 TAXES AND EXPENSES ........................................................................... 33

**Section 11.1**    **Recording Expenses** .......................................................................................33
**Section 11.2**    **Asset Taxes** .....................................................................................................33
**Section 11.3**    **Tax Returns** ....................................................................................................34
**Section 11.4**    **Transfer Taxes** ...............................................................................................34
**Section 11.5**    **Roll Back Taxes** .............................................................................................34

iii

ARTICLE 12 MISCELLANEOUS ......................................................................... 34

| Section 12.1 | **Survival and Remedies** ................................................ | 34 |
| Section 12.2 | **Public Announcements** ................................................ | 35 |
| Section 12.3 | **Expenses** ............................................................ | 35 |
| Section 12.4 | **Notices** ............................................................. | 35 |
| Section 12.5 | **Assignment** ......................................................... | 37 |
| Section 12.6 | **Entire Agreement; Amendment and Waivers** ........................ | 37 |
| Section 12.7 | **Non-Recourse** ....................................................... | 38 |
| Section 12.8 | **Severability** ....................................................... | 38 |
| Section 12.9 | **Counterparts** ....................................................... | 38 |
| Section 12.10 | **Governing Law** ..................................................... | 38 |
| Section 12.11 | **Jurisdiction; Waiver of Right to Trial by Jury** ................ | 38 |
| Section 12.12 | **Time of Essence** ................................................... | 39 |
| Section 12.13 | **Waiver of Damages** ................................................ | 39 |
| Section 12.14 | **Payments** .......................................................... | 39 |

526512.000004 23802768.24

**ANNEXES**

Annex A                    Form of Sale Order

**EXHIBITS**

Exhibit A          A-1 –  Assigned Real Property Leases
                   A-2 –  Wells and Equipment
                   A-3 –  Easements and Surface Rights
                   A-4 –  Royalty Interests
                   A-5 –  Mineral Interests
                   A-6 –  Assigned Contracts
                   A-7 –  Real Property
                   A-8 –  Personal Property
                   A-9 –  Hall Property
                   A-10 –  Allocation of Assets
Exhibit B          Excluded Assets
Exhibit C          C-1 – Form of Assignments and Bills of Sale
                   C-2 – Form of Deed

**SCHEDULES**

Schedule 2.5(p)     Hall Entities
Schedule 4.6        Permits, Easements and Surface Rights
Schedule 4.7        Notices or Directives (Wells)
Schedule 4.8        AFEs
Schedule 4.9        Preferential Rights
Schedule 4.12       Compliance with Applicable Laws
Schedule 4.14       Suspense Funds
Schedule 4.15       Imbalances
Schedule 4.19       Bonds; Insurance
Schedule 7.9        Vehicle Loans

526512.000004 23802768.24

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated March 10th, 2021 (the "**Execution Date**"), is by and between California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("**CalNRG OC**"), Realm California, LLC, a Delaware limited liability company ("**Realm**"), and Alatex, LLC, a Delaware limited liability company ("**Alatex**"), on the one hand, and Bridgemark Corporation, a California corporation ("**Bridgemark**"), Gregson Energy Drilling, LLC, a Wyoming limited liability company ("**Gregson**"), and Bridgemark Texas, LLC, a Texas limited liability company ("**Bridgemark Texas**"), on the other hand. Except where necessary for sake of clarity, CalNRG OC, Realm and Alatex shall be referred to herein collectively as "**Buyer**," and Bridgemark, Gregson and Bridgemark Texas shall be referred to herein collectively as "**Seller**." Buyer is a designee of Placentia Development Company, LLC ("**PDC**").  Buyer and Seller are sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**."

## RECITALS

WHEREAS, on January 14, 2020 (the "**Petition Date**"), Bridgemark commenced a voluntary case (the "**Chapter 11 Case**") under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**") in response to a December 31, 2019 judgment against Seller and in favor of PDC in excess of Forty-Two Million Dollars ($42,000,000) (the "**PDC Judgment**") in *PDC v. Bridgemark* (Case No. 30-2016-00888920-CU-CO-CJC), Superior Court for the State of California, County of Orange;

WHEREAS, Gregson and Bridgemark Texas are wholly-owned subsidiaries of Bridgemark;

WHEREAS, Seller continues to operate its business and manage its affairs as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on June 3, 2020, the Seller filed that certain Term Sheet, by and among the Seller, Robert J. Hall ("**Hall**") and PDC (the "**Settlement Term Sheet**"), which, *inter alia*, contemplates the sale of substantially all assets of the Seller to PDC or its designee;

WHEREAS, on June 26, 2020, the Bankruptcy Court entered that certain *Order Granting Motion for Order Approving Settlement Term Sheet Between the Debtor, Robert J. Hall and Placentia Development Company, LLC* (the "**Settlement Order**") approving the Settlement Term Sheet;

WHEREAS, contemporaneously with the entry into this Agreement, Seller Hall and PDC entered into that certain Settlement Agreement (the "**Settlement Agreement**") to, together with this Agreement, effectuate the Settlement Term Sheet;

WHEREAS, in accordance with the Settlement Term Sheet and Settlement Agreement, Seller desires to sell to Buyer the Purchased Assets and assign to Buyer the Assumed Obligations, and Buyer desires to purchase from Seller the Purchased Assets and to assume from Seller the Assumed Obligations, in each case upon the terms and conditions set forth in this

1

Agreement (such purchase, sale, assignment and assumption collectively, the "**Sale Transaction**");

WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein, following entry of the Sale Order, Seller shall sell and transfer to Buyer, and Buyer shall purchase and acquire from Seller, pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Purchased Assets, and Buyer shall assume from Seller the Assumed Obligations, all as more specifically provided herein and in the Sale Order.

NOW, THEREFORE, in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, subject to entry of the Sale Order, Buyer and Seller hereby agree as follows:

## AGREEMENT

## ARTICLE 1
## DEFINITIONS

**Section 1.1     Definitions.**  The following capitalized terms shall have the following meanings for all purposes of this Agreement:

"**Action**" means any action, claim, demand, arbitration, hearing, charge, complaint, investigation, examination, indictment, litigation, suit or other civil, criminal, administrative or investigative proceedings.

"**Affiliate**" means, (i) with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such specified Person and (ii) with respect to Seller, an "affiliate" as such term defined in section 101 of the Bankruptcy Code.  For the purposes of this definition, the term "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise; and the terms "controlling" and "controlled" have correlative meanings.

"**Applicable Law**" means all federal, state and local statutes, rules, ordinances and common law relevant and applicable to the Parties, the Sale Transaction and the Purchased Assets.

"**Asset Taxes**" means ad valorem, property, excise, severance, production, sales, use, or similar Taxes (excluding, for the avoidance of doubt, any Income Taxes and Transfer Taxes) based upon or measured by the ownership or operation of the Purchased Assets or the production of Hydrocarbons therefrom or the receipt of proceeds therefrom.

"**Bankruptcy Code**" means, as amended from time to time, chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq.

2

"**Business**" means the business of Seller, including the ownership and operation of the Purchased Assets.

"**Business Day**" means any day other than a Saturday, a Sunday or other day on which commercial banks in Orange County, California are authorized or required by Law to close.

"**Cash and Cash Equivalents**" means, collectively, all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, net of uncleared checks issued by Seller that are not yet reflected in the applicable bank account of the Seller.

"**Claim**" means a "claim" as such term is defined in section 101 of the Bankruptcy Code, and any and all demands, losses, Liabilities, damages, obligations, expenses, fines, penalties, costs, claims, causes of action and judgments for (a) breaches of Contract, (b) loss or damage to property, injury to or death of Persons (including illness and disease), and other tortious injury, or (c) violations of applicable Laws, Orders or any other legal right or duty actionable at law or equity.  The term "**Claims**" also includes reasonable attorneys' fees, court costs, and other reasonable costs resulting from the investigation or defense of any Claim.

"**Code**" means the Internal Revenue Code of 1986, as amended, and any successor statute.

"**Contract**" means any contract, agreement, indenture, note, bond, loan, lease, sublease, conditional sales contract, mortgage, license, sublicense, franchise agreement, obligation, promise, undertaking, commitment or other binding arrangement (in each case, whether written or oral).

"**Effective Date**" means 12:00 a.m., Pacific Standard Time, on the Closing Date.

"**Encumbrance**" means any charge, lien (including a "lien" as defined in section 101 of the Bankruptcy Code and mechanics liens), Claim, mortgage, lease, license, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, preemptive right, easement, right of way, servitude, restrictive covenant, encroachment, encumbrance, community property interest, third party interest or other restriction or limitation of any kind, whether voluntarily incurred or arising by operation of Law.

"**Environmental Condition**" means a condition that causes any Purchased Asset or other property (or Seller with respect to the Purchased Assets) not to be in compliance with or subject to Liability under an Environmental Law.

"**Environmental Laws**" means any federal, state, or local Law relating to the prevention of pollution, remediation of contamination, protection of the environment and human health and safety and natural resources, and restoration of environmental quality, including the following federal statutes, their state analogs, and the regulations promulgated thereunder: (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, (b) the Emergency Planning and Community Right-To-Know Act, (c) the Resources Conservation and Recovery Act, (d) the Clean Air Act, (e) the Clean Water Act, (f) the Safe Drinking Water Act,

3

(g) the Oil Pollution Act, and (h) the Toxic Substances Control Act, and their state analogs include, but are not limited to: (i) the California Porter-Cologne Water Quality Act, and (j) the provisions of the California Public Resources Code and California Health & Safety Code applicable to the Purchased Assets, as each of the foregoing has been amended.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Executory Contract**" means an "executory contract" as such term is used in section 365(a) of the Bankruptcy Code as related to the Purchased Assets to which Seller is a party.

"**FIRPTA Certificate**" means a certificate in form and substance reasonably satisfactory to Buyer that complies with Section 1445(b)(2) of the Code and the Treasury Regulations promulgated thereunder and establishes that Seller is not a "foreign person" within the meaning of that Section.

"**GAAP**" means generally accepted accounting principles in the United States of America.

"**Governmental Authority**" means (a) any federal, provincial, state, local, municipal, national or international government or governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body (public or private), (b) any self-regulatory organization, or (c) any political subdivision of any of the foregoing, and includes, without limitation, the California Department of Conservation, Division of Geologic Energy Management ("**CalGEM**") the California Air Resources Board, and the South Coast Air Quality Management District.

"**Hard Consent**" means any consent with respect to which (a) there is a provision within the applicable instrument that such consent may be withheld in the sole and absolute discretion of the holder, or (b) there is provision within the applicable instrument expressly stating that an assignment in violation thereof (i) is void or voidable, (ii) triggers the payment of specified liquidated damages, or (iii) causes termination of the applicable Purchased Assets to be assigned. For the avoidance of doubt, "Hard Consent" does not include any consent, which, by its terms, cannot be unreasonably withheld; provided, however, that (x) any consents and approvals which are rendered unenforceable by sections 363 and 365 of the Bankruptcy Code and the applicable provisions of the Sale Order and (y) any consents that would be Hard Consents but which consent or approval has been granted in writing prior to the Closing Date, in each case shall not be "Hard Consents."

"**Hazardous Substance**" means Hydrocarbons, petroleum and its byproducts, asbestos, polychlorinated biphenyls, per- and polyfluoroalkyl substances (including perfluorooctanoic acid, perfluorooctane sulfonic acid, Gen X, and perfluorobutane sulfonic acid), radioactive material (including naturally occurring radioactive material), and any other material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any Environmental Law or for which Liability can be imposed under any Environmental Law.

"**Hydrocarbons**" means all oil, gas, minerals, casinghead gas, coalbed methane, condensate, distillate and other liquid and gaseous hydrocarbons of every kind or description, or any combination of the foregoing.

"**Imbalances**" means over-production or under-production or over-deliveries or under-deliveries with respect to Hydrocarbons produced from or allocated to the Wells, Real Property Leases and Equipment, regardless of whether such overproduction or under-production or over-deliveries or under-deliveries arise at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Real Property Leases, and imbalances under gathering or transportation agreements.

"**Income Taxes**" means any income, franchise and similar Taxes based upon, measured by, or calculated with respect to gross or net income, profits, capital, or similar measures.

"**Law**" means any law, statute, ordinance, code, regulation, rule or other requirement of any Governmental Authority.

"**Liability**" means any "debt" as defined in section 101 of the Bankruptcy Code, penalty, fine, obligation, duty or liability of any nature (including any unknown, undisclosed, unmatured, unaccrued, un-asserted, contingent, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), regardless of whether such debt, obligation, duty or liability would be required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether such debt, obligation, duty or liability is immediately due and payable.

"**Material Adverse Effect**" means a material adverse effect on the Purchased Assets and the Business, taken as a whole, except for any such effect resulting from or arising out of any of the following: (A) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (including (i) any disruption of any of the foregoing markets, (ii) any decline or rise in the price of any security, commodity, Contract or index and (iii) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the transactions contemplated by this Agreement), (B) changes in any applicable Law or in GAAP, including any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing (such as with respect to immigration, border, tariff, or import, export, or other trade matters), (C) the announcement or pendency of this Agreement or the transactions contemplated hereby, including on relationships, contractual or otherwise, with customers, suppliers, vendors or employees, (D) changes caused by political or social conditions, including acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, cyberattack, sabotage or terrorism threatened or underway, (E) pandemics (including the currently existing global COVID-19 pandemic), earthquakes, hurricanes, floods, other natural disasters or other calamity or act of God or any other force majeure, (F) any action taken by Seller that is required by this Agreement or is taken at the request of Buyer and the failure to take any action if such action is prohibited by this Agreement, (G) changes, events or effects that are generally applicable to Persons engaged in the industry in which Seller operates, (H) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions,

performance metrics or operating statistics or the inputs into such items (whether or not shared with Buyer or its Affiliates or representative) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), or (I)(1) the commencement or pendency of the Chapter 11 Case, (2) any objections in the Bankruptcy Court to (I) this Agreement or any of the transactions contemplated hereby, (II) the reorganization of Seller, any plan of reorganization or any disclosure statement, (III) the assumption or rejection of any Executory Contract or Real Property Lease; or (3) any order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith.

"**Order**" means any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of the Bankruptcy Court or any other Governmental Authority (in each such case whether preliminary or final).

"**Permits**" means any permit, license, registration, consent, order, approval, variance, exemption, waiver, franchise, right or other authorization, in each case, of any Governmental Authority relating to the ownership, operation, construction, use, maintenance, or improvement of the Purchased Assets.

"**Person**" means any natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust or other legal entity, including any Governmental Authority.

"**Preferential Right**" means any right or agreement that enables any Person to purchase or acquire any Purchased Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

"**Property Costs**" means all actual production and operating costs and expenses, overhead charges under applicable operating agreements, and capital expenditures paid or incurred in connection with the ownership or operation of the Purchased Assets (including royalties, minimum royalties, rentals and prepaid charges), but excluding Liabilities, losses, costs, and expenses attributable to:

(a)     Claims directly or indirectly arising out of or resulting from (i) actual or claimed personal injury, illness or death, (ii) property damage, (iii) breach of Contract (other than Claims for payments owing under such Contract in the ordinary course of business), (iv) improper calculation, reporting or payment of royalties or (v) rights of action given under any Law, including with respect to any violation of Law;

(b)     obligations to plug wells, dismantle facilities, close pits and restore the surface around such wells, facilities and pits;

(c)     Claims directly or indirectly arising out of or resulting from actual or claimed contamination of groundwater, surface water, soil or Equipment, and obligations to remediate such contamination;

6

(d)     obligations to balance or furnish make-up Hydrocarbons according to the terms of applicable Hydrocarbon sales, gathering, processing, storage, transportation or similar Contracts;

(e)     gas balancing and other production balancing obligations;

(f)     obligations to pay revenues, royalties or other amounts payable to third parties with respect to the Purchased Assets but held in suspense, including Suspense Funds;

(g)     Income Taxes, Asset Taxes and Transfer Taxes; and

(h)     any Claims for indemnification, contribution or reimbursement from any third party with respect to Liabilities, losses, costs and expenses of the type described in preceding clauses (a) through (g), whether such claims are made pursuant to Contract or otherwise.

"**Real Property Lease**" means all of the real property leased, subleased, licensed, used or occupied by Seller (including oil, gas and mineral leases, and operating rights), together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights, privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

"**Release**" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"**Remediation**" means, with respect to any Environmental Condition, the implementation and completion of any remedial, removal, response, construction, closure, permitting, disposal or other corrective actions required or necessary under Environmental Laws to fully correct or remove such Environmental Condition.

"**Royalties**" means all royalties, overriding royalties, production payments, carried interests, net profits interests, reversionary interests, back-in interests and other burdens upon, measured by or payable out of production.

"**Sale Motion**" means the motion seeking entry of the Sale Order, in the form attached hereto as <u>Annex A</u>, with only such modifications as are (a) acceptable to each of Seller, Buyer and PDC or (b) imposed by the Bankruptcy Court and not materially adverse to any of Seller, Buyer or PDC that asserts any such modification, amendment or supplement is unacceptable.

"**Sale Order**" means an order of the Bankruptcy Court approving this Agreement, the Sale Transaction and the Settlement Agreement, together with supporting findings of fact and conclusions of law, in the form attached hereto as <u>Annex A</u>, with only such modifications, amendments or supplements as are (a) acceptable to each of Seller, Buyer and PDC, or (b) imposed by the Bankruptcy Court and not materially adverse to any of Seller, Buyer or PDC that asserts any such modification, amendment or supplement is unacceptable.

"**Sale Transaction**" means the transactions contemplated by this Agreement.

"**Straddle Period**" means any Tax period beginning before and ending on or after the Effective Date.

"**Surface Use Agreement**" means that certain Surface Use and Cooperation Agreement, the form of which is attached to the Transaction Agreement, which Surface Use and Cooperation Agreement will be executed and delivered concurrently with the Closing.

"**Suspense Funds**" means proceeds of production and associated penalties and interest in respect of any of the Wells that are payable to any third party and are being held in suspense by Seller or its Affiliate as the operator of such Wells.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any supplementary or supporting schedules or attachment thereto, and including any amendment thereof, filed with or submitted to, or required to be filed with or submitted to, any Taxing Authority.

"**Taxes**" means any federal, state, local or foreign taxes, assessments and other governmental charges imposed by any Taxing Authority, including income, profits, gross receipts, employment, stamp, occupation, premium, alternative or add-on minimum, ad valorem, real property, roll back taxes, personal property, transfer, real property transfer, value added, sales, use, customs, duties, capital stock, franchise, excise, escheat, withholding, social security (or similar), unemployment, disability, payroll, windfall profit, severance, production, levies or other like assessment, impost, charges, surcharges, or fees, estimated or other tax, including any tax that arises by reason of transferee or successor liability, by contract or otherwise, and in each instance such term will include any interest, penalty or addition thereto.

"**Taxing Authority**" means, with respect to any Tax, the governmental entity or political subdivision thereof that imposes such Tax, and the agency (if any) charged with the collection of such Tax for such entity or subdivision.

"**Transaction Agreement**" means that certain Transaction Agreement by and between Buyer and PDC of even date herewith.

"**Transaction Documents**" means this Agreement and each other document and agreement executed or delivered pursuant to or in connection with this Agreement on the Closing Date.

"**Transfer Taxes**" means any sales, use, transfer, stamp, documentary, goods and services, value added, gross receipts, excise, conveyance or similar Taxes with respect to the sale or assignment of real, personal, tangible or intangible property or any interest therein incurred or imposed with respect to the transactions described in this Agreement.

"**Working Interest**" means, with respect to any Well, Unit or Real Property Lease, the interest in and to such Well, Unit or Real Property Lease that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations on or in

connection with such Well, Unit or Real Property Lease, but without regard to the effect of any Royalties or other burdens.

**Section 1.2    Other Capitalized Terms**.  The following terms shall have the meanings specified in the indicated section of this Agreement:

| Term | Section |
| --- | --- |
| AFEs | Section 4.8 |
| Agreement | Preamble |
| Alatex | Preamble |
| Allocated Assets | Section 2.1(s) |
| Assigned Contracts | Section 2.1(h) |
| Assigned Real Property Leases | Section 2.1(a) |
| Assignment Documents | Section 7.2(a) |
| Assumed Obligations | Section 2.4 |
| Bankruptcy Court | Recitals |
| Break-Up Fee | Section 8.2 |
| Bridgemark | Preamble |
| Bridgemark Texas | Preamble |
| Buyer | Preamble |
| CalNRG OC | Preamble |
| Chapter 11 Case | Recitals |
| Closing | Section 7.1 |
| Closing Date | Section 7.1 |
| Competing Bid | Section 10.1(j) |
| Consent | Section 4.3 |
| Cure Costs and Rejection Damages Claims | Section 2.5(q) |
| PDC | Preamble |
| PDC Judgment | Recitals |
| Easements and Surface Rights | Section 2.1(e) |
| Equipment | Section 2.1(d) |
| Escrow Agent | Section 4.13(e) |
| Excluded Assets | Section 2.2 |
| Excluded Obligations | Section 2.5 |
| Execution Date | Preamble |
| Gregson | Preamble |
| Hall Property | Section 2.1(r) |
| Hired Current Employees | Section 7.6(a) |
| Insurance Policies | Section 4.19 |
| Lands | Section 2.1(a) |
| Mineral Interests | Section 2.1(g) |
| Outside Date | Section 10.1(b) |
| Outstanding Accounts Receivable | Section 2.1(l) |
| Parties | Preamble |
| Party | Preamble |
| Personal Property | Section 2.1(h) |

9

| Term | Section |
|------|---------|
| Petition Date | Recitals |
| Pipeline Inventory | Section 2.1(n) |
| Property Records | Section 2.1(i) |
| Purchased Assets | Section 2.1 |
| Real Property | Section 2.1(h) |
| Realm | Preamble |
| Rollback Escrow Agreement | Section 11.5 |
| Rollback Taxes | Section 11.5 |
| Royalty Interests | Section 2.1(f) |
| RWI Policy | Section 6.4 |
| Seller | Preamble |
| Seller's Excess Funds | Section 7.8(d) |
| Settlement Agreement | Recitals |
| Settlement Order | Recitals |
| Settlement Term Sheet | Recitals |
| Stock Tank Oil | Section 2.1(n) |
| Tax Allocation | Section 3.2 |
| Units | Section 2.1(b) |
| Wells | Section 2.1(c) |

**Section 1.3    Interpretive Provisions.**

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)    words defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(iii)    the words "Dollars" and "$" means U.S. dollars;

(iv)    references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement;

(v)    wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation";

(vi)    references herein to any gender shall include each other gender;

(vii)    references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; provided, however,

526512.000004 23802768.24

that nothing contained in this clause (vii) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement;

(viii)  references herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity;

(ix)  with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding";

(x)  the word "or" shall be disjunctive but not exclusive;

(xi)  references herein to any Law shall be deemed to refer to such Law as amended, reenacted, supplemented or superseded in whole or in part and in effect from time to time and also to all rules and regulations promulgated thereunder;

(xii)  references herein to any Contract mean such Contract as amended, supplemented or modified (including any waiver thereto) in accordance with the terms thereof;

(xiii)  the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties;

(xiv)  all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated into and made a part of this Agreement as if set forth in full herein;

(xv)  any capitalized terms used in any Exhibits or Schedules but not otherwise defined therein will be defined as set forth in this Agreement;

(xvi)  if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day; and

(xvii)  the omission of certain provisions of this Agreement from the Assignment Documents does not constitute a conflict or inconsistency between this Agreement and the Assignment Documents, and will not effect a merger of the omitted provisions.  To the fullest extent permitted by Law, all provisions of this Agreement are hereby deemed incorporated into the Assignment Documents by reference.

(b)  The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

# ARTICLE 2
## PURCHASE AND SALE

**Section 2.1    The Purchased Assets**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions of this Agreement and the Sale Order, at the Closing, Seller shall convey and assign (or shall cause to be conveyed and assigned) to Buyer, and Buyer shall accept all of Seller's right, title and interest in and to all the following assets and properties of Seller (such assets and properties, SAVE and EXCEPT the Excluded Assets, hereafter referred to collectively as the "**Purchased Assets**") free and clear of all Encumbrances:

(a)    all Real Property Leases of Seller as described on <u>Exhibit A-1</u> (collectively, the "**Assigned Real Property Leases**"), and all related rights and interest in the lands covered by the Assigned Real Property Leases and Units (such lands, the "**Lands**");

(b)    all rights, obligations and interests in any unit or pooled area in which the Assigned Real Property Leases are included, including all rights and obligations derived from any unitization, pooling, operating, communitization or other Contract or from any Order (the "**Units**");

(c)    all oil, gas and condensate wells, water source, water injection and other injection or disposal wells and systems described on <u>Exhibit A-2</u> (the "**Wells**");

(d)    (i) all flow lines, pipelines, gathering systems and related equipment located on the Assigned Real Property Leases, the Units, or the Easements and Surface Rights, (ii) all facilities, equipment, compressors, well pads, tank batteries, radio towers, remote terminal units, SCADA equipment, personal computer equipment, vehicles, communication equipment, improvements, fixtures, inventory, spare parts, tools, abandoned property and junk and other personal property located on the Assigned Real Property Leases, the Units, or the Easements and Surface Rights, and (iii) all off-Assigned Real Property Lease facilities and other personal property described in <u>Exhibit A-2</u> (items (i), (ii) and (iii) referred to collectively as the "**Equipment**");

(e)    all easements, rights-of-way, Permits, servitudes, surface leases, surface use agreements, and similar rights, obligations and interests applicable to or used in operating the Assigned Real Property Leases, Units, Wells, or Equipment (collectively, the "**Easements and Surface Rights**"), including those described in <u>Exhibit A-3</u>;

(f)    all royalty, overriding royalty, net profits or other similar oil or gas interests not described above in which Seller holds any right, title or interest of any kind (the "**Royalty Interests**"), including those described in <u>Exhibit A-4</u> and including all rights pertaining to the Royalty Interests under any of the Assigned Contracts;

(g)    all mineral interests in which Seller holds any right, title or interest of any kind, including without limitation mineral fee interests and mineral leasehold interests (the "**Mineral Interests**"), including those described in <u>Exhibit A-5</u> and including all rights and obligations pertaining to the Mineral Interests under any of the Assigned Contracts;

(h)    all Executory Contracts described in <u>Exhibit A-6</u> (collectively, the "**Assigned Contracts**");

(i)    all lease files, right-of-way files, well files (including well logs), production records, division order files, Asset Tax records, abstracts, title opinions, and Contract files and reservoir and field studies related to any or all of the Assigned Real Property Leases, Units, Wells, Equipment, Permits, Easements and Surface Rights, Royalty Interests, Mineral Interests and Assigned Contracts (the "**Property Records**"), and all other tangibles, movables, immovables, miscellaneous interests or other assets on the Assigned Real Property Leases or Units;

(j)    all (i) seismic, geological, geochemical, or geophysical data (including cores and other physical samples or materials from wells or tests) belonging to Seller or licensed from third parties, and (ii) interpretations of seismic, geological, geochemical or geophysical data belonging to Seller or licensed from third parties;

(k)    all proceeds, benefits, income or revenues (including accounts and notes receivable, to the extent not collected as of the Closing Date), in each case with respect to the Purchased Assets attributable to periods after the Effective Date;

(l)    all accounts and notes receivable with respect to the Purchased Assets attributable to periods prior to the Effective Date, to the extent outstanding as of the Closing Date (collectively, the "**Outstanding Accounts Receivable**");

(m)    all rights, Claims or causes of action of Seller against third parties arising out of events occurring prior to, on, or after the Effective Date, to the extent relating to the Purchased Assets and/or the Assumed Obligations;

(n)    Hydrocarbons produced from or attributable to the Purchased Assets before the Effective Date that are stored in the Assigned Real Property Lease or unit stock tanks (the "**Stock Tank Oil**"), or in gathering lines or production facilities upstream of the sale or custody transfer meters (or other applicable point at which the transfer of title actually occurs) of the purchaser or processor of Hydrocarbon production from or attributable to the Purchased Assets (the "**Pipeline Inventory**"); and

(o)    the real property described on <u>Exhibit A-7</u> (the "**Real Property**"), together with all rights, titles and interests of Seller, if any, in and to all rights and appurtenances directly pertaining to such real property, including, without limitation, all development rights and entitlements pertaining to such real property and all improvements and fixtures in or on such real property;

(p)    the personal property described on <u>Exhibit A-8</u> (the "**Personal Property**") which, shall be free and clear of any loans or liens, and, with respect to any vehicles listed on <u>Exhibit A-8</u>, any loans must be current;

(q)    an amount equal to any funds received by or owed to Seller by any third party which properly exercises any Preferential Rights in connection with any of the Assets;

13

(r)    all right, title and interest in and to any and all personal property and real property interests held by Hall, as described on Exhibit A-9, which Mr. Hall is or was obligated to deliver or convey to Bridgemark pursuant to the Settlement Agreement (the "**Hall Property**"), provided, however, that:

(s)    CalNRG OC, Realm, and Alatex shall separately acquire and take title to those portions of the Purchased Assets as allocated and described in Exhibit A-10 (the "**Allocated Assets**").

**Section 2.2    Excluded Assets**.  Notwithstanding the forgoing, the Purchased Assets do not include, and there is excepted, reserved and excluded from the transactions contemplated by this Agreement, all of the properties, rights and interests described on Exhibit B, and any Claim released pursuant to the Settlement Agreement (collectively, the "**Excluded Assets**").

**Section 2.3    Ownership of Production from the Purchased Assets; Allocation of Property Costs**.

(a)    Production and Property Costs Before the Effective Date.  Seller shall be responsible for all Property Costs attributable to the Purchased Assets and incurred before the Effective Date.

(b)    Production and Property Costs After the Effective Date.  After Closing, Buyer will own all Hydrocarbons produced from or attributable to the Purchased Assets on and after the Effective Date and shall be responsible for (and entitled to any refunds with respect to) all Property Costs attributable to the Purchased Assets and incurred on and after the Effective Date.  Seller will sell on Buyer's behalf all Hydrocarbons produced from or attributable to the Purchased Assets between the Effective Date and the Closing Date, and Seller will promptly turn over and pay to Buyer the proceeds of these sales.

**Section 2.4    Assumed Obligations**.  At the Closing, Buyer shall assume, and agree to pay, perform, fulfill and discharge (or cause to be paid, performed, fulfilled or discharged) when due (in accordance with their respective terms and subject to the respective conditions thereof), the following, and only the following, Liabilities of Seller (collectively, the "**Assumed Obligations**"):

(a)    responsibility for performance of all express and implied obligations and covenants under the terms of the Assigned Real Property Leases and Assigned Contracts, in each case, only to the extent such obligations or covenants are required to be performed after the Closing and are attributable to periods from and after the Effective Date;

(b)    responsibility for payment of all royalties, overriding royalties, production payments, net profits obligations, rentals and other burdens or encumbrances to which the Purchased Assets are subject, in each case, only to the extent the same are attributable to periods from and after the Effective Date;

(c)    responsibility for proper accounting for and disbursement of production proceeds from the Purchased Assets from and after the Closing Date, including the Suspense

14

Funds (and, with respect to the Suspense Funds, regardless of whether attributable to time periods before, on or after the Closing Date), to the extent actually received by Buyer;

(d)    all Taxes and expenses allocated to Buyer pursuant to <u>ARTICLE 11</u>, including all Transfer Taxes; and

(e)    the obligations of the Seller expressly set forth on <u>Schedule 2.4(e)</u> solely if and to the extent they are current as of the Closing.

Notwithstanding anything to the contrary herein, the Buyer's assumption of the Assumed Obligations shall in no way expand the rights or remedies of third parties against the Buyer as compared to the rights and remedies which such parties would have had against the Seller had this Agreement not been consummated.

**Section 2.5    Excluded Obligations.** Notwithstanding any provision in this Agreement to the contrary, except for the Assumed Obligations, Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform or otherwise discharge any Liability or obligation of Seller, whether or not related to the Purchased Assets, and whether or not occurring or arising before or after the Effective Date (all such Liabilities or obligations, collectively, the "**Excluded Obligations**").  For the avoidance of doubt, and without limiting the generality of the foregoing, the Excluded Obligations shall include each of the following:

(a)    any Liabilities related to the Excluded Assets;

(b)    all indebtedness for borrowed money of Seller, all guarantees of third party obligations by Seller and reimbursement obligations to guarantors of Seller's obligations or under letters of credit;

(c)    all Taxes and expenses allocated to Seller pursuant to <u>ARTICLE 11</u>;

(d)    all Liabilities of Seller for any fees, costs or expenses of the type referred to in <u>Section 12.3</u>;

(e)    all Liabilities with respect to any civil, criminal or administrative actions, investigations or proceedings relating to the actions or inactions of Seller or the conduct of the Business or the Purchased Assets, in each case, prior to the Closing;

(f)    except to the extent specifically assumed by Buyer pursuant to <u>Section 7.6</u>, all Liabilities with respect to employees, independent contractors, agents or other Persons engaged at any time by Seller or its Affiliates, whether arising before, on or after the Effective Date, relating to, arising out of or in connection with their respective employment or engagement with Seller or its Affiliates, including any claims to rights or benefits under any contract, collective bargaining agreement, document, policy or understanding with any such employees, independent contractors, agents or other Persons or their representatives, heirs, executors, administrators, successors or assigns, or under any stock option, phantom stock, incentive, pension, death benefit, retirement, medical, retiree, insurance, vacation, sales commission or workers' compensation plan, or under any applicable Laws;

(g)    all Liabilities relating to or at any time arising under, with respect to, or in connection with any employee benefit plans or any other compensation or benefit plan, program, policy, agreement or arrangement of any kind (including all assets, trusts, insurance policies and administration service contracts related thereto) that at any time is or was maintained, sponsored, contributed to or required to be contributed to by Seller or any of its Affiliates or under or with respect to which Seller or any of its Affiliates has (or has had) any Liability, including on account of Buyer or any of its Affiliates being deemed successor due to the operation of the Purchased Assets or otherwise;

(h)    all Liabilities relating to the accounting for, failure to pay or the incorrect payment of any royalties, overriding royalties, production payments, net profits obligations, rentals or other burdens, owners' revenues or proceeds attributable to sales of Hydrocarbons (including Suspense Funds to the extent attributable to the Purchased Assets), insofar as the same are attributable to periods and Hydrocarbons produced and marketed with respect to the Purchased Assets prior to the Closing Date;

(i)    all unpaid Property Costs that are attributable to the ownership or operation of the Purchased Assets prior to the Effective Date;

(j)    any Taxes (other than Taxes subject to ARTICLE 11) of Seller for taxable periods ending on or before the Closing Date;

(k)    Liabilities arising out of or related to the offsite transportation, disposal, or arrangement for transportation or disposal of any Hazardous Substance generated by or used in connection with the ownership or operation of the Purchased Assets prior to the Closing;

(l)    violations of any Environmental Laws, all remediation Liabilities (whether on site or offsite of the Purchased Assets) and all environmental occurrences, events, conditions, and activities to the extent related to the Purchased Assets arising or occurring prior to the Closing Date;

(m)    fines and/or penalties assessed by a Governmental Authority for noncompliance with Environmental Laws during the ownership or operation of the Purchased Assets prior to Closing;

(n)    all Liabilities arising out of any breach or default of the Assigned Contracts or the Assigned Real Property Leases on or prior to the Closing Date or arising out of any event that occurs on or prior to the Closing Date which with the passage of time or giving of notice, or both, would constitute or give rise to such a breach or default;

(o)    all Liabilities for any legal, accounting, investment banking, financial advisory, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or similar fees or expenses incurred by such Seller in connection with, resulting from or attributable to, the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise; and

(p)    any obligation to pay Suspense Funds to (i) Hall, (ii) any of the entities listed on Schedule 2.5(p); or any other entity owned or controlled, directly or indirectly, by Hall; and

(q)    any Cure Costs and Rejection Damages Claims, as said terms may be used or defined for purposes of Section 365 of the Bankruptcy Code and Sale Order.

**Section 2.6    Assumption of Contracts**. As soon as practicable following the Execution Date, Seller shall provide notice to all non-debtor counterparties to all Assigned Contracts and Assigned Real Property Leases of their proposed assumption, assignment and sale.

