1 | William N. Lobel, Esq. (State Bar No. 93202)
wlobel@tocounsel.com
2 | THEODORA ORINGHER PC
535 Anton Boulevard, Ninth Floor
3 | Costa Mesa, California 92626-7109
Telephone:    (714) 549-6200
4 | Facsimile:    (714) 549-6201

5 | [Proposed] Co-Counsel for Debtor and Debtor in
Possession, Bridgemark Corporation
6 |

7 | **UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
8 | **SANTA ANA DIVISION**

9 | In re | Case No. 8:20-bk-10143-TA

10 | BRIDGEMARK CORPORATION, | Chapter 11

11 |      Debtor and Debtor-in Possession.[1] | **NOTICE OF REVISED PROPOSED ORDER GRANTING DEBTOR'S**
12 | | **MOTION PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365 AND FED. R.**
13 | | **BANKR. P. 9019 FOR ENTRY OF ORDER (I) APPROVING SETTLEMENT**
14 | | **AGREEMENT BETWEEN THE DEBTOR, ROBERT J. HALL, AND PLACENTIA**
15 | | **DEVELOPMENT COMPANY AND RELATED AGREEMENTS,**
16 | | **(II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF THE**
17 | | **DEBTOR FREE AND CLEAR OF LIENS, (III) APPROVING ASSUMPTION**
18 | | **AND/OR ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND**
19 | | **UNEXPIRED LEASES, (IV) MODIFYING ORDER AUTHORIZING EMPLOYMENT**
20 | | **OF NUMERIC SOLUTIONS LLC, AND (V) GRANTING RELATED RELIEF**
21 | |
22 | | **Hearing**
23 | | Date:    March 31, 2021
Time:    10:00 a.m.
Place:    ZoomGov

---

[1] The Debtor's last four digits of its taxpayer identification number are (1669).  The headquarters and service address for the above-captioned Debtor is 17671 Irvine Blvd., Suite 217, Tustin, CA 92780.

Bridgemark Corporation ("Bridgemark") hereby submits this notice of revisions to the proposed order (the "Order") granting the *Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365 and Fed. R. Bankr. P. 9019 for Entry of Order (I) Approving Settlement Agreement Between the Debtor, Robert J. Hall, and Placentia Development Company and Related Agreements, (II) Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens, (III) Approving Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Modifying Order Authorizing Employment of Numeric Solutions LLC, and (V) Granting Related Relief* [Docket No. 392] (the "Motion").[2]

No objections to the Motion were filed by the March 17, 2021 objection deadline.

The Order has been revised to address an informal response to the Motion received from Argonaut Insurance Company ("Argonaut"). *See* Order (Ex. A) ¶ 45. Argonaut did not file an objection to the Motion, and has confirmed that the revised language resolves its informal response.

The Order has also been revised to reflect two scriveners' errors in the Motion and accompanying documents regarding entity names. Specifically, the Motion and certain accompanying documents incorrectly referred to: (i) Gregson Energy Group, LLC (one of Bridgemark's non-debtor subsidiaries) as "Gregson Energy Drilling, LLC"; and (ii) Alatex E&P LLC (one of the Buyer entities) as "Alatex, LLC." The correct entity names have been inserted in the revised Order. Appropriate amendments to the Asset Purchase Agreement and other transaction documents will be executed prior to the closing of the transaction in order to reflect the correct entity names.

A copy of the revised Order is attached hereto as **Exhibit A**. A redline comparing the revised Order to the version of the Order that was attached to the Motion[3] is attached hereto as **Exhibit B**.

_____

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3] The initial proposed Order was attached as Exhibit C to the Settlement Agreement. The Settlement Agreement was attached to the Motion as Exhibit B.

1    WHEREFORE, Bridgemark respectfully requests that the Court enter the Order in the

2    form attached hereto as Exhibit A.

3

4    DATED: March 24, 2021                    Respectfully submitted,

5                                             THEODORA ORINGHER, PC

6                                             */s/ William N. Lobel*
7                                             William N. Lobel, Esq. (State Bar No. 93202)

8                                             *[Proposed] Co-Counsel for Debtor and Debtor in*
                                             *Possession, Bridgemark Corporation*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re | Case No. 8:20-bk-10143-TA |
| BRIDGEMARK CORPORATION,[1] | Chapter 11 |
| Debtor. | **ORDER (I) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, ROBERT J. HALL, AND PLACENTIA DEVELOPMENT COMPANY AND RELATED AGREEMENTS, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, (III) APPROVING ASSUMPTION AND/OR ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) MODIFYING ORDER AUTHORIZING EMPLOYMENT OF NUMERIC SOLUTIONS LLC, AND (V) GRANTING RELATED RELIEF** |

This matter having come before the Court on the *Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365 and Fed. R. Bankr. P. 9019 for Entry of Order (I) Approving Settlement Agreement Between the Debtor, Robert J. Hall, and Placentia Development Company and Related Agreements, (II) Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens, (III) Approving Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Modifying Order Authorizing Employment of Numeric Solutions LLC, and (V) Granting Related Relief* (the "Motion"); and the Court having read and considered the Motion, and being fully advised of the premises, for good cause shown,

IT IS HEREBY ORDERED that the Court makes the following findings of fact and conclusions of law:[2]

---

[1] The Debtor's last four digits of its taxpayer identification number are (1669), and its headquarters and service are 17671 Irvine Boulevard, Suite 217, Tustin, California 92780.

[2] The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of

1.    On January 14, 2020 (the "<u>Petition Date</u>"), Bridgemark Corporation ("<u>Bridgemark</u>") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the above-captioned case (the "<u>Bankruptcy Case</u>").  Bridgemark has continued to operate its business and manage its affairs as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.    Bridgemark's primary assets are certain oil and gas leases and related agreements and rights pursuant to which Bridgemark operates wells in Placentia, California and Anaheim, California.  Bridgemark also has certain non-operating interests in wells in Mobile, Alabama; Fullerton, California; and Nueces County, Texas, as well as certain other assets, including through Bridgemark's two non-debtor subsidiaries, Gregson Energy Group, LLC ("<u>Gregson</u>") and Bridgemark Texas, LLC ("<u>Bridgemark Texas</u>," and together with Gregson, the "<u>Non-Debtor Subsidiaries</u>").

3.    Of the wells that Bridgemark operates in Placentia, California, a portion are situated on land (the "<u>PDC Parcel</u>") owned by Placentia Development Company, LLC ("<u>PDC</u>"), on which PDC intends to build residential homes.  Bridgemark also owns and operates an oil tank farm on a portion of real property within the PDC Parcel (the "<u>Remainder Tract</u>," as more specifically defined in the Transaction Agreement).

4.    On December 31, 2019, a judgment (as subsequently amended, the "<u>PDC Judgment</u>") was entered in favor of PDC and against Bridgemark.  The PDC Judgment was originally in the principal amount of approximately $42 million, and was subsequently amended in post-judgment proceedings such that it is now in the principal amount of approximately $38 million.  An appeal of the PDC Judgment (the "<u>Appeal</u>") is pending but stayed.

5.    Broadly speaking, and without rehashing the details of the multi-year

---

law pursuant to Federal Rule of Civil Procedure 52, made applicable to these proceedings pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>").  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

1   proceedings that culminated in the PDC Judgment or the parties' claims and contentions

2   related thereto, the PDC Judgment arose out of Bridgemark's failure to plug and abandon

3   oil wells on the PDC Parcel, as the state court determined that Bridgemark was legally

4   obligated to do, such that PDC could develop the residential homes on the PDC Parcel.

5           6.      Pursuant to that certain *Stipulation Between Bridgemark Corporation and

6   *Placentia Development Company, LLC Regarding (I) Use of Cash Collateral Pursuant to*

7   *11 U.S.C. § 363; and (II) Grant of Adequate Protection Pursuant to 11 U.S.C. § 361, 362,*

8   *and 363* [Docket No. 140] and the order approving same [Docket No. 155], funds subject

9   to PDC's liens have been deposited in a restricted debtor-in-possession account at East

10  West Bank (the "Customer DIP Account").  There is no dispute that PDC holds valid,

11  perfected, first-position liens on the funds in the Customer DIP Account, although

12  Bridgemark's Adversary Proceeding alleges that the liens are avoidable (an allegation PDC

13  denies).

14          7.      On April 14, 2020, the Court entered the *Order Approving Application of*

15  *Debtor and Debtor in Possession to Employ Numeric Solutions LLC as Expert Valuation*

16  *Consultant and John Harris as Expert Witness Effective as of February 24, 2020* [Docket

17  No. 162] (the "Numeric Solutions Employment Order"), pursuant to which the Court

18  authorized Bridgemark to employ and retain John Harris and Numeric Solutions LLC

19  ("Numeric Solutions") as estate professionals.