**Section 2.7    Assignment of Purchased Assets Subject to Consent Requirements and Preferential Rights**.

(a)    Within three (3) Business Days after the Execution Date, Seller shall send letters seeking any consent to assignment (including Hard Consents) or approval rights applicable to the transactions contemplated hereby. This Agreement shall not constitute an agreement to assign or transfer and shall not effectuate the assignment or transfer of any Purchased Asset if such Purchased Asset is subject to an un-obtained Hard Consent. Seller and Buyer shall use their reasonable best efforts to obtain all such Hard Consents; provided, however, neither Seller nor Buyer will be obligated to pay any consideration or initiate any Action to obtain any such Hard Consent. Each Purchased Asset affected by a Hard Consent that is not obtained prior to Closing shall, at the option of Buyer, be held back from the Purchased Assets conveyed at Closing and shall be deemed to be an Excluded Asset until such time as such Hard Consent is obtained, waiver or otherwise satisfied and such Purchased Asset is conveyed to Buyer, subject to the following provisions of this Section 2.7. Except for Hard Consents, if any consents to the assignment of any Purchased Asset are not obtained prior to Closing, such Purchased Asset shall nevertheless be sold and conveyed to Buyer at Closing.

(b)    Within three (3) Business Days of the Execution Date, and in full compliance with any third party agreements containing any Preferential Rights, Seller shall provide written notice of this Agreement and the transaction thereby contemplated, to all such third parties holding any such Preferential Rights, thus triggering the applicable time period(s) within which such Preferential Rights must be exercised. A copy of any such notice(s) shall be provided contemporaneously to Buyer. Seller shall inform Buyer in writing of any exercise of a Preferential Right by any such third party within three (3) Business Days of Sellers receipt thereof. If a third party holding a Preference Right exercises its rights in that regard, the affected Asset shall be excluded from this Agreement.

## ARTICLE 3
## CONSIDERATION

**Section 3.1    Consideration**. The aggregate consideration for the Purchased Assets will be (i) the assumption of the Assumed Obligations by Buyer at Closing, (ii) the mutual promises and releases contained in this Agreement and in the Settlement Agreement, and (iii) other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

**Section 3.2    Allocation of Values**.  Seller and Buyer agree that the transaction under this Agreement is not subject to the reporting requirement of Section 1060 of the Code and that, therefore, IRS Form 8594 (Asset Acquisition Statement Under Section 1060) is not required to be and will not be filed for this transaction.  In the event that the Seller and Buyer mutually agree that a filing of Form 8594 is required, Seller and Buyer will confer and cooperate in the preparation and filing of their respective forms to reflect a consistent reporting of the agreed upon allocation.  In the event that the allocation is disputed by any taxing authority, the Party receiving notice of such dispute will promptly notify and consult with the other Party and keep the other Party apprised of material developments concerning resolution of such dispute.


# ARTICLE 4
# REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer, as of the Effective Date and as of the Closing, as follows:

**Section 4.1    Organization and Good Standing**.  Seller is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization, and subject to any limitations that may be imposed on Seller resulting from or relating to the Chapter 11 Case, has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Seller is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary.

**Section 4.2    Authority**.  Subject to entry of the Sale Order and such other authorization as may be required by that Bankruptcy Court, Seller has the requisite corporate or similar power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and the consummation of the Sale Transaction have been duly authorized by all requisite corporate or similar action on the part of Seller.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered, by Seller (assuming the due authorization, execution and delivery by the other Parties and the entry of the Sale Order) and this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party constitutes legal, valid and binding obligations of Seller enforceable against Seller in accordance with its respective terms, subject to general principles of equity.

**Section 4.3    Consents; Fees**.  Except to the extent rendered unnecessary through the entry of the Sale Order, no consent, waiver, clearance, approval, Order or authorization of, or declaration, filing or registration with, or notification to (each of the foregoing, a "**Consent**"), any Person or Governmental Authority is required on the part of Seller in connection with the

execution and delivery of this Agreement or any other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, the compliance by Seller with any of the provisions hereof or thereof, the consummation of the Sale Transaction or the taking by the Seller of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both), except (a) for the entry of the Sale Order and (b) for Consents required in connection with the Chapter 11 Case.  The consummation of the transactions contemplated hereby will not give rise to any obligation or liability on the part of Buyer to pay any fee, penalty or other cost as a result of the assignment, transfer or conveyance of the Assets to Buyer.

Section 4.4      **No Conflict**.    The execution and delivery of this Agreement, the Transaction Documents and any other agreement, document or instrument contemplated hereby or thereby to which Seller is a party, the consummation of the Sale Transaction and the taking by Seller of any other action contemplated hereby or thereby will not result in the breach of any of the terms and provisions of, or constitute a default (with or without notice, lapse of time or both) under, or conflict with, or give rise to a right of termination, loss of right, adverse modification of provisions, cancellation of, or cause any acceleration of any obligation of Seller, or result in the creation of any Encumbrance upon any of the Purchased Assets under (a) any agreement, indenture, or other instrument to which Seller is bound, (b) the partnership agreement, bylaws or other governing documents of Seller, (c) any Order or (d) any Applicable Law.

Section 4.5      **Contracts**.   Schedule 2.6(b) lists all Contracts and Real Property Leases to which the Seller is a party.  Such Contracts and Real Property Leases constitute all Contracts and Real Property Leases necessary to own, maintain and operate the Purchased Assets as owned, maintained and operated on the date hereof.    All such Contracts and Real Property Leases are in full force and effect, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.  Except as a result the Chapter 11 Case, no default or breach (or event that, with notice or lapse of time, or both, would become a material default or breach) of any such Contracts or Real Property Leases has occurred or is continuing on the part of Seller or on the part of any other Person that is a party to such Contract or Real Property Lease.  Seller has provided true, complete and accurate copies of all such Contracts and Real Property Leases (together with any amendments thereto) to Buyer prior to the date hereof.  Except for the Assigned Contracts and the Assigned Real Property Leases, Buyer will not become subject to any Contracts solely as a result of the consummation of the Sale Transaction.

Section 4.6      **Permits, Easements and Surface Rights**.  (a) All necessary Permits, Easements and Surface Rights with respect to the ownership or operation of the Purchased Assets have been obtained, (b) such Permits, Easements and Surface Rights are in effect, and (c) no violations exist with respect to such Permits, Easements and Surface Rights.   Schedule 4.6 lists all Permits, Easements and Surface Rights necessary to own, construct, use, maintain and operate the Purchased Assets.  Seller has provided true, complete and accurate copies of such Permits, Easements and Surface Rights to Buyer prior to the date hereof.

Section 4.7      **Wells**.    There are no Wells (a) that Seller is presently required to plug or abandon, or (b) that are neither in use for purposes of production or injection, nor suspended or temporarily abandoned in accordance with applicable Law.  Except as set forth on Schedule 4.7,

19

Seller has not received any notice or directive, written or oral, from any Governmental Authority to reduce, now or in the future, the volume of fluids injected or disposed of into any injection or disposal wells that are included in the Purchased Assets or to shut in any such injection or disposal wells, nor, to Seller's knowledge, has any such action by a Governmental Authority been threatened.

**Section 4.8      AFEs.**  Schedule 4.8 sets forth, as of the Execution Date and the Closing, all approves authorizations for expenditures under joint operating agreements for which remaining expenditures and other approved capital commitments (the "**AFEs**") relating to the Purchased Assets to drill or rework any Wells or for other capital expenditures for which all of the activities anticipated in such AFEs.

**Section 4.9      Preferential Rights**.  Except as set forth in Schedule 4.9, none of the Purchased Assets is subject to (a) any Preferential Rights, (b) any tag-along or drag-along rights, (c) rights of first refusal or rights of first offer, or (d) any similar rights, in each case, which may be applicable to the Sale Transaction.

**Section 4.10      Taxes**.  Seller has (a) timely filed or caused to be filed on its behalf all Tax Returns required to be filed by Seller with respect to Asset Taxes on or prior to the Execution Date, and such Tax Returns are true, correct and complete in all material respects, and (b) timely paid all Asset Taxes due and payable.  No audits, examinations or administrative or judicial proceedings with respect to Taxes are ongoing, pending, or proposed by any Taxing Authority with respect to the Purchased Assets.  No adjustment has been proposed with respect to any Tax Returns for the last five (5) fiscal years by any Taxing Authority.  There are no liens or Encumbrances for Taxes on the Purchased Assets.  None of the Purchased Assets is subject to any tax partnership agreement or is otherwise treated as held in an arrangement requiring a partnership income Tax Return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Code.

**Section 4.11      Litigation**.  Other than the Bankruptcy Action, there are no Actions or Orders pending or threatened against Seller with respect to the Business or any of the Purchased Assets or the ownership or operation thereof or which questions the validity of this Agreement or which would reasonably be expected to impair the ability of Seller to consummate the Sale Transaction or perform its obligations under this Agreement or the Transaction Documents.

**Section 4.12      Compliance with Applicable Laws**.  Except as set forth on Schedule 4.12, (i) Seller owns and operates, and has owned and operated, the Purchased Assets in compliance with all Applicable Law (including Environmental Laws) and Orders applicable to Seller except for prior instances of non-compliance that have been fully and finally resolved to the satisfaction of all Governmental Authorities with jurisdiction over such matter; (ii) Seller has not received written notice from a Governmental Authority alleging that Seller, any of its Affiliates or the Purchased Assets are not in compliance with Applicable Law (including Environmental Laws) or Orders; and (iii) Seller has obtained and is in compliance with all Permits issued or granted by a Governmental Authority necessary to own, construct, maintain, use, or operate the Purchased Assets as presently owned or operated.

**Section 4.13      Environmental Matters**.  Except as set forth on Schedule 4.7:

(a)	Seller's ownership and operation of the Purchased Assets are in compliance with all applicable Environmental Laws.

(b)	Seller has not received any written notice, report or other information from any Person alleging the violation of or Liability under any Environmental Law with respect to the Purchased Assets, and no such notice, report or other information is pending.

(c)	There have been no releases of Hazardous Substances in connection with the Purchased Assets, nor are there any facts, circumstances, or events relating to the Purchased Assets, that could reasonably be expected to give rise to a material Remediation obligation or other material Liability.

(d)	Seller has furnished or made available to Buyer all environmental site assessment reports, environmental compliance audits, correspondence with Governmental Authorities or other third parties relating to Actions or Liability (whether actual or alleged) under Environmental Law, and other documents related to any environmental matters that are in the Seller's possession or control and relating to the Purchased Assets.

(e)	There are no unpaid permit fees due to Governmental Authorities or fees, civil or criminal penalties related to any violations of, or noncompliance with, Environmental Laws or any other similar amounts owed to Governmental Authorities including, without limitation, CalGEM. To the extent that there are any such unpaid amounts owed to Governmental Authorities, any such fees, civil or criminal penalties or other similar amounts attributable to operations conducted on the Assets between the Execution Date and the Closing Date arise and such penalties and interest amounts are unknown, Seller shall escrow an amount equal to one hundred ten percent (110%) of the estimated amount of such penalties and interest with an escrow holder mutually satisfactory to the Parties (an "***Escrow Agent***") pursuant to an escrow agreement executed by and among Seller, Buyer, and said Escrow Agent in form and substance reasonably acceptable to Seller and Buyer, and which shall provide that upon receipt of a bill for unpaid penalties and interest due to Governmental Authorities therefore, the Escrow Agent will be authorized and instructed to pay the amount due. If the amount due exceeds the amount deposited by Seller, Seller will pay the amount of such excess to the Escrow Agent within ten (10) days of the Escrow Agent's notification to Seller that an additional amount is due hereunder.

**Section 4.14	Suspense Funds**.  Schedule 4.14 sets forth, as of the date set forth on such Schedule, all Suspense Funds.

**Section 4.15	Imbalances.**  Schedule 4.15 sets forth, as of the Closing, or the date closest to and before the Closing on which said information can be accurately stated, all Imbalances relating to the Purchased Assets.

**Section 4.16	Brokers or Finders**.  Seller has not incurred any Liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement or the Sale Transaction for which Buyer is or will become liable.

**Section 4.17	Benefit Plans**.  Neither Seller nor any of its Affiliates sponsor, maintain or contribute to, or have any Liability with respect to, (a) a "multiemployer plan" (as defined in Section 3(37) or 4001(a)(3) of ERISA) or (b) a defined benefit plan (as defined in Section 3(35)

of ERISA) or a pension plan subject to the minimum funding standards of Section 302 of ERISA or Section 412 of the Code. Each arrangement sponsored by Seller or one of its Affiliates in which employees of Seller or its Affiliates participate that is intended to be qualified under Section 401(a) of the Code has been determined to be so qualified and no condition exists that would reasonably be expected to result in the loss of such qualified status.

**Section 4.18    Real Property Leases; Royalties; Payments**. Seller is not in breach of, or default under, any of the Real Property Leases. All (a) Royalties due and payable with respect to the Real Property Leases have been timely and properly paid, (b) all production proceeds from the Purchased Assets have been timely and properly paid, and (c) all other expenses and costs associated with the ownership or operation of the Assets have been timely and properly paid. The Real Property Leases and Units are in full force and effect in accordance with their respective terms.

**Section 4.19    Bonds; Insurance**. Schedule 4.19 sets forth (a) all bonds, surety bonds, letters of credit, guarantees and cash deposits provided (or required to be provided) by Seller or any of its Affiliates with respect to the Purchased Assets, (b) all insurance policies maintained by Seller or its Affiliates with respect to the Purchased Assets (collectively, the "**Insurance Policies**"), and (c) all claims made by Seller or its Affiliates with respect to the Insurance Policies prior to the date hereof. The Insurance Policies are in full force and effect and satisfy all requirements (whether contractual, imposed by a Governmental Authority or otherwise) applicable to Seller or its ownership or operation of the Purchased Assets.

**Section 4.20    Condition of Equipment**. The Purchased Assets have been maintained in a state of repair so as to be reasonably adequate for normal operations. All personal property and equipment included in the Purchased Assets (including, without limitation, the Equipment) is in good working order and condition subject to ordinary wear and tear as is customarily associated with the use and operation of such personal property and equipment under normal working conditions.

**Section 4.21    Employee, Consultant or Contractor Bonuses**. There are no accrued but unpaid bonuses or vacation pay for any employee, consultant or contractor of Seller.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller, as of the Effective Date and as of the Closing, as follows:

**Section 5.1    Organization and Good Standing**. Buyer is an entity duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

**Section 5.2    Authority**. Buyer has the requisite power and authority to execute and deliver this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which it is a party and to perform its respective obligations hereunder and thereunder. The execution and delivery of this Agreement and each other agreement, document

22

or instrument contemplated hereby or thereby to which it is a party and the consummation of the Sale Transaction have been duly authorized by all requisite corporate or similar action on the part of Buyer.  This Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Buyer is a party has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby or thereby to be delivered at or prior to Closing will be duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by the other Parties) this Agreement and each other agreement, document or instrument contemplated hereby or thereby to which Buyer is a party constitutes legal, valid and binding obligations of Buyer enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**Section 5.3     No Conflict**.  The execution and delivery of this Agreement, the Transaction Documents and any other agreement, document or instrument contemplated hereby or thereby to which Buyer is a party, the consummation of the Sale Transaction and the taking by Buyer of any other action contemplated hereby or thereby will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which Buyer is bound, (b) the partnership agreement, bylaws or other governing documents of Buyer, (c) any Order or (d) any applicable Law.

**Section 5.4     Bankruptcy**.  There are no bankruptcy, reorganization, receivership or similar debt adjustment proceedings pending, being contemplated by, or to Buyer's knowledge, threatened against Buyer.

**Section 5.5     Litigation**.  There are no Actions pending or, to Buyer's knowledge, threatened against Buyer, which would reasonably be expected to impair the ability of Buyer to consummate the Sale Transaction or perform its obligations under this Agreement or the Transaction Documents.

**Section 5.6     Brokers or Finders**.  Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable.

## ARTICLE 6
## ACTIONS PRIOR TO THE CLOSING DATE

**Section 6.1     Access and Reports**.  From and after the Execution Date and until the Closing, Seller, at its sole cost, shall (and shall cause its Affiliates to) afford Buyer's authorized representatives reasonable access, during normal business hours to its employees, consultants, contractors, properties, books, and all Contract, land, lease, accounting and Asset Tax records, and operational, regulatory, and environmental records, and, during such period, the Seller shall furnish promptly to Buyer all information Seller may have concerning the Purchased Assets as

may reasonably be requested (including Property Records and reserve reports related to the Purchased Assets).

**Section 6.2**      **Operations Prior to the Closing Date**.  Seller covenants and agrees that, except (x) as expressly contemplated by this Agreement, (y) with the prior written consent of Buyer and PDC (which consent shall not be unreasonably withheld, conditioned or delayed), or (z) as otherwise required by Applicable Laws or Orders, subject to any approvals required by the Bankruptcy Court, from and after the Execution Date and until the Closing:

(a)      Seller shall (i) operate, manage and administer the Purchased Assets in a good and workmanlike manner consistent with good oil field practice and in compliance with all Applicable Laws (including the Bankruptcy Code and Environmental Laws), (ii) comply with all the terms of the Settlement Agreement applicable to the Seller, (iii) pay all expenses as they come due in the ordinary course, (iv) maintain the Insurance Policies in full force and effect, (v) use its best efforts to address and cure any matters identified on Schedule 4.7 hereto, (vi) keep each of Buyer and PDC reasonably informed with respect to all operations and other matters relating in any way to the Purchased Assets, and (vii) pay off all amounts, including interest and penalties, past due as of Closing on all of the vehicle loans identified on Schedule 7.9.

(b)      Seller shall not, and shall cause its Affiliates not to:

(i)      exercise any election to abandon any Purchased Asset (except any abandonment of Real Property Leases to the extent such Real Property Leases terminate pursuant to their terms);

(ii)      make any election to be a non-consenting co-owner or other election not to participate in any operation with respect to any of the Purchased Assets;

(iii)      propose or agree to participate in any single operation with respect to any of the Purchased Assets with an anticipated cost in excess of Fifty Thousand Dollars ($50,000), except for emergency operations, operations scheduled under the AFEs, operations required by any Governmental Authority or workover operations;

(iv)      reject, terminate, cancel or materially amend or modify any Assigned Contract, Assigned Real Property Lease or other material Contract to which Seller is party;

(v)      enter into any Contract or arrangement that will be binding on Buyer or the Assets after Closing;

(vi)      sell, lease, encumber or otherwise dispose of all or any portion of the Purchased Assets, except with respect to Preferential Rights as provided herein and sales of Hydrocarbons, equipment or inventory in the ordinary course of business;

(vii)      waive, release, assign, settle or compromise any Action to the extent that such waiver, release, assignment, settlement or compromise (A) imposes any binding obligation or restriction, whether contingent or realized, on the Purchased Assets, the Business or

Buyer, or (B) waive or releases any material rights or claims that would constitute Purchased Assets; or

(c)    enter into any agreement or commitment to take any action prohibited by this Section 6.2.

**Section 6.3    Real Property Lease Expirations**.  If any Real Property Lease is scheduled to expire prior to the Closing Date, Seller shall notify Buyer and PDC a reasonable amount of time prior to such expiration and, at the direction of Buyer and at Buyer's sole cost and expense, the Seller shall use its commercially reasonable efforts to renew or otherwise extend the term of such Real Property Lease on terms acceptable to Buyer.

**Section 6.4    RWI Policy**. Seller acknowledges that Buyer may elect to obtain and bind a buyer-side representation and warranty insurance policy with respect to the representations and warranties set forth in Article 4 (the "**RWI Policy**").  If Buyer elects to obtain an RWI Policy, Seller shall, and shall cause its agents and representatives to, reasonably cooperate with the Buyer and its agents and representatives in connection with the issuance of the RWI Policy, including by providing all documents and information reasonably requested by Buyer or its agents or representatives in connection therewith.

## ARTICLE 7
## CLOSING, POST-CLOSING OBLIGATIONS

**Section 7.1    Closing Date**.  Subject to the satisfaction of the conditions set forth in ARTICLE 89 (or the waiver thereof by the Party entitled to waive that condition), the closing of the assignment and conveyance of the Purchased Assets and the assumption of the Assumed Obligations provided for in ARTICLE 2 (the "**Closing**") will take place at the offices of the Escrow Agent, provided that the Closing shall be set up remotely so that Buyer and Seller and their respective attorneys do not need to be physically present.  Where originals are required, such originals shall be delivered to Escrow Agent, otherwise signatures may be exchanged by electronic exchange of documents and signatures in PDF format.  Closing will occur at 10:00 a.m. Pacific Standard Time on the date that is fourteen (14) days after the satisfaction or waiver of the conditions set forth in ARTICLE 9 (other than conditions that by their nature are to be first satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place and time as the Parties may agree in writing.  Upon the Closing, each Party acknowledges and agrees that (a) the items set forth in Section 7.2 shall be delivered to Buyer and (b) the items set forth in Section 7.3 shall be delivered to the Seller.  Each of Seller and Buyer shall deliver to the Escrow Agent any confirmations or instructions or take such other actions as are necessary to effect the deliveries set forth in the immediately preceding sentence. The date on which the Closing is held is referred to in this Agreement as the "**Closing Date.**"

**Section 7.2    Deliveries by Seller**.  At the Closing, Seller shall deliver to Buyer:

(a)    (i) Assignment and bills of sale substantially in the form attached hereto as Exhibit C-1 (Parts A, B and C) conveying the Purchased Assets described in Section 2.1(a) through Section 2.1(n) to Buyer, and (ii) a deed substantially in the form attached hereto as

Exhibit C-2 conveying the Purchased Assets described in <u>Section 2.1(o)</u> and the Real Property to Buyer (collectively, the "**Assignment Documents**"), each duly executed by Seller;

(b)    assignments in the forms required by federal, state, or county agencies for the assignment of any federal, state, or county Purchased Assets, duly executed by Seller, in sufficient duplicate originals to allow recording in all appropriate offices, including but not limited to those documents necessary for Buyer or its designee to become the "Operator," as that term is commonly used and understood under California law and practice, of the Wells and other Assets for purposes of compliance with Applicable Law enforced by CalGEM and any other Governmental Authority;

(c)    a certified copy of the Sale Order;

(d)    the letters-in-lieu of transfer orders to be prepared by Buyer and change of operator forms to be prepared by Seller, in each case duly executed (and acknowledged, where applicable) by Seller;

(e)    the officer's certificate required to be delivered pursuant to <u>Section 9.3(a)</u> and <u>Section 9.3(b)</u>;

(f)    a FIRPTA Certificate from Seller (or, if Seller is classified as a disregarded entity for U.S. federal income Tax purposes, from Seller's regarded owner);

(g)    duly-executed, recordable releases (in sufficient counterparts to facilitate recording in the applicable counties where the Purchased Assets are located) in form reasonably acceptable to Buyer of any mortgages or security interests over the Purchased Assets; and

(h)    those documents reasonably necessary for Buyer to receive any and all monies to which Buyer is entitled pursuant to <u>Section 7.8</u>;

(i)    written confirmation from the applicable Governmental Authority(ies) that all amounts Seller was obligated to pay pursuant to <u>Section 4.13(e)</u> have been paid and that all related violations of Environmental Law have been resolved to the satisfaction of the relevant Governmental Authority; and

(j)    written confirmation from applicable Third Parties that Seller has paid prior to Closing all amounts relating to the Assets due and payable for (i) utilities, (ii) fees and fines owed to Governmental Authorities, including all permit fees, (iii) Taxes, and (iv) amounts payable under <u>Section 6.2(b)(vii)</u>.

**Section 7.3**    **Deliveries by Buyer**.  At the Closing, Buyer shall deliver to Seller:

(a)    the Assignment Documents, each duly executed by Buyer;

(b)    assignments in the forms required by federal, state, or county agencies for the assignment of any federal, state, or county Purchased Assets, duly executed by Buyer, in sufficient duplicate originals to allow recording in all appropriate offices;

26

(c)    the letters-in-lieu of transfer orders to be prepared by Buyer, change of operator forms to be prepared by Seller, any applicable change of operator notices required under applicable operating agreements, and any other applicable forms and declarations required by federal and state agencies relative to Buyer's assumption of operations with respect to the Purchased Assets, in each case duly executed (and acknowledged, where applicable) by Buyer;

(d)    the officer's certificate required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>;

(e)    evidence that Buyer has obtained all bonds, permits and has otherwise satisfied the obligations of all Governmental Authorities to take over ownership and operation of the Assets; and

(f)    evidence that Buyer has complied with its obligations under <u>Section 7.9</u>.

**Section 7.4    Delivery of Property Records; Recording**.  Within five (5) days after Closing, Seller shall deliver to Buyer the originals of the Property Records at a location designated by Buyer.  The Escrow Agent will (i) record all Assignment Documents and all other instruments that must be recorded to effectuate the transfer of the Purchased Assets, and (ii) file for approval with the applicable federal, state, tribal or local agencies all Assignment Documents and other federal, state, tribal or local transfer documents required to effectuate transfer of the Purchased Assets.

**Section 7.5    Further Assurances**.  Subject to the other provisions of this Agreement and any relevant Order of the Bankruptcy Court, Buyer and Seller shall use their commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the Sale Transaction, (b) provide the other Parties with reasonable cooperation and take such actions as such other Parties may reasonably request in connection with the consummation of the Sale Transaction, (c) obtain and then convey or deliver to Buyer any Hall Property not delivered or conveyed to Buyer at the Closing, (d) cause the fulfillment at the earliest practicable date of all the conditions to their respective obligations to consummate the Sale Transaction.  In the event that, following the Closing, (i) Buyer or its designee holds any Excluded Assets or Excluded Obligations or (ii) Seller holds any Purchased Assets or Assumed Obligations, Buyer or Seller will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other Party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other Party.

**Section 7.6    Employee Matters**.

(a)    Buyer is not obligated to hire any current employees of Seller but may interview all current employees. Buyer will notify Seller of the identities of employees to whom Buyer has made an offer of employment that has been accepted to be effective on the Closing Date (the "**Hired Current Employees**").  Subject to Applicable Law, Buyer will have reasonable access to the Assets and personnel records (including compensation, benefits, performance appraisals, disciplinary actions, and grievances) of Seller for the purpose of preparing for and conducting employment interviews with all current employees and will conduct the interviews as

expeditiously as possible prior to the Closing Date.  Effective immediately before the Closing, Seller will terminate the employment of all of its Hired Current Employees.

(b)    Neither Seller nor its Affiliates shall solicit the continued employment of any current employee (unless and until Buyer has informed Seller that the particular current employee will not receive any employment offer from Buyer) or the employment of any Hired Current Employee after the Closing.

(c)    It is understood and agreed that (i) Buyer's expressed intention to extend offers of employment as set forth in this Section 7.6(c) shall not constitute any commitment, contract or understanding (expressed or implied) of any obligation on the part of Buyer to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Buyer may establish pursuant to individual offers of employment; and (ii) employment offered by Buyer is "at will" and may be terminated by Buyer or by an employee at any time for any reason (subject to (x) any written commitments to the contrary made by Buyer or an employee and (y) Applicable Law).  Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Buyer to terminate, reassign, promote or demote any of the Hired Current Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees.

Section 7.7    **Adequate Assurance and Performance**.  With respect to each Assigned Contract and Assigned Real Property Lease, Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assigned Contract and Assigned Real Property Lease.  Buyer and Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts and Assigned Real Property Leases, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Seller's employees and representatives reasonably available to testify before the Bankruptcy Court.

Section 7.8    **Delivery of Certain Funds**.

(a)    If and to the extent that any bonds maintained by Seller as listed on Schedule 4.19 are collateralized or otherwise supported by Cash and Cash Equivalents and are released to Seller by the bond holder or relevant Governmental Authority as a consequence of the sale by Seller of the Assets, the abandonment by Seller of any Wells covered by said bonds, or the conclusion of the Chapter 11 Case, Seller and PDC shall be entitled to retain all of said released Cash or Cash Equivalents, including any accrued interest, and Buyer shall have no rights with respect thereto.

(b)    If and to the extent that there are any Suspense Funds in Seller's possession or control at Closing, Seller shall deliver all such Funds, including any accrued interest, to Buyer at Closing.

(c)    If and to the extent that Seller receives any funds on account of any third party's exercise of any Preferential Right, Seller shall deliver all such funds to Buyer at Closing.

(d)    Buyer acknowledges and agrees that neither Buyer nor any of its Affiliates shall be entitled to any funds held by Seller at any time, whether before, on or after the Closing, other than: (a) the Suspense Funds as provided in Section 7.8(b), and (b) any funds received on account of any third party's exercise of any Preferential Right as provided in Section 7.8(c). Subject to the exceptions stated in this Section 7.8(d), from and after the Closing, Buyer shall be deemed to have waived and relinquished any claims that Buyer or any of its Affiliates may have or may subsequently acquire, known or unknown, with respect to any funds of Seller except as expressly provided in this Section 7.8(d) (such funds held by Seller other than as expressly provided in this Section 7.8(d), collectively, "**Seller's Excess Funds**"). In the event Buyer or any of its Affiliates receives any portion of Seller's Excess Funds to which it is not entitled, Buyer shall promptly pay them over to Seller. In addition, in the event any Party receives any revenues or invoices related in any way to the Assets that are attributable to the time during which that Party did not own the Assets, the receiving Party shall promptly pay such revenues and deliver such invoices to the proper Party.

**Section 7.9    Vehicles.** At Closing, and assuming Seller has performed its obligations under Section 6.2(a)(vii), Buyer will pay off any and all future amounts owed on said loans.

## ARTICLE 8
## BANKRUPTCY COURT MATTERS

**Section 8.1    Bankruptcy Court Filings**. Seller shall file the Sale Motion with the Bankruptcy Court within one (1) Business Day following the Execution Date and use its best efforts to obtain entry of the Sale Order. The Sale Motion shall pray for approval of (a) the Sale Transaction free and clear of all liens, claims, and encumbrances to the fullest extent permitted by 11 U.S.C. § 363(f) and Applicable Law and shall comply with procedural requirements for the granting of the Sale Motion free and clear of lien, claims, and encumbrances and (b) payment of the Break-Up Fee if required pursuant to Section 8.2. Seller shall seek approval of this Agreement and the Sale Transaction without being the sale being subject to higher and better bid. Seller shall consult with Buyer, PDC and their respective representatives concerning any order of the Bankruptcy Court relating to this Agreement or the Chapter 11 Case and provide each of Buyer and PDC with copies of all applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Seller shall diligently defend against such appeal, petition or motion and shall use commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion; provided, that Seller shall consult with each of Buyer and PDC regarding the status of such actions. Seller further covenants and agrees that, after the Closing, the terms of any reorganization plan submitted to the Bankruptcy Court or any other court by or with support of the Seller for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

29

**Section 8.2     Break-Up Fee**.  In the event that this Agreement is terminated by Buyer or Seller pursuant to <u>Section 10.1(j)</u>, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall, promptly upon consummation of a Competing Bid, pay to Buyer an amount equal to Two Hundred Thousand Dollars ($200,000) (the "**Break-Up Fee**"), such payment of the Break-Up Fee to be made by wire transfer(s) in immediately available funds to one or more bank accounts of Buyer designated in writing by Buyer to Seller.  The Parties acknowledge and agree that (a) the Parties expressly negotiated the provisions of this <u>Section 8.2</u> and the payment of the Break-Up Fee are integral parts of this Agreement and (b) in the absence of Seller's obligation to make this payment, Buyer would not have entered into this Agreement.  The obligation of Seller to pay the Break-Up Fee shall survive the termination of this Agreement.  Upon payment of the Break-Up Fee to Buyer in accordance with this <u>Section 8.2</u> and subject to the Transaction Agreement, Seller and its representatives and Affiliates, on the one hand, and Buyer and its representatives and Affiliates, on the other hand, will be deemed to have fully released and discharged each other from any liability resulting from the termination of this Agreement and none of the Seller, its representatives or Affiliates, on the one hand, nor the Buyer, its representatives or Affiliates, on the other hand, or any other Person will have any other remedy or cause of action under or relating to this Agreement or any Applicable Law, including for reimbursement of expenses.

## ARTICLE 9
## CONDITIONS TO CLOSING

**Section 9.1     Conditions Precedent to the Obligations of the Buyer and the Seller**. The respective obligations of the Buyer and Seller to consummate the Sale Transaction are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by the Buyer and Seller in whole or in part to the extent permitted by Applicable Law and <u>Section 12.6</u>):

(a)     no Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the Sale Transaction or could cause the Sale Transaction to be rescinded following the Closing; and

(b)     the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall not have been stayed as of the Closing Date, stayed pending appeal, reversed or vacated.

**Section 9.2     Conditions Precedent to the Obligations of the Seller**.  The obligations of the Seller to consummate the Sale Transaction are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Seller in whole or in part to the extent permitted by Applicable Law and <u>Section 12.6</u>):

(a)     (i) the representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct in all material respects as of such date), and (ii) Seller shall have received a

certificate signed by an authorized person of Buyer, dated as of the Closing Date, to the foregoing effect;

(b)    (i) Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date, and (ii) Seller shall have received a certificated signed by an authorized person of Buyer, dated as of the Closing Date, to the foregoing effect; and

(c)    Buyer shall have delivered, or caused to be delivered, to the Escrow Agent all of the items set forth in Section 7.3.

**Section 9.3    Conditions Precedent to the Obligations of the Buyer**.  The obligation of Buyer to consummate the Sale Transaction is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by Applicable Law and Section 12.6):

(a)    (i) the representations and warranties of Seller contained in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" set forth therein) as of the Closing Date as if made on and as of the Closing Date (other than for such representations and warranties that are made as of a specific date which shall be so true and correct as of such date), except for such failures to be true and correct as would not reasonably be expected to have a Material Adverse Effect, and (ii) Buyer shall have received a certificate signed by an authorized person of Seller, dated as of the Closing Date, to the foregoing effect; and

(b)    (i) Seller shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Seller on or prior to the Closing Date, and (ii) Buyer shall have received a certificate signed by an authorized person of Seller, dated as of the Closing Date, to the foregoing effect.

**Section 9.4    Frustration of Closing Conditions**.  No Party may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused by such Party's breach of any provision of this Agreement.

**Section 9.5    Transaction Agreement, Settlement Agreement and Surface Use Agreement**.  No Party may consummate the transactions contemplated hereby or otherwise cause the Closing to occur unless, (a) concurrently therewith, (i) PDC receives the Purchase Price (as defined in the Transaction Agreement) and (ii) CalNRG OC, Realm and PDC have executed and delivered the Surface Use Agreement in accordance with the Transaction Agreement and (b) no breach by Seller of the Settlement Term Sheet or the Settlement Agreement shall have occurred or be continuing except for any such breach waived in writing by PDC.  For the avoidance of doubt, no Party may waive compliance with this Section 9.5 except with PDC's prior written consent.

## ARTICLE 10
## TERMINATION

**Section 10.1    Termination**  This Agreement may be terminated at any time prior to the Closing as follows:

(a)    by mutual written consent of Buyer and Seller;

(b)    by Buyer or Seller if the Closing has not occurred by 5:00 P.M. Pacific Standard Time on May 14, 2021 (the "**Outside Date**"); provided, however, that if the Closing has not occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or Seller, then such breaching Party, may not terminate this Agreement pursuant to this Section 10.1(b);

(c)    by Buyer, if the Seller materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would reasonably be expected to result in failure of a condition set forth Section 9.1 or Section 9.3 and such breach, if curable, has not been cured by the earlier of (i) fifteen (15) Business Days after the giving of written notice by Buyer to Seller of such breach and (ii) the Outside Date; provided, that Buyer is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(d)    by Seller, if Buyer materially breaches any representation or warranty or any covenant or agreement contained in this Agreement, such breach would reasonably be expected to result in failure of a condition set forth Section 9.1 or Section 9.2 and such breach, if curable, has not been cured by the earlier of (i) fifteen (15) Business Days after the giving of written notice by Seller to Buyer of such breach and (ii) the Outside Date; provided, that Seller is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement;

(e)    by Buyer or Seller if there is in effect a final non-appealable Order of a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Sale Transaction, it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and use their respective commercially reasonable efforts to pursue such appeal unless and until this Agreement is terminated pursuant to this Section 10.1; provided, that the terminating Party is not then in material breach of any representation, warranty, covenant or agreement contained Agreement;

(f)    by Buyer, within two (2) Business Days of the Bankruptcy Court approving the Sale Transaction and APA subject to revisions to the APA and Sale Transaction imposed by the Bankruptcy Court that are materially adverse to Buyer (for the avoidance of doubt, Buyer's right to terminate pursuant to this Section 10.1(f) shall expire if Buyer does not elect to terminate within such two (2) Business Day period and Buyer shall be deemed to have consented to such revisions); provided, so long as the Bankruptcy Court approves the payment of the Break-Up Fee if required pursuant to Section 8.2, Buyer may not terminate this Agreement pursuant to this Section 10.1(f) based solely on the Bankruptcy Court requiring an auction for the Purchased Assets to be held or the occurrence of such auction;

(g)    by Buyer, if the Bankruptcy Court enters an Order (i) dismissing the Chapter 11 Case or (ii) converting the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code;

(h)    by Buyer, if the Bankruptcy Court enters any Order materially inconsistent with the Sale Order;

(i)    by Buyer, if the Bankruptcy Court enters any Order materially inconsistent with the Sale Order and such inconsistency is materially adverse to Buyer; and

(j)    by Buyer or Seller if the Bankruptcy Court requires the Sale Transaction to be subject to higher and better bids at an auction (each such bid, a "**Competing Bid**") and Buyer is not the successful bidder in such auction.