20          8.      On April 15, 2020, PDC, Bridgemark, and Robert J. Hall ("Hall") executed

21  that certain *Term Sheet* (the "Term Sheet"), as clarified by the correspondence dated

22  August 10, 2020, pursuant to which they agreed to compromise and resolve all disputes

23  between them on the terms set out therein, with the proviso that definitive documentation

24  (the "Definitive Documentation") would thereafter be executed.  The Term Sheet

25  contemplated that the Definitive Documentation would ultimately bind Hall and also

26  certain related persons and entities (the "Hall-Related Parties").  Hall deposited $4.375

27  million of his personal funds (the "Hall Cash Contribution") into an escrow account

28  pursuant to the Term Sheet.  This Court approved Bridgemark's entry into the Term Sheet

1    by order dated June 26, 2020.

2        9.    On May 13, 2020, the Court entered the *Order Authorizing Debtor to*

3    *Assume Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code*

4    *Section 365(a)* [Docket No. 203] (the "Prior Assumption Order"), pursuant to which the

5    Court authorized Bridgemark to assume, *inter alia*, the oil and gas leases listed on Exhibit

6    1 thereto.

7        10.    Bridgemark, PDC, and Hall (both individually and as agent for the Hall-

8    Related Parties) have negotiated that certain *Settlement Agreement* (the "Settlement

9    Agreement"), which – together with that certain *Asset Purchase Agreement by and among*

10   *Bridgemark Corporation, Gregson Energy Group, LLC, and Bridgemark Texas LLC,*

11   *collectively, as Seller, and California Natural Resources Group Orange County, LLC,*

12   *Realm California, LLC, and Alatex E&P LLC, collectively, as Buyer* (the "Asset Purchase

13   Agreement"), that certain *Transaction Agreement* (the "Transaction Agreement"), and that

14   certain *Surface Use and Cooperation Agreement* (the "Surface Use Agreement," and

15   together with the Settlement Agreement, the Asset Purchase Agreement, and the

16   Transaction Agreements, the "Agreements") – collectively constitute the Definitive

17   Documentation contemplated by the Term Sheet.  The Hall-Related Parties are specifically

18   identified in Exhibit A to the Settlement Agreement.

19       11.    California Natural Resources Group, LLC ("CalNRG OC"), a third-party

20   buyer, is a party to the Asset Purchase Agreement, the Transaction Agreement, and the

21   Surface Use Agreement.  Realm California LLC ("Realm"), an affiliate of CalNRG OC, is

22   a party to the Asset Purchase Agreement and the Surface Use Agreement.  Alatex E&P

23   LLC ("Alatex"), an affiliate of CalNRG OC and Realm, is a party to the Asset Purchase

24   Agreement.  Except where necessary for the sake of clarity, CalNRG OC, Realm, and

25   Alatex are referred to herein collectively as "Buyer."

26       12.    By the Motion, Bridgemark seeks this Court's approval of the Agreements

27   as well as authorization and direction to proceed with the consummation of the transactions

28   contemplated by the Agreements.

13.     In broad strokes – and subject entirely to the specific terms of the actual Agreements – the transactions contemplated by the Agreements will result in essentially all of Bridgemark's non-cash assets that are ***not*** located on the PDC Parcel being transferred to Buyer, which will also assume certain liabilities of Bridgemark (such purchase, sale, assignment, and assumption collectively, the "Sale Transaction"); PDC, in turn, will transfer the Remainder Tract to Realm, which is CalNRG OC's affiliate; the settlement between PDC, Bridgemark, and Hall (the "Settlement") will go into effect – all on a date (the "Closing Date") to occur shortly following the entry of this Order.  The specific allocation of the Purchased Assets among CalNRG, Realm, and Alatex is set forth in Exhibit A-10 to the Asset Purchase Agreement.

14.     The Asset Purchase Agreement provides for Bridgemark to assign certain contracts and agreements (collectively, the "Assigned Contracts") to Buyer.  A complete list of the Assigned Contracts and the cure costs associated therewith is set forth in Exhibit A to the Motion.[3]  Certain of the Assigned Contracts (the "Prior Assumed Contracts") were previously assumed by Bridgemark pursuant to the Prior Assumption Order, as set forth in Exhibit A to the Motion.  The remainder of the Assigned Contracts (the "Remaining Contracts") were not previously assumed.  Through the Motion, Bridgemark seeks to assign the Prior Assumed Contracts and assume and assign the Remaining Contracts to Buyer.

15.     Following the Closing Date, Bridgemark will be left with only minimal non-cash assets – primarily the wells on the PDC Parcel.  Bridgemark will immediately stop pumping from those wells.  John Harris of Numeric Solutions will be appointed Chief Wind-Down Officer.  Bridgemark, under the direction and control of the Chief Wind-Down Officer, will pursue confirmation of a non-impaired chapter 11 plan of liquidation that is consistent with the Plan Term Sheet attached to the Settlement Agreement.  The

---

[3]  Inclusion of any document or agreement on the list of Assigned Contracts shall not constitute or be deemed to be a determination or admission by Bridgemark, Buyer, PDC, or any other party that such document or agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

1   primary purpose of the plan will be the creation of a liquidation trust tasked with plugging

2   and abandoning the remaining wells on the PDC Parcel so that PDC can develop

3   residential homes on the PDC Parcel.

4        16.    Following the Closing Date, neither Hall nor any of the Hall-Related Parties

5   shall serve as an officer or director of Bridgemark, nor shall they have any involvement in

6   or right to participate in or manage the business or affairs of Bridgemark's limited

7   remaining operations.  In addition, although certain Hall-Related Parties will continue to

8   the be equityholders of Bridgemark until a chapter 11 plan of liquidation that cancels their

9   equity interests takes effect (as provided for in the Plan Term Sheet), they are waiving their

10   rights to receive any distributions on account of such equity (subject to Paragraph 5(c) of

11   the Settlement Agreement) or to vote, manage, or otherwise exercise direct or indirect

12   control with respect to Bridgemark on account of such equity, and thus will have no legal

13   or practical control over Bridgemark such that it would not be lawful or appropriate for

14   Hall or any Hall-Related Parties to have or incur any legal liability on account of such

15   post-Closing-Date equity ownership.

16        17.    The Court has subject matter jurisdiction over the Bankruptcy Case and

17   authority to hear and determine the Motion.  The Motion was timely served on the parties

18   listed on the Proof of Service filed with respect to the Motion – which include all

19   potentially affected landowners, royalty holders, regulators, contract counterparties,

20   lienholders, and other parties in interest – and appropriate notice and opportunity to be

21   heard regarding the relief requested has been provided.

22        18.    The Agreements for which approval is sought and the Sale Transaction and

23   Settlement contemplated thereby are all fair, reasonable, and in the best interests of

24   Bridgemark and its estate, creditors, and all parties in interest.  No creditor, royalty holder,

25   or other party in interest shall have any claim for damages arising from the Sale

26   Transaction or the transactions contemplated in the Plan Term Sheet, including, without

27   limitation, the plugging and abandonment contemplated thereby.

28        19.    Bridgemark has demonstrated sound business reasons for the Agreements

for which approval is sought and the Sale Transaction and Settlement contemplated

thereby, all of which are the product of extensive arms'-length, good-faith negotiations and

are not tainted by fraud or collusion.  All terms of the Sale Transaction and Settlement, as

well as the genesis and background of the arrangements, have been appropriately disclosed

to the Court and all parties in interest.

20.     CalNRG OC, Realm, Alatex, and PDC are acquiring the assets they are

acquiring in good faith and qualify as good-faith purchasers within the meaning of Section

363(m) of the Bankruptcy Code.  CalNRG OC, Realm, and Alatex are not related to

Bridgemark or PDC, and all material terms of the arrangements have been disclosed.

Accordingly, the Agreements may not be avoided and no party shall be entitled to damages

or other recovery pursuant to section 363(n) of the Bankruptcy Code.

21.     The Agreements and the Sale Transaction and Settlement contemplated

thereby constitute the highest and best offer for the assets being acquired, and will provide

a greater recovery for the estate than would be provided by any other available alternative.

Bridgemark's determination that the Agreements and the Sale Transaction and Settlement

contemplated thereby constitute the highest and best offer for the assets being acquired

constitutes a valid and sound exercise of Bridgemark's business judgment.  The

consideration to be provided is fair and adequate, and constitutes reasonably equivalent

value and fair consideration under the Bankruptcy Code and under other applicable law.