**Section 10.2    Procedure Upon Termination**.  In the event of termination pursuant to Section 10.1, the terminating Party will give written notice thereof to the other Party or Parties, and this Agreement will terminate as described in Section 10.3, and the purchase of the Purchased Assets hereunder will be abandoned, without further action by Buyer or Seller.

**Section 10.3    Effect of Termination**.

(a)    Except as otherwise provided in this Section 10.3, in the event that this Agreement is terminated as provided in this ARTICLE 10, then each of the Parties will be relieved of its duties and obligations arising under this Agreement after the date of such termination; provided; however; that the provisions of this Section 10.3 and ARTICLE 12, and, to the extent necessary to effectuate the foregoing enumerated provisions, ARTICLE 1, will survive any such termination and will be enforceable hereunder; provided, further, that nothing in this Section 10.3 will be deemed to release any Party from (a) breach of this Agreement prior to termination or for fraud and (b) any Liability arising under the Settlement Term Sheet, Settlement Order or Settlement Agreement.

## ARTICLE 11
## TAXES AND EXPENSES

**Section 11.1    Recording Expenses**.  Buyer shall pay all costs of recording and filing the Assignment Documents for the Purchased Assets, all other state and federal transfer documents, and all other instruments that must be filed to effectuate the transfer of the Purchased Assets and any assumption of operations by Buyer.

**Section 11.2    Asset Taxes**.  Seller shall be allocated and bear all Asset Taxes for any Tax period ending prior to the Effective Date and the portion of any Straddle Period ending prior to the Effective Date.  Buyer shall be allocated and bear all Asset Taxes for any Tax period beginning at or after the Effective Date and portion of any Straddle Period that begins at or after the Effective Date.  For purposes of the preceding sentence, (a) Asset Taxes that are attributable to the severance or production of Hydrocarbons shall be allocated to the period in which the severance or production giving rise to such Asset Taxes occurred, (b) Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis (other than such Asset Taxes described in clause (a) or (c)), shall be allocated to the period in which the transaction giving rise to such Asset Taxes occurred, and (c) Asset Taxes that are ad valorem, property or other Asset Taxes imposed on a periodic basis pertaining to a Straddle Period shall be allocated between the portion of such Straddle Period ending immediately prior to the Effective Date and the portion of such Straddle Period beginning at the Effective Date by prorating each such Asset

Tax based on the number of days in the applicable Straddle Period that occur before the Effective Date, on the one hand, and the number of days in such Straddle Period that occur on or after the Effective Date, on the other hand.  To the extent the actual amount of an Asset Tax is not known at the time an adjustment is to be made with respect to such Asset Tax pursuant to this Section 11.2, the Parties shall utilize the most recent information available in estimating the amount of such Asset Tax for purposes of such adjustment.

Section 11.3    **Tax Returns**.  Buyer shall be responsible for the preparation and timely filing of any Tax Returns with respect to Asset Taxes for Tax periods beginning at or after the Effective Date that are required to be filed after the Closing Date, and the payment to the applicable Taxing Authority of all Asset Taxes for such Tax periods that become due and payable after the Closing Date.

Section 11.4    **Transfer Taxes**.  Buyer shall be responsible for and pay all Transfer Taxes, regardless of the Party on whom Liability is imposed under the provisions of the Applicable Law relating to such Transfer Taxes.  The Parties shall cooperate to obtain any available exemption from such Taxes.  Buyer shall timely remit, or cause to be timely remitted, all such Transfer Taxes to the appropriate Taxing Authority; provided, however, that, if Seller or any of if Affiliates pays any such Transfer Taxes, Buyer shall timely reimburse Seller for any such amounts.

Section 11.5    **Roll Back Taxes**.  Notwithstanding anything to the contrary in Section 11.2, Seller will be responsible for all roll back taxes (including any applicable penalty and interest) for ad valorem taxes deferred as a result of any agricultural or open space designation made prior to Closing and claimed for all or part of the Real Property, including any roll back taxes due to changes in use occurring after Closing (collectively, "**Rollback Taxes**").  If the Rollback Taxes will be payable but have not yet been assessed at the time of the Closing, then Seller will escrow with an Escrow Agent mutually satisfactory to the Parties an amount equal to one hundred ten percent (110%) of the estimated amount of such Rollback Taxes with an Escrow Agent mutually satisfactory to the Parties pursuant to an escrow agreement executed by and among Seller, Buyer and the Escrow Agent in form and substance reasonably acceptable to Seller and Buyer (the "**Rollback Escrow Agreement**"), and which shall provide that upon receipt of a Tax bill therefore, the Escrow Agent will be authorized and instructed to pay the amount due.  If the amount due exceeds the amount deposited by Seller, Seller will pay the amount of such excess to the Escrow Agent within ten (10) days of the Escrow Agent's notification to Seller that an additional amount is due hereunder.

## ARTICLE 12
## MISCELLANEOUS

Section 12.1    **Survival and Remedies**.

(a)    None of the representations, warranties, covenants, agreements or undertakings set forth in this Agreement or in any instrument, document or certificate delivered in accordance with this Agreement shall survive the Closing, other than each covenant and agreement set forth in this Agreement that by its terms is to be performed following the Closing, which shall survive the Closing until fully performed. No Party or any of its respective Affiliates

34

shall have any Liability with respect to any representation, warranty, covenant, agreement or undertaking from and after the time that such representation, warranty, covenant, agreement or undertaking ceases to survive hereunder (provided, that the foregoing shall not limit any claim or recovery that may be available to the Buyers under the RWI Policy). The Parties agree that none of the Seller or its Affiliates shall be liable to the insurer under the RWI Policy for subrogation claims pursuant to the RWI Policy, and the Buyer covenants and agrees that the RWI Policy will include a waiver of such subrogation claims for the benefit of the Seller and its Affiliates.

(b)     The Parties shall have the non-exclusive right to specific performance and other equitable remedies available at law or equity (including injunctive relief) for the breach or failure of any other Party to perform its obligations hereunder required to be performed at or prior to Closing.

**Section 12.2     Public Announcements**.  From and after the Closing, Buyer and Seller may make public statements: (a) with respect to this Agreement, the Sale Transaction, the Settlement Agreement or the Surface Use Agreement so long as such announcements do not disclose the specific terms or conditions of this Agreement, the Settlement Agreement or the Surface Use Agreement, or (b) related to PDC or any of its Affiliates, except (x) where such terms and conditions have already been disclosed,  (y) as required by Law, or applicable rules or regulations of any Governmental Authority, (z) where disclosure is permitted or required under this Agreement; provided, that the issuing Party shall use its commercially reasonable efforts to consult with the other Party with respect to the text thereof to the extent practicable.   The foregoing limitations shall not prevent Buyer or the Escrow Agent from recording the Assignment Documents delivered at Closing.

**Section 12.3     Expenses**.  Except as otherwise expressly provided in this Agreement, Buyer and Seller will each bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Sale Transaction.

**Section 12.4     Notices**.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission) or (c) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to Seller:

Bridgemark Corporation
1761 Irvine Blvd., Suite 217
Tustin, CA 92780

and

Numeric Solutions LLC
1536 Eastman Avenue, Suite D

Ventura, California 93003
Attn: John Harris
Email: harris@numericsolutions.com


With copies (which will not constitute notice) to:

William N. Lobel, Esq.
THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
Costa Mesa, California 92626-7109
Telephone:      (714) 549-6200
Facsimile:      (714) 549-6201
Email: wlobel@tocounsel.com

and

Ira D. Kharasch
Erin Gray
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail: ikharasch@pszjlaw.com
egray@pszjlaw.com

and

Placentia Development Company LLC4
1140 Virginia Drive
Fort Washington, Pennsylvania 19034
Attention: Yolanda Rodriguez – Vice President
Email: YRodriguez2@tollbrothers.com
Attention: Seth Ring – Regional President, Western Region
Email: SRing@tollbrothers.com

and

Thompson & Knight LLP
777 Main Street, Suite 3300
Fort Worth, Texas 76102
Attention: Cole Bredthauer
Email: Cole.Bredthauer@tklaw.com

If to Buyer:

California Natural Resources Group Orange County, LLC
1746-F South Victoria Avenue, Suite 245
Ventura, CA 93003
Attention:  Clifton Simonson and Jeffrey Katersky
Email:  clif.simonson@gmail.com and jkatersky@gmail.com


With copies (which will not constitute notice) to:

OSSENTJUK & BOTTI
2815 Townsgate Road, Suite 320
Westlake Village, CA 91361
Attention:  David Ossentjuk
Email:  dossentjuk@oandblawyers.com


**Section 12.5    Assignment**.   Prior to the Closing, (a) Seller may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of each of Buyer and PDC, which consent may be withheld in Buyer's or PDC's respective sole discretion) and (b) Buyer may not assign this Agreement or any of its rights or obligations except to (i) a wholly-owned subsidiary or Affiliate of Buyer, (ii) PDC or (iii) with the prior written consent of each of Seller and PDC (which consent may be withheld in Seller's or PDC's respective sole discretion).   Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.   Nothing in this Agreement will create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement, except PDC shall be a third party beneficiary of this Agreement.

**Section 12.6    Entire Agreement; Amendment and Waivers**.    This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.   This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by PDC and the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.   Without limiting the generality of the foregoing, no action by any Party or PDC prior to the Closing Date, including any investigation by or on behalf of any Party or PDC, will be deemed to constitute a waiver by PDC or the Party, as applicable, taking such action of compliance with any representation, warranty, covenant or agreement contained herein.   The waiver by any Party or PDC of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.   No failure on the part of any Party or PDC to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party or PDC preclude any other or further exercise thereof or the exercise of any other right,

power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

Section 12.7    **Non-Recourse**.    Except as otherwise explicitly provided in this Agreement, neither Buyer nor its Affiliates, or, in each case, any of their respective past, present or future directors, officers, employees, incorporators, members, partners, equity holders, managers, agents, attorneys, or other representatives will have any Liability for any Liabilities of Seller under this Agreement or any agreement entered into in connection herewith of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby. Any claim or cause of action of Seller based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against Buyer, and then only with respect to the specific obligations set forth herein or therein.  Other than Buyer, no other party will have any Liability for any of the representations, warranties, covenants, agreements or Liabilities of Buyer under this Agreement or the agreements, documents or instruments contemplated hereby or of or for any Action based on, in respect of, or by reason of, the Sale Transaction, in each case whether based on contract, tort, fraud, strict liability, other Laws or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of Seller or another Person or otherwise.

Section 12.8    **Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the Sale Transaction is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the Sale Transaction is consummated as originally contemplated to the greatest extent possible.

Section 12.9    **Counterparts**.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 12.10    **Governing Law**.    THIS AGREEMENT SHALL BE GOVERNED, CONSTRUED AND ENFORCED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF CALIFORNIA SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE. THE ASSIGNMENT DOCUMENTS, AND ANY OTHER INSTRUMENTS OF CONVEYANCE EXECUTED UNDER THIS AGREEMENT, WILL BE GOVERNED BY AND MUST BE CONSTRUED ACCORDING TO THE LAWS OF THE STATE WHERE THE PROPERTY TO WHICH THEY PERTAIN IS LOCATED, EXCLUDING ANY CONFLICTS-OF-LAW RULE OR PRINCIPLE THAT MIGHT APPLY THE LAW OF ANOTHER JURISDICTION.

Section 12.11    **Jurisdiction; Waiver of Right to Trial by Jury**.  THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR

38

AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; PROVIDED; HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE, WILL HAVE THE SOLE JURSDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES HERETO, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

Section 12.12   **Time of Essence**.  This Agreement contains a number of dates and times by which performance or the exercise of rights is due, and the Parties intend that each and every such date and time be the firm and final date and time, as agreed.  For this reason, each Party hereby waives and relinquishes any right it might otherwise have to challenge its failure to meet any performance or rights election date applicable to it on the basis that its late action constitutes substantial performance, to require the other Party or Parties to show prejudice, or on any equitable grounds.  Without limiting the foregoing, time is of the essence in this Agreement.

Section 12.13   **Waiver of Damages**.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, SELLER SHALL NOT BE ENTITLED TO RECOVER FROM BUYER OR BUYER'S AFFILIATES ANY INDIRECT, CONSEQUENTIAL, PUNITIVE, SPECIAL, SPECULATIVE OR EXEMPLARY DAMAGES ARISING OUT OF, RESULTING FROM OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER THE SAME MAY BE CAUSED).

Section 12.14   **Payments**.  All payments under this Agreement will be by wire transfer of immediately available funds to an account designated by the Party receiving payment unless the Parties otherwise agree in writing.

[*Signature Pages Follow*]

526512.000004 23802768.24

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized representatives as of the date hereof.

**SELLER:**

**BRIDGEMARK CORPORATION,**
a California corporation

By: _____
Name: ____Robert J. Hall_____
Title: ____President and Chief Executive Officer____

**GREGSON ENERGY DRILLING LLC,**
a Wyoming limited liability company

By: _____
Name: ____Robert J. Hall_____
Title: ____Authorized Signatory_____

**BRIDGEMARK TEXAS LLC,**
a Texas limited liability company

By: _____
Name: ____Robert J. Hall_____
Title: ____Authorized Signatory_____

**BUYER:**

**CALIFORNIA NATURAL RESOURCES
GROUP ORANGE COUNTY, LLC,**
a Delaware limited liability company

By:    Golden State Exploration & Production, LLC, a Delaware limited liability company
Its:    Managing Member

By: _____
        Clifton O. Simonson
Its:    Managing Member

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized representatives as of the date hereof.

**SELLER:**

**BRIDGEMARK CORPORATION,**
a California corporation

By: _____
Name:   Robert J. Hall
Title:   President and Chief Executive Officer

**GREGSON ENERGY DRILLING LLC,**
a Wyoming limited liability company

By: _____
Name:   Robert J. Hall
Title:   Authorized Signatory

**BRIDGEMARK TEXAS LLC,**
a Texas limited liability company

By: _____
Name:   Robert J. Hall
Title:   Authorized Signatory

**BUYER:**

**CALIFORNIA NATURAL RESOURCES GROUP ORANGE COUNTY, LLC,**
a Delaware limited liability company

By:   Golden State Exploration & Production, LLC, a Delaware limited liability company
Its:   Managing Member

By: _____
      Clifton O. Simonson
Its:   Managing Member

[Signature Page to Asset Purchase Agreement]

**REALM CALIFORNIA, LLC,**
a Delaware limited liability company
By:     Golden State Exploration & Production,
LLC, a Delaware limited liability company
Its:     Managing Member

By:     _Clifton O. Simonson_
        Clifton O. Simonson
Its:     Managing Member


**ALATEX, LLC,**
a Delaware limited liability company

By:     Golden State Exploration & Production,
LLC, a Delaware limited liability company
Its:     Managing Member

By:     _Clifton O. Simonson_
        Clifton O. Simonson
Its:     Managing Member

[Signature Page to Asset Purchase Agreement]

## ANNEX A

### FORM OF SALE ORDER

Attached.

526512.000004 24179367.15

**[Separately Filed – See Exhibit B to Motion]**

EXHIBIT A-1

ASSIGNED REAL PROPERTY LEASES

| RICHFIELD LEASES | | | | | | |
|---|---|---|---|---|---|---|
| LESSOR | LESSEE | RECORDED DATE | EFFECTIVE DATE | BOOK | PAGE | LEGAL – SEE RECORDED DOCUMENTS FOR FULL DESCRIPTIONS |
| Joanna Adella Coyle | Union Oil Company of California, a California corporation | 11/26/1917 | 6/26/1917 | 8 | 257 | Lot 17, Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Harold H. Coyle and Genevieve B. Coyle, his wife (et al) | Union Oil Company of California, a California corporation | 11/26/1917 | 6/26/1917 | 8 | 264 | The West 11.25 acres of Lot 25, Hazard's Subdivision, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California, excepting therefrom a lot in the northeast corner thereof, described as follows: Beginning at the Northeast corner of said land; thence South 50 feet; thence West parallel with the North line thereof, 140 feet; thence North 50 feet to the North line thereof and thence East 140 feet to the point of beginning |
| N. Frank Morse and Mrs. Lottie E. Morse | M.L. Jenks | 11/26/1917 | 2/24/1917 | 8 | 274 | Lot 16 and the North 3.28 acres of the East 11 acres of Lot 25, and the North 50 feet of the East 140 feet of the West half (W 1/2) of Lot 25, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |

EXHIBIT A-1

| | | | | | | |
|---|---|---|---|---|---|---|
| Charlotte S. Ayers, a widow and William J. Parson, a single man | Union Oil Company of California, a California corporation | 11/26/1917 | 8/1/1917 | 8 | 298 | Lot 20, Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Towell Investment Company, a California corporation | Union Oil Company of California, a California corporation | 11/26/1917 | 8/1/1917 | 8 | 305 | The East half (E 1/2) and the South half (S 1/2) of the West half (W 1/2) of Lot 19, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company of Los Angeles California | M.L. Jenks | 9/20/1918 | 8/1/1918 | 7 | 76 | Lot 22, Hazard's Subdivision of the Shanklin Tract, as shown on Map Lot 22, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company of Los Angeles California (et al) | M.L. Jenks | 9/20/1918 | 8/1/1918 | 7 | 81 | Blocks 16, 18 and 19, Lots 1 to 11 inclusive, in Block 27, Block 28 and Block 29, as shown on Amended Map of Richfield, filed in Book 1 at Page 26 of Licensed Surveyors Maps, Records of Orange County, California |
| Susan C. Yarnell (et al) | California Star Oil Company, a corporation | 10/27/1919 | 4/9/1919 | 12 | 87 | Lot 24 and the East half (E 1/2) of Lot 25 of Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California, excepting the Northerly 3.29 acres of said Lot 25, which 3.28 acres is bounded and described as follows: Beginning at the Northeast corner of said Lot 25; thence South 300 feet along the East line of said Lot 25 to a point; thence West 478.525 feet to a point; thence North 300 feet to the North line of said Lot 25; thence East to the point of beginning |

EXHIBIT A-1

| | | | | | | |
|---|---|---|---|---|---|---|
| California Star Oil Company, a corporation | Petroleum Midway Company, LTD., a corporation | 10/27/1919 | 4/18/1919 | 12 | 95 | Lot 24 and the East half (E 1/2) of Lot 25 of Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California, excepting the Northerly 3.29 acres of said Lot 25, which 3.28 acres is bounded and described as follows: Beginning at the Northeast corner of said Lot 25; thence South 300 feet along the East line of said Lot 25 to a point; thence West 478.525 feet to a point; thence North 300 feet to the North line of said Lot 25; thence East to the point of beginning |
| Oak Company, a California corporation | L.M. Dorn | 9/7/1939 | 3/17/1939 | 1012 | 207 | The North half (N 1/2) of the West half (W 1/2) of Lot 19, Hazard's Subdivision, Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company | Union Oil Company of California, a California corporation Recorded: | 11/15/1918 | 11/1/1918 | 7 | 185 | (a) The South 5.695 acres of that portion of Lot 2 in Section 24, Township 4 South, Range 9 West, S.B.B.M., Orange County, California.<br><br>(b) Lot 35, of Hazard's Subdivision, excepting a strip of land containing 1.10 acres conveyed by Jacob Stern to Santa Fe Land Improvement Company; also a strip of land 50.00 feet wide lying South of and contiguous to the South line of that certain piece of land conveyed by said deed to the Santa Fe Land Improvement Company and extending from the West line of Block 44 of the Town of Richfield; also excepting the South Half of the East 20.00 acres (being 10.00 acres) of said Lot 35.<br><br>Also excepting the following: Commencing at a point in the West line of Lot 35 of Hazard's Subdivision, as per amended Map of Richfield |

EXHIBIT A-1

filed in Book 1, Page 26 of Licensed Surveyor's Map, records of Orange County, California, said point bearing North 03° 36' West along lot line 843.02 feet from the Southwest corner of Lot 35; thence North 03° 36' West 195.92 feet to an intersection with the South line of the Atchison, Topeka and Santa Fe Railway Co's right of way as per Deed recorded in Book 178, Page 28 of Deeds, records of Orange County, California; thence Easterly along the South line of the above mentioned right of way 778.47 feet to an intersection with the West line of "Block 44 Richfield as shown on said Map, thence South parallel to the East line of said Lot 35,
201.60 feet; thence West 765.29 feet to the point of beginning.

(c) Lots 17, 20 and 23, in Block 22; and Lots 27 to 32, inclusive, in Block 24; and Lots 16, 17 and 18 in Block 25; and Lots 1 to 5, inclusive, and Lot 11, in Block 26, all as shown on the amended Map of Richfield filed in Book 1, Page 26 of Licensed Surveyor's Map, records of Orange County, California.

(d) Lot 36 of Hazard's Subdivision.

(e) Lot 37 of Hazard's Subdivision; excepting therefrom the North Half of the South Half and the South Half of the South Half of the North Half of said Lot, conveyed to Edith Mary Abel.

(Parcel 16 continued)
(f) Lot 39 of Hazard's Subdivision; excepting portions conveyed to the Richfield Mutual Water Company and to Anna W. Grace, and the North Half of the South Half of said Lot.

EXHIBIT A-1

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | (g) Lot 40 of Hazard's Subdivision; excepting therefrom the South 10.00 acres conveyed to Sol Goodman.<br><br>(h) Lot 41 of Hazard's Subdivision; excepting therefrom the South 5.00 acres.<br><br>(i) Lot 42 of Hazard's Subdivision; excepting 7.19 acres conveyed to Anaheim Union Water Company, and 5.00 acres conveyed to William P. Speer, and 10.00 acres conveyed to Martin Apalategui.<br><br>(j) Block 44, Town of Richfield, reserving therefrom the Northerly 100.00 feet.<br><br>(k) Blocks 16, 18 and 19, Town of Richfield.<br><br>(l) Lots 1 to 11, inclusive, in Block 27, Town of Richfield.<br><br>(m) Blocks 28 and 29, Town of Richfield. |
| William A. Goodwin and Alice A. Goodwin, his wife (et al) | Union Oil Company of California, a California corporation | 3/27/1919 | 5/10/1919 | 10 | 197 | Portion of Lot 21, Hazard's Subdivision as shown on Map recorded in Book 1, Page 26, Licensed Surveyors' Maps, Official Records of Orange County, California, described as follows: Parcel A: Commencing at the Southwest corner of Lot 21 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyors' Maps, Records of Orange County, California, |

EXHIBIT A-1

| | | | | | | |
|---|---|---|---|---|---|---|
| A.S. Bradford and Winifred W. Bradford, his wife (et al) | Chiksan Oil Company, a California corporation | 5/2/1924 | 3/31/1924 | 45 | 186 | Portion of Lot 26 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Commencing at the northeast corner of Lot 27 of said Hazard's Subdivision; thence southerly, along the easterly line of said Lot 27, 325 feet; thence westerly, parallel with the northerly line of said Lots 26 and 27, 862 feet, more or less, to the true point of beginning; thence southerly, at right angles 350 feet, to a point which is 349.37 feet northerly, measured at right angles, from the southerly line of said Lots 26 and 27; thence westerly, parallel to said southerly line of Lots 26 and 27, 586.79 feet; thence southerly, parallel with the easterly line of said Lot 27, 349.37 feet to the southerly line of said Lots 26 and 27; thence westerly, along the southerly line of said Lots 26 and 27, 256.65 feet, more or less, to the southwest corner of said Lot 26; thence northerly, along the westerly line of said Lot 26, 601.13 feet; thence easterly, parallel with the northerly line of said Lot 26, 318.48 feet; thence northerly, at right angles, 100 feet; thence easterly, parallel with the northerly line of said Lot 26, 569.3 feet to the true point of beginning |
| Bradford Bros. Inc., a Nevada corporation (et al) | The Texas Company, a Delaware corporation Recorded | 9/7/1945 | 8/20/1945 | 1322 | 465 | That portion of Lot 26 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Commencing at the northeast corner of Lot 27 of said Hazard's Subdivision; thence southerly, along the easterly line of said Lot 27, 675 feet; thence westerly, parallel with the northerly lines of said Lots 26 and 27, 950.07 feet, to the true point of beginning; thence southerly, parallel with the easterly line of said Lot 27, 349.37 feet to the southerly line of said Lots 26 and 27; thence westerly, along the southerly line of said Lots 26 and 27, 498.72 feet; |

Exhibit A-1

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | thence northerly, parallel with the easterly line of said Lot 27, 349.37 feet; thence easterly, parallel with the northerly line of said Lots 26 and 27, 498.72 feet to the true point of beginning |
| Bradford Bros. Inc., a Nevada corporation (et al) | Arrowhead Oil Company, LTD.., a Nevada corporation Recorded | 8/12/1945 | 7/1/1947 | 1538 | 310 | Lots 26 and 27 of Hazard's Subdivision as shown on map filed in Book 1, Page 26 of Licensed Surveyor's Maps records of Orange County, State of California, described as follows: Beginning at the Northeast corner of Lot 27 of said Hazard's Subdivision, thence Southerly along the Easterly boundary of said Lot 27 a distance of 325 feet; thence Westerly parallel with the Northerly boundary of said Lots 26 and 27 a distance of 547 feet from the Easterly boundary of Lot 27; thence Southerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 315 feet; thence Northerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 569.3 feet; thence southerly at right angles a distance of 100 feet; thence Westerly at right angles a distance of 318.48 feet to the Westerly boundary of Lot 26; thence Northerly along the Westerly boundary of Lot 26 a distance of 425.85 feet to the Northwesterly corner of said Lot 26; thence Easterly along the Northerly boundary of Lots 26 and 27 to the point of beginning |
| Chanslor-Canfield Midway Oil Company, a California corporation (et al) | A.H. Bradford | 1/19/1966 | 9/28/1949 | 7813 | 45 | Lot 6, 7, 8 and 14, in Block 26, Lots 1 to 6, inclusive, in Block 33, and Lots 1 to 4, inclusive, in Block 34, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California. |

EXHIBIT A-1

That portion of Lot 21 of Hazard's Subdivision, as per map there of recorded in Book 1, Page 26 of Record of Surveys, in the office of the County Recorder of Orange County, California, lying within Lots 1 to 15, inclusive, and Lots 26 to 29, inclusive, in Block 31 of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California.

Beginning at the Northwest corner of Lot 1, in Block 34, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California, and running thence Northeasterly to the Southwest corner of Lot 1, in Block 33 of said Richfield; thence Easterly along the South lien of said Lot 1, in Block 33, 184.63 feet to the Southeast corner of said Lot 1 in Block 33; thence South at right angles to said South line 30.00 feet, to the center line of Orange Street (vacated); thence West along said center line to the Northerly extension of the East line of said Lot 1 in Block 34; thence South along said Northerly extension 30.00 feet to the Northeast corner of said Lot 1 in Block 34; thence West along the North line of said Lot 1 in Block 34, 150.00 feet to the point of beginning.

Beginning at the Northwest corner of Lot 6, in Block 33, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California, and running thence Northeasterly to the Southwest corner of Lot 1 in Block 31 of said Richfield; thence Easterly along the South line of said Lot 1, 184.63 feet to the Southeast corner of said Lot 1; thence South, at right angles to said South line, 25.00 feet; to the center line Pine Street (vacated); thence West, along said center line, to a line of said Lot 6 at right angles with the North line of said Lot 6; thence South 25.00 feet to

EXHIBIT A-1

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | the Northeast corner of Lot 6; thence West along the North lien of said Lot 6, 184.63 feet to the point of beginning. |
| *Susan C. Yarnell, Jessie Y. Kimball, Katherine Yarnell, Ellis T. Yarnell and Esther Yarnell | California Star Oil Company | April 9, 1919 | April 9, 1919 | 18 | 7 | Lot 18, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California |
| *Bradford Bros. Inc., as Lessor | Arrowhead Oil Company, Ltd. | 8/12/1947 | 7/1/1947 | 1538 | 310 | Portion of Lots 26 and 27 of Hazard's Subdivision as shown on map filed in Book 1, Page 26 of Licensed Surveyor's Maps records of Orange County, State of California, described as follows: Beginning at the Northeast corner of Lot 27 of said Hazard's Subdivision, thence Southerly along the Easterly boundary of said Lot 27 a distance of 325 feet; thence Westerly parallel with the Northerly boundary of said Lots 26 and 27 a distance of 547 feet from the Easterly boundary of Lot 27; thence Southerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 315 feet; thence Northerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 569.3 feet; thence southerly at right angles a distance of 100 feet; thence Westerly at right angles a distance of 318.48 feet to the Westerly boundary of Lot 26; thence Northerly along the Westerly boundary of Lot 26 a distance of 425.85 feet to the Northwesterly corner of said Lot 26; thence Easterly along the Northerly boundary of Lots 26 and 27 to the point of beginning |

EXHIBIT A-1

| *A.S. Bradford | Chiksan Oil Company | 3/31/1924 | 3/31/1924 | 45 | 186 | Lot 27 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Beginning at a point in the easterly line of said Lot 27, distant 325 feet southerly from the northeast corner of said lot; thence westerly parallel to the North line of said Lot 27, 547 feet; thence southerly at right angles, 350 feet to a point which is 349.37 feet northerly measured at right angles from the southerly line of said Lot 27; thence easterly, parallel with said southerly line 547 feet, more or less, to a point in the easterly line of said Lot 27; thence northerly along said easterly line 350 feet, more or less, to the point of beginning |
|---|---|---|---|---|---|---|
| *Morris D. Schatzman, John W. Schmid and Philip S. Magruder, coexecutors of the Estate of A. Hartwell Bradford, deceased | Union Oil Company | 1/1/1965 | | | | Block 17, Hazard's Subdivision as per Map of Richfield, recorded in Book 1, Page 26 of Licensed Surveyor's Maps, records of Orange County, State of California |
| *J.W. Newell and Lilla F. Newell | Union Oil Company | N/A | 5/31/1917 | N/A | N/A | N/A |
| *Esther L. Newell | Union Oil Company | N/A | 5/1/1917 | N/A | N/A | N/A |

EXHIBIT A-1

| *Lilla F. Newell | Union Oil Company | 4/12/1949 | 11/15/1948 | 1828 | 128 | Records of Orange County, State of California |
| *Malcom J. Renton, Executor of the Estate of David M. Renton | Union Oil Company | 5/11/1949 | 4/12/1949 | 1841 | 400 | Records of Orange County, State of California |
| *Malcom J. Renton, Executor of the Estate of David M. Renton | Union Oil Company | 8/16/1950 | 3/20/1950 | 2057 | 298 | Line Well Agreement, Records of Orange County, State of California |
| *Charles C. Chapman | Union Oil Company | 3/31/1917 | 3/31/1917 | 8 | 219 | Records of Orange County, State of California |

| DOWLING OLIVE LEASES | | | | | |
|---|---|---|---|---|---|
| LESSOR | LESSEE | EFFECTIVE DATE | DATE | BOOK | PAGE |
| Robert R. Dowling and Marquita S. Dowling et al | Alberta Stevenson | 2/23/1956 | 4/17/1956 | 3471 | 573 |

EXHIBIT A-1

| Edward Mills et al | Alberta Stevenson | N/A | N/A | 3476 | 495 |
| Reinhold Dinkler et al | Alberta Stevenson | N/A | N/A | 3483, 3832 | 550, 175 |

| EAST COYOTE | | | | | |
|---|---|---|---|---|---|
| LESSOR | LESSEE | EFFECTIVE DATE | RECORDED | BOOK / PAGE | DESCRIPTION |
| Anaheim Union Water Company | William Loftus | 12/1/1906 | 4/17/1907 | 3 / 25 | Hualde Dome Unit Tract 5 |

| TEXAS LEASES | | | | |
|---|---|---|---|---|
| LESSOR | LESSEE | DATED | INSTRUMENT | DESCRIPTION |
| Monica Mejia | T-Jay Exploration, L.L.C | 8/1/2005 | 2015047945 | Covering 194.72 acres out of Share 6 of the Vicente Lopez de Herrerra Survey, Abstract 145, Nueces County, Texas |
| Paul K. Taylor, Jr. | T-Jay Exploration, L.L.C. | 11/1/2013 | 2015047944 | As amended by Amendment to Oil, Gas and Mineral Lease dated March 24, 2016, but made effective as of November 1, 2013 and being recorded under Document No. 2016021633 of the Official Records of Nueces County, Texas |

EXHIBIT A-1

| John C. Dickerson, III | T-Jay Exploration, L.L.C. | 5/28/2016 | 2016021903 | Covering 194.72 acres out of Share 6 of the Vicente Lopez de Herrerra Survey, Abstract 145, Nueces County, Texas, and recorded under Document No 2016021903 of the Official Records of Nueces County, Texas |
| --- | --- | --- | --- | --- |
| Ivy Creek Investments, Ltd | T-Jay Exploration, L.L.C. | 5/27/2016 | 2016021902 | Covering 97.36 acres out of Share 6 of the Vicente Lopez de Herrerra Survey, Abstiact 145, Nueces County, Texas |
| La Sierrita, L.L.C | T-Jay Exploration, L.L.C. | 5/28/2016 | 2016021904 | Covering 97.36 acres out of Share 6 of the Vicente Lopez de Herrerra Survey, Abs 145, Nueces County, Texas, 97.36 acres of land, more or less, situated in Nueces County, Texas, being out of a 194.72 acre Oil, Gas and Mineral Lease by Sterling M. Morris, Et Al (Lessors) to T-Jay Exploration, L.L.C. (Lessee) recorded in Document No. 2014003710, Document No. 2014003711, Document No. 2014003712, Document No. 2015047944 and Document No. 2015047945 of the Official Public Records of Nueces County, Texas |
| Sandra Towler, Becky Green and Sheryl Hall | T-Jay Exploration, L.L.C. | 4/1/2014 | 2014014795, 2014014796, 2014014797 | Covering 24.59 acres of land, more or less, being the most Northerly 24.59 acre portion of a 184.59 acre tract which is the South 84.59 acres and the West 100 acres of the North 350 acres of a 434.59 acre tract out of Share 6 of the Vicente Lopez de Herrerra Survey, Abstract 145, Nueces County, Texas, and recorded by counterparts in the Official Records of Nueces County, Texas |

| ALABAMA | | | | | |
| --- | --- | --- | --- | --- | --- |
| GRANTOR | GRANTEE | RECORDED DATE | BOOK | PAGE | INSTRUMENT |

EXHIBIT A-1

| COASTAL EXPLORATION INC | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0812 | 2003031873 |
| EUBANKS B R | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0816 | 2003031875 |
| JACKSON ALAN | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0825 | 2003031878 |
| KNIGHT LUNA HASKEL KNIGHT SHIRLEY B | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0840 | 2003031881 |
| MILES JESSE M ERNST & YOUNG | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0843 | 2003031883 |
| O'CONNOR RALPH S | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0846 | 2003031885 |
| PERKINS MARION M | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0859 | 2003031894 |
| SMITH PAUL D | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0867 | 2003031900 |
| STRUZIK PATRICIA WYNN | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0872 | 2003031903 |
| TARGET INVEST LLC | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0889 | 2003031919 |
| JIM TRUCKS | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0897 | 2003031926 |
| WEBER DAVID J | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0903 | 2003031931 |
| GLADSTONE WILLIAM L | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0907 | 2003031934 |
| MENKE EVELYN C | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0916 | 2003031936 |

EXHIBIT A-1

| | | | | | |
|---|---|---|---|---|---|
| WELBORN JOE | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0922 | 2003031939 |
| EDWARD W CARTER FAMILY TR LTD | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0925 | 2003031941 |
| ESMERALDA INVEST | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0927 | 2003031942 |
| PITTS GLENN E | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0930 | 2003031944 |
| THOMPSON JAMES R | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0932 | 2003031945 |
| HEDERMAN H H | BRIDGEMARK CORP | 04/17/2003 | 5347 | 0945 | 2003031948 |
| MCCOY BONNIE JEAN IRRV TR | BRIDGEMARK CORP | 04/25/2003 | 5353 | 1170 | 2003034790 |
| PRINCE SYDNEY R | BRIDGEMARK CORP | 08/26/2003 | 5443 | 0012 | 2003075665 |
| DICKINSON MAUDIE M | BRIDGEMARK CORP | 08/26/2003 | 5443 | 0014 | 2003075666 |
| PXP GULF COAST INC | BRIDGEMARK CORP | 11/14/2003 | 5494 | 0685 | 2003101809 |
| KIDWELL SUZANNE L TR | BRIDGEMARK CORP | 12/23/2003 | 5514 | 0298 | 2003112006 |
| MALONE L E | BRIDGEMARK CORP | 12/23/2003 | 5514 | 0300 | 2003112007 |
| BOWEN DORIS WEIR | BRIDGEMARK CORP | 06/04/2004 | 5602 | 1977 | 2004041585 |
| CLINEBURG SUSAN E | BRIDGEMARK CORP | 10/20/2004 | 5674 | 1427 | 2004078078 |
| ELLIOT JAMES N JR | BRIDGEMARK CORP | 10/20/2004 | 5674 | 1429 | 2004078079 |