22.     No party to the Agreements has entered into the Agreements, or proposes

consummating the Sale Transaction and Settlement contemplated thereby, for the purpose

of hindering, delaying, or defrauding any present or future creditor.  Nor is any party to the

Agreements a continuation or successor to Bridgemark or its estate.  None of the

transactions contemplated by the Agreements amount to a consolidation, merger, or *de

facto* merger of any entity.

23.     PDC, as Bridgemark's secured creditor, has consented to the sale of the

assets being sold to Buyer on the terms set forth in the Agreements.  In addition, the

automobile lenders, as Bridgemark's other secured creditors, will be paid in full in cash on

1    the Closing Date.  Accordingly, the conditions for a sale free and clear of all encumbrances

2    pursuant to Section 363(f) of the Bankruptcy Code have been satisfied.

3        24.    Bridgemark has satisfied all conditions and requirements for assumption,

4    assignment, and sale of the assigned contracts and leases pursuant to Section 365 of the

5    Bankruptcy Code.  The assignment of the Prior Assumed Contracts and the assumption

6    and assignment of the Remaining Contracts is a sound exercise of Bridgemark's business

7    judgment.

8        25.    The transactions contemplated by the Agreements are legal, valid, and

9    properly authorized under all applicable provisions of the Bankruptcy Code, including,

10    without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(a) and 365(f) and all

11    applicable requirements of such Sections have been complied with in respect of the

12    transaction.

13        26.    The appointment of John Harris of Numeric Solutions as Chief Wind-Down

14    Officer – and the modification of the Numeric Solutions Employment Order consistent

15    therewith – is reasonable, appropriate, and in the best interest of the estate and creditors.

16        27.    The relinquishment by Hall and all Hall-Related Parties from all officer and

17    director positions and their exclusion from any involvement in or right to participate in or

18    manage the business or affairs of Bridgemark's limited remaining operations following the

19    Closing Date is reasonable, appropriate, and in the best interest of the estate and creditors.

20    The amendments to Bridgemark's bylaws and the other governance changes provided for

21    in the Settlement Agreement are reasonable, appropriate, and in the best interest of the

22    estate and creditors.

23        28.    Given the relinquishment by Hall and the Hall-Related Parties of all direct

24    or indirect control of Bridgemark pursuant to the Settlement Agreement approved hereby,

25    the Court has jurisdiction and authority to conclude and order that neither Hall nor any

26    Hall-Related Party shall have or incur any legal liability solely on account of post-Closing-

27    Date equity ownership of Bridgemark.  *Cf. Blixseth v. Credit Suisse (In re Yellowstone*

28    *Mountain Club, LLC)*, 961 F.3d 1074, 1081–1085 (9th Cir. 2020).

29.    This Order is a final and appealable order.  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no reason to delay implementation of this Order.

*       *       *

Based on the foregoing findings of fact and conclusions of law, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

30.    The Motion is GRANTED in its entirety.

31.    The Settlement Agreement, the Asset Purchase Agreement, the Transaction Agreement, and the Surface Use Agreement – including each and every term and condition in each – are approved in their entirety.  The failure to identify any particular provision of the Settlement Agreement or any of the other the Agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreements be authorized and approved in their entirety.

32.    Bridgemark is authorized and directed to perform all obligations under the Agreements to which it is a party and to take any and all actions reasonably necessary and appropriate to consummate the Agreements and to perform any and all obligations contemplated therein.

33.    Upon the closing of the Sale Transaction, Buyer shall take title to and possession of the Purchased Assets (as defined in the Asset Purchase Agreement). Pursuant to Section 363(f), the transfer of title to the Purchased Assets shall be free and clear of any and all liens, interests, and encumbrances except for any obligations expressly assumed by Buyer.

34.    Neither Buyer nor PDC is a successor and neither shall be deemed a successor to Bridgemark or its estate as a result of the consummation of the Sale Transaction or for any other reason.  Buyer and PDC have given substantial consideration under the Agreements for the ultimate benefit of Bridgemark, its estate, and the holders of

any encumbrances.  The consideration given by Buyer and PDC is valid and valuable

consideration for the releases of any potential claims of successor or transferee liability

against Buyer and PDC, which releases shall be deemed to have been given in favor of

Buyer and PDC by all holders of encumbrances against Bridgemark or any of the

Purchased Assets.  Therefore, following the closing date of the Sale Transaction, all

persons and entities are forever prohibited and enjoined from taking any action against

Bridgemark or its estate that would adversely affect or interfere with the ability of

Bridgemark to sell and transfer the Purchased Assets to Buyer in accordance with the

Agreements and this Order to the fullest extent provided by Section 363 or adversely affect

or interfere with Buyer's title to or use and enjoyment of the Purchased Assets based on or

related to any such Claim or based on any actions Bridgemark may take in this chapter 11

case.

35.    Except as expressly set forth herein or in the Agreements, Buyer and PDC,

and their respective successors and assigns shall have no liability for any claim against

Bridgemark or its estate, whether known or unknown as of the closing date of the Sale

Transaction, now existing or hereafter arising, whether fixed or contingent, whether

derivatively, vicariously, as a transferee, successor, *alter ego*, or otherwise, of any kind,

nature or character whatsoever, by reason of any theory of law or equity, including claims

arising under, without limitation: (i) any employment or labor agreements or the

termination thereof relating to Bridgemark; (ii) any pension, welfare, compensation or

other employee benefit plans, agreements, practices and programs, including, without

limitation, any pension plan of or related to Bridgemark or any affiliate or predecessor or

any current or former employee of any of the foregoing, including, without limitation, any

participation or other agreements related to any of the foregoing, or the termination of any

of the foregoing; (iii) Bridgemark's business operations or the cessation thereof; (iv) any

litigation involving Bridgemark; and (v) any employee, workers' compensation,

occupational disease or unemployment or temporary disability related law, including,

without limitation, claims that might otherwise arise under or pursuant to: (A) the

Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment, or termination of employment with Bridgemark or any predecessor; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statutes; (R) any bulk sales or similar laws; (S) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (T) any common-law doctrine of *de facto* merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.  For the avoidance of doubt nothing in this paragraph shall (i) restrict a party's right to appeal this Order or (ii) release Buyer or PDC from an applicable authority's proper exercise of police and regulatory powers.

36.     Except as expressly permitted or otherwise specifically provided in the Agreements or this Order, all persons or entities holding encumbrances in all or any portion of the Purchased Assets (other than any obligations expressly assumed by Buyer) arising under or from, or in any way relating to Bridgemark, the Purchased Assets, the operation of Bridgemark's business prior to the Closing Date or the transfer of the Purchased Assets to Buyer, are forever barred, estopped, and permanently enjoined from

asserting against Buyer or PDC or their respective successors or assigns, or their property

such persons' or entities' encumbrances in and to the Purchased Assets, or in any way

asserting or pursuing any action against Buyer, Buyer's successors or assigns, PDC, PDC's

successors or assigns, and/or the Purchased Assets based on any theory of successor or

transferee liability.  Effective as of the Closing Date, each creditor is authorized and

directed to execute such documents and take all other actions as may be necessary to

release any encumbrances on the Purchased Assets, as provided herein, that may have been

recorded or may otherwise exist.  If a creditor fails to cause an encumbrance to be released,

Bridgemark is hereby authorized and directed, and Buyer is hereby authorized, to execute

and file such statements, instruments, releases and other documents on behalf of such

person or entity with respect to the Purchased Assets.  The transactions authorized herein

shall be of full force and effect, regardless of Bridgemark's lack of good standing in any

jurisdiction in which it is formed or authorized to transact business.

37.    All persons and entities that are in possession of some or all of the

Purchased Assets on the closing date of the Sale Transaction are directed to surrender

possession of such Purchased Assets to Buyer at the Closing Date.  The provisions of this

Order authorizing the Sale Transaction by Bridgemark free and clear of encumbrances

shall be self-executing, and none of Bridgemark, Buyer, PDC, or any other party shall be

required to execute or file releases, termination statements, assignments, cancellations,

consents or other instruments to effectuate, consummate, and/or implement the provisions

hereof with respect to the Sale Transaction; *provided, however,* that this paragraph shall

not excuse such parties from performing any and all of their respective obligations under

the Agreements or as otherwise set forth in this Order, requested by Buyer, or sought by

PDC.

38.    Without limiting the foregoing, a certified copy of this Order may be filed

with the appropriate clerk or recorded to act to cancel any encumbrances on the Purchased

Assets of record.  This Order is binding upon all persons and entities, including, without

limitation, all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental

departments, secretaries of state, federal and local officials, and all other persons or entities

who may be required by operation of law, the duties of their office, or contract, to accept,

file, register, or otherwise record or release any documents or instruments, or who may be

required to report or insure any title or state of title in or to any lease; and each of the

foregoing persons and entities is hereby directed to accept for filing any and all of  the

documents and instruments necessary and appropriate to consummate the transactions of

Bridgemark contemplated by the Agreements; provided that nothing herein shall relieve

any entity of the obligation to pay filing fees required to be paid under applicable non-

bankruptcy law.