EXHIBIT A-1

| EXXON MOBIL CORP | BRIDGEMARK CORP | 06/22/2007 | 6207 | 1139 | 2007047504 |
|---|---|---|---|---|---|

| UNIT AGREEMENTS | | | | |
|---|---|---|---|---|
| PARTIES | EFFECTIVE DATE | RECORDED DATE | INSTRUMENT | DESCRIPTION |
| Firstrike Energy Corporation, T-Jay Exploration, LLC, Griffin 3-D Joint Venture, Bridgemark Texas, LLC | 5/5/2016 | 5/31/2016 | 2016021906 | Unit Designation "Mejia Unit" |
| Firstrike Energy Corporation, T-Jay Exploration, LLC, Griffin 3-D Joint Venture, Bridgemark Texas, LLC | 10/27/2017 | 10/27/2017 | 2017045321 | Amendment to Unit Designation "Mejia Unit" |

EXHIBIT A-1

| State of Texas and T-Jay Exploration, LLC | 12/1/2015 | N/A | N/A | Pooling Agreement covering 18.954 acres out of the Toribio Molina Survey, A-18, San Patricio County, Texas, and the Vicente Lopez de Herrerra Survey, Abstract 145, Nueces County, Texas, 18.954 acres, more or less, situated in Nueces and San Patricio Counties, Texas, being a portion of the current course of the Nueces River. <br><br> Said 18.954 acre tract is situated in the Vicente Lopez de Herrera Survey, Abstract 145, Nueces County, Texas and the Toribio Molina Survey, Abstract 18, San Patricio County, Texas, approximately 3.6 miles southeast of the community of San Patricio |
| --- | --- | --- | --- | --- |

EXHIBIT A-1

| RICHFIELD | | | | |
|---|---|---|---|---|
| COMPANY | RECORDED DATE | BOOK | PAGE | UNIT DESCRIPTION |
| Union Oil Company of California | 7/19/1972 | 10231 | 96 | West Richfield Kraemer Zone |
| Union Oil Company of California | 6/7/1961 | 5764 | 759 | West Richfield Chapman Zone |

| ASSIGNMENTS | | | |
|---|---|---|---|
| GRANTOR | GRANTEE | RECORDED DATE | INSTRUMENT |
| Blackhawk Oil Company | Bridgemark Corporation | 10/3/1996 | 96-0505658 |
| Nuevo Energy Company | Bridgemark Corporation | 6/25/1996 | 96-0321908 |
| Texaco Exploration and Production Inc. | Bridgemark Corporation | 9/20/1993 | 93-0635294 |
| Mobil Oil Corporation | Bridgemark Corporation | 10/11/1994 | 94-0604269 |
| Hartwel Oil Inc. | Bridgemark Corporation | 1/31/2003 | 03-00121560 |

EXHIBIT A-1

# Exhibit A-2

## Wells and Equipment

| API No. | Designation | Operator Name | Current Type | Current Status | Field | Lease Name | Well No. |
|---------|-------------|---------------|--------------|----------------|-------|------------|----------|
| 405920859 | Yarnell 37 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Yarnell | 37 |
| 405906496 | Yarnell 28 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Yarnell | 28 |
| 405906573 | Mobil Thompson 6 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Mobil Thompson | 6 |
| 405906475 | Thompson 11 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Thompson | 11 |

Exhibit A-2

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 405906574 | Mobil Thompson 10 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Mobil Thompson | 10 |
| 405921091 | Mobil-Thompson 15 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Mobil-Thompson | 15 |
| 405921092 | Mobil-Thompson 14 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Mobil-Thompson | 14 |
| 405921093 | Mobil-Thompson 13 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Mobil-Thompson | 13 |
| 405906476 | Mobil Thompson 12 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Mobil Thompson | 12 |
| 405921090 | Mobil-Sterns 16 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Mobil-Sterns | 16 |

EXHIBIT A-2

| 405921143 | Mobil-Sterns 14 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Mobil-Sterns | 14 |
| 405921144 | Mobil-Thompson 16 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Mobil-Thompson | 16 |
| 405906568 | WRKZU M. Stern 8 | Bridgemark Corporation | Oil & Gas | Active | Richfield | WRKZU M. Stern | 8 |
| 405920880 | Mobil-Sterns 13 | Bridgemark Corporation | Water Flood (Injector) | Idle | Richfield | Mobil-Sterns | 13 |
| 405920882 | Yarnell 39 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell | 39 |
| 405906495 | Yarnell 22 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell | 22 |

EXHIBIT A-2

| 405921288 | Union Stern 16 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Union Stern | 16 |
| 405906460 | WRKZU U.O. Stern 4 | Bridgemark Corporation | Oil & Gas | Active | Richfield | WRKZU U.O. Stern | 4 |
| 405906463 | U.O. Stern 7 | Bridgemark Corporation | Oil & Gas | Active | Richfield | U.O. Stern | 7 |
| 405906467 | Stern 11 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Stern | 11 |
| 405906446 | Richfield 1 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Richfield | 1 |
| 405906450 | Richfield 5 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Richfield | 5 |

EXHIBIT A-2

| 405906453 | Richfield 8 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Richfield | 8 |
| 405906479 | TG & 3 (Lease) | Bridgemark Corporation | Oil & Gas | Active | Richfield | Unspecified | TG & 3 |
| 405906451 | Richfield 6 | Bridgemark Corporation | Oil & Gas | Idle (Shut In) | Richfield | Richfield | 6 |
| 405906415 | Hartwell 2 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Hartwell | 2 |
| 405906416 | Hartwell 3 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Hartwell | 3 |
| 405906417 | WRKZU Hartwell 4 | Bridgemark Corporation | Water Source (Well) | Active | Richfield | WRKZU Hartwell | 4 |

526512.000004 24179367.15

| 405906444 | Newell-Renton 1 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Newell-Renton | 1 |
| 405906626 | Yarnell 25 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell | 25 |
| 405906624 | Yarnell 23 | Bridgemark Corporation | Oil & Gas | Idle | Richfield | Yarnell | 23 |
| 405906627 | Yarnell (nct-3) 26 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell (nct-3) | 26 |
| 405906625 | Yarnell Lease (nct-3) 24 | Bridgemark Corporation | Oil & Gas | Idle | Richfield | Yarnell Lease (nct-3) | 24 |
| 405906628 | Yarnell Lease (nct-3) 30 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell Lease (nct-3) | 30 |

EXHIBIT A-2

| 405920357 | Towell 7 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Towell | 7 |
| 405907327 | Yarnell 21 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell | 21 |
| 405906461 | U.O. Stern 5 | Bridgemark Corporation | Oil & Gas | Idle | Richfield | U.O. Stern | 5 |

EXHIBIT A-2

| 405906497 | Yarnell 29 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell | 29 |
| 405905869 | Dowling 1 | Bridgemark Corporation | Oil & Gas | Active | Olive | Dowling | 1 |
| 405905870 | Dowling 2 | Bridgemark Corporation | Oil & Gas | Active | Olive | Dowling | 2 |
| 405905871 | Dowling 3 | Bridgemark Corporation | Oil & Gas | Active | Olive | Dowling | 3 |
| 405905872 | Dowling 4 | Bridgemark Corporation | Oil & Gas | Active | Olive | Dowling | 4 |

EXHIBIT A-2

**EXHIBIT A-3**

EASEMENTS AND SURFACE RIGHTS

Any and all easements and surface rights transferable and held by Seller necessary to operate the Purchased Assets.

1.    Partial Quitclaim Deed dated June 26, 1992 from Union Oil Company of California to Stern Realty Company of Los Angeles.

2.    Remediation Agreement dated May 8, 1992 between Union Oil Company of California, Texaco Exploration and Production Inc., and Sand Dollar Development Inc.

3.    Development Agreement dated August 11, 1989 between The Fieldstone Company and Union Oil Company of California.

4.    Relinquishment and Accommodation Agreement dated December 16, 1992 between Huntington Beach Company and Union Oil Company of California.

5.    Letter Agreement dated August I, 1988 between Union Oil Company of California and Huntington Beach Company.

**EXHIBITS A-4 AND A-5**

MINERAL AND ROYALTY INTEREST

| GRANTOR | GRANTEE | RECORDED DATE | BOOK | PAGE | INSTRUMENT |
|---|---|---|---|---|---|
| Nuevo Energy Company | Bridgemark Corporation | 6/25/1996 | 96 | 321908 | All minerals in, on and under Lot 2 of Tract 952 as per map thereof recorded in Book 32, Page 45 of Miscellaneous Maps, Official Records, Orange County, California. |

| GRANTOR | GRANTEE | RECORDED DATE | INSTRUMENT | LEGAL |
|---|---|---|---|---|
| LAOR Liquidating Associates | Bridgemark Corporation | 8/29/2003 | 03-1054519 | Lots 223 and 224 of Tract 14161 (Ptn Lot 22 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518. |
| Dorothy T Lodge | Bridgemark Corporation | 12/16/2003 | 03-1488213 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |

526512.000004 24179367.15

| | | | | |
|---|---|---|---|---|
| Lionell E. Cross Jr. | Bridgemark Corporation | 12/16/2003 | 03-1488214 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |
| Earl G Garthwait, Trustee | Bridgemark Corporation | 12/16/2003 | 03-1488215 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |
| R. Orrin Cross | Bridgemark Corporation | 12/16/2003 | 03-1488216 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |

EXHIBIT A-5

| | | | | |
|---|---|---|---|---|
| B.L. Conway, Trustee | Bridgemark Corporation | 12/16/2003 | 03-1488219 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |
| B.L. Conway, Trustee | Bridgemark Corporation | 12/16/2003 | 03-1488220 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |
| B.L. Conway, Trustee | Bridgemark Corporation | 12/16/2003 | 03-1488221 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |

EXHIBIT A-5

| | | | | |
|---|---|---|---|---|
| Lois Marow, Trustee | Bridgemark Corporation | 12/19/2003 | 03-1501766 | Lots 225 through 230 of Tract 14161 (Ptn Lot 23 of Hazard's Subdivision) by deed recorded August 29, 2003 as Document No. 03-1054518 and by deeds recorded December 16, 2003 as Document No. 03-1488206, 03-1488213, 03-1488214, 03-1488215, 03-1488216, 03-1488219, 03-1488220, 03-1488221 and deed recorded December 19, 2003 as Document No. 03-1501766. |

| EAST COYOTE | | | |
|---|---|---|---|
| Grantor | Grantee | Recorded Date | Instrument |
| Randall W. Blanchard, as Trustee of the Blanchard Family Trust u/d/t dated December 28, 1988 | Bridgemark Corporation | 10/11/1994 | 94-0604264 |
| Gardena Family Limited Partnership, Randall W. Blanchard | Bridgemark Corporation | 10/3/1996 | 96-0505620 |

EXHIBIT A-5

## Exhibit A-6

### Assigned Contracts

| Type | Company | Date | Book | Page | Unit Description |
|---|---|---|---|---|---|
| Unit Agreement | Union Oil Company of California | 7/19/1972 | 10231 | 96 | West Richfield Kraemer Zone |
| Unit Agreement | Union Oil Company of California | 6/7/1961 | 5764 | 759 | West Richfield Chapman Zone |
| Unit Operating Agreement for the Kraemer Zone | Union Oil Company of California | February 2, 1970 | | | West Richfield Kraemer Zone |
| Unit Operating Agreement for the Chapman Zone | Union Oil Company of California | April 1, 1960 | | | West Richfield Chapman Zone |
| Production Purchase Contract | Texican | 8/21/2020 | -- | -- | -- |
| Production Purchase Contract | Texican | 6/25/2020 | -- | -- | -- |

526512.000004 24179367.15

| | | | | | |
|---|---|---|---|---|---|
| Factory Protection Plan – End User Agreement | Capstone Turbine Corporation / Regatta Solutions | 3/15/2014 | -- | -- | -- |
| Factory Protection Plan – End User Agreement | Capstone Turbine Corporation / Regatta Solutions | 6/3/15 | -- | -- | -- |
| Invoice No. 1399 | Cal Microturbine, Inc. | 9.24.2018 | | | |

**[Chunchula Unit Agreement]** Unit Agreement for Chunchula Unit dated July 1, 1980 by and between Union Oil Company of California and the other parties who executed or ratified the Agreement

**[Chunchula Operating Agreement]** Unit Operating Agreement, Fieldwide Unitization, Chunchula Field, Mobile County, Alabama, dated July 1, 1980 by and between Union Oil Company of California and the other parties who executed or ratified the Agreement

Operating Agreement dated May 1, 2015 covering Griffin Prospect in Nueces County, Texas by and between Firstrike Energy Corporation, as Operator, and T-Jay Exploration, LLC, Griffin 3D Joint Venture, and Bridgemark Texas, LLC, as Non-Operators

526512.000004 24179367.15

**EXHIBIT A-7**

REAL PROPERTY

1.    412 N. Tidland Ct., Placentia, CA APN# 341-433-34

2.    406 N. Nevin Ln., Placentia, CA APN# 341-433-23

3.    502 N. Gerhold Ln., Placentia, CA APN# 341-421-33

4.    1421 E Cisneros Ln., Placentia, CA APN# 341-433-48

5.    424 N Levin Ln., Placentia, CA APN# 341-433-05

EXHIBIT A-7

**EXHIBIT A-8**

PERSONAL PROPERTY[1]

| GREGSON ENERGY DRILLING LLC ASSETS | | |
|---|---|---|
| BRAND | ITEM | MISC. |
| | Drilling Rig and Related Equipment | |

| VEHICLES[2] | | | | |
|---|---|---|---|---|
| YEAR | MAKE | MODEL | VIN | DRIVER |
| 2019 | Ford | F150 | 1FTMF1CB9KKC54722 | Dowling Day Truck |
| 2019 | Ford | F150 | 1FTMF1CB8KKP33749 | Long Bed |
| 2019 | Ford | F150 | 1FTMF1CB0KKC54723 | Richfield Day Truck |
| 2018 | Ford | F150 | 1FTEX1CP4JKD08522 | Juan |
| 2015 | Ford | F150 | 1FTEW1CF7FKE17204 | Kevin |
| 2013 | Ford | F150 | 1FTMF1CM6DFB22059 | Fluid Shot Truck |
| 2013 | Ford | F150 | 1FTMF1CM0DFE06304 | Carlos |
| 2007 | Ford | Expedition | 1FMFK20577LA33335 | Field |

---

[1] **NTD:** To confirm what is being excluded.

[2] **NTD:** CalNRG OC will pay off any current amounts due. BMark must bring the loans current before Closing.

**EXHIBIT A-9**

HALL PROPERTY

All decimal interests in the following:

NCT-3

Chapman Zone Unit

Kraemer Zone Unit

EXHIBIT A-9

**EXHIBIT A-10**

ALLOCATION OF ASSETS

To Realm: All of the Purchased Assets listed in Exhibits A-7 and A-9.

To Alatex: The portions of the Purchased Assets in Alabama and Texas.

To CalNRG OC: The remaining portions of the Purchased Assets.

**EXHIBIT B**

EXCLUDED ASSETS

Other than those assets to be delivered to CalNRG OC pursuant to this Agreement, all assets, rights and interests of PDC under the Settlement Agreement, including all Cash and Cash Equivalents, provided, however, that Seller shall use such Cash and Cash Equivalents to satisfy any of its pre-Closing obligations under this Agreement.

| WELLS | | | | | | | |
|---|---|---|---|---|---|---|---|
| API No. | DESIGNATION | OPERATOR NAME | CURRENT TYPE | CURRENT STATUS | FIELD | LEASE NAME | WELL NO. |
| 405921141 | Morse U-19 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Morse | U-19 |
| 405920941 | Morse 14 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Morse | 14 |
| 405920942 | Morse U-15 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Morse | U-15 |

EXHIBIT B

| 405920943 | Morse U-16 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Morse | U-16 |
| 405920944 | Morse U-17 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Morse | U-17 |
| 405920945 | Morse U-18 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Morse | U-18 |
| 405920881 | Morse 13 | Bridgemark Corporation | Water Flood (Injector) | Active | Richfield | Morse | 13 |
| 405906428 | Union-Morse 6 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Union-Morse | 6 |
| 405906498 | Yarnell T-31 | Bridgemark Corporation | Oil & Gas | Active | Richfield | Yarnell | T-31 |
| | | | | | | | |

EXHIBIT B

| 405900221 | Morse 2 | Bridgemark Corporation | Oil & Gas | Idle | Richfield | Morse | 2 |
|---|---|---|---|---|---|---|---|

| BONDS |
|---|
| 1. Argonaut Insurance Company and USI Insurance Company/$120,000 bond in favor of the State of California, Department of Conservation |
| 2. City of Yorba Linda Oil Operating & Production Blanket Bond #RLB0003854 - $25,000 limit |
| 3. City of Anaheim Oil Well Bond #RLB0010809 – $25,000 limit |
| 4. City of Placentia Oil Operating & Production Blanket Bond #RLB0003855 - $25,000 limit |

| OFFICE LEASE |
|---|
| 1. That certain Office Building Lease dated September 29, 2005 by and between Tustin Sycamore Plaza, as Landlord, and Bridgemark Corp., as Tenant, as amended |

EXHIBIT B

| MISCELLANEOUS | | |
|---|---|---|
| ITEM | AGENCY | ACTION |
| 1 | Orange County Planning & Development | Permit transfer documentation — official notification of closing, reimbursement agreements, compliance deposits, certificate of insurance |
| 3 | SWQCB | Site Inspection — Facilities — all leases |
| 8 | CALGEM / EPA | Spill Prevention Countermeasure Control Plan (SPCC) — all leases |
| 9 | CALGEM | Tank I&M Plan; Plan does not require agency submittal but must be in-place and implemented; available upon request by CALGEM — all leases |
| 10 | CALGEM | Idle Well Management Plan — all leases |
| 11 | CALGEM | Post Blanket Surety Bond for all wells |
| 12 | CALGEM | Transfer documentation — change of operator, facilities & wells transfer forms, agent form, emergency contact |
| 13 | CA Div. Fish & Wildlife / OSPR | Inland Oil Spill Contingency Plan — all leases |
| 14 | CA Div. Fish & Wildlife / OSPR | Certificate of Financial Responsibility (COFR) — all leases |
| 15 | SCAQMD | Transfer permit applications — all leases (South Coast Air Quality Management District) |

EXHIBIT B

| 16 | County Health / Hazmat | CERS chemical inventory for each lease; need to submit Haz Map Plan for all tank farms where Haz chemicals are stored |
| 17 | County Health / Hazmat | UNIFIED PROGRAM FACILITY PERMIT — all leases |
| 19 | Various Agencies | Training Materials on regulatory requirements for Employees — target training completion by end of June |

EXHIBIT B

**EXHIBIT C-1**

FORM OF ASSIGNMENT AND BILL OF SALE

Attached.

EXHIBIT C-1

526512.000004 24179367.15

## <u>EXHIBIT C-1</u>

**FORM OF ASSIGNMENT AND BILL OF SALE**

**Part A — California**

**Part B — Alabama and Texas**

**Part C — Utah**

## PART A — CALIFORNIA

## ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale ("Agreement") is made this ____ day of, _____, 2021, by and between Bridgemark Corporation, a California corporation ("Assignor") and California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("Assignee").

  A. Assignor is the successor lessee and successor unit operator under and with respect to the oil and gas leases and oil and gas units listed in Exhibit A hereto, and incorporated by this reference (the "Assigned Assets").

  B. Assignor intends to assign to Assignee, and Assignee intends to take an assignment from Assignor of the Assigned Assets.

  NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

  1. <u>Assignment</u>.  Assignor hereby quitclaims, assigns, transfers and conveys unto Assignee, as of the date of this Agreement, all of its right, title and interest in and to the Assigned Assets.

  2. <u>Representations, Warranties and Requirements</u>.

   a. Assignee hereby represents and warrants to Assignor (i) that it owns or otherwise holds whatever rights may be necessary to operate, disturb, or modify the Assigned Assets, and (ii) that it r will provide proper bond coverage, if any is required, and necessary well information for the Assigned Assets to the California Department of Geologic Energy Management ("CalGEM") and any other governmental authority that may require the same.

   b. Assignee hereby assumes sole responsibility and liability for the ownership, operation, maintenance, repair, abandonment and re-abandonment of the Assigned Assets in accordance with applicable federal, state and local laws and regulations, including, without limitation, those enforced by CalGem under the California Public Resources Code

  3. <u>Other Provisions</u>.

   a. Upon full execution of this Agreement by the parties, Assignor will execute CalGEM's "Report of Property/Well Transfer or Acquisition" form attached hereto as Exhibit "C" and provide an original thereof to Assignee for its execution and delivery to CalGEM.  Any interests in Assigned Assets conveyed by said form are the same, and not in addition to, the interests conveyed in this Agreement.

   b. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Assignor and Assignee.

    c. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and such counterparts together shall constitute one in the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement.


**BRIDGEMARK CORPORATION**   **CALIFORNIA NATURAL RESOURCES GROUP ORANGE COUNTY, LLC**


By:_____   By: Golden State Exploration & Production,
Robert J. Hall            LLC, a Delaware limited liability company
Its: Authorized Signatory

                Its: Managing Member


                By: _____
                    Clifton O. Simonson

                Its: Managing Member

## PART B — ALABAMA, TEXAS

## ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale ("Agreement") is made this ____ day of, _____, 2021, by and among Gregson Energy Drilling, LLC and Bridgemark Texas, LLC (collectively, "Assignor") and Alatex, LLC, a Delaware limited liability company ("Assignee").

A.      Assignor is the successor lessee and successor unit operator under and with respect to the oil and gas leases and oil and gas units listed in Exhibit A hereto, and incorporated by this reference (the "Assigned Assets").

B.      Assignor intends to assign to Assignee, and Assignee intends to take an assignment from Assignor of the Assigned Assets.

NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

4.      <u>Assignment</u>.  Assignor hereby quitclaims, assigns, transfers and conveys unto Assignee, as of the date of this Agreement, all of its right, title and interest in and to the Assigned Assets.

5.      <u>Representations, Warranties and Requirements</u>.

a.      Assignee hereby represents and warrants to Assignor (i) that it owns or otherwise holds whatever rights may be necessary to operate, disturb, or modify the Assigned Assets, and (ii) that it will provide proper bond coverage, if any is required, and necessary well information for the Assigned Assets to any governmental authority that may require the same.

b.      Assignee hereby assumes sole responsibility and liability for the ownership, operation, maintenance, repair, abandonment and re-abandonment of the Assigned Assets in accordance with applicable federal, state and local laws and regulations.

6.      <u>Other Provisions</u>.

d.      Upon full execution of this Agreement by the parties, Assignor will execute whatever forms or other documents are necessary to complete the assignment of the Assigned Assets pursuant to applicable federal, state and local laws and regulations.  Any interests in Assigned Assets conveyed by said form are the same, and not in addition to, the interests conveyed in this Agreement.

e.      This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Assignor and Assignee.

f.      This Agreement may be executed in counterparts, each of which shall be deemed to be an original and such counterparts together shall constitute one in the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement.

**GREGSON ENERGY DRILLING, LLC**          **BRIDGEMARK TEXAS, LLC**

By:_____          By:_____

Robert J. Hall                       Robert J. Hall

Its: Authorized Signatory            Its: Authorized Signatory

**ALATEX, LLC**, a Delaware limited liability company

By: Golden State Exploration & Production, LLC, a Delaware limited liability company,

Its: Managing Member

By: _____
        Clifton O. Simonson

Its: Managing Member

## EXHIBIT "A"

[list of leases and unit agreements]

(Attached)

## PART C — UTAH

## ASSIGNMENT AND BILL OF SALE

This Assignment and Bill of Sale ("Agreement") is made this _____ day of, _____, 2021, by and among Gregson Energy Drilling, LLC ("Assignor"), a _____ limited liability company, and California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("Assignee").

      A.     Assignor is owner of certain personal property located in the state of Utah, including without limitation an oil and gas drilling rig and associated equipment, facilities and tools (the "Assigned Assets").

      B.     Assignor intends to assign to Assignee, and Assignee intends to take an assignment from Assignor of the Assigned Assets.

      NOW, THEREFORE, for valuable consideration, the receipt and adequacy of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

      7.     <u>Assignment</u>.  Assignor hereby quitclaims, assigns, transfers and conveys unto Assignee, as of the date of this Agreement, all of its right, title and interest in and to the Assigned Assets.

      8.     <u>Representations, Warranties and Requirements</u>.

      a.     Assignee hereby represents and warrants to Assignor that it owns or otherwise holds whatever rights may be necessary to operate, disturb, or modify the Assigned Assets.

      b.     Assignee hereby assumes sole responsibility and liability for the ownership, operation, maintenance, repair, abandonment and re-abandonment of the Assigned Assets in accordance with applicable federal, state and local laws and regulations.

      9.     <u>Other Provisions</u>.

      g.     Upon full execution of this Agreement by the parties, Assignor will execute whatever forms or other documents are necessary to complete the assignment of the Assigned Assets pursuant to applicable federal, state and local laws and regulations.  Any interests in Assigned Assets conveyed by said form are the same, and not in addition to, the interests conveyed in this Agreement.

      h.     This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of Assignor and Assignee.

      i.     This Agreement may be executed in counterparts, each of which shall be deemed to be an original and such counterparts together shall constitute one in the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement.


**GREGSON ENERGY DRILLING, LLC**

By:_____

Robert J. Hall

Its: Authorized Signatory


**CALIFORNIA NATURAL RESOURCES
GROUP ORANGE COUNTY, LLC**

By: Golden State Exploration & Production,
LLC, a Delaware limited liability company,

Its: Managing Member


By: _____
         Clifton O. Simonson

Its: Managing Member

## EXHIBIT C-2

FORM OF DEED

Attached.

EXHIBIT C-2

## EXHIBIT C-2

### FORM OF DEED

### GRANT DEED

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Bridgemark Corporation., a California corporation, hereby GRANTS to California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("Grantee"), the real property located in the County of Orange, State of California, and more particularly described on Exhibit A attached hereto and incorporated herein by this reference.

Dated: _____, 2021

**GRANTOR:**

Bridgemark Corporation, a California corporation

By:    _____
Name:    Robert J. Hall
Title:    Authorized Signatory

**GRANTEE:**

California Natural Resources Group Orange County, LLC

By:    Golden State Exploration &
       Production, LLC, a Delaware limited
       liability company

       _____
Its:    Managing Member

By:    _____
       Clifton O. Simonson
Its:    Managing Member

SCHEDULE 2.5(P)

HALL ENTITIES

1.    Robert J. Hall Family Trust

2.    Casa Real LP

3.    Casa Real Management, LLC

4.    Casa Real Apartments, L.P.

5.    Casa Real GP, LLC

6.    Casa Real Holdings, LLC

7.    Casa Real LLC

8.    Casa Real Management, LLC

9.    Casa Real Preferred Income Associates

10.    Casa Real Properties, LLC

11.    Casa Real Property Group LLC

12.    Casa Real, Inc.

13.    Casa Real Mortgage, Inc.

14.    Casa Real Homes, Inc.

15.    Casa Real Corporation

16.    O&G Investment Trust

17.    Las Cienegas, LLC

18.    Meadow Deep LLC

19.    Gregson Energy Group, LLC

20.    Bridgemark Texas, LLC

## SCHEDULE 2.6(B)

### EXECUTORY CONTRACTS AND REAL PROPERTY LEASES

This Schedule 2.6(b) incorporates by reference all of the contracts and real property leases described on Exhibit A-1 and Exhibit A-6.

526512.000004 24179367.15

### SCHEDULE 4.6

### PERMITS, EASEMENTS, AND SURFACE RIGHTS

In addition to the items described below, this Schedule 4.6 incorporates by reference Exhibit A-3, Exhibit A-7, and Exhibit B.

| MISCELLANEOUS | | |
|---|---|---|
| ITEM | AGENCY | ACTION |
| 1 | Orange County Planning & Development | Permit transfer documentation — official notification of closing, reimbursement agreements, compliance deposits, certificate of insurance |
| 2 | SWQCB | Submittal of Underground Injection Control (UIC) Information |
| 3 | SWQCB | Site Inspection — Facilities — all leases |
| 4 | SWQCB | Waste Pile Management Facility / Beneficial Reuse program |
| 5 | SWQCB | Storm Water Pollution Prevention Plan — all leases |
| 6 | CALGEM | Pipeline Management Plan — all leases |
| 7 | CALGEM | Aquifer Exemption Status |
| 8 | CALGEM / EPA | Spill Prevention Countermeasure Control Plan (SPCC) — all leases |

526512.000004 24179367.15

| 9 | CALGEM | Tank I&M Plan; Plan does not require agency submittal but must be in-place and implemented; available upon request by CALGEM — all leases |
|---|---|---|
| 10 | CALGEM | Idle Well Management Plan — all leases |
| 11 | CALGEM | Post Blanket Surety Bond for all wells |
| 12 | CALGEM | Transfer documentation — change of operator, facilities & wells transfer forms, agent form, emergency contact |
| 13 | CA Div. Fish & Wildlife / OSPR | Inland Oil Spill Contingency Plan — all leases |
| 14 | CA Div. Fish & Wildlife / OSPR | Certificate of Financial Responsibility (COFR) — all leases |
| 15 | SCAQMD | Transfer permit applications — all leases (South Coast Air Quality Management District) |
| 16 | County Health / Hazmat | CERS chemical inventory for each lease; need to submit Haz Map Plan for all tank farms where Haz chemicals are stored |
| 17 | County Health / Hazmat | UNIFIED PROGRAM FACILITY PERMIT — all leases |
| 18 | County Fire Department | FIRE DEPT. OPERATIONAL PERMIT — all leases |
| 19 | Various Agencies | Training Materials on regulatory requirements for Employees — target training completion by end of June |

SCHEDULE 4.6

SCHEDULES 4.7

NOTICES OR DIRECTIVES (WELLS)

| NOV LIST | | | |
|---|---|---|---|
| NO. | TYPE | DATE OF VIOLATION | NOTES |
| P-67919 | Failure to maintain permitted equipment in good operating conditions at all time (south wash tank leak at tank seam, secondary stock tank leaking unaccessible PRD) | 4.16.2019 | |
| P-69251 | Failure to maintain permitted equipment in good operating conditions at all time (skim tank leak at tank seam, north wash tank leaking inaccessible PRD, secondary stock tank leak at tank seam) | 4.16.2019 | |

526512.000004 24179367.15

| SPILL REPORTS | | | |
|---|---|---|---|
| DATE OF SPILL | ADDRESS OF SPILL | CITY | AGENCY NOTIFIED |
| October 27,2000 | US#4 & US#6 Draft Way and Cameron Way | Placentia | -- |
| January 9, 2001 | Center of Buena Vista, 50 ft West of Westmoreland | Placentia | Office of Emergency Services<br><br>DOGGR |
| February 10, 2001 | 1449 Munoz Place | Placentia | Office of Emergency Services<br><br>DOGGR |
| December 30, 2001 | 1460 Garcia Place | Placentia | Office of Emergency Services<br><br>DOGGR<br><br>Department of Fish and Game<br><br>Orange County Fire Authority |
| August 7, 2003 | Corner of Windemere & Buena Vista | Placentia | Office of Emergency Services<br><br>DOGGR |
| November 18, 2003 | 1460 Garcia Place | Placentia | Office of Emergency Services<br><br>DOGGR<br><br>Department of Fish and Game |

SCHEDULE 4.7

| | | | Orange County Fire Authority |
|---|---|---|---|
| February 9, 2006 | 6071 Jefferson Street | Placentia | Office of Emergency Services<br><br>DOGGR<br><br>Department of Fish and Game<br><br>Orange County Fire Authority |
| October 5, 2007 | Dowling #4, 2954 E Jackson | Anaheim | Office of Emergency Services<br><br>DOGGR<br><br>Anaheim Fire Department |
| April 28, 2008 | Rose & Buena Vista, Placentia, CA | Placentia | Office of Emergency Services<br><br>DOGGR |
| July 29, 2008 | Tank Farm 1625 E. Alta Vista, | Placentia | Office of Emergency Services<br><br>DOGGR |
| January 6, 2015 | Morse 19 Pumping Unit | Placentia | Office of Emergency Services<br><br>DOGGR |
| January 1, 2016 | Intersection of Alta Vista And Jefferson | Placentia | Office of Emergency Services<br><br>DOGGR |

SCHEDULE 4.7

## SCHEDULE 4.8

AFEs

None.

526512.000004 24179367.15

## SCHEDULE 4.9

### PREFERENTIAL RIGHTS

1.    That certain Mutual Interest Area / Farm-in dated April 10, 1973 between Union Oil Company of California, Davis McCoy Inc, Getty Oil Company, Phillips Petroleum Company and Cities Services Oil Company – Bayou Sara Prospect, Mobile County, Alabama (for which CalNRG OC has allocated a portion of the Purchase Price equal to Forty-Five Thousand Dollars (US$45,000)).

526512.000004 24179367.15

**SCHEDULE 4.12**

COMPLIANCE WITH APPLICABLE LAWS

This Schedule 4.12 incorporates by reference Schedule 4.7.

526512.000004 24179367.15

SCHEDULE 4.14

SUSPENSE FUNDS

$131,891.00 — as of January 29, 2021

526512.000004 24179367.15

## SCHEDULE 4.15

### IMBALANCES

None.

526512.000004 24179367.15

SCHEDULE 4.19

BONDS; INSURANCE

| BONDS |
|---|
| 1.    Argonaut Insurance Company and USI Insurance Company/$120,000 bond in favor of the State of California, Department of Conservation |
| 2.    City of Yorba Linda Oil Operating & Production Blanket Bond #RLB0003854 - $25,000 limit |
| 3.    City of Anaheim Oil Well Bond #RLB0010809 – $25,000 limit |
| 4.    City of Placentia Oil Operating & Production Blanket Bond #RLB0003855 - $25,000 limit |

| INSURANCE POLICIES | | | |
|---|---|---|---|
| TYPE | INSURER | POLICY No. | TERM |
| General Liability | Clear Blue Specialty Insurance Co. | **WCENCGL000084901** | 12/31/20-21 |
| Auto | Infinity Select Insurance Co. | 504610149706001 | 12/31/20-21 |
| Property | Allianz Global Corporate & Specialty | MXI93086974 | 12/31/20-21 |
| Umbrella | Clear Blue Specialty Insurance Co. | WCENCEL000085001 | 12/31/20-21 |

SCHEDULE 4.19

| EPL | Mount Vernon Fire Insurance | EPL2560083 | 3/14/20-21 |
| Workers Comp | State Compensation Insurance Fund | 198085820 | 6/27/20-21 |
| Site Pollution Liability | Axis Surplus Insurance Company | EIL1900019302 | 12/31/20-21 |

| INSURANCE CLAIMS |
| --- |
| None. |

| RESTRICTED CASH — FBO CALIFORNIA DEPARTMENT OF CONSERVATION | | | |
| --- | --- | --- | --- |
| BANK | ACCOUNT | BALANCE | AS-OF-DATE |
| Wells Fargo | 860003438 | $ 35,471.83 | |
| Wells Fargo | 929936086 | $ 36,539.65 | |
| Wells Fargo | 7400702929 | $ 35,859.14 | |
| Wells Fargo | 929935575 | $ 36,862.34 | |
| Wells Fargo | 15610180 | $ 30,000.00 | |
| California Bank and Trust | *****7701 | $ 113,588.43 | |

SCHEDULE 4.19

**SCHEDULE 7.9**

VEHICLE LOANS

| VEHICLE LOANS | | | |
|---|---|---|---|
| MAKE | AMOUNT OWED | VIN NO. | (AS OF) DATE |
| 19 FORD F-150 | $15,858.94 | 1FTMF1CB8KKD33749 | 2.28.2021 |
| 2019 FORD F150 | $18,899.43 | 1FTMF1CB9KKC54722 | 2.28.2021 |
| 2019 FORD F-150 | $30,207.84 | 1FTMF1CB0KKC54723 | 9.18.2019 |

526512.000004 24179367.15

# EXHIBIT D

EXECUTION VERSION

# TRANSACTION AGREEMENT

This Transaction Agreement (this "***Agreement***") is made and entered into on this 10th day of March, 2021 (the "***Effective Date***"), not to be confused with the Effective Date of the APA, as that term is defined below, by and between Placentia Development Company LLC, a California limited liability company ("***PDC***"), and California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("***CalNRG OC***").  PDC and CalNRG OC are sometimes collectively referred to herein as the "***Parties***" and each, individually, as a "***Party***."