39.    Any and all governmental recording offices and all other parties, persons, or

entities are authorized to accept this Order for recordation on or after the closing date of

the Sale Transaction as conclusive evidence of the free, clear, and unencumbered, transfer

of all right, title, interest, and ownership in and to the Purchased Assets conveyed to Buyer

upon closing.

40.    Bridgemark is authorized and directed to (i) assign and sell each of the Prior

Assumed Contracts to Buyer, and (ii) assume, assign and sell each Remaining Contract to

Buyer, in each case free and clear of all encumbrances, as described herein.  The Prior

Assumed Contracts having been previously assumed by Bridgemark, any and all

objections to assignment of such leases are overruled.  *Cf. In re Catapult Entm't, Inc.*, 165

F.3d 747, 754 (9th Cir. 1999).  Bridgemark is authorized to pay any cure costs, as

contemplated by the Asset Purchase Agreement.  The payment of the applicable cure costs

(if any) in connection with an Assigned Contract shall (a) effect a cure of all defaults

existing thereunder as of the closing date of the Sale Transaction and (b) compensate for

any actual pecuniary loss to such non-debtor party resulting from such default.  Buyer shall

then have assumed the assigned contracts and assigned real property leases and, pursuant

to section 365(f) of the Bankruptcy Code, the assignment by Bridgemark of such Assigned

Contracts shall not be a default thereunder.  Upon the payment of the relevant cure costs, if

13

any, Bridgemark shall have no further liabilities to the counterparties to the Assigned

Contracts that accrue and become due and payable on or after the closing date of the Sale

Transaction except as provided in the Agreements.  *See* 11 U.S.C. § 365(k).

41.    Upon the assumption of an assigned contract and assigned real property

lease and the payment of the relevant cure costs, if any, in accordance with the Asset

Purchase Agreement, Buyer shall be deemed to be substituted for Bridgemark as a party to

the applicable Assigned Contracts and Bridgemark shall be relieved, pursuant to Section

365(k) of any further liability under the Assigned Contracts.  Bridgemark may assume (in

the case of the Remaining Contracts), assign and sell the Assigned Contracts

notwithstanding the provision in any such contract or lease that prohibits or restricts

assumption or assignment or that conditions assumption or assignment upon the consent of

the non-debtor counterparty thereto.

42.    To the extent any counterparty to an Assigned Contract failed to timely

object to the cure cost set forth in Exhibit A to the Motion, such cure cost shall be deemed

to be finally determined as of the entry of this Order and any such counterparty shall be

barred from challenging, objecting to or denying the validity of the cure cost.  All other

requirements and conditions under Sections 363 and 365 for the assumption by

Bridgemark and the assignment and sale to Buyer of the Assigned Contracts have been

satisfied.  Upon the closing of the Sale Transaction, in accordance with Sections 363 and

365, Buyer shall be fully and irrevocably vested with all legal, equitable, and beneficial

right, title, and interest of Bridgemark under the Assigned Contracts.

43.    To the extent necessary and applicable, Buyer has provided adequate

assurance of future performance under the Assigned Contracts within the meaning of

Sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).  Pursuant to

Sections 105(a) 363, and 365, all counterparties to the Assigned Contracts are forever

barred and permanently enjoined from raising or asserting against Bridgemark, Buyer, or

PDC any assignment fee, default, breach or claim of pecuniary loss, or condition to

assignment, arising under or related to the Assigned Contracts existing as of the closing of

14

the Sale Transaction or arising by reason of such closing.

44.     The assumption and assignment of the Remaining Contracts and the assignment of the Prior Assumed Contracts shall be effective upon entry of this Order (conditioned upon the closing of the Sale Transaction) notwithstanding timely unresolved objections to the proposed cure costs, which objections are hereby preserved and shall not delay closing of the Sale Transaction.  The undisputed portion of the proposed cure costs, if any, shall be paid by Bridgemark within three days after the Closing Date.  Any remaining disputed cure costs must be paid by the earlier of (a) when Bridgemark, Buyer, PDC, and the Assigned Contract counterparty can agree to an amount or (b) the date specified in a final and non-appealable order entered by this Court.  With respect to any cure objections resolved by the Court at the hearing on the Motion, Bridgemark shall pay the cure cost, if any, no later than three days after the Closing Date.  Bridgemark shall use commercially reasonable efforts to cooperate with Buyer and PDC in resolving any disputed cure costs arising after the closing of the Sale Transaction.

45.     Nothing in this Order or any documents related to the Motion shall be construed to authorize or permit the assumption and assignment of any existing Argonaut Insurance Company ("Argonaut") surety bonds or indemnity agreements.  Nothing herein shall be deemed to provide Argonaut's consent to the substitution of any principal under any existing surety bond or existing indemnity agreement.  Except as provided for herein, the Buyer shall not be (a) liable for any existing surety bonds and/or obligations arising under any existing indemnity agreements to the extent they relate to any assets that are not transferred to the Buyer or (b) deemed a substitute principal under any existing surety bond or as an indemnitor under any existing indemnity agreement.  Nothing in this Order or any other document, agreement or instrument shall be deemed to (a) alter, limit, expand, modify, prejudice, waive, or release any rights or claims of Argonaut against Bridgemark under the existing surety bond, the existing indemnity agreement, or (b) alter, limit, expand, modify, prejudice, waive, or release any rights or claims of Argonaut against any non-debtors.

46.     Nothing contained in any chapter 11 plan confirmed in this case, any order confirming any such chapter 11 plan, any order approving wind-down or dismissal of this chapter 11 case or any subsequent chapter 7 case, or any other order of any type or kind entered in this case shall conflict with or derogate from the provisions of the Agreements or this Order; and to the extent of any conflict or derogation between this Order or the Agreements and such future plan or order, the terms of this Order and the Agreements shall control.

47.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately upon entry and Bridgemark, Buyer, Hall, and PDC are authorized to effectuate the Agreements and close the Sale Transaction immediately upon entry of this Order.

48.     The Sale Transaction shall be exempt from any "bulk sales" or similar law of any state or jurisdiction.  There are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

49.     This Order may be recorded in the land records and relied upon by title insurers and subsequent purchasers.

50.     Immediately upon entry of the Approval Order, Bridgemark shall cease all active extraction of oil from the PDC Parcel.

51.     The Chief Wind-Down Officer of Bridgemark from and after the Closing Date shall be John Harris of Numeric Solutions, or any successor approved by the Bankruptcy Court and consented to by PDC.  The Chief Wind-Down Officer is authorized to perform the following services: (i) appropriate claim administration, reconciliation, satisfactions, compromises, and/or objections with respect to claims that were not Assumed Obligations transferred to Buyer; (ii) appropriate reconciliation and satisfaction of any remaining obligations to royalty holders that were not Assumed Obligations transferred to Buyer; (iii) appropriate disposition of any remaining assets that were not Purchased Assets transferred to Buyer; (iv) appropriate resolution of all administrative expense applications and related matters of Bankruptcy Case administration, including the

1    filing of all required reports and the payment of all required U.S. Trustee fees;

2    (v) appropriate formulation and prosecution of the liquidating chapter 11 plan

3    contemplated in the Plan Term Sheet; (vi) such other work as is reasonable and appropriate

4    in connection with the administration of the estate and consistent with Bridgemark's

5    bylaws.  The Numeric Solutions Employment Order is hereby modified, effective as of

6    March 10, 2021, to the extent necessary to authorize the performance of such services.

7         52.    Hall and each Hall-Related Party shall be prohibited from objecting to

8    confirmation of any chapter 11 plan that is materially consistent with the Plan Term Sheet.

9         53.    Neither Hall nor any Hall-Related Party shall have or incur any legal

10   liability relating solely to or arising solely out of post-Closing-Date equity ownership of

11   Bridgemark.

12        54.    The releases set forth in Section 5 of the Settlement Agreement are

13   approved, subject to the occurrence of the Closing Date.  For the avoidance of doubt, the

14   Hall-Related Parties (as defined in the Settlement Agreement) are Releasing Parties (as

15   defined in the Settlement Agreement) and are bound by the releases set forth in the

16   Settlement Agreement.

17        55.    The parties to the Settlement Agreement shall, upon request by one or more

18   of the other parties, execute such further documents, agreements, and contracts, and shall

19   perform such further acts as may be reasonably necessary to carry out and give full effect

20   to the terms of Agreements.  Without limiting the generality of the preceding sentence,

21   Hall, in his individual capacity and in his capacity as agent and attorney-in-fact for the

22   Hall-Related Parties, and Bridgemark shall cooperate with PDC to adjust, initial, re-

23   execute and re-deliver the Agreements and any amendments thereto, or any closing

24   statements or closing certificates, estoppels, authorizing resolutions, certificates, deeds,

25   assignments, confirmations, ratifications, releases, withdrawals, or similar documents if,

26   as, and when deemed necessary or desirable in the reasonable discretion of PDC to provide

27   for consistency with or to effectuate the agreed terms of the Agreements.