WHEREAS, concurrently with the execution of this Agreement, CalNRG OC and Bridgemark Corporation, a California corporation ("***Seller***," or "***Bridgemark***"), have entered into that certain Asset Purchase Agreement (the "***APA***"), a copy of which is attached hereto as Exhibit 1;

WHEREAS, pursuant to the APA, CalNRG OC has agreed, among other things, to acquire the Purchased Assets (as defined in the APA and used with the same meaning herein);

WHEREAS, pursuant to this Agreement, PDC has agreed, among other things, to convey to Realm California, LLC ("***Realm***"), an affiliate of CalNRG OC, and Realm has agreed to acquire from PDC, certain real property, as defined in Exhibit 2 (but excluding any facilities located thereon, all of which have been owned and operated by Bridgemark) (the "***Remainder Tract***"), and as referenced in a form of deed attached hereto as Exhibit 3 (the "***Deed***");

WHEREAS, concurrently with the execution of this Agreement, PDC, Seller and Robert J. Hall have entered into that certain Settlement Agreement (the "***Settlement Agreement***"), a copy of which is attached hereto as Exhibit 4;

WHEREAS, the Settlement Agreement provides for certain agreements among the Parties in connection with the settlement of claims related to the voluntary case commenced by Seller on January 14, 2020 in the United States Bankruptcy Court for the Central District of California (the "***Bankruptcy Court***");

WHEREAS, concurrently with the closing of the transactions contemplated by the APA, the Parties have agreed to enter into a Surface Use and Cooperation Agreement (the "***SUA***") in the form attached hereto as Exhibit 5;

WHEREAS, on September 15, 2020, PDC, Ceson FH, LLC ("***Ceson***"), which is an Affiliate of CalNRG OC, and First American Title Insurance Company ("***Escrow Agent***") entered into that certain Escrow Agreement dated September 9, 2020 (the "***Escrow Agreement***") in connection with the transactions contemplated by the APA;

WHEREAS, concurrently with the execution of the Escrow Agreement, Ceson paid an amount equal to One Hundred Thousand Dollars ($100,000) (the "***Initial Deposit***") to Escrow Agent to be governed in accordance with the terms and provisions of the Escrow Agreement; and

WHEREAS, the Parties desire to enter into this Agreement to further define the rights and obligations of the Parties with respect to the APA, the SUA and the Escrow Agreement.

NOW THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.      Purchase Price; Consideration.  CalNRG OC agrees to pay to PDC an amount equal to Six Million Five Hundred Thousand Dollars (US$6,500,000) (the "*Purchase Price*"), in immediately available funds via a wire transfer to a bank account in the United States designated by PDC contemporaneously with the closing of the transactions contemplated by the APA.  As consideration for the Purchase Price, (a) PDC hereby designates CalNRG OC to enter into the APA as "*Buyer*" thereunder in accordance with PDC's rights under the Settlement Agreement, and (b) will convey the Remainder Tract to Realm.  In the event that the Bankruptcy Court holds an auction for the Purchased Asset despite the Parties' efforts and CalNRG OC is not the successful bidder, Ceson shall be entitled to a refund of its Deposit, including accrued interest thereon, as that term is defined in the APA.  For federal and applicable state income tax purposes, the Parties acknowledge and agree that the Purchase Price shall be treated as (a) paid by CalNRG OC to Seller in exchange for the Purchased Assets pursuant to the APA, and immediately thereafter, (b) paid by Seller to PDC in satisfaction of PDC's claims with respect to Seller in accordance with the Settlement Agreement.

2.      Closing Deliverables.  Contemporaneously with the closing of the transactions contemplated by the APA and this Agreement:

(a)      the Parties shall execute, acknowledge (as needed) and deliver to one another (i) the SUA, and (ii) the Deed conveying the Remainder Tract from PDC to Realm, the form of which is attached hereto as Exhibit 3;

(b)      PDC shall deliver to CalNRG OC a fully executed and acknowledged Quitclaim Deed from Robert J. Hall, Casa Real limited partnership, Casa Real Apartments, and any other affiliate(s) of Robert J. Hall, in the form attached hereto as Exhibit 6; *provided*, *however,* that PDC may remove one or more of the parties listed as "Grantor" on Exhibit 6 in the event Robert J. Hall certifies that such parties are not connected directly or indirectly with Robert J. Hall pursuant to the Settlement Agreement;

(c)      CalNRG OC shall execute, acknowledge and deliver to PDC a Quitclaim and Surrender of Leasehold Surface Rights, a form of which is attached hereto as Exhibit 7, together with any other documents or instruments contemplated thereby; and

(d)      CalNRG OC will (and will cause any of its lenders to) execute and deliver any and all documentation necessary to guaranty that CalNRG OC will perform its obligations under the SUA with respect to lot line adjustments, including, without limitation, the Joinder Agreement (as defined in the SUA).

2

3.    No Amendment; Termination.  The Parties shall not amend or waive any terms, conditions or other provisions of the APA without the other Party's prior written consent, which consent may be withheld or conditioned in that other Party's absolute discretion.  Any attempted amendment to the APA without the other Party's prior written consent shall be deemed to be *void ab initio*.  If the APA is terminated or does not become effective by the Outside Date (as defined in the APA) for any reason, this Agreement shall automatically terminate concurrently therewith; *provided*, *however*, that Sections 4, 6 and 11 hereof shall survive any such termination and be enforceable hereunder and no such termination will release any Party from any breach of this Agreement prior to termination or for fraud.

4.    Deposit.

(a)    Initial Deposit.  The Initial Deposit, together with any interest earned thereon, shall be refundable to Ceson only upon the termination of negotiations related to the APA prior to the execution of the APA.

(b)    Additional Deposit.  Concurrently with the submission of the APA and Settlement Agreement to the Bankruptcy Court, CalNRG OC shall cause Ceson to pay an additional deposit of Four Hundred Thousand Dollars ($400,000) (the "***Additional Deposit***" and, together with the Initial Deposit, collectively, the "***Deposit***") to the Escrow Agent to be held in accordance with the terms and provisions of the Escrow Agreement.  Following the submission of the Sale Motion to the Bankruptcy Court, the Deposit shall be refundable to Ceson only if (i) CalNRG OC validly terminates the APA due to the Bankruptcy Court not entering the Sale Order (as defined in the APA), including pursuant to Section 10.1(f) of the APA, or (ii) the APA is terminated pursuant to Section 10.1(i) of the APA (any such termination, a "***Deposit Refund Termination***"), in which case the entire Deposit, plus any accrued interest, shall within three (3) business days following a Deposit Refund Termination be refunded by the Escrow Holder to Ceson.

(c)    No Refund of Deposit.  Following entry of the Sale Order or, if applicable, expiration of Buyer's right to terminate the APA pursuant to Section 10.1(f) of the APA, the Deposit shall be non-refundable.  If the closing of the transactions contemplated by the APA occurs and PDC has received the Purchase Price, the Parties shall instruct the Escrow Agent to pay the Deposit, and any interest earned thereon, to Ceson and the Deposit shall not be credited to the Purchase Price.  If (i) the closing of the transactions contemplated by the APA does not occur on or before May 14, 2021, or (ii) the APA is earlier terminated for any reason other than a Deposit Refund Termination, the Parties shall immediately deliver joint written instruction to the Escrow Agent to pay the Deposit and any interest thereon to PDC, and the Deposit shall be deemed to be owned by PDC free and clear of any claims by CalNRG OC or Ceson.

(d)    Escrow Agent Fees.  Any fees payable to the Escrow Agent under the Escrow Agreement shall be borne and paid by PDC.

5.    Reserved.

3

6.    <u>Certain Funds</u>.  CalNRG OC acknowledges and agrees that neither CalNRG OC nor any of its affiliates shall be entitled to any funds held by Seller at any time, whether before, on or after the Closing, other than: (a) the Suspense Funds (as defined in the APA), and (b) any funds received by Seller in connection with the exercise of the Preferential Rights described on Schedule 4.9 to the APA (the funds attributable thereto, the "***Alabama Preferential Rights Funds***").  CalNRG OC shall only be entitled to the Suspense Funds and the Alabama Preferential Rights Funds as expressly provided in the APA.  With respect to the Purchased Asset(s) (as defined in the APA) that are subject to the Preferential Right(s) (as defined in the APA) described on Schedule 4.9 to the APA, CalNRG OC has allocated a portion of the Purchase Price equal to Forty-Five Thousand Dollars (US$45,000).

7.    <u>Release</u>.  Notwithstanding anything herein or in the APA to the contrary: **PDC MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO CALNRG OC (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO CALNRG OC  OR ITS AFFILIATES OR REPRESENTATIVES BY ANY AFFILIATES OR REPRESENTATIVES OF PDC OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, PDC'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF PDC).  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PDC EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE PURCHASED ASSETS, (B) THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING DISTINCTLY UNDERSTOOD THAT THE PURCHASED ASSETS ARE BEING ACQUIRED BY CALNRG OC "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) ANY INFRINGEMENT BY PDC OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (D) ANY INFORMATION, DATA, OR OTHER MATERIALS (WRITTEN OR ORAL) FURNISHED TO CALNRG OC BY OR ON BEHALF OF PDC (INCLUDING THE EXISTENCE OR EXTENT OF HYDROCARBONS OR THE MINERAL RESERVES, THE RECOVERABILITY OF SUCH RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, AND THE ABILITY TO SELL HYDROCARBON PRODUCTION AFTER THE CLOSING), (E) THE ENVIRONMENTAL CONDITION AND OTHER CONDITION OF THE PURCHASED ASSETS AND ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE PURCHASED ASSETS, AND (F) THE CALCULATION OF, AND LIABILITY WITH RESPECT TO, ANY TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF CALNRG OC RELATING TO THE PURCHASED ASSETS. CALNRG OC RELEASES PDC AND ITS AFFILIATES AND ITS AND THEIR RESPECTIVE MEMBERS, OWNERS, MANAGERS, DIRECTORS, OFFICERS, PARTNERS, EMPLOYEES AND AGENTS (COLLECTIVELY, THE "*PDC GROUP*") FROM ANY AND ALL CLAIMS, CAUSES**

4

OF ACTION, PROCEEDINGS, OR OTHER LEGAL RIGHTS AND REMEDIES OF CALNRG OC OR ITS AFFILIATES OR ITS AND THEIR RESPECTIVE MEMBERS, OWNERS, MANAGERS, DIRECTORS, OFFICERS, PARTNERS, EMPLOYEES AND AGENTS (COLLECTIVELY, THE "*CALNRG OC GROUP*"), KNOWN OR UNKNOWN, WHICH CALNRG OC MIGHT NOW OR SUBSEQUENTLY HAVE, BASED ON, RELATING TO OR IN ANY WAY ARISING OUT OF THE TRANSACTIONS CONTEMPLATED BY THE APA, THE OWNERSHIP, USE OR OPERATION OF THE PURCHASED ASSETS, OR THE CONDITION, QUALITY, STATUS, OR NATURE OF THE PURCHASED ASSETS, INCLUDING ANY AND ALL CLAIMS RELATED TO ENVIRONMENTAL MATTERS OR LIABILITY OR VIOLATIONS OF ENVIRONMENTAL LAWS AND INCLUDING RIGHTS TO CONTRIBUTION UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980, AS AMENDED, OR SIMILAR STATE STATUTES, BREACHES OF STATUTORY OR IMPLIED WARRANTIES, NUISANCE, OR OTHER TORT ACTIONS, RIGHTS TO PUNITIVE DAMAGES, COMMON LAW RIGHTS OF CONTRIBUTION, AND RIGHTS UNDER INSURANCE MAINTAINED BY PDC OR ANY OF PDC'S AFFILIATES. CALNRG OC SPECIFICALLY WAIVES THE BENEFITS AND PROTECTIONS OF SECTION 1542 OF THE CIVIL CODE OF CALIFORNIA, WHICH PROVIDES AS FOLLOWS:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

8.    <u>Reciprocal Representations and Warranties</u>.  Each Party represents and warrants to the other Party (the Party making such representation or warranty, the "***Representing Party***"):

(a)    <u>Organization and Good Standing</u>.  The Representing Party is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and has the requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.  The Representing Party is duly qualified or licensed to do business and is in good standing in each jurisdiction where the character of its business or the nature of its properties makes such qualification or licensing necessary.

(b)    <u>Authority</u>.  Subject to, the Representing Party has the requisite corporate or similar power and authority to execute and deliver this Agreement and the SUA and to perform its respective obligations hereunder and thereunder.  The execution and delivery of this Agreement and the SUA have been duly authorized by all requisite corporate or similar action on the part of the Representing Party.  This Agreement has been duly and validly executed and delivered, and each agreement, document or instrument contemplated hereby to be delivered will be duly and validly executed and delivered, by the Representing Party (assuming the due authorization, execution and delivery by the

5

other Parties) and this Agreement constitutes (and the SUA will constitute) legal, valid and binding obligations of the Representing Party enforceable against the Representing Party in accordance with its respective terms, subject to general principles of equity.

(c)    <u>Consents; Fees</u>.    No consent, waiver, clearance, approval, order or authorization of, or declaration, filing or registration with, or notification to (each of the foregoing, a "***Consent***"), any person, entity or governmental authority is required on the part of the Representing Party in connection with the execution and delivery of this Agreement or the SUA, the compliance by the Representing Party with any of the provisions hereof or thereof, or the taking by the Representing Party of any other action contemplated hereby or thereby (with or without notice or lapse of time, or both).

(d)    <u>No Conflict</u>.  The execution and delivery of this Agreement and the SUA, the consummation of the transactions contemplated hereby and thereby and the taking by the Representing Party of any other action contemplated hereby or thereby will not result in the breach of any of the terms and provisions of, or constitute a default (with or without notice, lapse of time or both) under, or conflict with, or give rise to a right of termination, loss of right, adverse modification of provisions, cancellation of, or cause any acceleration of any obligation of the Representing Party, under (i) any agreement, indenture, or other instrument to which the Representing Party is bound, (ii) the partnership agreement, bylaws or other governing documents of the Representing Party, (iii) any order or (d) any applicable law.

(e)    <u>Brokers or Finders</u>.  The Representing Party has not incurred any liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the SUA or the APA for which the non-Representing Party is or will become liable.

9.    <u>Additional Representations and Warranties</u>.  In addition to the representations and warranties of CalNRG OC in <u>Section 8</u>, CalNRG OC hereby represents and warrants to PDC:

(a)    <u>Knowledgeable Investor</u>.  CalNRG OC is experienced and knowledgeable investor in the oil and gas business.  Prior to entering into this Agreement and the APA, CalNRG OC was advised by its own legal, tax, environmental, and other professional counsel concerning this Agreement and the APA, the transactions contemplated hereby and thereby, the Purchased Assets, and their value, and they have relied solely thereon.

(b)    <u>Financial Ability</u>.  Within fourteen (14) days after the satisfaction or waiver of the conditions set forth in Article 9 of the APA (other than conditions that, by their nature, are to be first satisfied at the Closing (as defined in the APA), but subject to the satisfaction or waiver of such conditions), CalNRG OC shall have sufficient cash, available lines of credit, or other sources of immediately available funds to enable it to (a) deliver the amounts due at the closing of the transactions contemplated by the APA, (b) take such actions as may be required to consummate the transactions contemplated by the APA, and (c) timely pay and perform CalNRG OC's obligations under the APA. CalNRG OC expressly acknowledges that the failure to have sufficient funds shall in no

6

event be a condition to the performance of its obligations hereunder or under the APA, and in no event shall CalNRG OC's failure to perform its obligations under the APA be excused by failure to receive funds from any source.

10.    <u>Reserved</u>.

11.    <u>Assignment</u>.  Other than to one of its Affiliates, CalNRG OC may not assign this Agreement or any of its rights or obligations hereunder without the prior written consent of PDC (which consent may be withheld in PDC's sole discretion).  Subject to the foregoing, this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

12.    <u>Notices</u>.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission) or (c) one (1) business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to CalNRG OC:

California Natural Resources Group, LLC
1746-F South Victoria Ave, Suite 245
Ventura, CA 93003
Attention:  Clifton Simonson and Jeffrey Katersky
Email:  clif.simonson@gmail.com and jkatersky@gmail.com

With a copy (which will not constitute notice) to:

OSSENTJUK & BOTTI
2815 Townsgate Road, Suite 320
Westlake Village, CA 91361
Attention:  David Ossentjuk
Email:  dossentjuk@oandblawyers.com


If to PDC:

Placentia Development Company LLC4
1140 Virginia Drive
Fort Washington, Pennsylvania 19034
Attention: Yolanda Rodriguez – Vice President
Email: YRodriguez2@tollbrothers.com
Attention: Seth Ring – Regional President, Western Region
Email: SRing@tollbrothers.com

7

With a copy (which will not constitute notice) to:

Thompson & Knight LLP
777 Main Street, Suite 3300
Fort Worth, Texas 76102
Attention: Cole Bredthauer
Email: Cole.Bredthauer@tklaw.com

13.    <u>Entire Agreement; Amendment and Waivers</u>.   This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  The waiver by any Party of a breach of any provision of this Agreement will not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor will any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.   All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

14.    <u>Further Cooperation</u>.   In the event that, after the completion of the transaction contemplated by the APA, either Party to this Agreement determines that Robert Hall ("***Hall***"), formerly the President and Chief Executive Officer of Bridgemark, has in his possession, custody or control any property (whether real or personal) which Hall should have delivered or conveyed to Bridgemark pursuant to the Settlement Agreement, the Parties to this Agreement shall fully cooperate with one another in a mutual effort to see that that property is conveyed or delivered, as the case may be, to CalNRG OC without any consideration to Hall; *provided*, *however*, that in no event shall PDC: (i) be required to expend any funds or incur any liability (or potential liability) in connection with the performance of its obligations under this <u>Section 14</u>, or (ii) otherwise have any liability under this Agreement if any such property (whether or personal) is not conveyed or delivered, as the case may be, to CalNRG OC.

15.    <u>Severability</u>.   If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect.

16.    <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

17.    <u>Governing Law</u>.   This Agreement will be governed by and construed in accordance with the laws of the state of California, without regard to its conflict of laws principles.

8

18.    <u>Dispute Resolution; Waiver of Jury Trial</u>.

(a)    Prior to the dismissal of the voluntary case commenced by Bridgemark on January 14, 2020 under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "***Chapter 11 Case***"), the Bankruptcy Court will have jurisdiction over any and all disputes between or among the Parties, whether in law or equity, arising out of or relating to this Agreement or any agreement contemplated hereby.

(b)    From and after the dismissal of the Chapter 11 Case, or if the Bankruptcy Court in the Chapter 11 Case is unwilling or unable to hear a dispute prior to the dismissal of the Chapter 11 Case, any disputes between the Parties arising out of or relating to this Agreement or any agreement contemplated hereby will be submitted to judicial reference pursuant to California Civil Code Section 638.  If a judicial reference proceeding is initiated based on any such dispute, the following provisions apply (unless the Parties agree in writing otherwise):

(i)    The proceeding will be brought and held in Orange County, California.

(ii)    The Parties will use the procedures adopted by JAMS for judicial reference and selection of a referee.

(iii)    The referee must be a retired judge or a licensed attorney with substantial experience in relevant legal matters.  The Parties will agree upon a single referee who will have the power to try any and all of the issues raised, whether of fact or law, which may be pertinent to the matters in dispute, and to issue a statement of decision thereon.  Any dispute regarding the selection of the referee will be resolved by JAMS or the entity providing the reference services, or, if no entity is involved, by the court in accordance with California Code of Civil Procedure Sections 638 through 640.

(iv)    The referee may require one or more pre-hearing conferences.  The referee will have authority to provide all remedies available in law or equity appropriate under the circumstances of the controversy.  The referee will have the authority to rule on all post-hearing motions in the same manner as a trial judge.

(v)    The Parties will be entitled to discovery as provided in the California Code of Civil Procedure, and the referee will oversee discovery and may enforce all discovery orders in the same manner as any trial judge.

(vi)    A stenographic record of the reference proceedings will be made.

(vii)    The referee's statement of decision must contain findings of fact and conclusions of law to the extent applicable.  The statement of decision will be binding upon the Parties, and upon filing of the statement of decision with the

clerk of court, or with the judge where there is no clerk, and judgment may be entered thereon.

(viii)    The decision of the referee will be appealable as if rendered by the court.

(ix)    The prevailing Party, as determined by the referee, will be entitled to obtain from the non-prevailing Party the prevailing Party's reasonable attorneys' fees and experts' fees and costs, costs related to the judicial reference, and the portion of fees and costs of the referee borne by the prevailing Party.  For all other claims not specifically addressed in this Section 18.b.(ix), each Party will bear its own attorneys' fees and experts' fees and costs and costs related to the judicial reference.  Until the referee determines the prevailing Party, each Party to the reference will bear an equal share of the fees and costs of the referee and the reference proceeding.

(c)    THE PARTIES DO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

19.    Attorneys' Fees and Costs.  If any action or proceeding at law or in equity shall be brought to enforce or interpret any provision of this Agreement, or any right, duty or obligation between the Parties hereto, the prevailing Party in such action, as determined by the Court or arbitrator, shall in addition to all costs of suit, shall recover judgment or award from the other Party for the actual and reasonable sum as and for the prevailing Party's attorneys' fees and costs, including all professional advisors, expert witness and consultant fees and mediator or arbitrator fees, which sum shall be fixed by the Court or arbitrator and made a part of such judgment or award.  This provision shall apply to attorney's fees and related costs on appeal, and on remand from any such appeal.

20.    PDC Use of CalNRG OC Employees.

(a)    Upon reasonable prior request from PDC and subject to their job duties to CalNRG OC, CalNRG OC will make its employees available to perform services with respect to facilities or operations on the PDC Property, so long as such services do not materially interfere with CalNRG OC's operations.

(b)    In the event PDC or an Affiliate of PDC engages a CalNRG OC employee, PDC or its Affiliate, as applicable, will reimburse CalNRG OC an amount equal to the product of (i) one and fifteen one-hundredths (1.15) *multiplied by* (ii) the aggregate amount of all documented costs and expenses incurred by CalNRG in connection with the employment of such employee (including such employee's salary and benefits, employer share of employment taxes, worker's compensation insurance,

10

and the like) in proportion of his or her time spent providing such services (the "***CalNRG OC Employee Costs***").

(c)       Upon completion of services by any CalNRG OC employee who is engaged by PDC, PDC will provide written notice to CalNRG OC of such completion. The CalNRG OC employee will provide the amount of time spent by such employee in connection with the PDC engagement.  Thereafter, CalNRG OC will provide an itemized statement (together with sufficient supporting documentation) of all CalNRG OC Employee Costs to be reimbursed by PDC.  PDC will reimburse CALNRG OC for all undisputed amounts described therein as described in Section 20(a) within ten (10) business days of receipt of such statement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGES FOLLOW.]

11

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized representatives as of the date hereof.

**PLACENTIA DEVELOPMENT COMPANY LLC**,

a California limited liability company

By: _____

Name: Seth Ring

Title: Regional President, Western Region

**CALIFORNIA NATURAL RESOURCES
GROUP ORANGE COUNTY, LLC**
a Delaware limited liability company

By:   Golden State Exploration & Production, LLC,
a Delaware limited liability company
Its:  Managing Member

By:   *Clifton O. Simonson*
      Clifton O. Simonson
Its:  Managing Member

SIGNATURE PAGE

**EXHIBIT 1**

APA


Attached.

EXHIBIT 1

526512.000004 24068332.21

**[Separately Filed – See Exhibit C to Motion]**

## EXHIBIT 2

### REMAINDER TRACT

That certain real property in the City of Placentia, County of Orange, State of California, commonly referred to as Tract 15700, Parcel No. 341-501-66.

EXHIBIT 2

526512.000004 24068332.21

EXHIBIT 3

DEED TO THE REMAINDER TRACT

RECORDING REQUESTED BY:

Ossentjuk & Botti
2815 Townsgate Rd., Suite 320
Westlake Village, CA 91361

AND WHEN RECORDED RETURN TO:

California Natural Resources Group Orange County, LLC
1746-F South Victoria Avenue, Suite 245
Ventura, CA 93003
Attn:  Clifton Simonson

---

**(Above Space for Recorder's Use Only)**

DOCUMENTARY TRANSFER TAX: $_____        APN:  341-501-66

☑    Computed on full value of the interest or property conveyed

APN:  341-501-66

**GRANT DEED**

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Placentia Development Company LLC, a California limited liability company ("Grantor") hereby GRANTS to Realm California, LLC, a Delaware limited liability company ("Grantee"), the real property located in the County of Orange, State of California, and more particularly described on Exhibit A attached hereto and incorporated herein by this reference.

Dated: _____, 2021

**GRANTOR:**

 Placentia Development Company LLC, a California limited liability company

By:    _____
Name:    Seth Ring
Title:    Regional President, Western Region

EXHIBIT 3

**Exhibit A to Grant Deed.**

That certain real property in the City of Placentia, County of Orange, State of California, commonly referred to as Tract 15700, Parcel No. 341-501-66.

EXHIBIT 3

# EXHIBIT 4

SETTLEMENT AGREEMENT

Attached.

EXHIBIT 4

526512.000004 24068332.21

**[Separately Filed – See Exhibit B to Motion]**

**EXHIBIT 5**

SUA

Attached.

EXHIBIT 5

526512.000004 24068332.21

**[Separately Filed – See Exhibit E to Motion]**

EXHIBIT 6

HALL QUITCLAIM

Recording Requested By &
When Recorded Mail Recorded Document &
Tax Statements To:

[Orange County Assessor's Parcel No. 341-301-09]

**[Documentary Transfer Tax:  $0.]  This is the surrender of partial rights and interests arising under oil and gas leases, the value of which is less than $100.  R&T Code Section _____.**

**By:** _____

## SURRENDER AND QUITCLAIM

The Robert J. Hall Family Trust; Casa Real LP, a California limited partnership; Casa Real Management, LLC, a California limited liability company; Casa Real Apartments, LP, a California limited partnership; Casa Real GP, LLC, a California limited liability company; Casa Real Holdings, LLC, a Nevis limited liability company; Casa Real LLC, a Nevada limited liability company; Casa Real Preferred Income Associates, a California limited partnership; Casa Real Properties, LLC, a California limited liability company; Casa Real Property Group LLC, a California limited liability company; Casa Real Mortgage, Inc., a California corporation; Casa Real Homes, Inc., a California corporation; Casa Real Corporation, a California corporation; O&G Investment Trust, a Nevada trust; Las Cienegas, LLC, a California limited liability company; Meadow Deep LLC, a Wyoming limited liability company; Gregson Energy Group, LLC, a Wyoming limited liability company; and Bridgemark Texas, LLC, a Texas limited liability company (collectively, "Grantor") do hereby surrender, relinquish, and release to Realm California, LLC, a Delaware limited liability ("Grantee"), any and all of Grantor's individual and collective rights, title, and interest in, under and to the following described land and instruments:

See Exhibit A attached hereto and incorporated herein by this reference.

[SIGNATURE PAGES FOLLOW]

EXHIBIT 6

GRANTOR

Dated:_____, 2021

ROBERT J. HALL FAMILY TRUST

By: _____

Name:_____
Title:_____

Dated:_____, 2021

CASA REAL, LP,
a California limited partnership

By: _____

Name:_____
Title:_____

EXHIBIT 6

1

Dated:_____, 2021                     Dated:_____, 2021

2    CASA REAL MANAGEMENT, LLC,                          CASA REAL APARTMENTS, LP,
     a California limited liability company              a California limited partnership

3

By: _____             By: _____

4

5    Name:_____                     Name:_____
     Title:_____                    Title:_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    Exhibit 6

1

Dated:_____, 2021                    Dated:_____, 2021

2  CASA REAL GP, LLC,                              CASA REAL HOLDINGS, LLC,
   a California limited liability company          a Nevis limited liability company
3

By: _____            By: _____
4

Name:_____                   Name:_____
5  Title:_____                Title:_____

6

7

8

9

10

11

12  Dated:_____, 2021                   Dated:_____, 2021

13  CASA REAL, LLC,                                 CASA REAL PREFERRED INCOME
   a Nevada limited liability company              ASSOCIATES,
14                                                  a California limited partnership

15  By: _____
                                                    By: _____
16  Name:_____
   Title:_____                 Name:_____
17                                                  Title:_____

18

19

20

21

22

23

24

25

26

27

28                                    EXHIBIT 6

526512.000004 24068332.21

Dated:_____, 2021

CASA REAL PROPERTIES, LLC,
a California limited liability company

By: _____

Name:_____
Title:_____


Dated:_____, 2021

CASA REAL MORTGAGE, INC.,
a California corporation

By: _____

Name:_____
Title:_____


Dated:_____, 2021

CASA REAL CORPORATION,
a California corporation

By: _____

Name:_____
Title:_____


Dated:_____, 2021

LA CIENEGAS, LLC,
a California limited liability company

By: _____

Name:_____
Title:_____


Dated:_____, 2021

CASA REAL  PROPERTY GROUP, LLC,
a California limited liability company

By: _____

Name:_____
Title:_____


Dated:_____, 2021

CASA REAL HOMES, INC.,
a California corporation

By: _____

Name:_____
Title:_____


Dated:_____, 2021

O&G INVESTMENT TRUST,
a Nevada Trust

By: _____

Name:_____
Title:_____


Dated:_____, 2021

MEADOW DEEP, LLC,
a Wyoming limited liability company

By: _____

Name:_____
Title:_____


EXHIBIT 6

Dated:_____, 2021                Dated:_____, 2021

GREGSON ENERGY GROUP, LLC,                   BRIDGEMARK TEXAS, LLC,
a Wyoming limited liability company          a Texas limited liability company

                                             By: _____

By: _____        Name:_____
                                             Title:_____
Name:_____
Title:_____


**GRANTEE:**                                 ?

Dated:_____, 2021

Realm California, LLC,
a Delaware limited liability company

By: _____

Name:_____
Title:_____


EXHIBIT 6

EXHIBIT A

All real and personal property rights, title and interests, subject to, and located within the boundaries of, the Chapman Zone Unit Agreement dated April 1, 1960 (which was recorded on June 7, 1961 in Book 5746, page 759, as Document 4625 of the Official Records of Orange County, California), and the Kramer Zone Unit Agreement dated February 2, 1970 (which was recorded on July 19, 1972 in Book 10231, Page 96 as Document 17083 of the Official Records of Orange County, California), including, without limitation, all royalty interests, overriding royalty interests, fee interests (both in the surface estate and/or the mineral estate), net profits interests, income interests, oil and gas leasehold working interests, easements, rights of way, licenses, equipment, facilities, pipelines, utility lines, and any and all other similar real and personal property rights, title and interests.

EXHIBIT 6

526512.000004 24068332.21

1

2

3

4

5

## EXHIBIT 7

### CalNRG OC Surface Quitclaim

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Recording Requested By &
When Recorded Mail Recorded Document &
Tax Statements To:

California Natural Resources Group
Orange County, LLC
1746-F South Victoria Avenue, Suite 245
Ventura, CA 93003
Attn: Clifton Simonson

**[Orange County Assessor's Parcel Nos. 341-501-01 through 341-501-65**

**[Documentary Transfer Tax: $0.] This is the surrender of a partial interest in an oil and gas lease, the value of which is less than $100. R&T Code Section _____.**

**By: _____**

### SURRENDER AND QUITCLAIM OF SURFACE RIGHTS

CALIFORNIA NATURAL RESOURCE GROUP ORANGE COUNTY, LLC, a Delaware limited liability company ("Grantor"), does hereby surrender, relinquish, and release to Placentia Development Company LLC, a California limited liability company ("Grantee"), any and all of Grantor's right, title, and interest in, under and to the following described land and instruments (including, without limitation, in its capacities as lessee under those certain Oil and Gas Leases and Operator under the Chapman Zone Unit Agreement dated April 1, 1960 (which was recorded on June 7, 1961 in Book 5746, page 759, as Document 4625 of the Official Records of Orange County, California), and the Kramer Zone Unit Agreement dated February 2, 1970 (which was recorded on July 19, 1972 in Book 10231, Page 96 as Document 17083 of the Official Records of Orange County, California)):

See Exhibit A attached hereto and incorporated herein by this reference.

Dated: _____, 2021

EXHIBIT 7

526512.000004 24068332.21

CALIFORNIA NATURAL RESOURCES GROUP ORANGE COUNTY, LLC,
a Delaware limited liability company

By:   Golden State Exploration & Production, LLC,
a Delaware limited liability company
Its:  Managing Member

By: _____
      Clifton O. Simonson
Its:  Managing Member

EXHIBIT 7

526512.000004 24068332.21

Exhibit A

From the surface to 500' below for Lots 1-65 (including Tebay Drive, Saucedo Circle, Baumann Way, Troop Way, Fergus Court and Blankenship Circle) of Tract NO. 15700 in the Assessors Map Book 342, Page 50, Records of Orange County

APNS: 341-501-01 through 341-501-65



Exhibit 7

526512.000004 24068332.21

# EXHIBIT E

EXECUTION VERSION

## Surface Use and Cooperation Agreement

This Surface Use and Cooperation Agreement (this "***Agreement***") is made and entered into on this _____ day of _____, 2021 (the "***Effective Date***") by and between Placentia Development Company LLC, a California limited liability company ("***PDC***"), on the one hand, and California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("***CalNRG OC***"), and Realm California LLC, a Delaware limited liability company ("***Realm***"), on the other hand.  PDC, CalNRG OC and Realm are sometimes collectively referred to herein as the "***Parties***" and each, individually, as a "***Party***."

WHEREAS, concurrently with the Effective Date of this Agreement, CalNRG OC has acquired certain assets from Bridgemark Corporation, a California corporation ("***Bridgemark***") including oil and gas leasehold interests and related surface and subsurface wells, pipelines, equipment and facilities (the "***Bridgemark Assets***"), as more particularly described on Exhibit A;

WHEREAS, pursuant to the APA and concurrently with the Effective Date of this Agreement, Realm has acquired from PDC that portion of the PDC Property commonly known and identified as Orange County, California Assessor's Parcel No. 341-501-66 (but excluding any facilities located thereon, all of which have been owned and operated by Bridgemark) (the "***Remainder Tract***" and, together with the Bridgemark Assets, collectively, the "***Assets***"), which is more specifically described on Exhibit B;

WHEREAS, PDC is the owner of surface estate in that certain real property in the City of Placentia, County of Orange, California, commonly referred to as Tract 15700, Orange County, California Assessor's Parcel Nos. 341-501-01 through 341-501-65 (the "***PDC Property***"), which is more specifically described on Exhibit C;

WHEREAS, PDC had the right to acquire the Assets in partial satisfaction of an outstanding judgment against Bridgemark in favor of PDC;

WHEREAS, PDC agreed to allow CalNRG OC to acquire the Bridgemark Assets and Realm to acquire the Remainder Tract on the condition that CalNRG OC and Realm agree to the terms and provisions of this Agreement;

WHEREAS, PDC, Bridgemark and Robert J. Hall ("***Hall***") are the parties to that certain Settlement Agreement dated as of March 10, 2021 pertaining, among other things, to the PDC Property (the "***Settlement Agreement***"); and

WHEREAS, the PDC Property is entitled for residential development and PDC intends to develop the PDC Property for residential use (including the Re-Entitlement), and, therefore, the Parties desire that PDC, CalNRG OC and Realm take certain actions and agree to refrain from taking certain actions in order to facilitate their respective future activities on the PDC Property and Remainder Tract, as more particularly described herein.

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

# ARTICLE 1

## DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**.  The following capitalized terms shall have the following meanings for all purposes of this Agreement:

"*Affiliate*" means, (i) with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such specified Person and (ii) with respect to Seller, an "affiliate" as such term defined in section 101 of the Bankruptcy Code.  For the purposes of this definition, the term "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management or policies of such Person, directly or indirectly, whether through the ownership of voting securities, by Contract or otherwise; and the terms "controlling" and "controlled" have correlative meanings.

"*Applicable Law*" means any law, statute, ordinance, code, regulation, rule or other requirement of any Governmental Authority.

"*Bankruptcy*" means, with respect to any Person, (i) the filing by such Person of a petition, including a petition under Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended, seeking to adjudicate such Person as bankrupt or insolvent or otherwise commencing, authorizing or acquiescing in the commencement of a proceeding or cause of action seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over it or any substantial part of its property, or consenting to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or taking any corporate or similar official action to authorize any of the foregoing; (ii) the commencement of an involuntary case or other proceeding against such Person seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, composition or other relief with respect to such Person or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official over such Person or any substantial part of its property, which involuntary case or other proceeding remains un-dismissed and un-stayed for a period of thirty (30) days; (iii) the making of an assignment or any general arrangement for the benefit of creditors of such Person; (iv) such Person's generally being unable or admitting its inability to pay its debts as they fall due (or otherwise generally failing to pay its debts as they fall due); (v) such Person's filing an answer or other pleading admitting or failing to contest the allegations of a petition filed against it in any proceeding of the foregoing nature, or taking any other action to authorize any of the actions set forth above; (vi) dissolution of such Person other than pursuant to a consolidation, amalgamation or merger; or (vii) a secured party takes possession of all or substantially all of such Person's assets.