28

56.    The Agreements, and any related agreements or other instruments (other than this Order), may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further notice to or order of this Court; provided, however, that any such modification, amendment or supplement does not materially affect Bridgemark's estate in adverse fashion.

57.    The terms of this Order shall govern any inconsistencies between the terms of this Order and the Agreements.

58.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

59.    This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms of the Order and the Agreements, as well as all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, and to adjudicate, if necessary, any and all disputes relating in any way to the Agreements or Sale Transaction.

###

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:20-bk-10143-TA |
| BRIDGEMARK CORPORATION,[1] | Chapter 11 |
| Debtor. | **ORDER (I) APPROVING SETTLEMENT AGREEMENT BETWEEN THE DEBTOR, ROBERT J. HALL, AND PLACENTIA DEVELOPMENT COMPANY AND RELATED AGREEMENTS, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, (III) APPROVING ASSUMPTION AND/OR ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) MODIFYING ORDER AUTHORIZING EMPLOYMENT OF NUMERIC SOLUTIONS LLC, AND (V) GRANTING RELATED RELIEF** |

This matter having come before the Court on the *Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365 and Fed. R. Bankr. P. 9019 for Entry of Order (I) Approving Settlement Agreement Between the Debtor, Robert J. Hall, and Placentia Development Company and Related Agreements, (II) Approving Sale of Substantially All Assets of the Debtor Free and Clear of Liens, (III) Approving Assumption and/or Assignment of Certain Executory Contracts and Unexpired Leases, (IV) Modifying Order Authorizing Employment of Numeric Solutions LLC, and (V) Granting Related Relief* (the "Motion"); and the Court having read and considered the Motion, and being fully advised of the premises, for good cause shown,

IT IS HEREBY ORDERED that the Court makes the following findings of fact and conclusions of law:[2]

---

[1]    The Debtor's last four digits of its taxpayer identification number are (1669), and its headquarters and service are 17671 Irvine Boulevard, Suite 217, Tustin, California 92780.

[2]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of

1      1.      On January 14, 2020 (the "<u>Petition Date</u>"), Bridgemark Corporation

2  ("<u>Bridgemark</u>") filed a voluntary petition for relief under chapter 11 of the Bankruptcy

3  Code, commencing the above-captioned case (the "<u>Bankruptcy Case</u>").  Bridgemark has

4  continued to operate its business and manage its affairs as debtor-in-possession pursuant to

5  Sections 1107(a) and 1108 of the Bankruptcy Code.

6      2.      Bridgemark's primary assets are certain oil and gas leases and related

7  agreements and rights pursuant to which Bridgemark operates wells in Placentia, California

8  and Anaheim, California.  Bridgemark also has certain non-operating interests in wells in

9  Mobile, Alabama; Fullerton, California; and Nueces County, Texas, as well as certain other

10  assets, including through Bridgemark's two non-debtor subsidiaries, Gregson Energy

11  Group, LLC ("<u>Gregson</u>") and Bridgemark Texas, LLC ("<u>Bridgemark Texas</u>," and together

12  with Gregson, the "<u>Non-Debtor Subsidiaries</u>").

13      3.      Of the wells that Bridgemark operates in Placentia, California, a portion are

14  situated on land (the "<u>PDC Parcel</u>") owned by Placentia Development Company, LLC

15  ("<u>PDC</u>"), on which PDC intends to build residential homes.  Bridgemark also owns and

16  operates an oil tank farm on a portion of real property within the PDC Parcel (the

17  "<u>Remainder Tract</u>," as more specifically defined in the Transaction Agreement).

18      4.      On December 31, 2019, a judgment (as subsequently amended, the "<u>PDC</u>

19  <u>Judgment</u>") was entered in favor of PDC and against Bridgemark.  The PDC Judgment was

20  originally in the principal amount of approximately $42 million, and was subsequently

21  amended in post-judgment proceedings such that it is now in the principal amount of

22  approximately $38 million.  An appeal of the PDC Judgment (the "<u>Appeal</u>") is pending but

23  stayed.

24      5.      Broadly speaking, and without rehashing the details of the multi-year

25  proceedings that culminated in the PDC Judgment or the parties' claims and contentions

26  _____

27  law pursuant to Federal Rule of Civil Procedure 52, made applicable to these proceedings pursuant to
Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure ("<u>Bankruptcy Rules</u>").  To the extent
that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the

28  extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

related thereto, the PDC Judgment arose out of Bridgemark's failure to plug and abandon oil wells on the PDC Parcel, as the state court determined that Bridgemark was legally obligated to do, such that PDC could develop the residential homes on the PDC Parcel.

6.      Pursuant to that certain *Stipulation Between Bridgemark Corporation and Placentia Development Company, LLC Regarding (I) Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (II) Grant of Adequate Protection Pursuant to 11 U.S.C. § 361, 362, and 363* [Docket No. 140] and the order approving same [Docket No. 155], funds subject to PDC's liens have been deposited in a restricted debtor-in-possession account at East West Bank (the "Customer DIP Account").  There is no dispute that PDC holds valid, perfected, first-position liens on the funds in the Customer DIP Account, although Bridgemark's Adversary Proceeding alleges that the liens are avoidable (an allegation PDC denies).

7.      On April 14, 2020, the Court entered the *Order Approving Application of Debtor and Debtor in Possession to Employ Numeric Solutions LLC as Expert Valuation Consultant and John Harris as Expert Witness Effective as of February 24, 2020* [Docket No. 162] (the "Numeric Solutions Employment Order"), pursuant to which the Court authorized Bridgemark to employ and retain John Harris and Numeric Solutions LLC ("Numeric Solutions") as estate professionals.

8.      On April 15, 2020, PDC, Bridgemark, and Robert J. Hall ("Hall") executed that certain *Term Sheet* (the "Term Sheet"), as clarified by the correspondence dated August 10, 2020, pursuant to which they agreed to compromise and resolve all disputes between them on the terms set out therein, with the proviso that definitive documentation (the "Definitive Documentation") would thereafter be executed.  The Term Sheet contemplated that the Definitive Documentation would ultimately bind Hall and also certain related persons and entities (the "Hall-Related Parties").  Hall deposited $4.375 million of his personal funds (the "Hall Cash Contribution") into an escrow account pursuant to the Term Sheet.  This Court approved Bridgemark's entry into the Term Sheet by order dated June 26, 2020.

9.     On May 13, 2020, the Court entered the *Order Authorizing Debtor to Assume Certain Executory Contracts and Unexpired Leases Pursuant to Bankruptcy Code Section 365(a)* [Docket No. 203] (the "Prior Assumption Order"), pursuant to which the Court authorized Bridgemark to assume, *inter alia*, the oil and gas leases listed on Exhibit 1 thereto.

10.    Bridgemark, PDC, and Hall (both individually and as agent for the Hall-Related Parties) have negotiated that certain *Settlement Agreement* (the "Settlement Agreement"), which – together with that certain *Asset Purchase Agreement by and among Bridgemark Corporation, Gregson Energy ~~Drilling~~Group, LLC, and Bridgemark Texas LLC, collectively, as Seller, and California Natural Resources Group Orange County, LLC, Realm California, LLC, and Alatex, E&P LLC, collectively, as Buyer* (the "Asset Purchase Agreement"), that certain *Transaction Agreement* (the "Transaction Agreement"), and that certain *Surface Use and Cooperation Agreement* (the "Surface Use Agreement," and together with the Settlement Agreement, the Asset Purchase Agreement, and the Transaction Agreements, the "Agreements") – collectively constitute the Definitive Documentation contemplated by the Term Sheet.  The Hall-Related Parties are specifically identified in Exhibit A to the Settlement Agreement.

11.    California Natural Resources Group, LLC ("CalNRG OC"), a third-party buyer, is a party to the Asset Purchase Agreement, the Transaction Agreement, and the Surface Use Agreement.  Realm California LLC ("Realm"), an affiliate of CalNRG OC, is a party to the Asset Purchase Agreement and the Surface Use Agreement.  Alatex, E&P LLC ("Alatex"), an affiliate of CalNRG OC and Realm, is a party to the Asset Purchase Agreement.  Except where necessary for the sake of clarity, CalNRG OC, Realm, and Alatex are referred to herein collectively as "Buyer."