"*Business Day*" means any day other than a Saturday, a Sunday or other day on which commercial banks in Orange County, California, are authorized or required by Applicable Law to close.

2

"***Buyout Price***" means, with respect to wells Plugged and Abandoned in accordance with this Agreement:

(i)      With respect to a producing well, One Hundred Twenty Percent (120%) of the present value (PV-8) of the expected net income stream to CalNRG OC (*i.e.*, after deducting royalties and all field level operating costs,) reasonably expected to be obtained from the operation of the well for its anticipated remaining economic life.

(ii)      With respect to an injection well, One Hundred Ten Percent (110%) of the present value (PV-8) of the loss of production which is expected to be experienced as a result of the loss of use of any such injection well, after accounting for any savings in operating costs associated with loss of use.

(iii)      All projections of prices and operating costs used in calculations of Buyout Prices shall be those then being used by knowledgeable buyers and sellers in the oil and gas industry of oil producing properties on shore in California.  All estimates of future production or loss of production shall be made in accordance with generally accepted good reservoir engineering practices.

"***Chapter 11 Case***" means the voluntary case commenced by Bridgemark on January 14, 2020 under the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California.

"***Crimson Pipeline***" means the pipeline depicted on <u>Exhibit D</u>.

"***Development Plan***" means any residential development plan contemplated by PDC in connection with a Re-Entitlement of the PDC Property, as the same may be modified by PDC from time to time in its sole and absolute discretion.

"***Environmental Laws***" means any federal, state, or local Applicable Law relating to the prevention of pollution, remediation of contamination, protection of the environment and human health and safety and natural resources, and restoration of environmental quality, including the following federal statutes, their state analogs, and the regulations promulgated thereunder: (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, (b) the Emergency Planning and Community Right-To-Know Act, (c) the Resources Conservation and Recovery Act, (d) the Clean Air Act, (e) the Clean Water Act, (f) the Safe Drinking Water Act, (g) the Oil Pollution Act, and (h) the Toxic Substances Control Act, and their state analogs including, but are not limited to: (i) the California Porter-Cologne Water Quality Act, and (j) the provisions of the California Public Resources Code and California Health & Safety Code applicable to the Assets, as each of the foregoing has been amended, as each of the foregoing has been amended.

"***Force Majeure***" means an event or circumstance (each, a "***Force Majeure Event***") which is beyond the reasonable legal, business or operational control of, without the fault or negligence of, and could not, in the exercise of reasonable caution, have been foreseen and avoided or mitigated by the Party asserting Force Majeure, and which delays or prevents the affected Party from timely performing any obligation under this Agreement.  A Force Majeure Event may include, to the extent satisfying the criteria in the preceding sentence: an act of God, strike, lockout,

3

or other industrial disturbance, act of the public enemy, war, blockade, public riot, lightening, fire, storm, flood or other act of nature, explosion, action, inaction, delay, restraint or inaction by a Governmental Authority, unavailability of equipment or labor including, without limitation, such as is caused by disease outbreak, epidemic or pandemic.  Notwithstanding the foregoing: in no event shall any of the following constitute an event of Force Majeure: (a) economic, financial, credit or political conditions and general changes in markets, or (b) any condition or circumstance that could be overcome by a Party utilizing its reasonable commercial and good faith efforts.

"*Governmental Authority*" means (a) any federal, provincial, state, local, municipal, national or international government or governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency or instrumentality, court, tribunal, arbitrator or arbitral body (public or private), (b) any self-regulatory organization, or (c) any political subdivision of any of the foregoing, and includes, without limitation, the California Geologic Energy Management Division of the California Department of Conservation, the California Air Resources Board, and the South Coast Air Quality Management District.

"*Hazardous Substances*" means Hydrocarbons, petroleum and its byproducts, asbestos, polychlorinated biphenyls, per- and polyfluoroalkyl substances (including perfluorooctanoic acid, perfluorooctane sulfonic acid, Gen X, and perfluorobutane sulfonic acid), radioactive material (including naturally occurring radioactive material), and any other material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under any Environmental Law or for which liability can be imposed under any Environmental Law.

"*Hydrocarbons*" means all oil, gas, minerals, casinghead gas, coalbed methane, condensate, distillate and other liquid and gaseous hydrocarbons of every kind or description, or any combination of the foregoing.

"*Joinder Agreement*" means and refers to the agreement by a Lender to amend any deed of trust on the Remainder Tract in order to enable CalNRG OC to comply with its obligations under Section 2.4(a) and Section 2.4(b) of this Agreement, the form of which Joinder Agreement is attached hereto as Exhibit E.

"*Lender*" means and refers to a bank or other financial institution which may make a loan to Realm secured by a deed of trust on Realm's interest in the Remainder Tract.

"*Material Adverse Effect*" means a material adverse financial or operational effect on CalNRG OC's or Realm's: (x) ability to physically access the Assets (meaning that the Assets can no longer be reached using the same equipment as would have otherwise applied but excluding changes in the distances that must be traveled to reach the Assets), (y) ability to produce Hydrocarbons from the Assets, or (z) capacity to inject water into the reservoirs included in the Assets *provided*, *however*, that "Material Adverse Effect" does not and will not include any effect resulting from or arising out of any of the following: (A) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (including (i) any disruption of any of the foregoing markets, (ii) any decline or rise in the price of any security, commodity, contract or index and (iii) any increased cost, or decreased availability,

4

of capital or pricing or terms related to any financing for the transactions contemplated by the APA), (B) changes in any Applicable Law, including any increase (or decrease) in the terms or enforcement of (or negotiations or disputes with respect to) any of the foregoing (such as with respect to immigration, border, tariff, or import, export, or other trade matters), (C) the announcement or pendency of the APA, this Agreement, or the transactions contemplated thereby, including on relationships, contractual or otherwise, with customers, suppliers, vendors or employees, (D) changes caused by political or social conditions, including acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, cyberattack, sabotage or terrorism threatened or underway, (E) pandemics (including the currently existing global COVID-19 pandemic), earthquakes, hurricanes, floods, other natural disasters or other calamity or act of God or any other force majeure, (F) any action taken by PDC that is required by this Agreement or is taken at the request of CalNRG OC or Realm, and the failure to take any action if such action is prohibited by this Agreement, (G) changes, events or effects that are generally applicable to Persons engaged in the industry in which CalNRG OC operates, (H) any failure, in and of itself, to achieve any budgets, projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with CalNRG OC or Realm, or their Affiliates or representatives) (but, for the avoidance of doubt, not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from the definition of Material Adverse Effect), (I) (1) the commencement or pendency of the Chapter 11 Case, (2) any objections in the Bankruptcy Court to (I) the APA, this Agreement, or any of the transactions contemplated thereby, (II) the reorganization of PDC, any plan of reorganization or any disclosure statement, or (3) any order of the Bankruptcy Court or any actions or omissions of PDC in compliance therewith, or (J) any temporary cessations occurring during any time period when PDC is required to make Cessation Payments.

"*Person*" means any natural person, corporation, company, partnership, association, limited liability company, limited partnership, limited liability partnership, joint venture, business enterprise, trust or other legal entity, including any Governmental Authority.

"*Pipeline*" means any pipeline or facility utilized for the flowing, transportation, gathering or transmission of Hydrocarbons, fresh water, produced water, or other substances related to the Hydrocarbon development operations.

"*Plug and Abandon*" (and its derivatives) means the plugging and abandonment of a well or wells and the removal of appurtenant cellars, production pads, piers, structures and equipment, and the removal of all associated flow lines so that the area in which the well or wells have been abandoned is left in a clean, level and safe condition with all plugged and abandoned facilities being located a sufficient depth beneath the surface to accommodate the development of the surface of the affected property, and is performed in accordance with all Applicable Laws, and in accordance with the terms and conditions of contracts or agreements related thereto; and upon completion of the plugging and abandonment providing documentation of approval of the plugging and abandonment by the California Department of Conservation, Division of Geologic Energy Management ("*CalGEM*") pursuant to California Public Resources Code Section 3229.

"*Third Party Costs*" means reasonable and documented, out-of-pocket costs or expenses incurred by a Party that are payable to a non-Affiliate of such Party; *provided, however*, that

CalNRG OC may use one or more of its Affiliates to perform any of its obligations under <u>Article 2</u> and <u>Article 3</u> hereof so long as the rates charged by said Affiliate and reimbursable to CalNRG OC by PDC: (a) are no higher than those which would result for the use of an un-Affiliated third party in an arms' length transaction, and (b) CalNRG OC provides reasonably sufficient supporting documentation to PDC that the criteria set forth in subsection (a) of this definition have been satisfied.

"***Transaction Agreement***" means that certain Transaction Agreement by and among the CalNRG OC and PDC of even date herewith.

"***Well Modification Price***" means, with respect to any operations conducted pursuant to <u>Section 2.8</u>, the sum of Two Hundred Fifty Thousand Dollars ($250,000) per well, as adjusted annually from and after the Effective Date in order to compensate for inflation based on the Los Angeles—Riverside—Orange County regional Consumer Price Index ("CPI") by reference to the United States Department of Labor, Bureau of Labor Statistics (http://www.bls.gov/cpi/). The CPI adjustment shall be proportional to the percent change in the CPI from year to year with January 2021 as a starting point of reference in the adjustment calculation. The first CPI adjustment shall be made one (1) month prior to the first (1st) anniversary of the Effective Date of this Agreement.

**Section 1.2    Other Capitalized Terms**. The following terms shall have the meanings specified in the indicated section of this Agreement:

| <u>Term</u> | <u>Section</u> |
| --- | --- |
| Agreement | Preamble |
| Assets | Preamble |
| Bankruptcy Court | Section 7.10(a) |
| Bridgemark | Preamble |
| Bridgemark Assets | Preamble |
| Buyout Request | Section 3.1(a) |
| CalNRG OC | Preamble |
| CalNRG OC Indemnitees | Section 2.7(e) |
| CCRs | Section 2.7(g) |
| Cessation Payment | Section 2.5(c) |
| Claiming Party | Section 17.1 |
| Claims | Section 2.7(e) |
| Default | Section 4.1 |
| Defaulting Party | Section 4.1 |
| Effective Date | Preamble |
| Facilities | Section 2.5 |
| Hall | Preamble |
| Losses | Section 2.5(b) |
| Non-Claiming Party | Section 17.1 |
| Parties | Preamble |
| Party | Preamble |
| PDC | Preamble |
| PDC Property | Preamble |
| Re-Entitlement | Section 2.1 |

| Term | Section |
|------|---------|
| Realm ........................................................................... | Preamble |
| Referee ........................................................................ | Section 3.1(c) |
| Settlement Agreement ................................................ | Preamble |
| Surface Beautification Measures ................................. | Section 2.7(a) |
| Surface License .......................................................... | Section 2.9(a) |
| Remainder Tract .......................................................... | Preamble |
| Yarnell #29 .................................................................. | Section 2.6(a) |

**Section 1.3    Interpretive Provisions.**

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation will apply:

(i)    the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

(ii)    words defined in the singular shall have a comparable meaning when used in the plural, and vice versa;

(iii)    the words "Dollars" and "$" means U.S. dollars;

(iv)    references herein to a specific Section, Subsection, Recital, Schedule or Exhibit shall refer, respectively, to Sections, Subsections, Recitals, Schedules or Exhibits of this Agreement;

(v)    wherever the word "include," "includes" or "including" is used in this Agreement, it shall be deemed to be followed by the words "without limitation;"

(vi)    references herein to any gender shall include each other gender;

(vii)    references herein to any Person shall include such Person's heirs, executors, personal representatives, administrators, successors and assigns; *provided, however*, that nothing contained in this clause (vii) is intended to authorize any assignment or transfer not otherwise permitted by this Agreement;

(viii)    with respect to the determination of any period of time, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding;"

(ix)    the word "or" shall be disjunctive but not exclusive;

(x)    references herein to any Applicable Law shall be deemed to refer to such Applicable Law as amended, reenacted, supplemented or superseded in whole

or in part and in effect from time to time and also to all rules and regulations promulgated thereunder;

      (xi)    the headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the Parties;

      (xii)    all Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated into and made a part of this Agreement as if set forth in full herein; and

      (xiii)    if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day.

      (b)    The Parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as jointly drafted by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE 2

## RE-ENTITLEMENT; BOUNDARY ADJUSTMENTS; WELL ABANDONMENTS AND DECOMMISSIONING; FACILITIES RELOCATION; DRILLING LIMITS; SURFACE AESTHETICS

      **Section 2.1    Re-Entitlement Efforts**.  CalNRG OC and Realm acknowledge that PDC intends to: (a) seek to process a new subdivision map with respect to the PDC Property that may, among other things, increase the number, and/or modify the product type, of lots that may be developed on the PDC Property, and (b) take such other measures as may be reasonably necessary to obtain authorizations from the appropriate Governmental Authorities to pursue the expansion or modification of a residential development on the PDC Property (the "***Re-Entitlement***"). CalNRG OC and Realm agree to support (and not to oppose) any and all of PDC's efforts with respect to the Re-Entitlement so long as said Re-Entitlement would not result in a Development Plan which causes a Material Adverse Effect on CalNRG OC or Realm with respect to the Assets. Subject to the foregoing, CalNRG OC and Realm agree, to the extent reasonably necessary and on reasonable advance notice, to (w) attend and, if reasonably necessary, participate in any meetings or hearings before any Governmental Authority with respect to the Re-Entitlement, (x) provide letters and recommendations in support of the Re-Entitlement, (y) if so requested by PDC, sign any applications or other application materials as may be required by Governmental Authorities, and (z) take such other actions as may be reasonably requested by PDC from time to time in connection with the Re-Entitlement.

      **Section 2.2    Cessation of Production.**  From and after the Effective Date, (a) PDC will exercise its rights to cause Bridgemark to cease production of hydrocarbons from the wells located on the PDC Property (and, in the event the ownership of such wells ever inures to PDC, PDC

agrees to never recommence the production of hydrocarbons therefrom), and (b) PDC acknowledges that it will have no right to use the Remainder Tract.

**Section 2.3    Cooperation**.  CalNRG OC and Realm acknowledge that PDC intends to develop a residential subdivision on the PDC Property in accordance with the Development Plan. PDC acknowledges that CalNRG OC conducts and will in the future be conducting oil and gas exploration and production activities in the vicinity of the PDC Property, including the Remainder Tract, and that CalNRG OC and Realm will continue to operate/own the Remainder Tract.  To that end, and subject to the other terms and provisions of this Agreement, and in addition to the other covenants hereunder with respect to such development (and subject to any limitations therein), the Parties agree to reasonably cooperate and consult with each other in connection with the Development Plan.  Subject to the other terms and provisions of this Agreement, to the extent CalNRG OC's and Realm's efforts are not in violation of this Agreement or otherwise interfere with PDC's development, and CalNRG OC and Realm comply with all Applicable Law, PDC shall not cause a Material Adverse Effect on CalNRG OC or Realm with respect to the Assets. Without limiting the foregoing provisions of this Section 2.3:

(a)    PDC shall include provisions for pipeline easements in the Development Plan which shall be held in the name of, and for the benefit of, CalNRG OC in the PDC Property. Such pipeline easements will be sufficient to allow CalNRG OC to exercise the License Rights (as such License Rights may be relocated pursuant to the terms of this Agreement).  PDC may elect to grant easements memorializing such License Rights prior to the approval of the Development Plan.  CalNRG OC shall have the obligation (and PDC shall have the right) pursuant to such easements to repair and maintain any such pipelines as commercially prudent and required by Applicable Law.  Any such easements shall be non-exclusive and shall be granted subject to terms and provisions reasonably satisfactory to PDC and shall include, without limitation, (i) customary indemnity provisions in favor of PDC and its designees, (ii) minimum facility separation distances and (iii) insurance requirements.  After consultation with CalNRG OC, the exact locations of any such easements shall be selected by PDC in its sole (but reasonable) discretion in furtherance of the Development Plan.

(b)    The Development Plan shall permit CalNRG OC ingress and egress to and from the Remainder Tract by way of trucks and equipment with a minimum gross vehicle weight of not less than eighty thousand (80,000) pounds.  Those streets shall be designed, permitted and constructed accordingly.

**Section 2.4    Boundary Adjustments**.

(a)    At PDC's written request, PDC may on one (1) occasion notify CalNRG OC in writing that PDC desires to adjust the lot lines of the Remainder Tract to the boundaries shown on Exhibit F hereto.  Such notice shall include: (a) a specific surveyed description of the required adjustment, and (b) drafts of the documents and instruments necessary to accomplish such adjustment.  CalNRG OC shall, concurrently with the execution of this Agreement, cause any relevant Lender to execute the Joinder Agreement whereby said Lender will agree to partially release its deed of trust on the Remainder Tract to accommodate PDC's exercise of its rights under this Section 2.4(a).  Also, if so requested by PDC, CalNRG OC and Lender shall sign any applications or other application materials as may be required by Governmental Authorities, and

take such further action as may be reasonably necessary to facilitate the finalization and approval of any such adjustment, including its general duty to cooperate in PDC's efforts as set forth in Section 2.1, above, and taking any actions necessary to obtain releases of any liens, security interests, mortgages, or other charges encumbering the portion of the Remainder Tract affected by any such adjustment.  Within thirty (30) days of receiving notice from PDC, CalNRG OC will provide to PDC all releases of any liens, security interests, mortgages or other charges encumbering the affected portions of the Remainder Tract.  The covenants of Lender hereunder will be binding on Lender and its successors and assigns.

(b)      Separate and apart from the provisions in Section 2.4(a), if the Development Plan requires the adjustment of any boundary of the Remainder Tract by an amount less than twenty-five feet (25') (such distance to be measured from the boundary lines depicted on the exhibits to this Agreement), PDC may on one occasion prior to the third (3rd) anniversary of the Effective Date deliver written notice to CalNRG OC.  PDC will use its commercially reasonable efforts to minimize the square footage of any such boundary adjustment.  Such notice shall include: (i) a specific surveyed description of the required adjustment, and (ii) drafts of the documents and instruments necessary to accomplish such adjustment.  CalNRG OC shall, concurrently with the execution of this Agreement, cause any relevant Lender to execute the Joinder Agreement whereby Lender will agree to partially release its deed of trust on the Remainder Tract to accommodate PDC's exercise of its rights under this Section 2.4(b).  Also, if so requested by PDC at the time that PDC makes a request pursuant to this Section 2.4(b), CalNRG OC and Lender shall sign any applications or other application materials as may be required by Governmental Authorities, and take such further action as may be reasonably necessary to facilitate the finalization and approval of any such adjustment, including its general duty to cooperate in PDC's efforts as set forth in Section 2.1, above, and taking any actions necessary to obtain releases of any liens, security interests, mortgages, or other charges encumbering the portion of the Remainder Tract affected by any such adjustment.  Within thirty (30) days of receiving notice from PDC, CalNRG OC will provide to PDC all releases of any liens, security interests, mortgages or other charges encumbering the affected portions of the Remainder Tract.  The covenants of Lender hereunder will be binding on Lender and its successors and assigns.

(c)      Notwithstanding Section 2.3(b), but subject to Section 2.3(a), absent CalNRG OC's prior written agreement, PDC shall not be entitled to an adjustment to the boundary line of the Remainder Tract which would cause a Material Adverse Effect on CalNRG OC with respect to the facilities located thereon.  The Parties agree to reasonably cooperate and consult with one another with respect to any proposed adjustments to said boundary lines and take such other measures as may be required under Section 2.5.

(d)      Except with respect to liens, security interests, mortgages or other charges in favor of Lender, neither CalNRG OC nor Realm shall permit any lien, security interest, mortgage or other charge to encumber the Remainder Tract; *provided*, *however*, that the prohibition in this Section 2.4(d) shall not prohibit Realm from re-financing any loan secured by the Remainder Tract (i) prior to the completion of Re-Entitlement if Lender in the refinanced loan expressly agrees in writing to assume and be bound by the terms and provisions of Section 2.4(a) and Section 2.4(b) of this Agreement, or (ii) after the conclusion of the Re-Entitlement.

**Section 2.5    Facility Relocation**.  From time to time, PDC may deliver written notice to CalNRG OC that it desires to relocate or modify one (1) or more pipelines, electric lines, utility lines, power poles, power lines, transformers, or other similar infrastructure or facilities (but not including the equipment set forth on <u>Schedule 2.5</u>) and any other facilities or equipment located in, on or under lands covered by the Surface License (collectively, the "***Facilities***") that are located on or off the Remainder Tract (but are servicing the Remainder Tract) in order to accommodate the Development Plan.  Provided that the proposed relocation will not cause a Material Adverse Effect on CalNRG OC or Realm with respect to the Assets, as soon as reasonably possible (using diligent efforts to obtain any necessary permits or approvals) following CalNRG OC's receipt of any such notice (and, in any event, within ninety (90) days thereof) at PDC's election, CalNRG OC shall either (a) relocate or modify such Facility to the location requested by PDC subject to the other terms and provisions of this <u>Section 2.5</u>; or (b) permit PDC to relocate or modify such Facility to the location requested by PDC subject to the other terms and provisions of this <u>Section 2.5</u>.  Subject to the condition that the relocation not cause a Material Adverse Effect on CalNRG OC with respect to the Assets, Facilities may be relocated to other locations outside or on the Remainder Tract.  The Facilities to be relocated or modified include, but are not limited to, the Facilities described on <u>Exhibit G</u> and any other pipelines, facilities or equipment located in, on or under lands covered by the Surface License.  Notwithstanding anything herein to the contrary, except for the reimbursement of CalNRG OC for Third Party Costs, and reasonable and preapproved CalNRG OC personnel costs described in <u>Section 2.5(d)</u> and any amounts owed to CalNRG OC under <u>Section 2.5(c)</u>, in no event shall PDC be liable for any Losses associated with the relocation or modification of Facilities under this <u>Section 2.5</u>.  In addition, CalNRG OC will grant such new easements or amendments of existing easements on the Remainder Property for the Facilities consistent with and subject to the requirements governing the relocation of the Facilities provided that any such easements shall be non-exclusive, shall not have a Material Adverse Effect on CalNRG OC with respect to the Assets, and shall be granted subject to terms and provisions reasonably satisfactory to CalNRG OC, including, without limitation, (i) customary indemnity provisions in favor of CalNRG OC and its designees, and (ii) insurance requirements.

(a)      In connection with the submission of a notice under this <u>Section 2.5</u>, PDC shall consult with CalNRG OC regarding: (i) the scope of the Facilities to be relocated or modified, (ii) the location to which such Facilities would be moved, (iii) the scope of the work related to such relocation or modification, and (iv) the costs and expenses associated with such relocation or modification.

(b)      CalNRG OC acknowledges it may be required to cease its operations during the time period work is being conducted to relocate or modify a Facility.  Except as expressly provided in <u>Section 2.5(c)</u>, PDC shall not be liable for any losses, damages, claims, expenses, costs, fines, penalties, causes of action or liabilities (collectively, "***Losses***") arising from or related to any such cessation.  PDC shall use commercially reasonable efforts to minimize the length of time of any such cessation.

(c)      Notwithstanding <u>Section 2.5(b)</u>, in the event PDC performs the work to relocate or modify a Facility pursuant to this <u>Section 2.5</u>, and such work requires CalNRG OC to cease operations for more than three (3) consecutive days (*provided*, *however*, that for the purposes of calculating such three (3) consecutive day period, the time taken to shut down and re-start CalNRG OC's facilities shall not be taken into account, it being understood and agreed that such

time period shall commence on the date that CalNRG OC's facilities are shut-down such that the facilities may be relocated and shall end on the date that PDC notifies CalNRG OC that such facilities can be brought back online), PDC shall pay CalNRG OC an amount equal to the product of: (i) the number of days (in addition to three (3)) that CalNRG OC was required to cease operations as a direct result of PDC's relocation or modification work, *multiplied by* (ii) Three Thousand Dollars ($3,000) (such product, a "***Cessation Payment***").  With respect to each cessation of operations contemplated by this <u>Section 2.5(c)</u>, the Cessation Payment shall be due and payable within thirty (30) days of the date that both of the following occur: (x) PDC completes the relocation or modification work that required CalNRG OC to cease its operations, and (y) PDC receives a written invoice for the Cessation Payment from CalNRG OC.  CalNRG OC shall use commercially reasonable efforts to minimize the length of time of any such cessation of operations. Notwithstanding anything herein to the contrary, to the extent a cessation of operations could be mitigated, shortened or overcome by CalNRG OC using its best efforts to so minimize the impacts of a cessation, no Cessation Payment shall be payable hereunder with respect to any time which could have been mitigated, shortened or overcome.

(d)	To the extent that PDC requests CalNRG OC to perform the work to relocate or modify a Facility, PDC shall be required to reimburse CalNRG OC for all of the Third Party Costs, and reasonable and preapproved CalNRG OC personnel costs, incurred by CalNRG OC in connection with any relocation or modification work conducted pursuant to this <u>Section 2.5</u>. Such amount shall be due and payable by PDC within thirty (30) days of PDC's receipt of an invoice from CalNRG OC related thereto.  Such invoice shall include such documents and information as may be reasonably necessary for PDC to verify the amounts set forth therein.

(e)	Nothing herein shall require CalNRG OC to perform any operations necessary to relocate or modify the Crimson Pipeline.  However, CalNRG OC agrees to fully cooperate with PDC and support PDC's efforts, in the event PDC desires to relocate the Crimson Pipeline at PDC's sole cost and expense.  Such cooperation shall include participating in discussions with the owner of the Crimson Pipeline and supporting PDC in any non-judicial filings or requests required by a Governmental Authority with respect to such relocation.  In addition, PDC will grant such new easements or amendments of existing easements on the PDC Property for the Crimson Pipeline consistent with and subject to the requirements governing the relocation of the Crimson Pipeline provided that any such easements shall be non-exclusive and shall be granted subject to terms and provisions reasonably satisfactory to PDC, including, without limitation, (i) customary indemnity provisions in favor of PDC and its designees, and (ii) insurance requirements.  In addition, CalNRG OC will grant such new easements or amendments of existing easements on the Remainder Property for the Crimson Pipeline consistent with and subject to the requirements governing the relocation of the Crimson Pipeline provided that any such easements shall be non-exclusive, shall not have a Material Adverse Effect on CalNRG OC with respect to the Assets, and shall be granted subject to terms and provisions reasonably satisfactory to CalNRG OC, including, without limitation, (i) customary indemnity provisions in favor of CalNRG OC and its designees, and (ii) insurance requirements.  For the avoidance of doubt, in no event shall PDC be restricted by this Agreement from relocating (or attempting to relocate) the Crimson Pipeline.

(f)	Notwithstanding anything to the contrary in this Agreement, nothing herein shall restrict or prohibit PDC from removing, relocating, plugging or abandoning any wells or facilities located on the PDC Property.  CalNRG OC and Realm expressly agree that PDC shall

12

have the right to remove, relocate plug or abandon any wells or facilities located on the PDC Property as PDC may determine in PDC's sole and absolute discretion.

### Section 2.6    Limits on Drilling and Certain Operations.

(a)    There is now on the Remainder Tract one (1) well, the Yarnell #29, API No. 0405906497 (the "*Yarnell #29*").  CalNRG OC may re-drill the Yarnell #29 if, when, and to the extent that such re-drill is necessary for repairs, maintenance or other necessary service on the well.  PDC understands and acknowledges that CalNRG OC may, and likely will, re-drill the Yarnell #29 in the future for such purposes on a presently unknown number of occasions.  Prior to the third (3rd) anniversary of the Effective Date of this Agreement, any re-drilling of the Yarnell #29 shall be done solely for purposes of repairs, maintenance or other necessary service on the well.  From and after the third (3rd) anniversary of the Effective Date, CalNRG OC may re-drill the Yarnell #29 for any purpose, including improving the economics of the well.

(b)    CalNRG OC may drill a maximum of one (1) additional well on the Remainder Tract; *provided*, *however*, that CalNRG OC shall not drill any new wells on the Remainder Tract during the period of time between the Effective Date and the third (3rd) anniversary of the Effective Date.  Any such additional well shall be (i) at least one hundred feet (100') from the closest approved residential dwelling structure on the PDC Property, or (ii) no closer to any such residential dwelling structure than the current location of the Yarnell #29, whichever distance is less.  The maximum number of wells on the Remainder Tract shall be two (2).  Any such drilling of a new well on the Remainder Tract shall be performed in accordance with the requirements set forth in Section 2.8 (including, without limitation, the requirement that the lift equipment and related facilities are not more than six feet (6') above grade), except that PDC shall not be obligated to pay CalNRG OC the Well Modification Price in connection with any such new well.  CalNRG OC's operations on the Remainder Tract shall (i) not adversely impact the Re-Entitlement of the PDC Property, the Development Plan or PDC's use of the PDC Property, and (ii) be performed in accordance with the terms of this Agreement.

### Section 2.7    Surface Aesthetics.

(a)    So long as it does not cause a Material Adverse Effect on CalNRG OC with respect to the Assets (as such Assets are operated on the date hereof, or as they may be subsequently operated due to PDC's exercise of its rights under Sections 2.4 or 2.5, above) or limit ingress or egress of CalNRG OC's personnel, contractors and equipment to the Assets, CalNRG OC shall allow PDC, at PDC's sole cost and expense, from time to time to: (i) construct and maintain fencing, walls, sound barriers and other structures in, on and around the sites of CalNRG OC's operations on the Remainder Tract or any other facilities located on the other Bridgemark Assets, (ii) plant, install and maintain landscaping on and around the Remainder Tract, and (iii) take such other measures as may be reasonably necessary in connection with the appearance of the Remainder Tract as PDC may desire in connection with the Development Plan or as may be required by a Governmental Authority as a condition of the Re-Entitlement of the PDC Property ((i) through (iii), collectively, the "*Surface Beautification Measures*").  PDC shall reasonably consult and cooperate with CalNRG OC in connection with the Surface Beautification Measures, but the design and location of any Surface Beautification Measures shall be determined by PDC in its sole and absolute discretion, subject to the limitation contained in the first sentence of this

<u>Section 2.7(a)</u>.  PDC shall provide CalNRG OC thirty (30) days' notice prior to any construction of the Surface Beautification Measures.

(b)    Without limiting the generality of <u>Section 2.7(a)</u>, PDC shall have the right to construct one (1) or more sound walls or other sound barriers around the perimeter of the Remainder Tract and/or any Facilities located on the Remainder Tract.  The location of such walls and barriers: (i) shall be selected by PDC after reasonable consultation with CalNRG OC, and (ii) may be changed by PDC from time to time in order to, among other things, accommodate any changes to the configuration or location of the Facilities located on the Remainder Tract.  Prior to constructing any such sound wall or barrier, PDC shall provide CalNRG OC with at least sixty (60) Business Days' prior written notice.

(c)    In the event CalNRG OC reduces or reconfigures the facilities on the Remainder Tract, CalNRG OC reserves the right, at CalNRG OC's sole cost, risk and expense, to move the sound wall or other sound barrier constructed under <u>Section 2.7(b)</u> so long as the performance and aesthetics of the moved wall are substantially similar to the original and the movement and installation thereof is completed within sixty (60) days of the date operations commence therefor.  CalNRG OC may also remove the sound wall, or a portion thereof, so long as both Parties agree in writing it is no longer necessary.

(d)    In the event PDC gives CalNRG OC sixty (60) Business Days' prior written notice that it desires to: (i) relocate or reconfigure any Facilities located on the Remainder Tract, or (ii) otherwise modify the Facilities located on the Remainder Tract to accommodate the Development Plan, CalNRG OC shall reasonably cooperate with PDC in connection with coordinating any such operations, so long as the proposed relocation, reconfiguration or modification will not cause a Material Adverse Effect on CalNRG OC with respect to the Assets.

(e)    If and to the extent that PDC's implementation of Surface Beautification Measures or construction of sound walls or sound barriers requires PDC's employees, agents or contractors to enter upon the Remainder Tract, PDC shall, to the fullest extent permitted by Applicable Law, defend, indemnify and hold CalNRG OC and its Affiliates, agents, employees, consultants, contractors, members, partners, shareholders, subsidiaries, parents, directors and officers, and each of them (the "***CalNRG OC Indemnitees***") harmless from and against and any all claims, costs, Losses, suits, causes of action, or damages (collectively, "***Claims***") in any way arising from or related to those aforementioned activities except to the extent arising from the gross negligence or willful misconduct of any CalNRG OC Indemnitees.

(f)    Furthermore, and without limiting the provisions of <u>Section 2.7(e)</u>, above, PDC and any contractors and subcontractors which PDC may employ in performance of any Surface Beautification Measures or construction of any sound walls or sound barriers, shall maintain liability, worker's compensation and vehicle insurance in in compliance with <u>Section 7.14</u>.

(g)    CalNRG OC shall have no obligation to PDC or any third party to maintain or repair any Surface Beautification Measures, sound walls or sound barriers except to the extent any such maintenance or repair is necessary due to damage caused by any CalNRG OC Indemnitee (in which case CalNRG OC shall promptly perform such maintenance or repair at is sole cost, risk

and expense).  Subject to the preceding sentence, if CalNRG OC reasonably determines that maintenance or repair of any Surface Beautification Measures is reasonably necessary, CalNRG OC may notify PDC in writing setting forth the scope of such maintenance or repair.  If PDC agrees that the maintenance or repair set forth in such notice is reasonably necessary and fails to complete such maintenance and repair within sixty (60) Business Days of its receipt of such notice (as may be extended due to Force Majeure Events), CalNRG OC may, at its election and at PDC's sole cost, perform such maintenance or repairs if it determines in its sole discretion that such work is necessary or appropriate.  If PDC does not agree the maintenance or repair set forth in any such notice is reasonably necessary, such disagreement shall be resolved in accordance with Section 7.10.  Without limiting the foregoing sentence, from and after the time at which homes are constructed and sold on the PDC Property pursuant to the Development Plan, PDC shall ensure by way of appropriate recorded Conditions, Covenants And Restrictions ("*CCRs*"), or other appropriate methods running with the land, that the right and obligation to maintain the Surface Beautification Measures and sound walls or sound barriers, and to reimburse CalNRG OC for its repairs and maintenance thereof, shall permanently become those of whatever homeowner's association or special district is created by PDC in connection with those development efforts.  In connection with the foregoing, CalNRG OC shall (and shall cause Realm or any Affiliates of CalNRG OC or Realm to) grant to PDC any easements, rights-of-way or other rights requested by PDC that may be necessary to fulfill its obligations under this Section 2.7(g).

Section 2.8    **Modification of Wells**.  PDC may request from time to time that CalNRG OC modify one (1) or more of the wells located on the Remainder Tract or the Assets so that their lift equipment and related facilities are not more than six feet (6') above grade.  CalNRG OC shall conduct the operations to complete any such modifications within ninety (90) days of (a) CalNRG OC's receipt of written notice from PDC, and (b) CalNRG OC's receipt of the Well Modification Price; *provided*, *however*, that in no event shall CalNRG OC be required to undertake any operations related to any such conversion sooner than the second (2nd) anniversary of the Effective Date.  CalNRG OC will take all commercially reasonable efforts to minimize the profile and visibility of any modified wells, but PDC understands and acknowledges that wells which are modified pursuant to this Section 2.8 will have certain visible equipment above the surface grade and that CalNRG OC shall have satisfied its obligations under this Section 2.8 so long as the post-modification profile of any such well does not exceed six feet (6') above grade.

Section 2.9    **Surface License.**

(a)    **Grant.** Notwithstanding the Quitclaim and Surrender of Leasehold Surface Rights delivered from CalNRG OC to PDC pursuant to Section 2 of the Transaction Agreement, PDC hereby grants to CalNRG OC a non-exclusive license to use the surface of the PDC Property for the purposes of (i) ingress and egress to and from the Remainder Tract and (ii) operating, maintaining, and repairing the existing pipelines and utilities that are utilized in connection with the transportation of hydrocarbons from the Bridgemark Assets to the Remainder Tract (collectively, the "*License Rights*").  PDC reserves the right to modify the ingress and egress rights described in clause (i) above to the extent such modification does not cause a Material Adverse Effect on CalNRG OC.  A form of Memorandum of the Surface License is set forth in Exhibit K attached hereto (the "*Surface License*").

15

(b)     **Term.** The Surface License will expire on the date that PDC grants to CalNRG OC the permanent easements described in <u>Section 2.3(a)</u> above.