12.    By the Motion, Bridgemark seeks this Court's approval of the Agreements as well as authorization and direction to proceed with the consummation of the transactions contemplated by the Agreements.

13.     In broad strokes – and subject entirely to the specific terms of the actual Agreements – the transactions contemplated by the Agreements will result in essentially all of Bridgemark's non-cash assets that are ***not*** located on the PDC Parcel being transferred to Buyer, which will also assume certain liabilities of Bridgemark (such purchase, sale, assignment, and assumption collectively, the "Sale Transaction"); PDC, in turn, will transfer the Remainder Tract to Realm, which is CalNRG OC's affiliate; the settlement between PDC, Bridgemark, and Hall (the "Settlement") will go into effect – all on a date (the "Closing Date") to occur shortly following the entry of this Order.  The specific allocation of the Purchased Assets among CalNRG, Realm, and Alatex is set forth in Exhibit A-10 to the Asset Purchase Agreement.

14.     The Asset Purchase Agreement provides for Bridgemark to assign certain contracts and agreements (collectively, the "Assigned Contracts") to Buyer.  A complete list of the Assigned Contracts and the cure costs associated therewith is set forth in Exhibit A to the Motion.[3]  Certain of the Assigned Contracts (the "Prior Assumed Contracts") were previously assumed by Bridgemark pursuant to the Prior Assumption Order, as set forth in Exhibit A to the Motion.  The remainder of the Assigned Contracts (the "Remaining Contracts") were not previously assumed.  Through the Motion, Bridgemark seeks to assign the Prior Assumed Contracts and assume and assign the Remaining Contracts to Buyer.

15.     Following the Closing Date, Bridgemark will be left with only minimal non-cash assets – primarily the wells on the PDC Parcel.  Bridgemark will immediately stop pumping from those wells.  John Harris of Numeric Solutions will be appointed Chief Wind-Down Officer.  Bridgemark, under the direction and control of the Chief Wind-Down Officer, will pursue confirmation of a non-impaired chapter 11 plan of liquidation that is consistent with the Plan Term Sheet attached to the Settlement Agreement.  The primary

---

[3]  Inclusion of any document or agreement on the list of Assigned Contracts shall not constitute or be deemed to be a determination or admission by Bridgemark, Buyer, PDC, or any other party that such document or agreement is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved.

purpose of the plan will be the creation of a liquidation trust tasked with plugging and abandoning the remaining wells on the PDC Parcel so that PDC can develop residential homes on the PDC Parcel.

16.    Following the Closing Date, neither Hall nor any of the Hall-Related Parties shall serve as an officer or director of Bridgemark, nor shall they have any involvement in or right to participate in or manage the business or affairs of Bridgemark's limited remaining operations.  In addition, although certain Hall-Related Parties will continue to the be equityholders of Bridgemark until a chapter 11 plan of liquidation that cancels their equity interests takes effect (as provided for in the Plan Term Sheet), they are waiving their rights to receive any distributions on account of such equity (subject to Paragraph 5(c) of the Settlement Agreement) or to vote, manage, or otherwise exercise direct or indirect control with respect to Bridgemark on account of such equity, and thus will have no legal or practical control over Bridgemark such that it would not be lawful or appropriate for Hall or any Hall-Related Parties to have or incur any legal liability on account of such post-Closing-Date equity ownership.

17.    The Court has subject matter jurisdiction over the Bankruptcy Case and authority to hear and determine the Motion.  The Motion was timely served on the parties listed on the Proof of Service filed with respect to the Motion – which include all potentially affected landowners, royalty holders, regulators, contract counterparties, lienholders, and other parties in interest – and appropriate notice and opportunity to be heard regarding the relief requested has been provided.

18.    The Agreements for which approval is sought and the Sale Transaction and Settlement contemplated thereby are all fair, reasonable, and in the best interests of Bridgemark and its estate, creditors, and all parties in interest.  No creditor, royalty holder, or other party in interest shall have any claim for damages arising from the Sale Transaction or the transactions contemplated in the Plan Term Sheet, including, without limitation, the plugging and abandonment contemplated thereby.

19.    Bridgemark has demonstrated sound business reasons for the Agreements for

1  which approval is sought and the Sale Transaction and Settlement contemplated thereby, all

2  of which are the product of extensive arms'-length, good-faith negotiations and are not

3  tainted by fraud or collusion.  All terms of the Sale Transaction and Settlement, as well as the

4  genesis and background of the arrangements, have been appropriately disclosed to the Court

5  and all parties in interest.

6          20.     CalNRG OC, Realm, Alatex, and PDC are acquiring the assets they are

7  acquiring in good faith and qualify as good-faith purchasers within the meaning of Section

8  363(m) of the Bankruptcy Code.  CalNRG OC, Realm, and Alatex are not related to

9  Bridgemark or PDC, and all material terms of the arrangements have been disclosed.

10  Accordingly, the Agreements may not be avoided and no party shall be entitled to damages

11  or other recovery pursuant to section 363(n) of the Bankruptcy Code.

12          21.     The Agreements and the Sale Transaction and Settlement contemplated

13  thereby constitute the highest and best offer for the assets being acquired, and will provide a

14  greater recovery for the estate than would be provided by any other available alternative.

15  Bridgemark's determination that the Agreements and the Sale Transaction and Settlement

16  contemplated thereby constitute the highest and best offer for the assets being acquired

17  constitutes a valid and sound exercise of Bridgemark's business judgment.  The

18  consideration to be provided is fair and adequate, and constitutes reasonably equivalent

19  value and fair consideration under the Bankruptcy Code and under other applicable law.

20          22.     No party to the Agreements has entered into the Agreements, or proposes

21  consummating the Sale Transaction and Settlement contemplated thereby, for the purpose of

22  hindering, delaying, or defrauding any present or future creditor.  Nor is any party to the

23  Agreements a continuation or successor to Bridgemark or its estate.  None of the

24  transactions contemplated by the Agreements amount to a consolidation, merger, or *de facto*

25  merger of any entity.

26          23.     PDC, as Bridgemark's secured creditor, has consented to the sale of the

27  assets being sold to Buyer on the terms set forth in the Agreements.  In addition, the

28  automobile lenders, as Bridgemark's other secured creditors, will be paid in full in cash on

1  the Closing Date.  Accordingly, the conditions for a sale free and clear of all encumbrances

2  pursuant to Section 363(f) of  the Bankruptcy Code have been satisfied.

3        24.     Bridgemark has satisfied all conditions and requirements for assumption,

4  assignment, and sale of the assigned contracts and leases pursuant to Section 365 of the

5  Bankruptcy Code.  The assignment of the Prior Assumed Contracts and the assumption and

6  assignment of the Remaining Contracts is a sound exercise of Bridgemark's business

7  judgment.

8        25.     The transactions contemplated by the Agreements are legal, valid, and

9  properly authorized under all applicable provisions of the Bankruptcy Code, including,

10  without limitation, Sections 105(a), 363(b), 363(f), 363(m), 365(a) and 365(f) and all

11  applicable requirements of such Sections have been complied with in respect of the

12  transaction.

13        26.     The appointment of John Harris of Numeric Solutions as Chief Wind-Down

14  Officer – and the modification of the Numeric Solutions Employment Order consistent

15  therewith – is reasonable, appropriate, and in the best interest of the estate and creditors.

16        27.     The relinquishment by Hall and all Hall-Related Parties from all officer and

17  director positions and their exclusion from any involvement in or right to participate in or

18  manage the business or affairs of Bridgemark's limited remaining operations following the

19  Closing Date is reasonable, appropriate, and in the best interest of the estate and creditors.

20  The amendments to Bridgemark's bylaws and the other governance changes provided for in

21  the Settlement Agreement are reasonable, appropriate, and in the best interest of the estate

22  and creditors.

23        28.     Given the relinquishment by Hall and the Hall-Related Parties of all direct or

24  indirect control of Bridgemark pursuant to the Settlement Agreement approved hereby, the

25  Court has jurisdiction and authority to conclude and order that neither Hall nor any

26  Hall-Related Party shall have or incur any legal liability solely on account of

27  post-Closing-Date equity ownership of Bridgemark.  *Cf. Blixseth v. Credit Suisse (In re*

28  *Yellowstone Mountain Club, LLC)*, 961 F.3d 1074, 1081–1085 (9th Cir. 2020).