## ARTICLE 3

## WELL BUY-OUTS

### Section 3.1     Plugging and Abandonment.

(a)     PDC may request from time to time that CalNRG OC Plug and Abandon the well located on the Remainder Tract (each such request, a "***Buyout Request***").

(b)     Subject to CalNRG OC's rights to notify PDC of a Force Majeure Event, CalNRG OC shall complete such Plugging and Abandonment within sixty (60) days of CalNRG OC's receipt of the Buyout Price; *provided*, *however*, that PDC shall not provide any Buyout Request earlier than thirty (30) days prior to the second (2nd) anniversary of the Effective Date and in no event shall a Buyout Request be delivered prior to the earlier of (y) the date that PDC obtains an approval of a tentative map by a Governmental Authority in connection with the Re-Entitlement process, or (z) the date PDC elects, in its sole and absolute discretion, to move forward with the Development Plan or otherwise use, develop, or convert the PDC Property (regardless of whether the Re-Entitlement is complete). Notwithstanding the preceding sentence, if no Buyout Request has been sent as of the five (5) year anniversary of the Effective Date, CalNRG OC's obligation to Plug and Abandon wells pursuant to this <u>Section 3.1</u> shall immediately cease.

(c)     The Buyout Price shall be determined by Ryder Scott Company, LP ("***Referee***"), and any contractors or consultants which Referee may elect to use in that determination, and that determination shall be final and binding on the Parties. If the Referee is not available to determine the Buyout Price, the Parties shall agree on a mutually acceptable and qualified oil and gas geology and/or reservoir engineering firm to make that final and binding determination. The actual and reasonable costs and fees charged by the Referee in determining the Buyout Price shall be borne by PDC. Within thirty (30) days of the completion of any such Plugging and Abandonment operations, PDC shall pay to CalNRG OC all of the Third Party Costs, and reasonable and preapproved CalNRG OC personnel costs, incurred by CalNRG OC in connection with such Plugging and Abandonment.

## ARTICLE 4

## DEFAULT; REMEDIES

### Section 4.1     Events of Default. The following shall constitute a "***Default***" by a Party (such Party, a "***Defaulting Party***"): (a) the Bankruptcy of a Party, or (b) the material breach by either Party of its covenants and obligations hereunder (which failure is not cured within thirty (30) days after the Defaulting Party's receipt of written notice thereof from the non-Defaulting Party).

16

**Section 4.2    Self Help**.  In addition to any other rights and remedies a non-Defaulting Party may have at law or in equity with respect to a Default, if CalNRG OC is in Default under Section 4.1, PDC may perform any operations or take any actions that CalNRG OC failed to take in Default hereunder; *provided*, *however*, that in so doing, PDC may not cause a Material Adverse Effect on CalNRG OC or Realm with respect to the Assets.  In such event, CalNRG OC shall reimburse PDC for all costs and expenses associated therewith that would otherwise be the responsibility of CalNRG OC within thirty (30) days of CalNRG OC's receipt of a written invoice, including reasonable sufficient back up documentation, from PDC related thereto.  Without limiting the generality of the foregoing, the Parties expressly agree that PDC may exercise its rights defined under this Section 4.2 in the event CalNRG OC claims a Force Majeure Event prevents the performance of its obligations hereunder and PDC reasonably believes such obligations can be performed by PDC.

**Section 4.3    Specific Performance**.  The Parties acknowledge that they would be irreparably harmed as a result of the other Party's breach of this Agreement.  In the event either Party fails to timely perform any of its obligations hereunder, the other Party shall be entitled to seek and receive specific performance of this Agreement by the Party who has failed to timely perform any of its obligations hereunder, without posting any bond or the necessity of proving the inadequacy of a remedy of monetary damages.

**Section 4.4    Limitations on Damages**.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NEITHER PARTY SHALL BE ENTITLED TO RECOVER FROM THE OTHER PARTY OR ANY OF ITS OR THEIR AFFILIATES ANY PUNITIVE, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF, RESULTING FROM OR IN CONNECTION WITH THE PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT.  Notwithstanding the foregoing, the limitations in this Section 4.4 shall not apply to: (a) any damages resulting from the gross negligence or willful misconduct of the Party from whom such damages are sought, or (b) any damages claimed by a third party against a Party entitled to indemnification hereunder.

## ARTICLE 5

## INDEMNIFICATION

**Section 5.1    Indemnification.**  The Parties agree to protect, indemnify, and hold each other, their Affiliates, and their respective agents, employees, partners members, managers, heirs, and assigns harmless from and against all liabilities, Claims, damages, Losses, expenses, demands, penalties, causes of action, and suits (including, without limitation, attorney's fees, court costs, and other litigation-related expenses) of every kind and character, directly or indirectly, arising out of, in connection with, or related to: (a) in the case of CalNRG OC, CalNRG OC's operations on or access to the PDC Property, including violations of Environmental Laws or the release of Hazardous Substances (b) in the case of PDC, PDC's operations on or access to the Remainder Tract, including violations of Environmental Laws or the release of Hazardous Substances by PDC, or (c) either Party's breach of any of its covenants or obligations hereunder, **regardless of whether the same arose out of the negligence (whether sole, joint, concurrent or otherwise), strict liability or other fault of an indemnified Party**.

# ARTICLE 6

## RESTRICTIVE COVENANT

**Section 6.1    Restrictive Covenant**.    The covenants and agreements of the Parties hereunder constitute restrictive covenants that burden the Remainder Tract and the PDC Property such that the Parties and any of their successors in title to all or any portion of the Remainder Tract and the PDC Property shall be subject to the terms and provisions hereof.  The Parties intend for this Agreement and the covenants and agreements described in this Agreement to (a) constitute covenants running with the land with respect to the Remainder Tract, (b) be binding on and enforceable by a Party and its successors and assigns against the other Party, and its successors and assigns, and (c) in the event of a Bankruptcy of a Party or its successors or assigns, not be deemed to be an executory contract or subject to rejection by a Party or its successors or assigns. Notwithstanding the foregoing, Persons who purchase residential lots in the PDC Property, and their respective successors and assigns, and any homeowners' association or special district which is formed in connection with the PDC Property, shall not be successors to PDC's rights under this Agreement as against CalNRG OC, Realm and their respective successors and assigns (except as referenced in <u>Section 2.3(a)</u> for the easements on the PDC Property to be granted to CalNRG OC and the rights as referenced in <u>Section 2.7(g)</u> as to Surface Beautification Measures).

**Section 6.2    Memorandum**.    Concurrently with the execution of this Agreement, the Parties shall execute, acknowledge and deliver a memorandum substantially in the form of <u>Exhibit H</u> attached hereto to be filed in the public records of Orange County, California for the purpose of putting third parties on notice of the existence of this Agreement and the terms and provisions hereof.

# ARTICLE 7

## MISCELLANEOUS

**Section 7.1    Force Majeure**.    A delay in or failure to perform by a Party will not constitute a Default or breach of this Agreement if and to the extent the delay or failure to perform is a Force Majeure Event.  In the event that either Party is unable to perform any of its obligations under this Agreement by reason of a Force Majeure Event, such Party shall: (a) give written notice to the other Party specifying full particulars of such Force Majeure Event as soon as it is reasonably possible following the notifying Party's awareness of the occurrence of such Force Majeure Event, and in any event, within ten (10) Business Days of the notifying Party's awareness of the occurrence thereof; (b) use commercially reasonable efforts to remedy such Force Majeure Event as soon as it is reasonably possible; and (c) give written notice to the other Party that a Force Majeure Event has been remedied as soon as it is reasonably possible following the remedy of such Force Majeure Event. *For the avoidance of doubt*, no Party shall be entitled to the protections afforded by this <u>Section 7.1</u> until the notice required under this <u>Section 7.1</u> has been delivered to the other Party.  Notwithstanding the foregoing, in the event a Party desires to claim the protections afforded by this <u>Section 7.1</u> for more than ninety (90) consecutive days or one hundred eighty (180) days out of any consecutive three hundred sixty (360) days period, such Party (the "***Claiming Party***") must notify the other Party (the "***Non-Claiming Party***") in writing prior to expiration of the applicable time period.  If the Non-Claiming Party disputes the validity of the Force Majeure

Event claimed by the Claiming Party within thirty (30) days of the Non-Claiming Party's receipt of such notice, the Claiming Party shall not be entitled to the protections afforded under this Section 7.1 unless a determination is made that the claimed Force Majeure Event excuses the Claiming Party's performance in accordance with Section 7.10.

Section 7.2    **Assignment**.  Subject to the remaining provisions of this Section 7.2, this Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Until (a) the Re-Entitlement is completed, (b) PDC, in its sole and absolute discretion, finally determines to permanently abandon its efforts to pursue the Re-Entitlement (in such event, PDC will provide written notice to CalNRG OC of such determination), or (c) the later of (i) five (5) years from the Effective Date and (ii) the date on which any and all pending litigation and/or pending applications associated with the Re-Entitlement are fully and finally adjudicated such that the Re-Entitlement cannot be completed, in the case of (a) through (c), whichever occurs first, CalNRG OC and Realm may not, directly or indirectly, assign, convey or otherwise transfer all or any portion of the Assets to any Person other than an Affiliate of CalNRG OC without first obtaining PDC's prior written consent, which consent shall not be unreasonably withheld, delayed or conditioned; provided, however, that in the event CalNRG OC assigns all or any portion of the Assets to an Affiliate, such Affiliate must remain an Affiliate of CalNRG and may not undergo a change in control without PDC's prior written consent.  PDC may consider, among other things, the economic wherewithal of a proposed assignee in deciding whether to consent to such a proposed assignment, conveyance or transfer.  PDC may assign, convey or otherwise transfer all or any portion of the PDC Property without first obtaining CalNRG OC's prior written consent at any time; *provided*, *however*, any successor-in-interest to the rights or obligations of PDC under this Agreement will be required to provide reasonable documentation demonstrating its financial ability to reimburse CalNRG OC as required hereunder as a condition precedent to the exercise of any rights hereunder that require payment or reimbursement to CalNRG OC in connection therewith.   Any attempted direct or indirect assignment, conveyance or other transfer that is not in strict compliance with this Section 7.2 will be deemed to be null and void.

Section 7.3    **Disclosures to Homebuyers**.  PDC and any successor owner of the PDC Property which sells or intends to sell any finished residential lots or residential units to members of the public shall include in its written pre-sale disclosures and CCRs appropriate disclosures regarding oil and gas exploration and production activities in the vicinity of any such residences.

Section 7.4    **Notices**.  All notices and other communications under this Agreement will be in writing and will be deemed given (a) when delivered personally by hand, (b) when sent by email (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to CalNRG OC or Realm:

California Natural Resources Group Orange County, LLC
1746-F South Victoria Ave, Suite 245
Ventura, CA 93003
Attention:  Clifton Simonson and Jeffrey Katersky
Email:  clif.simonson@gmail.com and jkatersky@gmail.com
With a copy (which will not constitute notice) to:

OSSENTJUK & BOTTI
2815 Townsgate Road, Suite 320
Westlake Village, CA 91361
Attention:  David Ossentjuk
Email:  dossentjuk@oandblawyers.com

If to PDC:

Placentia Development Company LLC4
1140 Virginia Drive
Fort Washington, Pennsylvania 19034
Attention: Yolanda Rodriguez – Vice President
Email: YRodriguez2@tollbrothers.com
Attention: Seth Ring – Regional President, Western Region
Email: SRing@tollbrothers.com

With copies (which will not constitute notice) to:

Thompson & Knight LLP
777 Main Street, Suite 3300
Fort Worth, Texas 76102
Attention: Cole Bredthauer
Email: Cole.Bredthauer@tklaw.com

**Section 7.5    Entire Agreement; Amendment and Waivers**.    This Agreement
represents the entire understanding and agreement between the Parties with respect to the subject
matter hereof and supersedes all prior discussions and agreements between the Parties with respect
to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any
provision hereof can be waived, only by written instrument making specific reference to this
Agreement signed by the Party against whom enforcement of any such amendment, supplement,
modification or waiver is sought.  The waiver by any Party of a breach of any provision of this
Agreement will not operate or be construed as a further or continuing waiver of such breach or as
a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no
delay in exercising, any right, power or remedy hereunder will operate as a waiver thereof, nor
will any single or partial exercise of such right, power or remedy by such Party preclude any other
or further exercise thereof or the exercise of any other right, power or remedy.  All remedies
hereunder are cumulative and are not exclusive of any other remedies provided by Applicable Law.

**Section 7.6    Severability**.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement will nevertheless remain in full force and effect.

**Section 7.7    Counterparts**.  This Agreement may be executed in counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**Section 7.8    Governing Law**.  This Agreement will be governed by and construed in accordance with the laws of the state of California, without regard to its conflict of laws principles.

**Section 7.9    Corporate Guaranty**.   On or before the Effective Date, as part of the material consideration for the Parties' entry into this Agreement, CalNRG OC shall deliver to PDC a Parent Guaranty executed by Golden State Exploration and Production LLC substantially in the form attached hereto as Exhibit I.

**Section 7.10    Dispute Resolution; Waiver of Jury Trial.**

(a)    Prior to the dismissal of the Chapter 11 Case, the United States Bankruptcy Court for the Central District of California (the "***Bankruptcy Court***") will have jurisdiction over any and all disputes between or among the Parties, whether in law or equity, arising out of or relating to this Agreement or any agreement contemplated hereby.

(b)    From and after the dismissal of the Chapter 11 Case, or if the Bankruptcy Court is unwilling or unable to hear a dispute prior to the dismissal of the Chapter 11 Case, any disputes between the Parties arising out of or relating to this Agreement or any agreement contemplated hereby will be submitted to judicial reference pursuant to California Civil Code Section 638.  If a judicial reference proceeding is initiated based on any such dispute, the following provisions apply (unless the Parties agree in writing otherwise):

(i)    The proceeding will be brought and held in Orange County, California.

(ii)    The Parties will use the procedures adopted by JAMS for judicial reference and selection of a referee.

(iii)    The referee must be a retired judge or a licensed attorney with substantial experience in relevant legal matters.  The Parties will agree upon a single referee who will have the power to try any and all of the issues raised, whether of fact or law, which may be pertinent to the matters in dispute, and to issue a statement of decision thereon.  Any dispute regarding the selection of the referee will be resolved by JAMS or the entity providing the reference services, or, if no entity is involved, by the court in accordance with California Code of Civil Procedure Sections 638 through 640.

(iv)    The referee may require one or more pre-hearing conferences.  The referee will have authority to provide all remedies available in law or equity

21

appropriate under the circumstances of the controversy.  The referee will have the authority to rule on all post-hearing motions in the same manner as a trial judge.

(v)     The Parties will be entitled to discovery as provided in the California Code of Civil Procedure, and the referee will oversee discovery and may enforce all discovery orders in the same manner as any trial judge.

(vi)     A stenographic record of the reference proceedings will be made.

(vii)     The referee's statement of decision must contain findings of fact and conclusions of law to the extent applicable.  The statement of decision will be binding upon the Parties, and upon filing of the statement of decision with the clerk of court, or with the judge where there is no clerk, and judgment may be entered thereon.

(viii)     The decision of the referee will be appealable as if rendered by the court.

(ix)     The prevailing Party, as determined by the referee, will be entitled to obtain from the non-prevailing Party the prevailing Party's reasonable attorneys' fees and experts' fees and costs, costs related to the judicial reference, and the portion of fees and costs of the referee borne by the prevailing Party.  For all other claims not specifically addressed in this (b)Section 7.10(b), each Party will bear its own attorneys' fees and experts' fees and costs and costs related to the judicial reference.  Until the referee determines the prevailing Party, each Party to the reference will bear an equal share of the fees and costs of the referee and the reference proceeding.

(c)     THE PARTIES DO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY AND ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, SUIT OR OTHER LEGAL PROCEEDING BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS UNDER THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 7.11   Attorneys' Fees and Costs**.  If any action or proceeding at law or in equity shall be brought to enforce or interpret any provision of this Agreement, or any right, duty or obligation between the Parties hereto, the prevailing Party in such action, as determined by the Court or arbitrator, shall in addition to all costs of suit, shall recover judgment or award from the other Party for the actual and reasonable sum as and for the prevailing Party's attorneys' fees and costs, including all professional advisors, expert witness and consultant fees and mediator or arbitrator fees, which sum shall be fixed by the Court or arbitrator and made a part of such judgment or award.  This provision shall apply to attorney's fees and related costs on appeal, and on remand from any such appeal.

**Section 7.12   No Third Party Beneficiaries**.  Except as herein provided to the contrary, there are no third-party beneficiaries, intended or otherwise, of this Agreement.

**Section 7.13   Joint and Several Liability.**   Notwithstanding anything herein to the contrary, CalNRG OC and Realm shall be jointly and severally liable hereunder with respect to any breach of any covenant, agreement or obligation of either such Party hereunder including, without limitation, the obligations of either such party under <u>Section 5.1</u>.  CalNRG OC shall cause Realm to comply with all covenants and agreements of Realm hereunder.

**Section 7.14   Insurance**.   Prior to PDC entering onto the Assets, and prior to CalNRG OC or Realm entering onto the PDC Property, as applicable, the Party performing work on the other Party's property (and any of such Party's contractors and/or subcontractors) must obtain general liability, worker's compensation, pollution liability and vehicle insurance (a) in accordance with the amounts and requirements set forth on <u>Exhibit J</u> attached hereto, (b) that lists CalNRG OC and Realm as additional insureds (in the case of PDC) and PDC as an additional insured (in the case of CalNRG OC and/or Realm) under the policy, as applicable.  Prior to PDC entering onto the Assets, and prior to CalNRG OC or Realm entering onto the PDC Property, each Party must furnish valid, written copies of current certificates of insurance satisfying the criteria of this <u>Section 7.14</u>.

**Section 7.15   Conflicts Between the Settlement Agreement and This Agreement**.   As between CalNRG OC and Realm, on the one hand, and PDC, on the other hand, in the event of any conflicts between the terms of the Settlement Agreement and this Agreement, the terms and provisions of this Agreement shall prevail.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGE FOLLOWS.]

526512.000004 24029358.30

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective authorized representatives as of the date hereof.

**PDC:**

**PLACENTIA DEVELOPMENT COMPANY LLC,**
a California limited liability company

By: _____
Name: Seth Ring
Title: Regional President, Western Region

**CalNRG OC:**

**CALIFORNIA NATURAL RESOURCES GROUP ORANGE COUNTY, LLC**
a Delaware limited liability company

By:   Golden State Exploration & Production, LLC,
a Delaware limited liability company
Its:   Managing Member

By: _____
Clifton O. Simonson
Its:  Managing Member

**REALM:**

**REALM CALIFORNIA LLC,**
a Delaware limited liability company

By:   Golden State Exploration & Production, LLC,
a Delaware limited liability company
Its:   Managing Member

By: _____
Clifton O. Simonson
Its:  Managing Member

526512.000004 24029358.30

EXHIBIT A

BRIDGEMARK ASSETS

| RICHFIELD LEASES | | | | | | |
|---|---|---|---|---|---|---|
| LESSOR | LESSEE | RECORDED DATE | EFFECTIVE DATE | BOOK | PAGE | LEGAL – SEE RECORDED DOCUMENTS FOR FULL DESCRIPTIONS |
| Joanna Adella Coyle | Union Oil Company of California, a California corporation | 11/26/1917 | 6/26/1917 | 8 | 257 | Lot 17, Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Harold H. Coyle and Genevieve B. Coyle, his wife (et al) | Union Oil Company of California, a California corporation | 11/26/1917 | 6/26/1917 | 8 | 264 | The West 11.25 acres of Lot 25, Hazard's Subdivision, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California, excepting therefrom a lot in the northeast corner thereof, described as follows: Beginning at the Northeast corner of said land; thence South 50 feet; thence West parallel with the North line thereof, 140 feet; thence North 50 feet to the North line thereof and thence East 140 feet to the point of beginning |
| N. Frank Morse and Mrs. Lottie E. Morse | M.L. Jenks | 11/26/1917 | 2/24/1917 | 8 | 274 | Lot 16 and the North 3.28 acres of the East 11 acres of Lot 25, and the North 50 feet of the East 140 feet of the West half (W 1/2) of Lot 25, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |

EXHIBIT A

| Charlotte S. Ayers, a widow and William J. Parson, a single man | Union Oil Company of California, a California corporation | 11/26/1917 | 8/1/1917 | 8 | 298 | Lot 20, Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
|---|---|---|---|---|---|---|
| Towell Investment Company, a California corporation | Union Oil Company of California, a California corporation | 11/26/1917 | 8/1/1917 | 8 | 305 | The East half (E 1/2) and the South half (S 1/2) of the West half (W 1/2) of Lot 19, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company of Los Angeles California | M.L. Jenks | 9/20/1918 | 8/1/1918 | 7 | 76 | Lot 22, Hazard's Subdivision of the Shanklin Tract, as shown on Map Lot 22, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company of Los Angeles California (et al) | M.L. Jenks | 9/20/1918 | 8/1/1918 | 7 | 81 | Blocks 16, 18 and 19, Lots 1 to 11 inclusive, in Block 27, Block 28 and Block 29, as shown on Amended Map of Richfield, filed in Book 1 at Page 26 of Licensed Surveyors Maps, Records of Orange County, California |
| Susan C. Yarnell (et al) | California Star Oil Company, a corporation | 10/27/1919 | 4/9/1919 | 12 | 87 | Lot 24 and the East half (E 1/2) of Lot 25 of Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California, excepting the Northerly 3.29 acres of said Lot 25, which 3.28 acres is bounded and described as follows: Beginning at the Northeast corner of said Lot 25; thence South 300 feet along the East line of said Lot 25 to a point; thence West 478.525 feet to a point; thence North 300 feet to the North line of said Lot 25; thence East to the point of beginning |

Exhibit A

526512.000004 24179367.14

| California Star Oil Company, a corporation | Petroleum Midway Company, LTD., a corporation | 10/27/1919 | 4/18/1919 | 12 | 95 | Lot 24 and the East half (E 1/2) of Lot 25 of Hazard's Subdivision of the Shanklin Tract as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California, excepting the Northerly 3.29 acres of said Lot 25, which 3.28 acres is bounded and described as follows: Beginning at the Northeast corner of said Lot 25; thence South 300 feet along the East line of said Lot 25 to a point; thence West 478.525 feet to a point; thence North 300 feet to the North line of said Lot 25; thence East to the point of beginning |
|---|---|---|---|---|---|---|
| Oak Company, a California corporation | L.M. Dorn | 9/7/1939 | 3/17/1939 | 1012 | 207 | The North half (N 1/2) of the West half (W 1/2) of Lot 19, Hazard's Subdivision, Shanklin Tract, as shown on Map recorded in Book 18, Page 7, Miscellaneous Records of Los Angeles County, California |
| Stern Realty Company | Union Oil Company of California, a California corporation Recorded: | 11/15/1918 | 11/1/1918 | 7 | 185 | (a) The South 5.695 acres of that portion of Lot 2 in Section 24, Township 4 South, Range 9 West, S.B.B.M., Orange County, California.<br><br>(b) Lot 35, of Hazard's Subdivision, excepting a strip of land containing 1.10 acres conveyed by Jacob Stern to Santa Fe Land Improvement Company; also a strip of land 50.00 feet wide lying South of and contiguous to the South line of that certain piece of land conveyed by said deed to the Santa Fe Land Improvement Company and extending from the West line of Block 44 of the Town of Richfield; also excepting the South Half of the East 20.00 acres (being 10.00 acres) of said Lot 35.<br><br>Also excepting the following: Commencing at a point in the West line of Lot 35 of Hazard's Subdivision, as per amended Map of Richfield |

EXHIBIT A

filed in Book 1, Page 26 of Licensed Surveyor's Map, records of Orange County, California, said point bearing North 03° 36' West along lot line 843.02 feet from the Southwest corner of Lot 35; thence North 03° 36' West 195.92 feet to an intersection with the South line of the Atchison, Topeka and Santa Fe Railway Co's right of way as per Deed recorded in Book 178, Page 28 of Deeds, records of Orange County, California; thence Easterly along the South line of the above mentioned right of way 778.47 feet to an intersection with the West line of "Block 44 Richfield as shown on said Map, thence South parallel to the East line of said Lot 35,
201.60 feet; thence West 765.29 feet to the point of beginning.

(c) Lots 17, 20 and 23, in Block 22; and Lots 27 to 32, inclusive, in Block 24; and Lots 16, 17 and 18 in Block 25; and Lots 1 to 5, inclusive, and Lot 11, in Block 26, all as shown on the amended Map of Richfield filed in Book 1, Page 26 of Licensed Surveyor's Map, records of Orange County, California.

(d) Lot 36 of Hazard's Subdivision.

(e) Lot 37 of Hazard's Subdivision; excepting therefrom the North Half of the South Half and the South Half of the South Half of the North Half of said Lot, conveyed to Edith Mary Abel.

(Parcel 16 continued)
(f) Lot 39 of Hazard's Subdivision; excepting portions conveyed to the Richfield Mutual Water Company and to Anna W. Grace, and the North Half of the South Half of said Lot.

(g) Lot 40 of Hazard's Subdivision; excepting therefrom the South

526512.000004 24179367.14

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | 10.00 acres conveyed to Sol Goodman.<br><br>(h) Lot 41 of Hazard's Subdivision; excepting therefrom the South 5.00 acres.<br><br>(i) Lot 42 of Hazard's Subdivision; excepting 7.19 acres conveyed to Anaheim Union Water Company, and 5.00 acres conveyed to William P. Speer, and 10.00 acres conveyed to Martin Apalategui.<br><br>(j) Block 44, Town of Richfield, reserving therefrom the Northerly 100.00 feet.<br><br>(k) Blocks 16, 18 and 19, Town of Richfield.<br><br>(l) Lots 1 to 11, inclusive, in Block 27, Town of Richfield.<br><br>(m) Blocks 28 and 29, Town of Richfield. |
| William A. Goodwin and Alice A. Goodwin, his wife (et al) | Union Oil Company of California, a California corporation | 3/27/1919 | 5/10/1919 | 10 | 197 | Portion of Lot 21, Hazard's Subdivision as shown on Map recorded in Book 1, Page 26, Licensed Surveyors' Maps, Official Records of Orange County, California, described as follows: Parcel A: Commencing at the Southwest corner of Lot 21 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyors' Maps, Records of Orange County, California, |
| A.S. Bradford and Winifred W. Bradford, his wife (et al) | Chiksan Oil Company, a California corporation | 5/2/1924 | 3/31/1924 | 45 | 186 | Portion of Lot 26 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Commencing at the northeast corner of Lot 27 of said Hazard's Subdivision; thence southerly, along the easterly line of said Lot 27, 325 feet; thence westerly, parallel with |

EXHIBIT A

526512.000004 24179367.14

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | the northerly line of said Lots 26 and 27, 862 feet, more or less, to the true point of beginning; thence southerly, at right angles 350 feet, to a point which is 349.37 feet northerly, measured at right angles, from the southerly line of said Lots 26 and 27; thence westerly, parallel to said southerly line of Lots 26 and 27, 586.79 feet; thence southerly, parallel with the easterly line of said Lot 27, 349.37 feet to the southerly line of said Lots 26 and 27; thence westerly, along the southerly line of said Lots 26 and 27, 256.65 feet, more or less, to the southwest corner of said Lot 26; thence northerly, along the westerly line of said Lot 26, 601.13 feet; thence easterly, parallel with the northerly line of said Lot 26, 318.48 feet; thence northerly, at right angles, 100 feet; thence easterly, parallel with the northerly line of said Lot 26, 569.3 feet to the true point of beginning |
| Bradford Bros. Inc., a Nevada corporation (et al) | The Texas Company, a Delaware corporation Recorded | 9/7/1945 | 8/20/1945 | 1322 | 465 | That portion of Lot 26 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Commencing at the northeast corner of Lot 27 of said Hazard's Subdivision; thence southerly, along the easterly line of said Lot 27, 675 feet; thence westerly, parallel with the northerly lines of said Lots 26 and 27, 950.07 feet, to the true point of beginning; thence southerly, parallel with the easterly line of said Lot 27, 349.37 feet to the southerly line of said Lots 26 and 27; thence westerly, along the southerly line of said Lots 26 and 27, 498.72 feet; thence northerly, parallel with the easterly line of said Lot 27, 349.37 feet; thence easterly, parallel with the northerly line of said Lots 26 and 27, 498.72 feet to the true point of beginning |

EXHIBIT A

| Bradford Bros. Inc., a Nevada corporation (et al) | Arrowhead Oil Company, LTD.., a Nevada corporation Recorded | 8/12/1945 | 7/1/1947 | 1538 | 310 | Lots 26 and 27 of Hazard's Subdivision as shown on map filed in Book 1, Page 26 of Licensed Surveyor's Maps records of Orange County, State of California, described as follows: Beginning at the Northeast corner of Lot 27 of said Hazard's Subdivision, thence Southerly along the Easterly boundary of said Lot 27 a distance of 325 feet; thence Westerly parallel with the Northerly boundary of said Lots 26 and 27 a distance of 547 feet from the Easterly boundary of Lot 27; thence Southerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 315 feet; thence Northerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 569.3 feet; thence southerly at right angles a distance of 100 feet; thence Westerly at right angles a distance of 318.48 feet to the Westerly boundary of Lot 26; thence Northerly along the Westerly boundary of Lot 26 a distance of 425.85 feet to the Northwesterly corner of said Lot 26; thence Easterly along the Northerly boundary of Lots 26 and 27 to the point of beginning |
|---|---|---|---|---|---|---|
| Chanslor-Canfield Midway Oil Company, a California corporation (et al) | A.H. Bradford | 1/19/1966 | 9/28/1949 | 7813 | 45 | Lot 6, 7, 8 and 14, in Block 26, Lots 1 to 6, inclusive, in Block 33, and Lots 1 to 4, inclusive, in Block 34, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California.<br><br>That portion of Lot 21 of Hazard's Subdivision, as per map there of recorded in Book 1, Page 26 of Record of Surveys, in the office of the County Recorder of Orange County, California, lying within Lots 1 to 15, inclusive, and Lots 26 to 29, inclusive, in Block 31 of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of |

EXHIBIT A

Miscellaneous Records, Los Angeles County, California.

Beginning at the Northwest corner of Lot 1, in Block 34, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California, and running thence Northeasterly to the Southwest corner of Lot 1, in Block 33 of said Richfield; thence Easterly along the South lien of said Lot 1, in Block 33, 184.63 feet to the Southeast corner of said Lot 1 in Block 33; thence South at right angles to said South line 30.00 feet, to the center line of Orange Street (vacated); thence West along said center line to the Northerly extension of the East line of said Lot 1 in Block 34; thence South along said Northerly extension 30.00 feet to the Northeast corner of said Lot 1 in Block 34; thence West along the North line of said Lot 1 in Block 34, 150.00 feet to the point of beginning.

Beginning at the Northwest corner of Lot 6, in Block 33, of Richfield, as per map thereof recorded in Book 31, at Pages 61 to 66, inclusive, of Miscellaneous Records, Los Angeles County, California, and running thence Northeasterly to the Southwest corner of Lot 1 in Block 31 of said Richfield; thence Easterly along the South line of said Lot 1, 184.63 feet to the Southeast corner of said Lot 1; thence South, at right angles to said South line, 25.00 feet; to the center line Pine Street (vacated); thence West, along said center line, to a line of said Lot 6 at right angles with the North line of said Lot 6; thence South 25.00 feet to the Northeast corner of Lot 6; thence West along the North lien of said Lot 6, 184.63 feet to the point of beginning.

Exhibit A

| *Susan C. Yarnell, Jessie Y. Kimball, Katherine Yarnell, Ellis T. Yarnell and Esther Yarnell | California Star Oil Company | April 9, 1919 | April 9, 1919 | 18 | 7 | Lot 18, Hazard's Subdivision of the Shanklin Tract, as shown on Map recorded in Book 18, Page 7, of Miscellaneous Records of Los Angeles County, California |
| --- | --- | --- | --- | --- | --- | --- |
| *Bradford Bros. Inc., as Lessor | Arrowhead Oil Company, Ltd. | 8/12/1947 | 7/1/1947 | 1538 | 310 | Portion of Lots 26 and 27 of Hazard's Subdivision as shown on map filed in Book 1, Page 26 of Licensed Surveyor's Maps records of Orange County, State of California, described as follows: Beginning at the Northeast corner of Lot 27 of said Hazard's Subdivision, thence Southerly along the Easterly boundary of said Lot 27 a distance of 325 feet; thence Westerly parallel with the Northerly boundary of said Lots 26 and 27 a distance of 547 feet from the Easterly boundary of Lot 27; thence Southerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 315 feet; thence Northerly parallel with the Easterly boundary of Lot 27 a distance of 350 feet; thence Westerly parallel with the Northerly boundary of Lots 26 and 27 a distance of 569.3 feet; thence southerly at right angles a distance of 100 feet; thence Westerly at right angles a distance of 318.48 feet to the Westerly boundary of Lot 26; thence Northerly along the Westerly boundary of Lot 26 a distance of 425.85 feet to the Northwesterly corner of said Lot 26; thence Easterly along the Northerly boundary of Lots 26 and 27 to the point of beginning |
| *A.S. Bradford | Chiksan Oil Company | 3/31/1924 | 3/31/1924 | 45 | 186 | Lot 27 of Hazard's Subdivision as shown on Map filed in Book 1, Page 26 of Licensed Surveyor's Maps, Records of Orange County, California, described as follows: Beginning at a point in the easterly line of said Lot 27, distant 325 feet southerly from the northeast corner of said lot; thence westerly parallel to the North line of said Lot 27, 547 |

EXHIBIT A

526512.000004 24179367.14

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | feet; thence southerly at right angles, 350 feet to a point which is 349.37 feet northerly measured at right angles from the southerly line of said Lot 27; thence easterly, parallel with said southerly line 547 feet, more or less, to a point in the easterly line of said Lot 27; thence northerly along said easterly line 350 feet, more or less, to the point of beginning |
| *Morris D. Schatzman, John W. Schmid and Philip S. Magruder, coexecutors of the Estate of A. Hartwell Bradford, deceased | Union Oil Company | 1/1/1965 | | | | Block 17, Hazard's Subdivision as per Map of Richfield, recorded in Book 1, Page 26 of Licensed Surveyor's Maps, records of Orange County, State of California |
| *J.W. Newell and Lilla F. Newell | Union Oil Company | N/A | 5/31/1917 | N/A | N/A | N/A |
| *Esther L. Newell | Union Oil Company | N/A | 5/1/1917 | N/A | N/A | N/A |
| *Lilla F. Newell | Union Oil Company | 4/12/1949 | 11/15/1948 | 1828 | 128 | Records of Orange County, State of California |
| *Malcom J. Renton, Executor of the Estate of David M. Renton | Union Oil Company | 5/11/1949 | 4/12/1949 | 1841 | 400 | Records of Orange County, State of California |

EXHIBIT A

| | | | | | | |
|---|---|---|---|---|---|---|
| *Malcom J. Renton, Executor of the Estate of David M. Renton | Union Oil Company | 8/16/1950 | 3/20/1950 | 2057 | 298 | Line Well Agreement, Records of Orange County, State of California |
| *Charles C. Chapman | Union Oil Company | 3/31/1917 | 3/31/1917 | 8 | 219 | Records of Orange County, State of California |

| DOWLING OLIVE LEASES | | | | | |
|---|---|---|---|---|---|
| LESSOR | LESSEE | EFFECTIVE DATE | DATE | BOOK | PAGE |
| Robert R. Dowling and Marquita S. Dowling et al | Alberta Stevenson | 2/23/1956 | 4/17/1956 | 3471 | 573 |
| Edward Mills et al | Alberta Stevenson | N/A | N/A | 3476 | 495 |
| Reinhold Dinkler et al | Alberta Stevenson | N/A | N/A | 3483, 3832 | 550, 175 |

| EAST COYOTE | | | | | |
|---|---|---|---|---|---|
| LESSOR | LESSEE | EFFECTIVE DATE | RECORDED | BOOK / PAGE | DESCRIPTION |
| Anaheim Union Water Company | William Loftus | 12/1/1906 | 4/17/1907 | 3 / 25 | Hualde Dome Unit Tract 5 |

EXHIBIT A

| RICHFIELD | | | | |
|---|---|---|---|---|
| COMPANY | RECORDED DATE | BOOK | PAGE | UNIT DESCRIPTION |
| Union Oil Company of California | 7/19/1972 | 10231 | 96 | West Richfield Kraemer Zone |
| Union Oil Company of California | 6/7/1961 | 5764 | 759 | West Richfield Chapman Zone |

| ASSIGNMENTS | | | |
|---|---|---|---|
| GRANTOR | GRANTEE | RECORDED DATE | INSTRUMENT |
| Blackhawk Oil Company | Bridgemark Corporation | 10/3/1996 | 96-0505658 |
| Nuevo Energy Company | Bridgemark Corporation | 6/25/1996 | 96-0321908 |
| Texaco Exploration and Production Inc. | Bridgemark Corporation | 9/20/1993 | 93-0635294 |
| Mobil Oil Corporation | Bridgemark Corporation | 10/11/1994 | 94-0604269 |
| Hartwel Oil Inc. | Bridgemark Corporation | 1/31/2003 | 03-00121560 |

EXHIBIT A

## EXHIBIT B

REMAINDER TRACT

THE DESIGNATED REMAINDER PARCEL AS SHOWN ON TRACT NO. 15700, IN THE CITY OF PLACENTIA, COUNTY OF ORANGE, STATE OF CALIFORNIA, FILED IN BOOK 854, PAGES 17 THROUGH 22, INCLUSIVE, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. APN No. 341-501-66

526512.000004 24029358.30

**EXHIBIT C**

PDC PROPERTY

ALL OF TRACT NO. 15700, IN THE CITY OF PLACENTIA, COUNTY OF ORANGE, STATE OF CALIFORNIA, FILED IN BOOK 854, PAGES 17 THROUGH 22, INCLUSIVE, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY (APN Nos. 341-501-01 through 341-501-65, inclusive), EXCEPTING THEREFROM THE DESIGNATED REMAINDER PARCEL AS SHOWN ON SAID MAP (APN No. 341-501-66).