29.     This Order is a final and appealable order.  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no reason to delay implementation of this Order.

*        *        *

Based on the foregoing findings of fact and conclusions of law, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that:

30.     The Motion is GRANTED in its entirety.

31.     The Settlement Agreement, the Asset Purchase Agreement, the Transaction Agreement, and the Surface Use Agreement – including each and every term and condition in each – are approved in their entirety.  The failure to identify any particular provision of the Settlement Agreement or any of the other the Agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreements be authorized and approved in their entirety.

32.     Bridgemark is authorized and directed to perform all obligations under the Agreements to which it is a party and to take any and all actions reasonably necessary and appropriate to consummate the Agreements and to perform any and all obligations contemplated therein.

33.     Upon the closing of the Sale Transaction, Buyer shall take title to and possession of the Purchased Assets (as defined in the Asset Purchase Agreement).  Pursuant to Section 363(f), the transfer of title to the Purchased Assets shall be free and clear of any and all liens, interests, and encumbrances except for any obligations expressly assumed by Buyer.

34.     Neither Buyer nor PDC is a successor and neither shall be deemed a successor to Bridgemark or its estate as a result of the consummation of the Sale Transaction or for any other reason.  Buyer and PDC have given substantial consideration under the Agreements for the ultimate benefit of Bridgemark, its estate, and the holders of any

9

encumbrances.  The consideration given by Buyer and PDC is valid and valuable

consideration for the releases of any potential claims of successor or transferee liability

against Buyer and PDC, which releases shall be deemed to have been given in favor of

Buyer and PDC by all holders of encumbrances against Bridgemark or any of the Purchased

Assets.  Therefore, following the closing date of the Sale Transaction, all persons and

entities are forever prohibited and enjoined from taking any action against Bridgemark or its

estate that would adversely affect or interfere with the ability of Bridgemark to sell and

transfer the Purchased Assets to Buyer in accordance with the Agreements and this Order to

the fullest extent provided by Section 363 or adversely affect or interfere with Buyer's title

to or use and enjoyment of the Purchased Assets based on or related to any such Claim or

based on any actions Bridgemark may take in this chapter 11 case.

35.    Except as expressly set forth herein or in the Agreements, Buyer and PDC,

and their respective successors and assigns shall have no liability for any claim against

Bridgemark or its estate, whether known or unknown as of the closing date of the Sale

Transaction, now existing or hereafter arising, whether fixed or contingent, whether

derivatively, vicariously, as a transferee, successor, *alter ego*, or otherwise, of any kind,

nature or character whatsoever, by reason of any theory of law or equity, including claims

arising under, without limitation: (i) any employment or labor agreements or the termination

thereof relating to Bridgemark; (ii) any pension, welfare, compensation or other employee

benefit plans, agreements, practices and programs, including, without limitation, any

pension plan of or related to Bridgemark or any affiliate or predecessor or any current or

former employee of any of the foregoing, including, without limitation, any participation or

other agreements related to any of the foregoing, or the termination of any of the foregoing;

(iii) Bridgemark's business operations or the cessation thereof; (iv) any litigation involving

Bridgemark; and (v) any employee, workers' compensation, occupational disease or

unemployment or temporary disability related law, including, without limitation, claims that

might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security

Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights

Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations

Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age

Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as

amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus

Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of

1980; (K) state and local discrimination laws; (L) state and local unemployment

compensation laws or any other similar state and local laws; (M) state workers'

compensation laws; (N) any other state, local or federal employee benefit laws, regulations

or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits,

employment, or termination of employment with Bridgemark or any predecessor; (O) any

antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise;

(Q) any environmental laws, rules, or regulations, including, without limitation, under the

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§

9601, *et seq.*, or similar state statutes; (R) any bulk sales or similar laws; (S) any federal,

state or local tax statutes, regulations or ordinances, including, without limitation, the

Internal Revenue Code of 1986, as amended; and (T) any common-law doctrine of *de facto*

merger or successor or transferee liability, successor-in-interest liability theory or any other

theory of or related to successor liability.  For the avoidance of doubt nothing in this

paragraph shall (i) restrict a party's right to appeal this Order or (ii) release Buyer or PDC

from an applicable authority's proper exercise of police and regulatory powers.

36.    Except as expressly permitted or otherwise specifically provided in the

Agreements or this Order, all persons or entities holding encumbrances in all or any portion

of the Purchased Assets (other than any obligations expressly assumed by Buyer) arising

under or from, or in any way relating to Bridgemark, the Purchased Assets, the operation of

Bridgemark's business prior to the Closing Date or the transfer of the Purchased Assets to

Buyer, are forever barred, estopped, and permanently enjoined from asserting against Buyer

or PDC or their respective successors or assigns, or their property such persons' or entities'

encumbrances in and to the Purchased Assets, or in any way asserting or pursuing any action

against Buyer, Buyer's successors or assigns, PDC, PDC's successors or assigns, and/or the

Purchased Assets based on any theory of successor or transferee liability.  Effective as of the

Closing Date, each creditor is authorized and directed to execute such documents and take

all other actions as may be necessary to release any encumbrances on the Purchased Assets,

as provided herein, that may have been recorded or may otherwise exist.  If a creditor fails to

cause an encumbrance to be released, Bridgemark is hereby authorized and directed, and

Buyer is hereby authorized, to execute and file such statements, instruments, releases and

other documents on behalf of such person or entity with respect to the Purchased Assets.

The transactions authorized herein shall be of full force and effect, regardless of

Bridgemark's lack of good standing in any jurisdiction in which it is formed or authorized to

transact business.

37.    All persons and entities that are in possession of some or all of the Purchased

Assets on the closing date of the Sale Transaction are directed to surrender possession of

such Purchased Assets to Buyer at the Closing Date.  The provisions of this Order

authorizing the Sale Transaction by Bridgemark free and clear of encumbrances shall be

self-executing, and none of Bridgemark, Buyer, PDC, or any other party shall be required to

execute or file releases, termination statements, assignments, cancellations, consents or

other instruments to effectuate, consummate, and/or implement the provisions hereof with

respect to the Sale Transaction; ***provided, however,*** that this paragraph shall not excuse such

parties from performing any and all of their respective obligations under the Agreements or

as otherwise set forth in this Order, requested by Buyer, or sought by PDC.

38.    Without limiting the foregoing, a certified copy of this Order may be filed

with the appropriate clerk or recorded to act to cancel any encumbrances on the Purchased

Assets of record.  This Order is binding upon all persons and entities, including, without

limitation, all filing agents, filing officers, title agents, title companies, recorders of

mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental

departments, secretaries of state, federal and local officials, and all other persons or entities

who may be required by operation of law, the duties of their office, or contract, to accept,

1  file, register, or otherwise record or release any documents or instruments, or who may be

2  required to report or insure any title or state of title in or to any lease; and each of the

3  foregoing persons and entities is hereby directed to accept for filing any and all of  the

4  documents and instruments necessary and appropriate to consummate the transactions of

5  Bridgemark contemplated by the Agreements; provided that nothing herein shall relieve any

6  entity of the obligation to pay filing fees required to be paid under applicable

7  non-bankruptcy law.

8       39.     Any and all governmental recording offices and all other parties, persons, or

9  entities are authorized to accept this Order for recordation on or after the closing date of the

10  Sale Transaction as conclusive evidence of the free, clear, and unencumbered, transfer of all

11  right, title, interest, and ownership in and to the Purchased Assets conveyed to Buyer upon

12  closing.

13       40.     Bridgemark is authorized and directed to (i) assign and sell each of the Prior

14  Assumed Contracts to Buyer, and (ii) assume, assign and sell each Remaining Contract to

15  Buyer, in each case free and clear of all encumbrances, as described herein.  The Prior

16  Assumed Contracts having been previously assumed by Bridgemark, any and all objections

17  to assignment of such leases are overruled.  *Cf. In re Catapult Entm't, Inc.*, 165 F.3d 747,

18  754 (9th Cir. 1999).  Bridgemark is authorized to pay any cure costs, as contemplated by the

19  Asset Purchase Agreement.  The payment of the applicable cure costs (if any) in connection

20  with an Assigned Contract shall (a) effect a cure of all defaults existing thereunder as of the

21  closing date of the Sale Transaction and (b) compensate for any actual pecuniary loss to such

22  non-debtor party resulting from such default.  Buyer shall then have assumed the assigned

23  contracts and assigned real property leases and, pursuant to section 365(f) of the Bankruptcy

24  Code, the assignment by Bridgemark of such Assigned Contracts shall not be a default

25  thereunder.  Upon the payment of the relevant cure costs, if any, Bridgemark shall have no

26  further liabilities to the counterparties to the Assigned Contracts that accrue and become due

27  and payable on or after the closing date of the Sale Transaction except as provided in the

28  Agreements.  *See* 11 U.S.C. § 365(k).

41.     Upon the assumption of an assigned contract and assigned real property lease and the payment of the relevant cure costs, if any, in accordance with the Asset Purchase Agreement, Buyer shall be deemed to be substituted for Bridgemark as a party to the applicable Assigned Contracts and Bridgemark shall be relieved, pursuant to Section 365(k) of any further liability under the Assigned Contracts.  Bridgemark may assume (in the case of the Remaining Contracts), assign and sell the Assigned Contracts notwithstanding the provision in any such contract or lease that prohibits or restricts assumption or assignment or that conditions assumption or assignment upon the consent of the non-debtor counterparty thereto.