EXHIBIT C

526512.000004 24029358.30

## EXHIBIT D

CRIMSON PIPELINE

Attached.

526512.000004 24029358.30

SCALE: 1" = 175'

TRACT NO. 15700
M.M. 854/17-22

CRIMSON LINE

C/L ALTA VISTA STREET

EXHIBIT "D"
CRIMSON PIPELINE

| 10367.00 | 03/09/21 |
|---|---|

## EXHIBIT E

FORM OF JOINDER AGREEMENT

Surface Use and Cooperation Agreement Joinder

This Surface Use and Cooperation Agreement Joinder, dated as of [_____], 20[__] (this "Joinder Agreement"), is delivered pursuant to Sections 2.4(a) and 2.4(b) of that certain Surface Use and Cooperation Agreement dated as of [_____], 20[__] (as amended, restated, supplemented, amended and restated or otherwise modified and in effect from time to time, the "SUA") among Placentia Development Company, a California limited liability company ("PDC"), on the one hand, and California Natural Resources Group Orange County, LLC, a Delaware limited liability company ("Cal NRG OC") and Realm California LLC, a Delaware limited liability company ("Realm"), on the other hand.

The undersigned, [insert name of Lender], a [insert jurisdiction of organization] [insert form of entity], hereby agrees, as provided in Sections 2.4(a) and 2.4(b) of the SUA, to become party to the SUA solely for purposes of Sections 2.4(a) and 2.4(b) thereof, and to be bound by the terms of those provisions, and no others, with the same force and effect and hereby expressly assume all of the obligations and liabilities thereunder as fully as if the undersigned had originally executed and delivered the SUA.

IN WITNESS WHEREOF, each of the undersigned hereto has caused this Joinder Agreement to be duly executed and delivered by its respective authorized officer or representative as of the date first written above.

[Insert name of Lender]

By: _____

Name: _____

Title: _____

## EXHIBIT F

### CERTAIN BOUNDARY ADJUSTMENTS

Attached.

# EXHIBIT "F"

## CERTAIN BOUNDARY ADJUSTMENTS

BEING A PORTION OF TRACT NO. 15700, IN THE CITY OF PLACENTIA, COUNTY OF ORANGE, STATE OF CALIFORNIA, FILED IN BOOK 854, PAGES 17 THROUGH 22, INCLUSIVE, OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

**PARCEL 1:**

**BEGINNING** AT THE SOUTHEAST CORNER OF SAID TRACT, SAID POINT ALSO BEING ON THE NORTH RIGHT-OF-WAY OF ALTA VISTA STREET AS SHOWN ON SAID TRACT;

THENCE LEAVING SAID RIGHT-OF-WAY, ALONG THE EAST LINE OF SAID TRACT, NORTH 0°17'17" EAST 244.90 FEET TO THE **TRUE POINT OF BEGINNING;**

THENCE CONTINUING ALONG SAID EAST LINE, NORTH 0°17'17" EAST 380.61 FEET;

THENCE LEAVING SAID EAST LINE, NORTH 89°48'52" WEST 300.04 FEET;

THENCE SOUTH 0°00'00" WEST 34.64 FEET;

THENCE SOUTH 2°12'00" EAST 196.77 FEET;

THENCE SOUTH 90°00'00" WEST 8.18 FEET;

THENCE SOUTH 0°00'00" WEST 89.40 FEET TO THE BEGINNING OF A NON-TANGENT CURVE CONCAVE NORTHEASTERLY, AND HAVING A RADIUS OF 1030.00 FEET. A RADIAL LINE BEARS SOUTH 30°27'03" WEST TO SAID POINT;

THENCE SOUTHEASTERLY ALONG SAID CURVE 135.79 FEET THROUGH A CENTRAL ANGLE OF 7°33'13";

THENCE NORTH 89°59'53" EAST 177.49 FEET TO THE **TRUE POINT OF BEGINNING;**

CONTAINING 2.521 AC., MORE OR LESS.

ALL AS SHOWN ON EXHIBIT "B", ATTACHED HERETO AND BY THIS REFERENCE MADE A PART HEREOF.

SUBJECT TO COVENANTS, CONDITIONS, RESTRICTIONS, RESERVATIONS, EASEMENTS AND RIGHTS-OF-WAY OF RECORD IF ANY.

PREPARED BY:

_____
SCOTT M. WILSON          DATE
P.L.S. 7434
EXPIRES 12/31/21

PAGE 1 OF 2

# EXHIBIT "F"
## CERTAIN BOUNDARY ADJUSTMENTS

BEING A PORTION OF TRACT NO. 15700, IN THE CITY OF PLACENTIA, COUNTY OF ORANGE,
STATE OF CALIFORNIA, AS SHOWN ON THE MAP FILED IN BOOK 854, PAGES 17 THROUGH 22, INCLUSIVE,
OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.



| LINE TABLE – SHEET 1 ONLY | | |
|------|------|------|
| LINE | BEARING | LENGTH |
| L1 | N0°08'36"E | 78.45' |
| L2 | N27°33'58"E | 40.00' |
| L3 | N48°27'03"W | 112.45' |

SCALE: 1" = 250'

SEE PAGE 2

PARCEL 1

TRACT NO. 15700
M.M. 854/17-22

ALTA VISTA STREET

LEGEND:

□ PARCEL BOUNDARY

PREPARED UNDER THE SUPERVISION OF:

PROFESSIONAL LAND SURVEYOR
SCOTT M. WILSON
No. 7434
Exp. 12/31/21
STATE OF CALIFORNIA

MY LICENSE EXPIRES 12/31/21
SCOTT M. WILSON, P.L.S.

| CURVE TABLE – SHEET 1 ONLY | | |
|------|------|------|
| CURVE | RADIUS | DELTA | LENGTH |
| C1 | 1227.00' | 31°00'33" | 664.07' |
| C2 | 1000.00' | 13°58'59" | 244.05' |
| C3 | 1040.00' | 13°58'59" | 253.81' |

# EXHIBIT "F"
## CERTAIN BOUNDARY ADJUSTMENTS

PAGE 2 OF 2

BEING A PORTION OF TRACT NO. 15700, IN THE CITY OF PLACENTIA, COUNTY OF ORANGE,
STATE OF CALIFORNIA, AS SHOWN ON THE MAP FILED IN BOOK 854, PAGES 17 THROUGH 22, INCLUSIVE,
OF MISCELLANEOUS MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.





SCALE: 1" = 100'

| CURVE TABLE – SHEET 2 ONLY | | | |
|---|---|---|---|
| CURVE | RADIUS | DELTA | LENGTH |
| C1 | 1030.00' | 7°33'13" | 135.79' |

| LINE TABLE – SHEET 2 ONLY | | |
|---|---|---|
| LINE | BEARING | LENGTH |
| L1 | S0°00'00"W | 89.40' |
| L2 | S90°00'00"W | 8.18' |
| L3 | S2°12'00"E | 196.77' |
| L4 | S0°00'00"W | 34.64' |
| L5 | N89°48'52"W | 26.36' |

TANK FARM
**PARCEL 1**
2.521 AC.

T.P.O.B.
PARCEL 1

TRACT NO. 15700
M.M. 854/17-22

P.O.B.
PARCEL 1
S/E COR. TRACT
NO. 15700

ALTA VISTA STREET

LEGEND:

PARCEL BOUNDARY

## EXHIBIT G

CERTAIN FACILITIES

Attached.



SCALE: 1" = 175'

EXISTING WELLS
TO REMAIN

ELECTRICAL
TRANSFORMER
RELOCATION

CRIMSON LINE

TANK
FARM

① 

PROTECT EXISTING OIL
FACILITY IN PLACE

PROTECT EXISTING OIL
FACILITY IN PLACE

RELOCATE POLES WITH
TRANSFORMERS TO
PAD TRANSFORMERS
ANIREMOVE POLES

CESON LINES
ON-SITE WELLS

LOT LINE IS MIN. 2.0' OFF
OF EXISTING PIPES

LOT LINE IS 5.0' OFF CENTER OF POWER POLE

RELOCATE POLES WITH TRANSFORMERS
TO PAD TRANSFORMERS AND REMOVE
POLES

EXISTING WELL
TO REMAIN

① EXISTING PIPE TO BE RELOCATED
UNDERGROUND IN THE DEVELOPMENT
AREA

② POWER POLES TO BE RELOCATED OR
FACILITIES PUT UNDERGROUND WITHIN
FUTURE STREETS

CESON LINES
OFF-SITE WELLS

① 

② 

② 

**WILSON MIKAMI
CORPORATION**

9 CORPORATE PARK, SUITE 100
IRVINE, CA  92606
T: 949-679-0090

EXHIBIT "G"
CERTAIN FACILITIES

| 10367.00 | 03/09/21 |

**EXHIBIT H**

**MEMORANDUM OF
SURFACE USE AND COOPERATION AGREEMENT**

STATE OF CALIFORNIA    )
                       )
COUNTY OF ORANGE       )

This Memorandum of Surface Use and Cooperation Agreement (this "**Memorandum**"), dated as of [_____], 2021 (the "**Effective Date**"), is by and among Placentia Development Company LLC, a California limited liability company whose address is 725 Town & Country, Suite 200, Orange, California 92868 ("**PDC**"), California Natural Resources Group Orange County, LLC, a Delaware limited liability company whose address is 1746-F South Victoria Ave., Suite 245, Ventura California 93003 ("**CalNRG OC**"), and Realm California LLC, a Delaware limited liability company whose address is 1746-F South Victoria Ave., Suite 245, Ventura California 93003 ("**Realm**").   This Memorandum sometimes refers to PDC, CalNRG OC, and Realm individually as a "**Party**," and collectively as the "**Parties**."

**RECITALS**

A.    This Memorandum makes reference to that certain Surface Use and Cooperation Agreement dated [_____], 2021 by and among the Parties (the "**Agreement**").  Capitalized terms used but not defined in this Memorandum have the meanings given to them in the Agreement.

B.    Concurrently with the Effective Date of this Memorandum, CalNRG OC has acquired certain assets from Bridgemark Corporation, a California corporation ("**Bridgemark**"), including the oil and gas leasehold interests and related surface and subsurface wells, pipelines, equipment, and facilities (the "**Bridgemark Assets**").  The Bridgemark Assets are more particularly described on <u>Exhibit A</u>.

C.    PDC is the owner of surface estate in that certain real property in the City of Placentia, County of Orange, California commonly referred to as Tract 15700, Orange County, California Assessor's Parcel Nos. 341-501-01 through 341-501-65 (the "**PDC Property**").  The PDC Property is more specifically described on <u>Exhibit B</u>.

D.    Concurrently with the Effective Date of this Memorandum, Realm has acquired from PDC that portion of the PDC Property commonly known and identified as Orange County, California Assessor's Parcel No. 341-501-66 (the "**Tank Farm Tract**," and, together with the Bridgemark Assets, the "**Assets**").  The Tank Farm Tract and the Assets are more specifically described on <u>Exhibit C</u>.

EXHIBIT H

E.      PDC had the right to acquire the Assets in partial satisfaction of an outstanding judgment against Bridgemark in favor of PDC.  PDC agreed to allow CalNRG OC to acquire the Bridgemark Assets and Realm to acquire the Tank Farm Tract on the condition that CalNRG OC and Realm agree to the terms and provisions of the Agreement.

## MEMORANDUM

This Memorandum incorporates all of the terms, covenants, and other provisions in the Agreement, including and in accordance with the following:

1.      **Surface License.**  Pursuant to Section 2.9 of the Agreement, PDC granted and conveyed to CalNRG OC a non-exclusive license to use the surface of the PDC Property insofar and only insofar as is necessary to access, maintain, or operate the existing facilities and locations described on Exhibit K to the Agreement (the "**Surface License**").  The Surface License will expire on the date that PDC grants the permanent easements described in Section 2.3(a) of the Agreement to CalNRG OC.

2.      **Restrictive Covenants.**  The covenants and agreements of the Parties under the Agreement constitute restrictive covenants that burden the Tank Farm Tract and the PDC Property, such that the Parties and any of their successors in title to all or any portion of the Tank Farm Tract and/or the PDC Property will be subject to the terms and provisions of the Agreement and this Memorandum.  The Parties intend for the Agreement and the covenants and agreements described in the Agreement to (a) constitute covenants running with the land with respect to the Tank Farm Tract, (b) be binding on and enforceable by a Party and its successors and assigns against the other Party and its successors and assigns, and (c) in the event of a Bankruptcy of a Party or its successors or assigns, not be deemed to be an executory contract or subject to rejection by a Party or its successors or assigns. Notwithstanding the foregoing, Persons who purchase residential lots in the PDC Property, their respective successors and assigns, and any homeowners' association or special district which is formed in connection with the PDC Property, will not be successors to PDC's rights under the Agreement as against CalNRG OC, Realm, and/or their respective successors and assigns (except as referenced in (i) Section 2.3(a) of the Agreement with respect to the easements on the PDC Property to be granted to CalNRG OC and (ii) the rights referenced in Section 2.7(g) of the Agreement with respect to the Surface Beautification Measures).

3.      **Lender.**  Lender is required to provide releases of certain liens, security interests, mortgages, and/or other charges encumbering certain portions of the Tank Farm Tract as provided in Section 2.4(a) and Section 2.4(b) of the Agreement, and any successor lender will be required to expressly agree in writing to assume and be bound by the terms and agreements of the Agreement.

EXHIBIT H

4.      **No Modification; Conflict.**  This Memorandum incorporates all the terms, conditions, provisions, and covenants of the Agreement and in no way modifies the terms of the Agreement.  In the event of a conflict between the terms of this Memorandum and the terms of the Agreement, the terms of the Agreement control.

5.      **Severability.**  If any term or other provision of this Memorandum is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Memorandum will nevertheless remain in full force and effect.

6.      **Counterparts.**  This Memorandum may be executed in counterparts, each of which will be deemed to be an original copy of this Memorandum and all of which, when taken together, will be deemed to constitute one and the same agreement.

7.      **Governing Law.**  This Memorandum will be governed by and construed in accordance with the laws of the state of California, without regard to its conflict of laws principles.

8.      **Incorporation.**  The Agreement contains other terms and conditions which, by this reference, are incorporated herein and made a part hereof as if copied herein verbatim.  This Memorandum is executed and recorded solely for the purpose of affording notice of the existence of the Agreement to third parties and does not amend, alter, or otherwise affect the terms, provisions, and conditions therein.

9.      **Exhibits.**  All Exhibits that are referenced in this Memorandum are hereby made part of this Memorandum and incorporated herein by such reference.  References in such Exhibits to instruments on file in the public records are notice of such instruments for all purposes.  Unless otherwise expressly provided, references in this Memorandum to a specific Section or Exhibit refer respectively to Sections or Exhibits of this Memorandum.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGES FOLLOW.]

EXHIBIT H

IN WITNESS WHEREOF, the Parties have duly executed this Memorandum as of the Effective Date.

**PLACENTIA DEVELOPMENT COMPANY LLC**,
a California limited liability company

By: _____
Name: Seth Ring
Title:  Regional President, Western Region

STATE OF CALIFORNIA          )
                             )
COUNTY OF _____   )

On this [_____] day of [_____], before me, a Notary Public in the State of California, personally appeared Seth Ring, the Regional President, Western Region, of Placentia Development Company LLC, a California limited liability company, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

_____
Notary Public

My Commission Expires:  _____
Commission No.: _____

EXHIBIT H

## Exhibit A

### Bridgemark Assets

That certain real property in the City of Placentia, County of Orange, California commonly referred to as Tract 15700, California Assessor's Parcel Nos. 341-501-01 through 341-501-65, inclusive.

526512.000004 24029358.30

EXHIBIT I

PARENT GUARANTY

**PARENT GUARANTY**

THIS GUARANTY ("**Guaranty**"), effective as of _____, 2021, is made by Golden State Exploration and Production, LLC, a Delaware limited liability company ("**Guarantor**") to and for the benefit of Placentia Development Company LLC, a California limited liability company, and no other parties ("**Indemnitee**").  Guarantor and Indemnitee are herein collectively referred to as the "**Parties**."

RECITALS

A.  Guarantor is the sole member of California Natural Resources Group, LLC, a Delaware limited liability company ("**CalNRG OC**").

B.  CalNRG OC is a party to that certain Surface Use and Cooperation Agreement dated as of _____, 2021, by and between CalNRG OC and Realm California LLC, a Delaware limited liability company, on the one hand, and Indemnitee, on the other hand (the "**SUA**").

C.  As partial consideration for Indemnitee's entering into the SUA, CalNRG OC has caused Guarantor to provide Indemnitee with this Guaranty.

D.  Guarantor will obtain benefits from the SUA and, accordingly, desires to execute this Guaranty in order to induce Indemnitee to enter into the SUA.

AGREEMENT

NOW THEREFORE, for valuable consideration and with the intent to be legally bound hereby, the Parties hereby agree as follows:

1.  Guarantor hereby irrevocably and unconditionally guarantees to Indemnitee the full and timely performance when due and observance when due of all covenants, terms and agreements to be performed and observed by CalNRG OC pursuant to Sections 2.4(a) and (b) of the SUA (collectively, the "**Guaranteed Obligations**").  This Guaranty shall not apply to any other terms, covenants or provisions of the SUA.

2.  Guarantor's total liability under this Guaranty in respect to CalNRG OC's obligations under Sections 2.4(a) and (b) of the SUA shall not under any circumstances exceed Five Hundred Thousand Dollars (US$500,000) and shall terminate and no longer be in effect upon the earlier of (a) the third anniversary of the Effective Date of the SUA or (b) the date on which Indemnitee's rights under Sections 2.4(a) and (b) of the SUA have been exhausted or expired.

3.  Guarantor covenants to Indemnitees that if at any time CalNRG OC should default in the performance when due and observance when due of, or should commit a breach of, any of its covenants or obligations contained in Sections 2.4(a) or (b) of the SUA, Guarantor shall, promptly

EXHIBIT I

upon written notice by Indemnitee stating that CalNRG OC is in breach of any of said covenants or obligations, perform in CalNRG OC's stead, or cause CalNRG OC to perform, or otherwise cause the performance of, such covenants, terms or agreements.

4.  The obligations of Guarantor under this Guaranty shall be absolute and unconditional, shall not be subject to any counterclaim, setoff, deduction or defense based on any claim Guarantor may have against CalNRG OC or any other person, including, without limitation, Indemnitee or any other guarantor, and shall remain in full force and effect without regard to, and shall not be released, suspended, abated, deferred, reduced, limited, discharged, terminated or otherwise impaired or adversely affected by any circumstance or occurrence whatsoever, other than complete performance of, and, if applicable, indefeasible payment in full of, all of the Guaranteed Obligations.

5.  Guarantor unconditionally waives, to the maximum extent permitted under any applicable law now or hereafter in effect, insofar as its obligations under this Guaranty are concerned: (a) notice of any event relating to CalNRG OC or the SUA; (b) all notices required by statute, rule of law or otherwise to preserve any rights against Guarantor hereunder, including, without limitation, any demand, presentment, proof or notice of dishonor, non-performance or non-payment of any Guaranteed Obligation, notice of acceptance of this Guaranty, notice of the incurrence of any Guaranteed Obligation, notice of any failure on the part of CalNRG OC, any of its subsidiaries or Affiliates, or any other person, to perform or comply with any term or provision of the SUA or any other agreement or instrument to which CalNRG OC or any other person is a party, or notice of the commencement of any proceeding against any other person or its any of its property or assets; (c) any right to the enforcement, assertion or exercise against CalNRG OC or against any other person or any collateral of any right, power or remedy under or in respect of the SUA or any other agreement or instrument; and (d) any requirement that Guarantor be joined as a party to any proceedings against CalNRG OC or any other person for the enforcement of any term or provision of the SUA, this Guaranty or any other agreement or instrument.

6.  Guarantor confirms that an executed (or conformed) copy of the SUA has been made available to Guarantor, that Guarantor is familiar with the contents thereof and of this Guaranty, and that Guarantor has executed and delivered this Guaranty after reviewing the terms and conditions of the SUA and this Guaranty and such other information as Guarantor has deemed appropriate to make its own credit analysis and decision to execute and deliver this Guaranty.

7.  Guarantor confirms that it has made its own independent investigation with respect to the creditworthiness of CalNRG OC and its subsidiaries and Affiliates and is not executing and delivering this Guaranty in reliance on any representation or warranty by Indemnitee or by any other person acting on behalf of Indemnitee as to such creditworthiness. Guarantor expressly assumes all responsibilities to remain informed of the financial condition of CalNRG OC and its subsidiaries and Affiliates and any circumstances affecting (a) CalNRG OC's or any subsidiary's or Affiliate's ability to perform its obligations under the SUA or (b) any collateral securing, or any other guaranty for, all or any part of CalNRG OC's or such subsidiary's or Affiliate's payment and performance obligations thereunder; and Guarantor further agrees that Indemnitee shall have no duty to advise Guarantor of information known to it regarding such circumstances or the risks Guarantor undertake in this Guaranty.

EXHIBIT I

526512.000004 24029358.30

8. Guarantor represents and warrants to Indemnitee that Guarantor has all requisite power and authority to enter into this Guaranty and to perform all transactions contemplated hereby.  This Guaranty has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

9. Guarantor covenants and agrees that it will perform, discharge and/or pay all Guaranteed Obligations as and when the same become due.

10. This Guaranty is a continuing guaranty, all liabilities to which it applies or may apply under the terms hereof shall be conclusively presumed to have been created in reliance hereon, and this Guaranty shall remain in full force and effect until terminated as provided herein.  No failure or delay on the part of Indemnitee in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies that Indemnitee would otherwise have.  No notice to or demand on Guarantor in any case shall entitle Guarantor to any other further notice or demand in similar or other circumstances or constitute a waiver of the rights of Indemnitee to any other or further action in any circumstances without notice or demand.  It is not necessary for Indemnitee, and Indemnitee does not undertake any obligation or duty, to inquire into the capacity or powers of CalNRG OC or any of its subsidiaries or the officers, directors, partners, employees, agents or other representatives acting or purporting to act on behalf of CalNRG OC or any subsidiary of CalNRG OC, as applicable, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

11. Without limiting the generality of any of the other provisions hereof, Guarantor specifically agrees that upon the dissolution or winding-up of Guarantor and/or the filing or other commencement of any bankruptcy or insolvency proceedings by, for or against Guarantor, including, without limitation, any assignment for the benefit of creditors or other proceedings intended to liquidate or rehabilitate Guarantor, Indemnitee, in its sole discretion, may declare the unpaid principal balance of, and accrued interest on, the Guaranteed Obligations to be forthwith due and payable in full without notice.

12. Guarantor hereby agrees to pay all out-of-pocket costs and expenses of Indemnitee in connection with the enforcement of this Guaranty and any amendment, waiver or consent relating hereto (including, without limitation, the fees and disbursements of counsel).

13. This Guarantee shall in all respects be interpreted, and construed and governed by and in accordance with, the internal, substantive laws of the State of California and the United States of America.

14. Each of the Parties consents to the jurisdiction of the State of California, and to venue in the California Superior Court, County of Orange, for resolution of any dispute arising from this Guaranty.

EXHIBIT I

526512.000004 24029358.30

15. THIS GUARANTY REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, SUPERSEDES ANY AND ALL PRIOR AGREEMENTS AND UNDERSTANDINGS, ORAL OR WRITTEN, RELATING TO THE SUBJECT MATTER HEREOF, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS AMONG THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

16. NO CLAIM MAY BE MADE BY GUARANTOR AGAINST INDEMNITEE, OR THE AFFILIATES, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS OR AGENTS OF INDEMNITEE, FOR ANY PUNIVIVE, SPECIAL OR EXEMPLARY DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS GUARANTY OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION THEREWITH; AND GUARANTOR HEREBY, TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, WAIVES, RELEASES AND AGREES NOT TO SUE OR COUNTERCLAIM UPON ANY SUCH CLAIM FOR ANY SUCH PUNITIVE, SPECIAL OR EXPLARY DAMAGES, WHETHER ACCRUED AND WHETHER KNOWN OR SUSPECTED TO EXIST IN HIS FAVOR. Notwithstanding the foregoing, the limitations in this Section 16 shall not apply to: (a) any damages resulting from the gross negligence or willful misconduct of the Party from whom such damages are sought, or (b) any damages claimed by a third party against a Party hereunder.

IN WITNESS WHEREOF, each of the Guarantor and Indemnitee has caused this Guarantee to be executed as of _____, 2021.

**GUARANTOR:**

Golden State Exploration and Production LLC,
a Delaware limited liability company

By: _____
        Clifton O. Simonson
Its: Manager

INDEMNITEE:

Placentia Development Company LLC,
a California limited liability company

By: _____
        Seth Ring

Its: Regional President, Western Region

Exhibit I

**EXHIBIT J**

MINIMUM INSURANCE COVERAGE


## SECTION 1. -  INSURANCE PROVIDED BY CalNRG OC and REALM

1.1    As a condition to the Agreement, CAL*NRG and Realm shall procure and maintain for the term of this Contract, and for a period of two (2) years thereafter, the following types of insurance from a company or companies with an AM Best Financial Strength Rating of at least A- and Financial Size Category of at least VII:

1.1.1    Commercial General Liability ("CGL") with bodily injury and property damage limits of no less than:

| | |
|---|---|
| Each Occurrence | $1 million |
| General Aggregate | $2 million |
| Products/Completed Operations Aggregate | $2 million |

1.1.2    Workers' Compensation as required by and in such amounts to comply fully with the applicable statutory requirements in the jurisdiction where the Work is performed.  Employers' Liability with limits of no less than:

| | |
|---|---|
| Bodily Injury by Accident, Each Accident: | $500,000 |
| Bodily Injury by Disease, Each Employee: | $500,000 |
| Bodily Injury by Disease, Aggregate: | $500,000 |

1.1.3    Automobile Liability with limits of no less than Bodily Injury/Property Damage:

| | |
|---|---|
| Each Accident: | $1 million |

1.2    The following terms and conditions apply to all CGL coverage acquired to satisfy the terms of this Exhibit: (i) All CGL coverage shall be written on an Occurrence form. Claims made (or modified occurrence) forms are not acceptable; (ii) Separate aggregate limit(s) of liability shall apply at each location; (iii) All CGL policies shall name PDC, Toll Brothers, Inc., Toll Bros., Inc. and their subsidiaries and affiliates (collectively, "Additional Insureds") for both ongoing and completed operations, and shall provide additional insured coverage to Additional Insured's for the full limits of liability purchased.  All CGL coverage shall be considered primary coverage notwithstanding any insurance policies maintained by Additional Insureds. Additional Insureds' own insurance shall be noncontributory. Additional Insureds' own insurance, moreover, shall benefit only Additional Insureds. (iv) All CGL coverage shall provide that defense costs shall be payable in addition to, and do not reduce, policy limits.  CAL*NRG and Realm shall be solely responsible for paying any deductible or self-insured retention. Should CAL*NRG and Realm fail to pay any deductible or self-insured retention, Additional Insureds may pay same and seek reimbursement from CAL*NRG and Realm (v) No CGL policy shall contain exclusions or limitations applicable to Additional Insureds that are not applicable to the named insured; (vi) No

EXHIBIT J

CGL policy shall exclude coverage for punitive or exemplary damages, where or to the extent that coverage for such damages is permitted by law, unless Additional Insureds approve otherwise in writing.

1.3     The following terms and conditions shall apply to all Vehicle Liability coverage acquired to satisfy the terms this Exhibit: (i) Such coverage shall include owned, hired and non-owned vehicles; (ii) All Vehicle Liability coverage shall name PDC, Toll Brothers, Inc., Toll Bros., Inc. and their subsidiaries and affiliates (collectively, "Additional Insureds") and shall be considered primary coverage notwithstanding any insurance policies maintained by Additional Insureds. Additional Insureds' own insurance shall be non-contributory. Additional Insureds' own insurance, moreover, shall benefit only Additional Insureds. It is the intention that in no event shall Additional Insureds' own insurance inure to the benefit of CAL*NRG and Realm.

1.4     Further Insurance Requirements: (i) All insurance carriers must be authorized in the state in which the Work is performed, unless PDC approves otherwise in writing; (ii) All insurance policies will endeavor provide that they may not be canceled, terminated, non-renewed or modified without at least 30 days prior written notice to PDC or if such notice is not permitted by law in the policy or certificate of insurance then PDC shall be responsible for providing such notice and failure to do so shall be a material breach of this Contract; (iii) All insurance policies must include an endorsement by which the insurer waives its subrogation rights against Additional Insureds; (iv) CAL*NRG and Realm will provide PDC with Certificates of Insurance and endorsements evidencing their compliance with the insurance requirements of this Exhibit. These parties thereafter shall provide PDC with renewal Certificates of Insurance and endorsements upon each policy renewal for the duration of this Agreement and for two years thereafter. (v) PDC's failure to demand Certificates of Insurance and endorsements shall not constitute a waiver of the insurance requirements of this Exhibit. PDC may only waive such insurance requirements in writing; (vi) No insurance policy shall contain a cross-liability exclusion; (vii) The insurance requirements and amount of policy limits set forth in this Exhibit are minimums. These requirements shall not reduce or limit Additional Insureds' rights under any insurance policies which provide broader coverage or greater limits.

1.5     The provisions contained in this Exhibit shall survive the natural expiration of the Contract, or its earlier termination, the final payment of Work and any services to be provided pursuant to this Contract.

## SECTION 2. -  SUBCONTRACTOR REQUIRED INSURANCE

2.1     CAL*NRG and Realm agree to require each of their Consultants, Subcontractors and Sub-subcontractors to maintain the insurance required by this Exhibit, Section 1.

## SECTION 3. -  INSURANCE PROVIDED BY PDC

3.1     As a condition to the Agreement, PDC shall procure and maintain for the term of this Contract, and for a period of two (2) years thereafter, the following types of insurance from a company or companies with an AM Best Financial Strength Rating, of at least A- and Financial Size Category of at least VII:

    3.1.1    Commercial General Liability ("CGL") with bodily injury and property damage limits of no less than:

| | |
|---|---|
| Each Occurrence | $1 million |
| General Aggregate | $2 million |
| Products/Completed Operations Aggregate | $2 million |

    3.1.2    Workers' Compensation as required by and in such amounts to comply fully with the applicable statutory requirements in the jurisdiction where the Work is performed.  Employers' Liability with limits of no less than:

| | |
|---|---|
| Bodily Injury by Accident, Each Accident: | $500,000 |
| Bodily Injury by Disease, Each Employee: | $500,000 |
| Bodily Injury by Disease, Aggregate: | $500,000 |

    3.1.3    Automobile Liability with limits of no less than Bodily Injury/Property Damage:

| | |
|---|---|
| Each Accident: | $1 million |

    3.2    The following terms and conditions apply to all CGL coverage acquired to satisfy the terms of this Exhibit: (i) All CGL coverage shall be written on an Occurrence form.  Claims made (or modified occurrence) forms are not acceptable; (ii) Separate aggregate limit(s) of liability shall apply at each location where; (iii) All CGL policies shall name CAL*NRG and Realm (collectively, "Additional Insureds") on all CGL policies for ongoing operations. All CGL coverage shall be considered primary coverage notwithstanding any insurance policies maintained by Additional Insureds. Additional Insureds' own insurance shall be noncontributory. Additional Insureds' own insurance, moreover, shall benefit only Additional Insureds. (iv) All CGL coverage shall provide that defense costs shall be payable in addition to, and do not reduce, policy limits. PDC shall be solely responsible for paying any deductible or self-insured retention. Should PDC fail to pay any deductible or self-insured retention, Additional Insureds may pay same and seek reimbursement from PDC; (v) No CGL policy shall contain exclusions or limitations applicable to Additional Insureds that are not applicable to the named insured; (vi) No CGL policy shall exclude coverage for punitive or exemplary damages, where or to the extent that coverage for such damages is permitted by law, unless Additional Insureds approve otherwise in writing.

    3.3    The following terms and conditions shall apply to all Vehicle Liability coverage acquired to satisfy the terms this Exhibit: (i) Such coverage shall include owned, hired and non-owned vehicles; (ii) All Vehicle Liability coverage shall name CAL*NRG and Realm (collectively, "Additional Insured") and shall be considered primary coverage notwithstanding any insurance policies maintained by Additional Insureds. Additional Insureds' own insurance shall be non-contributory. Additional Insureds' own insurance, moreover, shall benefit only Additional Insureds.

    3.4    Further Insurance Requirements: (i) All insurance carriers must be authorized in the state in which the Work is performed, unless CAL*NRG and Realm approve otherwise in writing; (ii) All insurance policies must provide that they may not be canceled, terminated, non-renewed or modified without at least 30 days prior written notice to CAL*NRG and Realm or if

Exhibit J

such notice is not permitted by law in the policy or certificate of insurance then PDC shall be responsible for providing such notice and failure to do so shall be a material breach of this Contract; (iii) All insurance policies must include an endorsement by which the insurer waives its subrogation rights against Additional Insureds; (iv) PDC will provide CAL*NRG and Realm with Certificates of Insurance and endorsements evidencing their compliance with the insurance requirements of this Exhibit.  Thereafter, PDC shall provide CAL*NRG and Realm with renewal Certificates of Insurance and endorsements upon each policy renewal for the duration of this Agreement and for two years thereafter.

3.5     The provisions contained in this Exhibit shall survive the natural expiration of the Contract, or its earlier termination, the final payment of Work and any services to be provided pursuant to this Contract.

## SECTION 4. -  SUBCONTRACTOR REQUIRED INSURANCE

4.1     PDC agree to require each of its Consultants, Subcontractors and Sub-subcontractors to maintain the insurance required by this Exhibit, Section 3 and to name CAL*NRG and Realm, and any other entity that may be required from time to time as Additional Insureds under each Consultant, Subcontractor, or Sub-subcontractor's commercial general liability and automobile liability insurance coverages, on a primary and non-contributory basis.

4.2     PDC agrees to obtain from each of its consultants or subcontractors a written indemnification and defense substantively identical to the indemnification and defense contained in this agreement, except that such indemnification and defense shall be from each subcontractor for the benefit of CAL*NRG and Realm. CAL*NRG and Realm shall be third party beneficiary of such written indemnification and defense.

Exhibit J

## SCHEDULE 2.5

### CERTAIN EXCLUDED FACILITIES

| | | | | | | |
|---|---|---|---|---|---|---|
| Microturbine | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | C-65 Capstones |
| Microturbine | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | C-65 Capstones |
| Microturbine | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | C-65 Capstones |
| Microturbine | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | C-65 Capstones |
| Microturbine | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | C-65 Capstones |

| | | | | | | |
|---|---|---|---|---|---|---|
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 2,000 bbl ; produced water 100% |
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 1,500 bbl ; produced water 100% |
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 1,500 bbl ; produced water 75%, crude 25% |
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 1,500 bbl ; produced water 75%, crude 25% |
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 500 bbl ; oily wastewater |
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 1,600 bbl ; crude oil 100% |

SCHEDULE 2.5

| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 1,600 bbl ; crude oil 100% |
|---|---|---|---|---|---|---|
| Storage Tank | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 500 bbl ; produced water 75%, crude 25% |
| Test Separator | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 500 bbl |
| Test Separator | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 150 bbl |
| Test Separator | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 750 bbl |
| Test Separator | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 50 bbl |
| | | | | | | |

SCHEDULE 2.5

| Test Separator | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 100 bbl |
|---|---|---|---|---|---|---|
| Test Separator | Bridgemark Corporation | Equipment | Active | Richfield | Tank Farm | 75 bbl |

SCHEDULE 2.5