42.     To the extent any counterparty to an Assigned Contract failed to timely object to the cure cost set forth in Exhibit A to the Motion, such cure cost shall be deemed to be finally determined as of the entry of this Order and any such counterparty shall be barred from challenging, objecting to or denying the validity of the cure cost.  All other requirements and conditions under Sections 363 and 365 for the assumption by Bridgemark and the assignment and sale to Buyer of the Assigned Contracts have been satisfied.  Upon the closing of the Sale Transaction, in accordance with Sections 363 and 365, Buyer shall be fully and irrevocably vested with all legal, equitable, and beneficial right, title, and interest of Bridgemark under the Assigned Contracts.

43.     To the extent necessary and applicable, Buyer has provided adequate assurance of future performance under the Assigned Contracts within the meaning of Sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B).  Pursuant to Sections 105(a) 363, and 365, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against Bridgemark, Buyer, or PDC any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts existing as of the closing of the Sale Transaction or arising by reason of such closing.

44.     The assumption and assignment of the Remaining Contracts and the assignment of the Prior Assumed Contracts shall be effective upon entry of this Order

(conditioned upon the closing of the Sale Transaction) notwithstanding timely unresolved

objections to the proposed cure costs, which objections are hereby preserved and shall not

delay closing of the Sale Transaction.  The undisputed portion of the proposed cure costs, if

any, shall be paid by Bridgemark within three days after the Closing Date.  Any remaining

disputed cure costs must be paid by the earlier of (a) when Bridgemark, Buyer, PDC, and the

Assigned Contract counterparty can agree to an amount or (b) the date specified in a final

and non-appealable order entered by this Court.  With respect to any cure objections

resolved by the Court at the hearing on the Motion, Bridgemark shall pay the cure cost, if

any, no later than three days after the Closing Date.  Bridgemark shall use commercially

reasonable efforts to cooperate with Buyer and PDC in resolving any disputed cure costs

arising after the closing of the Sale Transaction.

45.    Nothing in this Order or any documents related to the Motion shall be

construed to authorize or permit the assumption and assignment of any existing Argonaut

Insurance Company ("Argonaut") surety bonds or indemnity agreements.  Nothing herein

shall be deemed to provide Argonaut's consent to the substitution of any principal under any

existing surety bond or existing indemnity agreement.  Except as provided for herein, the

Buyer shall not be (a) liable for any existing surety bonds and/or obligations arising under

any existing indemnity agreements to the extent they relate to any assets that are not

transferred to the Buyer or (b) deemed a substitute principal under any existing surety bond

or as an indemnitor under any existing indemnity agreement.  Nothing in this Order or any

other document, agreement or instrument shall be deemed to (a) alter, limit, expand, modify,

prejudice, waive, or release any rights or claims of Argonaut against Bridgemark under the

existing surety bond, the existing indemnity agreement, or (b) alter, limit, expand, modify,

prejudice, waive, or release any rights or claims of Argonaut against any non-debtors.

46.    45. Nothing contained in any chapter 11 plan confirmed in this case, any

order confirming any such chapter 11 plan, any order approving wind-down or dismissal of

this chapter 11 case or any subsequent chapter 7 case, or any other order of any type or kind

entered in this case shall conflict with or derogate from the provisions of the Agreements or

1    this Order; and to the extent of any conflict or derogation between this Order or the

2    Agreements and such future plan or order, the terms of this Order and the Agreements shall

3    control.

4        47.    46. Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this

5    Order shall be effective immediately upon entry and Bridgemark, Buyer, Hall, and PDC are

6    authorized to effectuate the Agreements and close the Sale Transaction immediately upon

7    entry of this Order.

8        48.    47. The Sale Transaction shall be exempt from any "bulk sales" or similar

9    law of any state or jurisdiction.  There are no brokers involved in consummating the Sale

10   Transaction and no brokers' commissions are due.

11       49.    48. This Order may be recorded in the land records and relied upon by title

12   insurers and subsequent purchasers.

13       50.    49. Immediately upon entry of the Approval Order, Bridgemark shall cease

14   all active extraction of oil from the PDC Parcel.

15       51.    50. The Chief Wind-Down Officer of Bridgemark from and after the Closing

16   Date shall be John Harris of Numeric Solutions, or any successor approved by the

17   Bankruptcy Court and consented to by PDC.  The Chief Wind-Down Officer is authorized to

18   perform the following services: (i) appropriate claim administration, reconciliation,

19   satisfactions, compromises, and/or objections with respect to claims that were not Assumed

20   Obligations transferred to Buyer; (ii) appropriate reconciliation and satisfaction of any

21   remaining obligations to royalty holders that were not Assumed Obligations transferred to

22   Buyer; (iii) appropriate disposition of any remaining assets that were not Purchased Assets

23   transferred to Buyer; (iv) appropriate resolution of all administrative expense applications

24   and related matters of Bankruptcy Case administration, including the filing of all required

25   reports and the payment of all required U.S. Trustee fees; (v) appropriate formulation and

26   prosecution of the liquidating chapter 11 plan contemplated in the Plan Term Sheet; (vi)

27   such other work as is reasonable and appropriate in connection with the administration of the

28   estate and consistent with Bridgemark's bylaws.  The Numeric Solutions Employment

Order is hereby modified, effective as of March 10, 2021, to the extent necessary to

authorize the performance of such services.

52. ~~51.~~ Hall and each Hall-Related Party shall be prohibited from objecting to

confirmation of any chapter 11 plan that is materially consistent with the Plan Term Sheet.

53. ~~52.~~ Neither Hall nor any Hall-Related Party shall have or incur any legal

liability relating solely to or arising solely out of post-Closing-Date equity ownership of

Bridgemark.

54. ~~53.~~ The releases set forth in Section 5 of the Settlement Agreement are

approved, subject to the occurrence of the Closing Date.  For the avoidance of doubt, the

Hall-Related Parties (as defined in the Settlement Agreement) are Releasing Parties (as

defined in the Settlement Agreement) and are bound by the releases set forth in the

Settlement Agreement.

55. ~~54.~~ The parties to the Settlement Agreement shall, upon request by one or

more of the other parties, execute such further documents, agreements, and contracts, and

shall perform such further acts as may be reasonably necessary to carry out and give full

effect to the terms of Agreements.  Without limiting the generality of the preceding sentence,

Hall, in his individual capacity and in his capacity as agent and attorney-in-fact for the

Hall-Related Parties, and Bridgemark shall cooperate with PDC to adjust, initial, re-execute

and re-deliver the Agreements and any amendments thereto, or any closing statements or

closing certificates, estoppels, authorizing resolutions, certificates, deeds, assignments,

confirmations, ratifications, releases, withdrawals, or similar documents if, as, and when

deemed necessary or desirable in the reasonable discretion of PDC to provide for

consistency with or to effectuate the agreed terms of the Agreements.

56. ~~55.~~ The Agreements, and any related agreements or other instruments (other

than this Order), may be modified, amended, or supplemented by the parties thereto and in

accordance with the terms thereof, without further notice to or order of this Court; provided,

however, that any such modification, amendment or supplement does not materially affect

Bridgemark's estate in adverse fashion.

57.    56. The terms of this Order shall govern any inconsistencies between the terms of this Order and the Agreements.

58.    57. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

59.    58. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms of the Order and the Agreements, as well as all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, and to adjudicate, if necessary, any and all disputes relating in any way to the Agreements or Sale Transaction.

###

Document comparison by Workshare 9.5 on Wednesday, March 24, 2021
11:57:30 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMS.KTBSLAW.COM/iManage/181064/1 |
| Description | #181064v1<iManage> - Proposed Approval Order (as Filed with Motion) |
| Document 2 ID | interwovenSite://DMS.KTBSLAW.COM/iManage/181064/2 |
| Description | #181064v2<iManage> - Proposed Approval Order (Revised Post-Filing) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 19 |
| Deletions | 17 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 36 |